**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re:<br><br>BRAZOS ELECTRIC POWER<br>COOPERATIVE, INC.,<br><br>           Debtor. | Chapter 11<br><br>Case No. 21-30725 (DRJ)<br><br>Adv. Proc. No. 21-04407 (DRJ) |
| BRAZOS ELECTRIC POWER<br>COOPERATIVE, INC.,<br>           Plaintiff,<br><br>v.<br><br>507 CAPITAL LLC, et al.,<br>           Defendants.[1] | |

**MOTION TO DISMISS ADVERSARY COMPLAINT OF
DEFENDANTS 507 CAPITAL LLC, 507 SUMMIT LLC, CETUS
CAPITAL VI, L.P., CROSSINGBRIDGE LOW DURATION HIGH YIELD
FUND, DESTINATIONS GLOBAL FIXED INCOME OPPORTUNITIES FUND,
DESTINATIONS LOW DURATION FIXED INCOME FUND, LEAFFILTER
NORTH HOLDINGS, INC., OFM II, LP, OU 2 LLC, RIVERPARK SHORT
TERM HIGH YIELD FUND, RIVERPARK STRATEGIC INCOME
<u>FUND AND TWO SEAS GLOBAL (MASTER) FUND LP</u>**

---

[1] The Defendants in this adversary proceeding are: 507 Capital LLC, 507 Summit LLC, Cetus Capital VI, L.P., Chase Lincoln First Commercial Corporation, Citigroup Financial Products Inc., CrossingBridge Low Duration High Yield Fund, Destinations Global Fixed Income Opportunities Fund, Destinations Low Duration Fixed Income Fund, Koch Energy Services LLC, Leaffilter North Holdings, Inc., NJR Energy Services Co., OFM II, LP, OU 2 LLC, RiverPark Short Term High Yield Fund, RiverPark Strategic Income Fund, Total Gas & Power North America, Inc. and Two Seas Global (Master) Fund LP.

## <u>TABLE OF CONTENTS</u>

Page

TABLE OF AUTHORITIES ................................................................................................. ii

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................. 3

I.      THE DEBTOR'S FINANCIAL CONDITION PRECIPITATING ITS CHAPTER 11
        CASE .................................................................................................................... 3

II.     THE DEBTOR'S OWN GAS-FIRED POWER PLANTS WERE INTENDED TO
        SERVE AS A HEDGE AGAINST POTENTIAL PRICE VOLATILITY IN THE
        ERCOT MARKET .................................................................................................. 4

III.    THE SUBJECT GAS SALE TRANSACTIONS ........................................................... 5

        A.      The NAESB Contracts ................................................................................ 5

        B.      Electricity and Natural Gas Pricing During Winter Storm Uri ....................... 6

IV.     LEGISLATIVE INVESTIGATION CONCLUDES THE PRICE OF GAS SOLD
        DURING WINTER STORM URI WAS SET BY THE MARKET ................................... 8

ARGUMENT ..................................................................................................................... 8

I.      LEGAL STANDARD .............................................................................................. 8

II.     THE FIRST CAUSE OF ACTION SHOULD BE DISMISSED FOR FAILURE TO
        PLEAD A TEXAS DECEPTIVE TRADE PRACTICES CONSUMER PROTECTION
        ACT VIOLATION, UNCONSCIONABILITY OR ECONOMIC DURESS ..................... 9

        A.      Texas Deceptive Trade Practices-Consumer Protection Act ....................... 10

        B.      Unconscionability ..................................................................................... 11

        C.      Economic Duress ...................................................................................... 17

III.    THE SECOND AND THIRD CAUSES OF ACTION SHOULD BE DISMISSED FOR
        FAILURE TO PLEAD RECEIPT OF LESS THAN REASONABLY EQUIVALENT
        VALUE ................................................................................................................ 18

IV.     THE FOURTH CAUSE OF ACTION SHOULD BE DISMISSED FOR FAILURE TO
        PLEAD THE SUBJECT GAS SALE TRANSACTIONS WERE OUTSIDE OF THE
        ORDINARY COURSE OF THE DEBTOR'S BUSINESS ............................................ 21

V.      THE FIFTH CAUSE OF ACTION SHOULD BE DISMISSED FOR FAILURE TO
        PLEAD THAT VALUE IN THE AMOUNT OF THE GAS CLAIMS WAS NOT
        PROVIDED ........................................................................................................... 25

CONCLUSION ................................................................................................................. 26

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

<u>Cases</u>

*In re AgFeed USA, LLC*,
  558 B.R. 116 (Bankr. D. Del. 2016) ........................................................ 18

*Amstadt v. U.S. Brass Corp.*,
  919 S.W.2d 644 (Tex. 1996) ..................................................................... 10

*Arkwright-Boston Mfrs. Mut. Ins. Co. v. Westinghouse Elec. Corp.*,
  844 F.2d 1174 (5th Cir. 1988) .................................................................. 12

*In re Arts Dairy, LLC*,
  414 B.R. 219 (Bankr. N.D. Ohio 2009) .................................................... 22

*ASARCO LLC v. Americas Mining Corp.*,
  396 B.R. 278 (S.D. Tex. 2008) ...................................................... 18, 19, 20

*Ashcroft v. Iqbal*,
  556 U.S. 662, 129 S. Ct. 1937 (2009) ........................................................ 8

*In re Beaulieu Group, LLC*,
  No. 18-cv-4027, 2021 WL 4469928 (Bankr. N.D. Ga. Sept. 29, 2021) .................................... 19

*Bell Atlantic v. Twombly*,
  550 U.S. 544, 127 S. Ct. 1955 (2007) ........................................................ 8

*Bradford v. Plains Cotton Co-op. Ass'n*,
  539 F.2d 1249 (10th Cir. 1976) ................................................................ 17

*Campbell v. Texas Tea Reclamation, LLC*,
  No. 20-cv-90, 2021 WL 221690 (S.D. Tex. May 6, 2021) ......................... 18

*Canatxx Gas Storage Ltd. v. Silverhawk Capital Partners, LLC*,
  No. 06-cv-1330, 2008 WL 1999234 (S.D. Tex. May 8, 2008) .................... 14

*In re Chomakos*,
  69 F.3d 769 (6th Cir. 1995) ...................................................................... 18

*Ciago v. Ameriquest Mortg. Co.*,
  295 F. Supp. 2d 324 (S.D.N.Y. 2003) ...................................................... 14

*In re Circuit City Stores, Inc.*,
  416 B.R. 531 (Bankr. E.D. Va. 2009) ....................................................... 23

*Claimant ID 100190818 v. BP Exploration & Prod., Inc.*,
718 Fed. App'x 220 (5th Cir. 2018) .................................................................. 20

*Crawford Pro. Drugs, Inc. v. CVS Caremark Corp.*,
748 F.3d 249 (5th Cir. 2014) ............................................................................. 15

*Cushman v. GC Services, LP*,
657 F. Supp. 2d 834 (S.D. Tex. 2009) ............................................................... 10

*In re Dant & Russell, Inc.*,
853 F.2d 700 (9th Cir. 1988) ............................................................................. 24

*Earman Oil Co., Inc. v. Burroughs Corp.*,
625 F.2d 1291 (5th Cir. 1980) ...................................................................... 14, 20

*El Paso Natural Gas Co. v. Minco Oil & Gas, Inc.*,
964 S.W.2d 54 (Tex.App.-Amarillo 1997) ............................................ 12, 13, 14, 15

*El Paso Natural Gas Co. v. Minco Oil & Gas, Inc.*,
8 S.W.3d 309 (Tex. 1999) .................................................................................. 12

*In re Essential Fin. Educ., Inc.*,
629 B.R. 401 (Bankr. N.D. Tex. 2021) .............................................................. 21

*Fleischmann Distilling Corp. v. Distillers Co. Ltd.*,
395 F. Supp. 221 (S.D.N.Y. 1975) ..................................................................... 12

*Fox v. Int'l Conference of Funeral Serv. Examining Bds.*,
242 F. Supp. 3d 272 (S.D.N.Y. 2017) ................................................................ 14

*Funk v. Stryker Corp.*,
631 F.3d 777 (5th Cir. 2011) .............................................................................. 9

*In re Garofalo's Finer Foods*,
186 B.R. 414 (N.D. Ill. 1995) ............................................................................. 25

*Gillman v. Chase Manhattan Bank, N.A.*,
73 N.Y.2d 1 (1988) ...................................................................................... 12, 13

*Gillman v. Chase Manhattan Bank, N.A.*,
521 N.Y.S.2d 729 (App. Div. 2nd Dep't 1987) .................................................. 12

*Hertz Corp. v. Attorney General of State of N.Y.*,
518 N.Y.S.2d 704 (Sup. Ct. N.Y. Co. 1987) ..................................................... 15

*ITT Rayonier Inc. v. U.S.*,
651 F.2d 343 (5th Cir. 1981) .............................................................................. 9

*In re James A. Phillips, Inc.*,
   29 B.R. 391 (S.D.N.Y. 1983) ......................................................................... 24

*In re Johns-Manville Corp.*,
   60 B.R. 612 (Bankr. S.D.N.Y. 1986) ........................................................ 24, 25

*KCM Fin. LLC v. Bradshaw*,
   457 S.W.3d 70 (Tex. 2015) ............................................................................ 21

*Kimbell v. U.S.*,
   371 F.3d 257 (5th Cir. 2004) .......................................................................... 20

*Kinnett Dairies, Inc. v. Farrow*,
   580 F.2d 1260 (5th Cir. 1978) .......................................................................... 9

*Knox v. Rosenberg*,
   No. 99-cv-123, 1999 WL 35233291 (S.D. Tex. Sept. 29, 1999) ...................... 9

*Lindemann v. Eli Lilly and Co.*,
   816 F.2d 199 (5th Cir. 1987) .......................................................................... 20

*Matter of Louisiana Pellets, Inc.*,
   838 Fed. App'x 45 (5th Cir. 2000) ................................................................. 18

*Lyles v. RDP Company*,
   702 Fed. App'x 385 (6th Cir. 2017) ............................................................... 17

*Marketic v. U.S. Bank N.A.*,
   436 F. Supp. 2d 842 (N.D. Tex. 2006) ........................................................... 10

*In re Marin Motor Oil, Inc.*,
   750 F.2d 220 (3d Cir. 1984) ........................................................................... 23

*Mattei v. Int'l Conference of Funereal Serv. Examining Bds.*,
   No. 15-cv-139, 2015 WL 5125799 (W.D. Tex. Sept. 1, 2015) ...................... 14

*Mayagüez S.A. v. Citigroup, Inc.*,
   No. 16-cv-6788, 2018 WL 1587597 (S.D.N.Y. Mar. 28, 2018) ................. 12, 16

*In re Missionary Baptist Found., Inc.*,
   712 F.2d 206 (5th Cir. 1983) ............................................................................ 9

*Nayal v. HIP Network Servs. IPA, Inc.*,
   620 F. Supp. 2d 566 (S.D.N.Y. 2009) ............................................................ 13

*NML Capital v. Republic of Argentina*,
   621 F.3d 230 (2d Cir. 2010) ........................................................................... 16

iv

*Norris v. Hearst Trust*,
  500 F.3d 454 (5th Cir. 2007) ........................................................................ 9

*In re Northgate Computer Sys., Inc.*,
  240 B.R. 328 (Bankr. D. Minn. 1999) .......................................................... 19

*In re Old Carco LLC*,
  509 Fed. App'x 77 (2d Cir. 2013) ................................................................ 18

*PDVSA Petroleo S.A. v. Trigean, Ltd.*,
  No. C-09-38, 2012 WL 3249531 (S.D. Tex. Aug. 7, 2012) ......................... 21

*In re Pilgrim's Pride Corp.*,
  421 B.R. 231 (Bankr. N.D. Tex. 2009) ................................................... 22, 23

*In re Pioneer Home Builders, Inc.*,
  147 B.R. 889 (Bankr. W.D. Tex. 1992) ........................................................ 19

*In re Roth American, Inc.*,
  975 F.2d 949 (3d Cir. 1992) ......................................................................... 25

*Simpson v. MBank Dallas, N.A.*,
  724 S.W.2d 102 (Tex.App.--Dallas 1987, writ ref'd n.r.e.) .................... 17, 18

*Ski River Dev., Inc. v. McCall*,
  167 S.W.3d 121 (Tex.App.--Waco 2005, pet. denied) ................................ 14

*Sol Group Marketing Co. v. Am. President Lines, LTD*,
  No. 14-cv-9929, 2016 WL 205444 (S.D.N.Y. Jan. 15, 2016) ...................... 16

*Sorenson v. Secretary of Treasury of U.S.*,
  475 U.S. 851, 106 S. Ct. 1600 (1986) .......................................................... 26

*Stewart M. Muller Constr. Co. v. New York Tel. Co.*,
  40 N.Y.2d 955 (1976) ................................................................................... 17

*Stinger v. Chase Bank, USA, N.A.*,
  265 Fed. App'x 224 (5th Cir. 2008) ....................................................... 11, 16

*In re Sun Valley Prods., Inc.*,
  328 B.R. 147 (Bankr. N.D. 2005) ................................................................ 19

*Tellabs, Inc., v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308, 127 S. Ct. 2499 (2007) ............................................................ 9

*Tierra Right of Way Servs., Ltd. v. Abengoa Solar Inc.*,
  No. 11-cv-323, 2011 WL 2292007 (D. Ariz. June 9, 2011) ........................ 13

v

*Tow v. Bulmahn*,
    565 B.R. 361 (E.D. La. 2017) ........................................................................ 18

*United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*,
    484 U.S. 365, 108 S. Ct. 626 (1988) .............................................................. 26

*U.S. Bank Nat'l Ass'n ex rel. CWCapital Asset Mgm't LLC v. Village at Lakeridge, LLC*,
    --- U.S. ---, 138 S. Ct. 960 (2018) ................................................................ 21

*In re USDigital, Inc.*,
    443 B.R. 22 (Bankr. D. Del. 2011) ................................................................. 18

*Wachovia Secs., LLC v. Joseph*,
    866 N.Y.S.2d 651 (App. Div. 1st Dep't 2008) .............................................. 15

*Wade v. Austin*,
    524 S.W.2d 79 (Tex.Civ.App.--Texarkana 1975, no writ) ...................... 13, 14

*In re World Imports, Ltd.*,
    862 F.3d 338 (3d Cir. 2017) ........................................................................... 23

## Statutes and Rules

11 U.S.C. § 361 ..................................................................................................... 26

11 U.S.C. § 506 ..................................................................................................... 26

11 U.S.C. § 546 ..................................................................................................... 23

11 U.S.C. § 548 ......................................................................................... 18, 19, 26

Fed. R. Civ. P. 12 .............................................................................................. 8, 9

Fed. R. Evid. 201 .................................................................................................. 9

N.Y. Uniform Commercial Code § 1-201 ........................................................ 22

N.Y. Uniform Commercial Code § 2-302 ........................................................ 12

Tex. Bus. & Com. Code § 1.201 ....................................................................... 22

Tex. Bus. & Com. Code § 2.302 ................................................................... 10, 11

Tex. Bus. & Com. Code § 9.103 ....................................................................... 26

Tex. Bus. & Com. Code § 17.45 ....................................................................... 10

Tex. Bus. & Com. Code § 17.49 ....................................................................... 11

Tex. Bus. & Com. Code § 17.50 ................................................................................ 10

Tex. Bus. & Com. Code § 24.001 .............................................................................. 18

Tex. Bus. & Com. Code § 24.005 .............................................................................. 18

Tex. Bus. & Com. Code § 24.006 .............................................................................. 18

Tex. Utilities Code § 104.361 ............................................................................... 8, 20

## **Other Authorities**

2 R. Anderson, Uniform Commercial Code § 2-302:28 ............................................. 13

2 R. Anderson, Uniform Commercial Code § 2-302:53 ............................................. 14

4 Collier on Bankruptcy ¶503.16 (15th ed.) .............................................................. 22

17 Am. Jur. 2d 561 Contracts, § 192 ....................................................................... 14

Restatement of Consumer Contracts § 5 .................................................................. 13

Restatement (Second) of Contracts § 208 ................................................................. 14

Defendants 507 Capital LLC, 507 Summit LLC, Cetus Capital VI, L.P., CrossingBridge Low Duration High Yield Fund, Destinations Global Fixed Income Opportunities Fund, Destinations Low Duration Fixed Income Fund, Leaffilter North Holdings, Inc., OFM II, LP, OU 2 LLC, RiverPark Short Term High Yield Fund, RiverPark Strategic Income Fund and Two Seas Global (Master) Fund LP, each a transferee of the claims of Concord Energy LLC ("<u>Concord</u>") and/or Mercuria Energy America, LLC ("<u>Mercuria</u>"), hereby move to dismiss the Complaint, and state:

## <u>INTRODUCTION</u>

1.      The spot market price of widely-traded bulk commodities like natural gas is never stable, but always fluctuates:  sometimes higher and other times lower, sometimes with moderate swings and other times with dramatic swings.  Both sellers and buyers of natural gas know this, and frequently try to protect themselves against the inherent unpredictability of future spot price movements via long-term contracts at prespecified prices and/or hedging strategies.

2.      During an unusual weather event in February 2021 ("<u>Winter Storm Uri</u>") which caused an upward spike in spot gas prices due to limitations on supply coupled with increases in demand, the Debtor engaged in multiple voluntary purchases of gas in arm's length transactions at spot market prices which were unusually high.  It was not buying from a monopolist, but from multiple suppliers (the "<u>Gas Suppliers</u>") who were rivals in a competitive market, albeit one in which other suppliers were temporarily unable to fill orders due to frozen pipelines and other weather-related issues.

3.      At the time, the Debtor apparently viewed these high-priced open-market gas purchases as preferable to the alternative, which would have been reducing its immediate need for gas by shutting down or limiting the use of its gas-fueled electrical generating plants until market prices came back down as the supply-demand dynamics changed.  But it now seeks to renege on

its contractual obligations via a variety of different theories that all boil down to nothing more than a single assertion: namely, that anyone who agrees to an arm's length purchase at the going market rate when the market rate is unusually high may accept and consume the goods purchased but then refuse to pay when the bill comes due. That is not how contract law works in a free-market economy, and neither the Bankruptcy Code nor state law can assist the Debtor in evading its obligations. The Gas Suppliers did assume the credit risk of their customer's potential bankruptcy, and if the Debtor's assets, distributed according to the Bankruptcy Code's priority scheme, ultimately prove inadequate for their claims to be paid in full, so be it. But there is no legal or factual basis beyond that to shortchange their legitimate contractual claims to create a windfall for Debtor's other creditors and/or owners.

4.      First, its "price-gouging" claim relies on a Texas consumer-protection statute which by its terms applies only to sales to "consumers." Unsurprisingly, a major utility in the business of generating electricity does not meet the statutory definition of a "consumer" as set forth in that statute, which is also by its terms inapplicable to transactions in excess of $500,000, as the Debtor has affirmatively pleaded the ones at issue here are. Separately, there is no basis as a matter of law for classifying arm's length transactions at market price between sophisticated commercial entities as "unconscionable" under the Uniform Commercial Code simply because the market price was unusually high at the time.

5.      Second, the Debtor's attempts under both the Bankruptcy Code and state law to avoid its obligations as constructive fraudulent transfers are premised exclusively on the alleged lack of "reasonably equivalent value," but the reasonably equivalent value of natural gas at a particular time and place is neither more nor less than its market price at that particular time and place as determined by the ever-shifting dynamics of supply and demand. If Debtor thought the market price was too high compared to the "value" of the gas, its option was to decline to buy until

2

the price declined, not to agree to the market rate then prevailing but refuse to pay the bill after the gas had already been purchased and consumed.

6.      Third, the Debtor's attempt to strip movant's claims of administrative priority under Bankruptcy Code section 503(b)(9) is based solely on the similar assertion that the "value" of the gas was somehow different than its market price at the relevant time and place, together with the related assertion that arm's length market-price transactions which were otherwise in the ordinary course of the Debtor's business are out of the ordinary course if the market price is high enough that the Debtor wishes in hindsight to be excused from having to pay it.  There is no legal authority for either of these assertions.

7.      Faced with a difficult and rapidly evolving situation, the Gas Suppliers agreed to continue to extend unsecured credit to the Debtor rather than condition further deliveries on the Debtor's satisfying outstanding payment obligations to compensate for the suddenly increased credit risk.  By doing so, they allowed the Debtor to keep running its generating plants and provide electricity to Texas utility customers at a time when many other generating plants in Texas were unable to operate.  Now that that crisis has subsided, the movants are entitled to have their claims from those transactions allowed, and afforded administrative priority status as to gas delivered within 20 days before the petition date.

## **BACKGROUND**

### I.      **THE DEBTOR'S FINANCIAL CONDITION PRECIPITATING ITS CHAPTER 11 CASE**

8.      The Debtor reports in its schedules (Case 21-30725, Doc. #353, annexed hereto as Exhibit 1, excluding Global Notes and Exhibits to Schedules A/B) approximately $3.4 billion in assets and approximately $5.1 billion in liabilities, much of which is disputed, as of the commencement of its case.  The liabilities include the approximately $1.9 billion claim of the

3

Electric Reliability Council of Texas ("ERCOT"), through which the Debtor had acquired electricity during the storm at rates set by the Public Utility Commission of Texas ("PUCT"). The Debtor and Committee are now litigating the validity and priority of ERCOT's claims in a separate adversary proceeding, involving different legal and factual issues than those presented here. However, it was the massive amount due to ERCOT (disputed by the Debtor), that precipitated the Debtor's bankruptcy filing on March 1, 2021. (Case 21-30725, Doc. #3 ("Karnei Decl."), referenced at Complaint ¶58 and annexed hereto as Exhibit 2, ¶¶56-62.) And further, the total amount of Gas Supplier claims (less than $180 million, see Complaint Exhibit A) is a low-single-digit percentage of Debtor's total debts, disputed and undisputed. Indeed, without the ERCOT claim, the Debtor's scheduled assets would exceed its liabilities, including those owed to Gas Suppliers and that it now seeks to repudiate.

## II. THE DEBTOR'S OWN GAS-FIRED POWER PLANTS WERE INTENDED TO SERVE AS A HEDGE AGAINST POTENTIAL PRICE VOLATILITY IN THE ERCOT MARKET

9.     The Debtor is an electric cooperative, that supplies wholesale power for its sixteen members. (Complaint ¶¶1, 27.)

10.     "Brazos Electric sources through a combination of purchased power, owned generation and forward-energy purchases from a number of different counterparties." (Karnei Decl. ¶25.)

11.     Purchased power is acquired in the ERCOT wholesale market; and whereas "[i]n the past, Brazos Electric's supply strategy focused on the acquisition of additional energy resources (either through owned generation plants or long-term power purchase agreements) … more recently, in response to Co-Op Members' desire for competitive rates, Brazos Electric has sought to take advantage of low energy prices in the ERCOT wholesale market to serve a portion of its load." (Id. ¶47.)

12.     As to owned generation, the Debtor owns three gas-fired plants that together provide approximately 2,075 megawatts of power.  (Id. ¶25.)

13.     The Debtor "is heavily dependent on natural gas for generating power[,] has gas transportation agreements with major Texas intrastate pipelines and purchases its natural gas through industry standardized NAESB contracts."  (Id. ¶11.)

14.     "Brazos Electric's mix of owned generation and contracted resources has helped it lower electric rates to members, limit operational risks through diversification of supply and provide a hedge against potentially higher prices in the ERCOT market under normal circumstances."  (Id. ¶29.)

## III.     THE SUBJECT GAS SALE TRANSACTIONS

### A.     The NAESB Contracts

15.     "The transactions making up the Gas Claims were entered into on the Debtor's behalf by Alliance for Cooperative Energy Services Power Marketing, LLC ("ACES"), which serves as the Debtor's agent for purposes of purchasing gas.  ACES purchased gas from 11 suppliers in February."  (Complaint ¶52.)

16.     "[E]ach of the Gas Suppliers had a pre-existing NAESB form contract with Brazos."  (Id. ¶53.)

17.     The NAESB contracts with Concord and Mercuria were included in movants' proofs of claim (referenced at Complaint ¶52 and Exhibit A), exemplars of which are annexed hereto as Exhibit 3 and Exhibit 4, respectively.

18.     "Those agreements [the NAESB contracts] did not obligate Brazos to purchase any gas.  Nor did they obligate the Gas Suppliers to sell any gas.  Those agreements set forth certain terms, other than quantity and price, that would apply if Brazos and a Gas Supplier were to agree to a sale of a given quantity of gas at a given price in a discrete transaction."  (Complaint ¶53.)

5

19.     Quantity and price were fixed by "individual communications between ACES and the [respective] Gas Suppliers during February of 2021." (Id.)

20.     Pursuant to the NAESB contracts (at § 7.2), the Debtor agreed to "remit the amount due under Section 7.1 [the amount invoiced for gas sold] on or before the later of the Payment Date [defined as the 25th day of the month following the delivery month] or 10 Days after receipt of the invoice."

21.     The NAESB contracts have a force majeure clause, that serves to modify certain contractual obligations in the case of "weather related events affecting an entire region, such as low temperatures which cause freezing or failure of wells or lines of pipe" (id. § 11.2); however, the force majeure clause (at § 11.1) does not affect "a party's obligation to make payment due under Section 7."  In other words, extreme weather might excuse a Gas Supplier from delivering gas it had contractually promised to deliver (which would in turn excuse the Debtor from paying), but to the extent gas was delivered to the Debtor, the weather would not excuse the Debtor from paying the agreed price for it.

**B.      Electricity and Natural Gas Pricing During Winter Storm Uri**

22.     "Price shocks in Texas [in anticipation of Winter Storm Uri] were felt as early as February 12 when natural-gas prices jumped from $3 to over $150/MMBtu in anticipation of short gas supply."  (Karnei Decl. ¶50.)

23.     "In the early hours of Monday, February 15, 2021, ERCOT declared an Energy Emergency Alert ('EEA') 'Level 1' [and] at 1:25 a.m., ERCOT elevated to an EEA 'Level 3.' Level 3 is the highest level of emergency in ERCOT."  (Complaint ¶45.)

24.     "On February 15, 2021, ERCOT ordered transmission operators to implement deep cuts in load in the form of rolling blackouts to reduce the strain on the ERCOT transmission grid and avoid a complete collapse of the ERCOT system."  (Id. ¶46.)

25.     "In addition, some natural gas wells froze at the wellheads, leaving much of Texas's large fleet of gas-fired power plants without fuel."  (Karnei Decl. ¶52.)

26.     "Natural gas prices spiked in response to failing supply as lines froze up." (Id. ¶53.)

27.     On February 15 and 16, 2021, the PUCT issued Orders, annexed hereto as <u>Exhibit 5</u> and <u>Exhibit 6</u>, respectively, pursuant to which ERCOT "set prices at the System Wide Offer Cap ($9,000 per MWh) for the duration of the time load was being shed.  ERCOT continued this practice until 9:00 a.m. on February 19."  (Id. ¶53.)

28.     Per the Orders, this was done for two reasons.  First, "[e]nergy prices should reflect scarcity of supply.  If customer load is being shed, scarcity is at its maximum, and the market price for the energy needed to serve that load should also be at its highest." The PUCT directed ERCOT to "ensure that firm load that is being shed in EEA3 is accounted for in ERCOT's scarcity pricing signals."  Second, "[d]ue to exceptionally high natural gas prices at this time."

29.     At a Joint Hearing of the Texas House Committees on Energy Resources and State Affairs, held February 25-26, 2021 ("<u>Joint Hearing</u>"),[1] "[t]he heads of two of Texas' largest power generation companies, Vistra Corp. and NRG Energy Inc., told members … that the promise of high prices couldn't help resurrect power plants that had difficulty operating in extreme cold or securing gas supplies.  Vistra Chief Executive Curt Morgan said gas supply constraints were one the company's biggest challenges, forcing it to take plants offline or run them at lower capacity levels.  'We had power plants ready to produce power that could not produce any,' he said." (Karnei Decl. Exhibit A; the testimony is at Joint Hearing, Part 1, at 0:23:15-0:23:30 of 15:26:49.) Tom Hancock, the COO of Garland Power and Light, testified that during the period at issue he

---

[1] Available at https://house.texas.gov/video-audio/committee-broadcasts/87, search "Joint Hearing: State Affairs and Energy Resources."

received a quote for natural gas at $1,100/MMBtu. (Joint Hearing, Part 2, at 7:07:29-7:08:00 of 10:12:48.)

## IV. LEGISLATIVE INVESTIGATION CONCLUDES THE PRICE OF GAS SOLD DURING WINTER STORM URI WAS SET BY THE MARKET

30.     In response to Winter Storm Uri, Texas enacted a new subchapter of the Rates and Services chapter of the Gas Utility Regulatory Act, designed "to reduce the cost that customers would otherwise experience because of extraordinary costs that gas utilities incurred to secure gas supply and provide service during Winter Storm Uri … by providing securitization financing for gas utilities to recover those costs."  TEX. UTILITIES CODE § 104.361(a).

31.     The Sponsor's Statement of Intent with respect to the new subchapter stated: "The cost of gas is … set by the market" and "The recent winter storm in Texas resulted in a historic demand for energy" that drove gas price increases.  Texas Bill An., H.B. 1520 (May 21, 2021), annexed hereto as Exhibit 7.

## ARGUMENT

## I. LEGAL STANDARD

32.     To survive a Rule 12(b)(6) motion, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic v. Twombly*, 550 U.S. 544, 570, 127 S. Ct. 1955, 1974 (2007).

33.     "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949 (2009) (citing *Twombly*, 550 U.S. at 556).  This standard "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*

34. When deciding a Rule 12(b)(6) motion, courts "must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Funk v. Stryker Corp.*, 631 F.3d 777, 783 (5th Cir. 2011) (quoting *Tellabs, Inc., v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322, 127 S. Ct. 2499, 2509 (2007)).

35. Pursuant to Federal Rule of Evidence 201(b), a court may take judicial notice of facts that are "not subject to reasonable dispute."

36. The Court may also take notice of matters from the record of the chapter 11 case. *ITT Rayonier Inc. v. U.S.*, 651 F.2d 343, 345 n.2 (5th Cir. 1981) (citing *Kinnett Dairies, Inc. v. Farrow*, 580 F.2d 1260, 1277 n.33 (5th Cir. 1978)) ("A court may … take judicial notice of its own records"); *In re Missionary Baptist Found., Inc.*, 712 F.2d 206, 211 (5th Cir. 1983) ("court may take judicial notice of the record in prior related proceedings"); *see also Norris v. Hearst Trust*, 500 F.3d 454, 461 n.9 (5th Cir. 2007) ("it is clearly proper in deciding a 12(b)(6) motion to take judicial notice of matters of public record").

37. Courts "need not accept the allegations of a complaint as true to the extent that the allegations conflict with such [judicially noticed] facts." *Knox v. Rosenberg*, No. 99-cv-123, 1999 WL 35233291, at *6 (S.D. Tex. Sept. 29, 1999).

## II. THE FIRST CAUSE OF ACTION SHOULD BE DISMISSED FOR FAILURE TO PLEAD A TEXAS DECEPTIVE TRADE PRACTICES CONSUMER PROTECTION ACT VIOLATION, UNCONSCIONABILITY OR ECONOMIC DURESS

38. The first cause of action seeks a declaratory judgment that the Gas Suppliers' claims are unenforceable under Bankruptcy Code section 502(b)(1) (1) because they engaged in "price gouging" during a declared disaster in violation of the Texas Deceptive Trade Practices-Consumer

Protection Act ("DTPA"), (2) under Tex. Bus. & Com. Code § 2.302, the Texas Uniform Commercial Code provision governing unconscionable contracts and (3) under the doctrine of economic duress.  (Complaint ¶¶62-67.)   Each branch of this cause of action fails for reasons set forth below.

### A.    Texas Deceptive Trade Practices-Consumer Protection Act

39.    Consumer status is a necessary element of a DTPA claim.  Tex. Bus. & Com. Code § 17.50(a) ("A consumer may maintain an action where …"); *see also Cushman v. GC Services, LP*, 657 F. Supp. 2d 834, 842 (S.D. Tex. 2009) (citing *Amstadt v. U.S. Brass Corp.*, 919 S.W.2d 644, 649 (Tex. 1996)) ("The elements of a DTPA cause of action are: (1) the plaintiff is a consumer").  "In all cases, a plaintiff must qualify as a 'consumer' in order to have standing to bring an action under the DTPA."  *Marketic v. U.S. Bank N.A.*, 436 F. Supp. 2d 842, 855 (N.D. Tex. 2006).

40.    The Debtor cannot, on the undisputed facts, fall within the statutory definition of the term "consumer."  Tex. Bus. & Com. Code § 17.45(4) excludes from the definition "a business consumer that has assets of $25 million or more, or that is owned or controlled by a corporation or entity with assets of $25 million or more."  Subsection (10) in turn defines "business consumer" to mean "an individual, partnership, or corporation who seeks or acquires by purchase or lease, any goods or services for commercial or business use."

41.    There is no doubt that the Debtor cannot be deemed a "consumer" under this standard.  (Karnei Decl. ¶¶25-30 (describing generation and transmission assets); Schedule A/B (Exhibit 1 hereto) (valuing Debtor's assets at $3.4 billion).) Absent consumer status, the DTPA claim fails, because the legislature elected not to provide large non-consumer businesses any statutory remedy against so-called "price gouging."

10

42.     In addition, TEX. BUS. & COM. CODE § 17.49(g) provides that "[n]othing in this subchapter shall apply to a cause of action arising from a transaction, a project, or a set of transactions relating to the same project, involving total consideration by the consumer of more than $500,000, other than a cause of action involving a consumer's residence."

43.     The Complaint alleges (at ¶52) that the subject transactions with each Gas Supplier exceed that threshold.

**B.     Unconscionability**

      1.     <u>Applicable Law</u>

44.     Section 15.5 of each NAESB contract provides that "[t]he interpretation and performance of this Contract shall be governed by the laws of the jurisdiction as indicated on the Base Contract, excluding, however, any conflict of laws rule which would apply the law of another jurisdiction."   For the Concord NAESB contract the chosen state is New York; and for the Mercuria one the chosen state is Texas.

45.     Because the unconscionability claim is contract-based, it is subject to the choice of law provision in the NAESB contract.  *Stinger v. Chase Bank, USA, N.A.*, 265 Fed. App'x 224, 228 (5th Cir. 2008) (citations omitted).

      2.     <u>Scope of Unconscionability Defense</u>

46.     TEX. BUS. & COM. CODE § 2.302 provides:

    (a) If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result.

    (b) When it is claimed or appears to the court that the contract or any clause thereof may be unconscionable the parties shall be afforded a reasonable opportunity to present evidence as to its

> commercial setting, purpose and effect to aid the court in
> making the determination.

N.Y. Uniform Commercial Code § 2-302 is identical, except that subsections (a) and (b) are

renumbered as subsections (1) and (2).

47.     Comment 1 to both statutes provides:

> The basic test is whether, in light of the general commercial
> background and the commercial needs of the particular trade or case,
> the clauses involved are so one-sided as to be unconscionable under
> the circumstances existing at the time of the making of the contract
> …
>
> The principle is one of the prevention of oppressions and unfair
> surprise … and not of disturbance of allocation of risks because of
> superior bargaining power …

48.     "The determination of unconscionability is a question of law properly before the

court on a motion to dismiss." *Fleischmann Distilling Corp. v. Distillers Co. Ltd.*, 395 F. Supp.

221, 233 n.18 (S.D.N.Y. 1975).  "A factual hearing on unconscionability, N.Y. U.C.C. § 2-302(2),

is only mandatory once the court accepts the possibility of unconscionability." *Id.*   *See also*

*Mayagüez S.A. v. Citigroup, Inc.*, No. 16-cv-6788, 2018 WL 1587597, at *12 (S.D.N.Y. Mar. 28,

2018) (citing additional authorities).

49.     Under Texas and New York law, the plaintiff must plead and prove both substantive

and procedural unconscionability.  *Arkwright-Boston Mfrs. Mut. Ins. Co. v. Westinghouse Elec.*

*Corp.*, 844 F.2d 1174, 1184 (5th Cir. 1988) (Texas law); *Gillman v. Chase Manhattan Bank, N.A.*,

73 N.Y.2d 1, 10 (1988) (New York law).

50.     Further, the doctrine's application is severely constrained in commercial contexts.

*El Paso Natural Gas Co. v. Minco Oil & Gas, Inc.*, 964 S.W.2d 54, 63 (Tex.App.-Amarillo 1997),

*rev'd in part on other grounds*, 8 S.W.3d 309 (Tex. 1999).  *Gillman v. Chase Manhattan Bank,*

*N.A.*, 521 N.Y.S.2d 729, 732 (App. Div. 2nd Dep't 1987), *aff'd*, 73 N.Y.2d 1 (1988) ("the doctrine

of unconscionability has little applicability in the commercial setting because it is presumed that businessmen deal at arm's length with relative equality of bargaining power"); *Tierra Right of Way Servs., Ltd. v. Abengoa Solar Inc.*, No. 11-cv-323, 2011 WL 2292007, at *7 (D. Ariz. June 9, 2011) (same).

51.    "Procedural abuse [is the type] which may arise in the contract formation." *Wade v. Austin*, 524 S.W.2d 79, 86 (Tex.Civ.App.--Texarkana 1975, no writ). It "is illustrated through such things as 1) the presence of deception, overreaching and sharp business practices … 2) the absence of a viable alternative … and 3) the relative acumen, knowledge and financial ability of the parties involved." *El Paso Natural Gas*, 964 S.W.2d at 61 (citations omitted).  The commercial setting of the transaction is also highly relevant.  *Id*.  A similar standard applies under New York law.  *Gillman*, 73 N.Y.2d at 10-11 ("The procedural element of unconscionability requires an examination of the contract formation process and the alleged lack of meaningful choice.  The focus is on such matters as the size and commercial setting of the transaction (see UCC 2-302 [2])").[2]

52.    Substantive unconscionability concerns the unfairness or oppressiveness of the contract terms.  *Id*.  *See also Nayal v. HIP Network Servs. IPA, Inc.*, 620 F. Supp. 2d 566, 571 (S.D.N.Y. 2009) ("the substantive element looks to the content of the contract, per se").  "At least one commentator suggests that the contract … must border on being inimical to public policy before it can be said to be sufficiently unfair or oppressive. 2 R. Anderson, Uniform Commercial Code § 2-302:28 … Others suggest that it must be utterly lopsided, that is, there must be no

---

[2] In addition, where the sole contract term asserted to be unconscionable is price, "[t]he procedural-unconscionability test may be more difficult to satisfy because the price is usually the most prominent element of a transaction."  Restatement of Consumer Contracts § 5 (2019), Cmt. 8.  That is all the more the case in a commercial context.

reasonable or subjective parity between the values exchanged. *Wade v. Austin*, 524 S.W.2d at 86;

Restatement (Second) of Contracts § 208, cmt. c; 2 R. Anderson, Uniform Commercial Code § 2-

302:53 …" *El Paso Natural Gas*, 964 S.W.2d at 61-62.

53.    Under both Texas and New York law, "[t]he grounds for substantive abuse must be

sufficiently shocking or gross to compel the court to intercede, and the same is true for procedural

abuse—the circumstances surrounding the negotiations must be shocking." *Canatxx Gas Storage*

*Ltd. v. Silverhawk Capital Partners, LLC*, No. 06-cv-1330, 2008 WL 1999234, at *19 (S.D. Tex.

May 8, 2008) (quoting *Ski River Dev., Inc. v. McCall*, 167 S.W.3d 121, 136 (Tex.App.--Waco

2005, pet. denied)). *See also Fox v. Int'l Conference of Funeral Serv. Examining Bds.*, 242 F.

Supp. 3d 272, 289 (S.D.N.Y. 2017) (quoting *Mattei v. Int'l Conference of Funereal Serv.*

*Examining Bds.*, No. 15-cv-139, 2015 WL 5125799, at *9 (W.D. Tex. Sept. 1, 2015)) (granting

motion to dismiss, where there was "nothing shocking" about the contract terms); *Ciago v.*

*Ameriquest Mortg. Co.*, 295 F. Supp. 2d 324, 330 (S.D.N.Y. 2003) ("the present case [is] not so

shocking as to bring this matter within the category of the 'exceptional cases' alluded to in

*Gillman*").

54.    In addition, under Texas law, "[a] party who knowingly enters a lawful but

improvident contract is not entitled to protection by the courts." *Wade*, 524 S.W.2d at 86. *See*

*also Earman Oil Co., Inc. v. Burroughs Corp.*, 625 F.2d 1291, 1299 (5th Cir. 1980) (rejecting

unconscionability defense where party asserting it "was a willing party to the transaction"); *Wade*,

524 S.W.2d at 86 (quoting 17 Am. Jur. 2d 561 Contracts, Sec. 192, Improvident, oppressive, or

unconscionable agreements) ("In the absence of any mistake, fraud, or oppression, the courts, as

such, are not interested in the wisdom or impolicy of contracts and agreements voluntarily entered

into between parties compos mentis and sui juris … It has accordingly been said that, almost

without limitation, what the parties agree upon is valid, the parties are bound by the agreement

they have made, and the fact that a bargain is a hard one does not entitle a party to be relieved therefrom if he assumed it fairly and voluntarily");   *El Paso Natural Gas*, 964 S.W.2d at 62 ("Our court system cannot act as the mother hen watching over its chicks, standing ready to ameliorate every unpleasant circumstance which might befall them").

55.   New York law similarly limits application of the doctrine.  *E.g.*, *Wachovia Secs., LLC v. Joseph*, 866 N.Y.S.2d 651, 653 (App. Div. 1st Dep't 2008) (affirming dismissal, on the ground that "the complaint does not establish that Wachovia was coerced in any way to enter into that specific transaction.  Rather, Wachovia placed an unsolicited market order in an attempt to cover its short position [and under these circumstances] price alone will not support a finding of substantive unconscionability") (citing *Hertz Corp. v. Attorney General of State of N.Y.*, 518 N.Y.S.2d 704, 709-710 (Sup. Ct. N.Y. Co. 1987)).[3]

### 3.   The Complaint Does Not Plead Procedural or Substantive Unconscionability

56.   Procedural unconscionability is not plausibly alleged, because none of the factors bearing on the inquiry have been pleaded.

57.   The Complaint does not plausibly allege the absence of a viable alternative.  Indeed, it alleges that during the period at issue, the Debtor was buying gas from a number of other sellers.  This is sufficient to defeat the cause of action.  *E.g.*, *Crawford Pro. Drugs, Inc. v. CVS Caremark Corp.*, 748 F.3d 249, 264 (5th Cir. 2014) (dismissing unconscionability claim, because

---

[3] As further observed in *Hertz*, 518 N.Y.S.2d 704, 709-710, wherein an unconscionability claim premised on excessive price was rejected: "We live in a quasi-capitalist society, where the economy is generally controlled by the law of supply and demand. With respect to certain services and commodities prices are regulated, i.e. electricity, insurance rates, residential rents, etc. However, such regulation is the exception, not the rule, and in the absence of an explicitly declared intention to regulate prices or profits, it is not for the courts at the behest of the Attorney General, to set policy on permissible profits and thus encroach on what is clearly a legislative function."

plaintiffs "failed to present any evidence that there were no other PBMs with which they could contract or that it was not economically feasible to refrain from contracting with the Defendants at all"); *Stinger*, 265 Fed. App'x at 229 ("Stinger did have a choice—he could have rejected the terms Chase offered and either adjusted his travel plans or used other forms of payment such as bank-issued check cards"); *Mayagüez*, 2018 WL 1587597, at \*13 ("Unconscionability claims are commonly dismissed where plaintiff has not pled a lack of meaningful choice"; and providing examples); *Sol Group Marketing Co. v. Am. President Lines, LTD*, No. 14-cv-9929, 2016 WL 205444, at \*7 (S.D.N.Y. Jan. 15, 2016) (dismissing unconscionability claim, because "there is no allegation that [defendant] was [plaintiff's] sole option for shipping melons"). If Debtor could not find cheaper alternative sources of gas for immediate delivery, that is simply because it was purchasing at the market price, albeit a market price that was unusually high due to the supply-demand dynamics that prevailed at the moment during the storm.

58.     Nor does the Complaint plead lack of sophistication, the Debtor being a multi-billion dollar, highly regulated electric cooperative.

59.     Nor does the Complaint plead overreaching, sharp business practices or mistake, let alone deception, fraud or oppression. Rather, the Complaint pleads only that gas prices rose dramatically, in the period leading up to Winter Storm Uri, and even more so after ERCOT set the price of electricity at $9,000 per MWh following its declaration of an Energy Emergency Alert; and despite the high prices, the Debtor deliberately purchased gas at these levels to fuel its owned generation facilities.

60.     As of 2010, there had been no reported decision finding a commercial transaction between commercially sophisticated entities, to be substantively unconscionable. *NML Capital v. Republic of Argentina*, 621 F.3d 230, 238 (2d Cir. 2010) ("Argentina has pointed to no authority— and we are aware of none—finding an agreement involving parties of like sophistication

unenforceable on substantive unconscionability grounds"). We have uncovered no subsequent decision finding substantive unconscionability under such circumstances.

61.     Further, courts have refused to reform commercial contracts on the ground of substantive unconscionability, where there has been significant post-execution price movement. *E.g.*, *Lyles v. RDP Company*, 702 Fed. App'x 385, 400 (6th Cir. 2017) (affirming refusal to reform natural gas leases on account of changed circumstances); *Bradford v. Plains Cotton Co-op. Ass'n*, 539 F.2d 1249, 1255 (10th Cir. 1976) (rejecting cotton grower's unconscionability challenge to price term under forward contract based on post-execution price increases). The Debtor knew the prices it was agreeing to pay the Gas Suppliers and knew how high they were compared to the historical range of price fluctuation. It chose to go forward with its eyes open rather than shut down its generating plants until the market price came back down again. As a matter of law, there is nothing "unconscionable" about holding the Debtor to its word.

**C.      Economic Duress**

62.     "The courts in Texas have consistently followed the rule that, as a matter of law, there can be no duress unless (1) there is a threat to do something which a party threatening has no legal right to do; (2) there is some illegal exaction or some fraud or deception; and (3) the restraint is imminent and such as to destroy free agency without present means of protection." *Simpson v. MBank Dallas, N.A.*, 724 S.W.2d 102, 109 (Tex.App.--Dallas 1987, writ ref'd n.r.e.). The same standard applies under New York law. *Stewart M. Muller Constr. Co. v. New York Tel. Co.*, 40 N.Y.2d 955, 956 (1976) ("A contract may be voided on the ground of economic duress where the complaining party was compelled to agree to its terms by means of a wrongful threat which precluded the exercise of its free will"). None of these elements are pleaded.

63.     "Furthermore, economic duress may be claimed only when the party against whom it is claimed was responsible for claimant's financial distress." *Simpson*, 724 S.W.2d at 109. The Debtor does not plead this either.

## III.   THE SECOND AND THIRD CAUSES OF ACTION SHOULD BE DISMISSED FOR FAILURE TO PLEAD RECEIPT OF LESS THAN REASONABLY EQUIVALENT VALUE

64.     The second and third causes of action seek to avoid the Debtor's agreed payment obligations to the respective gas sellers as constructive fraudulent transfers under the Texas Uniform Fraudulent Transfer Act (TEX. BUS. & COM. CODE § 24.001 et seq.) ("TUFTA") and Bankruptcy Code section 548(a)(1)(B).[4]

65.     The causes of action fail to state a claim, for failure to plausibly allege that the Debtor received less than reasonably equivalent value for the obligations incurred, under TUFTA §§ 24.005(a)(2) and 24.006(a) and Bankruptcy Code section 548(a)(1)(B).

66.     "Value is given for … an obligation if, in exchange for the … obligation, property is transferred."  TUFTA § 24.004(a).

67.     Value must be measured at the time of the transfer, and courts "should not consider subsequent events, such as [changes in commodity] prices".   *ASARCO LLC v. Americas Mining Corp.*, 396 B.R. 278, 336-37 (S.D. Tex. 2008). *See also Matter of Louisiana Pellets, Inc.*, 838 Fed. App'x 45, 50 (5th Cir. 2000) (quoting *In re Chomakos*, 69 F.3d 769, 711 (6th Cir. 1995)) ("Because value is determined at the time of transfer, '[n]either subsequent depreciation in nor appreciation

---

[4] Fraudulent transfer claims are subject to dismissal for failure to plausibly allege receipt of less than reasonably equivalent value.  *E.g.*, *In re Old Carco LLC*, 509 Fed. App'x 77, 78 (2d Cir. 2013); *Campbell v. Texas Tea Reclamation, LLC*, No. 20-cv-90, 2021 WL 221690, at *6 (S.D. Tex. May 6, 2021); *Tow v. Bulmahn*, 565 B.R. 361 (E.D. La. 2017); *In re AgFeed USA, LLC*, 558 B.R. 116, 130 (Bankr. D. Del. 2016); *In re USDigital, Inc.*, 443 B.R. 22, 39-40 (Bankr. D. Del. 2011).

in value of the consideration affects the question of whether reasonable equivalent value was given'"").

68.    In evaluating if reasonably equivalent value was given under section 548(a)(1)(B), courts consider the disparity between the obligations incurred and the value of the property received, and whether the transaction was at arm's length.  *E.g.*, *ASARCO*, 396 B.R. at 338.

69.    As is discussed below, the Complaint does not plead that the subject transactions were not at arm's length.

70.    Absent such allegations, the issue turns on market conditions.  *See In re Northgate Computer Sys., Inc.*, 240 B.R. 328, 365 (Bankr. D. Minn. 1999) (where complaint alleged defendant overcharged the debtor for personal computer motherboards, "[t]he inquiry on this element [reasonably equivalent value] is fundamentally one of common sense, measured against market reality"); *In re Sun Valley Prods., Inc.*, 328 B.R. 147, 156 (Bankr. N.D. 2005) ("often there is nothing to consider beyond simply comparing the fair market value of what the debtor transferred against the fair market value of what the debtor received").

71.    "An open market value, or simply, market value, has been further defined as that value that a prudent business person can obtain from the sale of an asset when there is a willing buyer and a willing seller."  *In re Pioneer Home Builders, Inc.*, 147 B.R. 889, 892 (Bankr. W.D. Tex. 1992) (citations omitted).

72.    The Complaint pleads that ACES transacted with at least a half-dozen gas sellers in purchasing gas during Winter Storm Uri, and that they reached agreement as to quantity and price.  (Complaint ¶52.)  This precludes a plausible fraudulent transfer claim relating to gas sales. *E.g.*, *In re Beaulieu Group, LLC*, No. 18-cv-4027, 2021 WL 4469928, at *39 (Bankr. N.D. Ga. Sept. 29, 2021) (allegations "that Beaulieu did not have a contract with Leinster make it plausible that Leinster overcharged Beaulieu").  The Court may further take judicial notice of the above-

referenced legislative history to Tex. Utilities Code § 104.361 et seq. finding that the price of gas sold during said period was set by the market.

73.    Again, the Debtor pleads no facts giving rise to a plausible inference that the true value of natural gas at that specific time and place was anything other than the market price resulting from the interplay of supply and demand.  By voluntarily agreeing to pay that market price, the Debtor itself demonstrated that it, at the time, placed greater value on having immediate access to the gas required to keep its generating plants operating than it did on saving money by limiting use of those plants until gas prices came back down again as the supply-demand dynamics eventually shifted back in the other direction.

74.    TUFTA § 24.004(d) gives a more precise definition than most comparable statutes, stating: "'Reasonably equivalent value' includes without limitation, a transfer or obligation that is within the range of values for which the transferor would have sold the assets in an arm's length transaction."

75.    "An arm's-length relationship is presumed in a commercial transaction covered by the UCC." *Lindemann v. Eli Lilly and Co.*, 816 F.2d 199, 204 (5th Cir. 1987).  *See also Earman Oil Co.*, 625 F.2d at 1299 (similar).

76.    More significantly, the term "arm's length transaction" as used in TUFTA § 24.004(d), is interpreted by reference to the Black's Law Dictionary definition, which is "a transaction between two unrelated and unaffiliated parties." *E.g.*, *Claimant ID 100190818 v. BP Exploration & Prod., Inc.*, 718 Fed. App'x 220, 223 (5th Cir. 2018) ("'arm's length transaction' is one that is substantively the same as transactions among strangers"); *Kimbell v. U.S.*, 371 F.3d 257, 261-62 (5th Cir. 2004) (defining "arm's length transaction as one involving 'two parties who are not related or on close terms'"); *ASARCO*, 396 B.R. at 363 n.92 ("An arm's length-transaction is '[a] transaction between two unrelated and unaffiliated parties' or '[a] transaction between two

20

parties, however closely related they may be, conducted as if the parties were strangers, so that no conflict of interest arises'"); *PDVSA Petroleo S.A. v. Trigean, Ltd.*, No. C-09-38, 2012 WL 3249531, at *11 (S.D. Tex. Aug. 7, 2012) ("An arm's length transaction is a transaction between two unrelated and unaffiliated parties"); *In re Essential Fin. Educ., Inc.*, 629 B.R. 401, 431 (Bankr. N.D. Tex. 2021) ("An arm's-length transaction is defined as a transaction taking place as if the two parties were strangers").

77.     The United States Supreme Court endorsed this definition as "the widely (universally?) understood definition of an arm's length transaction." *U.S. Bank Nat'l Ass'n ex rel. CWCapital Asset Mgm't LLC v. Village at Lakeridge, LLC*, --- U.S. ---, 138 S. Ct. 960, 968 (2018). So has the Texas Supreme Court.   *KCM Fin. LLC v. Bradshaw*, 457 S.W.3d 70, 85 n.11 (Tex. 2015).

78.     No affiliate relationship between the Debtor or ACES, on the one hand, and Concord or Mercuria (or their successors in interest), on the other, is alleged here.  There is thus no basis for a plausible inference that the price terms of the transactions which the Debtor seeks to avoid were anything other than the then-current market value of the gas, which by definition is "reasonably equivalent value."

## IV.     THE FOURTH CAUSE OF ACTION SHOULD BE DISMISSED FOR FAILURE TO PLEAD THE SUBJECT GAS SALE TRANSACTIONS WERE OUTSIDE OF THE ORDINARY COURSE OF THE DEBTOR'S BUSINESS

79.     The fourth cause of action seeks to strip movants' claims of their administrative priority, on the ground that they arose from gas sales during Winter Storm Uri (Complaint ¶79), when market prices were well above historic levels, and so were not "sold to the debtor in the ordinary course of such debtor's business", under section 503(b)(9).

80.     That Bankruptcy Code provision gives priority to claims to the extent of "the value of any goods received by the debtor within 20 days before the date of commencement of a case

under this title in which the goods have been sold to the debtor in the ordinary course of such debtor's business."

81.     The reasons for this priority are (1) "to encourage trade creditors to continue to extend credit to a debtor potentially heading for bankruptcy" and (2) "discourage abuse by debtors who seek to acquire goods at a time when it is known that bankruptcy is imminent and that payment for the goods will not have to be tendered."     *In re Arts Dairy, LLC*, 414 B.R. 219, 221 (Bankr. N.D. Ohio 2009) (citing 4 Collier on Bankruptcy ¶503.16 (15th ed.)).   The Debtor has admitted that the biggest issue facing it and other power generators, was obtaining gas supply during Winter Storm Uri.   (Complaint ¶79; *see also* Karnei Decl. Exhibit A.)   Stripping gas sellers that actually supplied gas during said period of priority status, and who would have gotten paid had they instead sold to purchasers that did not file, would serve to discourage gas sellers from extending credit to energy cooperatives perceived to be high risk in future weather events.   It would also encourage the very abuse that section 503(b)(9) was intended to curb.

82.     There is no dispute here that the transactions at issue involved the sale of "goods" (i.e. natural gas) to the debtor less than 20 days before its March 1, 2021 bankruptcy filing.   All that is disputed is whether the sales were in the ordinary course and the amount of "value" received by the Debtor.

83.     The term "in the ordinary course of such debtor's business" is not defined in the Bankruptcy Code, and thus should be interpreted by reference to the definition of the term "buyer in the ordinary course of business" in section 1-201(9) of the model Uniform Commercial Code,[5] which is as follows:

---

[5] *See Pilgrim's Pride*, 421 B.R. at 237 (endorsing use of model definition, to ensure uniformity in interpretation of federal law). The distinction is immaterial, the model definition being identical to that under TEX. BUS. & COM. CODE § 1.201(9) and N.Y. UNIFORM COMMERCIAL CODE § 1-201(9).

> [A] person that buys goods in good faith, without knowledge that the sale violates the rights of another person in the goods, and in the ordinary course from a person … in the business of selling goods of that kind. A person buys goods in the ordinary course if the sale to the person comports with the usual or customary practices in the kind of business in which the seller is engaged or with the seller's own usual or customary practices.

84.     That is because, as observed in *In re World Imports, Ltd.*, 862 F.3d 338, 342 (3d Cir. 2017), "[g]iven the interrelationship between these two provisions [sections 546(c) and 503(b)(9), their being amended and enacted, respectively, by the same BAPCPA provision, entitled "Reclamation" and section 546(c)(2) referencing section 503(b)(9) as providing an alternative remedy to reclamation] and our holding [in *In re Marin Motor Oil, Inc.*, 750 F.2d 220 (3d Cir. 1984)] that Congress meant for terms used in § 546(c) to bear the definitions used in the UCC at the time of BAPCPA's enactment, it follows that the UCC definitions also apply to the § 503(b)(9) exception".   Other courts have reached similar conclusions.   *E.g.*, *In re Circuit City Stores, Inc.*, 416 B.R. 531, 536 (Bankr. E.D. Va. 2009) ("the word 'goods' in § 503(b)(9) should be defined the same way as 'goods' is defined in § 546(c).   Based on § 546(c)'s purpose and origins, this should be the UCC definition"); *In re Pilgrim's Pride Corp.*, 421 B.R. 231, 236 (Bankr. N.D. Tex. 2009) (also adopting Uniform Commercial Code definition of "goods").

85.     Furthermore, the meaning of terms in section 503(b)(9) ought not "change depending on the terms of the contract at issue"; rather, section 503(b)(9) should be interpreted by reference to "the UCC definition—as a matter of federal law."   *World Imports*, 862 F.3d at 343 (citing *Marin Motor Oil*, 740 F.2d at 225).

86.     The Complaint pleads that the Debtor was a "Buyer in the ordinary course of business" under the above-quoted Uniform Commercial Code definition.   More specifically, it alleges that the Debtor was a good faith buyer, and that Defendants were gas sellers that sold gas to the Debtor under pre-existing NAESB contracts, to fuel the Debtor's gas-fired plants. Therefore,

the subject gas purchases were, as a matter of law, made "in the ordinary course of such debtor's business" under section 503(b)(9).

87.     Even if, in the alternative, the Court interpreted "in the ordinary course of such debtor's business" in section 503(b)(9), by reference to the term "in the ordinary course of business" in Bankruptcy Code sections 363 and 364, i.e. by reference to the horizontal- and vertical-dimension tests, the cause of action should still be dismissed.

88.     The horizontal dimension test asks if the transaction is of a type that other similar businesses would engage in as ordinary business.  *In re Johns-Manville Corp.*, 60 B.R. 612, 618 (Bankr. S.D.N.Y. 1986).  For example, "raising a crop would not be in the ordinary course of business for a widget manufacturer because that is not a widget manufacturer's ordinary business." *Id*. (citations omitted).

89.     Plainly, the horizontal dimension test is satisfied here, in that gas purchases are exactly the type of transaction that the Debtor would be expected to engage in as ordinary business, given its ownership of gas-fired plants.

90.     "The vertical dimension test, or creditor's expectation test, views the disputed transaction 'from the vantage point of a hypothetical creditor and inquires whether the transaction subjects a creditor to economic risks of a nature different from those he accepted when he decided to extend credit.'"  *In re Dant & Russell, Inc.*, 853 F.2d 700, 704 (9th Cir. 1988) (citing *Johns-Manville*, 60 B.R. at 616).  *See also In re James A. Phillips, Inc.*, 29 B.R. 391, 394 (S.D.N.Y. 1983) ("The touchstone of 'ordinariness' is … the interested parties' reasonable expectations of what transactions the debtor in possession is likely to enter in the ordinary course of business").

91.     The vertical dimension test is likewise satisfied.  The Debtor pleaded it regularly purchased gas prior to Winter Storm Uri, and further asserts it had no choice but to enter into the transactions at issue.  (Complaint ¶¶32, 79.)  Based on its own assertions, the Debtor's creditors

cannot have reasonably have assumed anything other than that the Debtor would have purchased gas during Winter Storm Uri to fuel its gas-fired plants.

92.     Nor did gas price increases during Winter Storm Uri render the subject transactions outside the ordinary course of the Debtor's business under this test.  *In re Roth American, Inc.*, 975 F.2d 949, 952 (3d Cir. 1992) (the inquiry includes whether "the nature of the [transaction] ventures beyond the domain of transactions that a hypothetical creditor would reasonably expect to be undertaken *in the circumstances*) (emphasis added); *Johns-Manville*, 60 B.R. at 617 ("The 'ordinary course of business' standard is purposely not defined so narrowly as to deprive a debtor of the flexibility it needs to run its business and respond quickly to changes in the business climate. Title 11 procedures are not meant to straitjacket a debtor, and a debtor must be allowed to marshall assets on an 'as needed basis'"); *In re Garofalo's Finer Foods*, 186 B.R. 414, 424 (N.D. Ill. 1995) ("in applying this test [creditor's expectations test], the court must also consider the changing circumstances that are inherent in a debtor's efforts to operate its business").  That, in the event, the Debtor opted to pay unusually high market prices for gas rather than shut down its generating plants until prices came back down cannot be argued to be surprising or unforeseeable from the perspective of such creditors.

## V.     THE FIFTH CAUSE OF ACTION SHOULD BE DISMISSED FOR FAILURE TO PLEAD THAT VALUE IN THE AMOUNT OF THE GAS CLAIMS WAS NOT PROVIDED

93.     The fifth cause of action seeks to strip movants' claims of their administrative priority, on the ground that "The Gas Claims far exceed the 'value' of the goods received by the Debtor.  The amounts that the Gas Claims seek are orders of magnitude beyond the actual value of the gas supplied to Debtor."  (Complaint ¶¶77-78.)

94.     This is not a factual assertion but a bare legal conclusion, and no facts are pleaded that give rise to a plausible inference that it might be true.  As with Debtor's other claims, it simply

assumes that natural gas has some sort of "true" intrinsic value unrelated to the market price set by supply and demand in arms-length voluntary transactions at a particular time and place, and that assumption is fatally flawed for the reasons already explained above.

95.     Even if "value" in the section 503(b)(9) context meant the same as "reasonably equivalent value" in the fraudulent transfer context, it has already been shown that the Debtor received reasonably equivalent value in these arms-length market-price transactions.

96.     The better view however, is that the term "value" in section 503(b)(9), like the terms "goods" and "received", is interpreted by reference to the Uniform Commercial Code, which in turn equates "value" with "price." *E.g.* TEX. BUS. & COM. CODE § 9.103(a).  This is consistent with the definition of "value" in Bankruptcy Code section 548(d)(2) ("property"), which would otherwise guide interpretation of the term as used in section 503(b)(9) and which notably does not import notions of reasonable equivalence.  *See Sorenson v. Secretary of Treasury of U.S.*, 475 U.S. 851, 860, 106 S. Ct. 1600, 1606 (1986) ("The normal rule of statutory construction assumes that 'identical words used in different parts of the same act are intended to have the same meaning'"); *United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371, 108 S. Ct. 626, 630 (1988) (reasoning the "value of such creditor's interest" in Bankruptcy Code section 506(a)(1) and the "value of such entity's interest" in Bankruptcy Code section 361, should be interpreted similarly).  In light of this, "the value of any goods received" in section 503(b)(9) is appropriately interpreted as the dollar amount of property received, determined by reference to the parties' voluntary agreement.

## CONCLUSION

97.     The motion should be granted, and the Complaint should be dismissed as against the moving Defendants.

Dated: January 7, 2022

Respectfully submitted,

*/s/ Robert M. Corn*
 Robert M. Corn
 Southern District of Texas Bar No. 2064
 State Bar of Texas No. 0482600
3131 Eastside Street, Suite 440
Houston, Texas 77098-1947
Tel: (713) 229-0055
Fax: (713) 229-0057
rcorn@corn-law.com

Of counsel:

Avery Samet (pro hac vice)
Jeffrey Chubak (pro hac vice)
Amini LLC
131 West 35th Street, 12th Floor
New York, New York 10001
Tel: (212) 490-4700
Fax: (212) 497-8222
asamet@aminillc.com
jchubak@aminillc.com

Attorneys for Defendants 507 Capital LLC,
507 Summit LLC, Cetus Capital VI, L.P.,
CrossingBridge Low Duration High Yield
Fund, Destinations Global Fixed Income
Opportunities Fund, Destinations Low
Duration Fixed Income Fund, Leaffilter North
Holdings, Inc., OFM II, LP, OU 2 LLC,
RiverPark Short Term High Yield Fund,
RiverPark Strategic Income Fund and Two
Seas Global (Master) Fund LP

## **CERTIFICATE OF SERVICE**

I hereby certify that on January 7, 2022, a true and correct copy of the above and foregoing was served upon all counsel of record using the Court's electronic filing system.


*/s/ Robert M. Corn*
Robert M. Corn