# Exhibit 4

**Fill in this information to identify the case:**

| Debtor: | Case Number: |
|---|---|
| Brazos Electric Power Cooperative, Inc. | 21-30725 |

**United States Bankruptcy Court for the Southern District of Texas**

# Proof of Claim

04/19

**Read the instructions before filling out this form.** This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed.** That date is on the notice of bankruptcy (Form 309) **that you received.**

## Part 1:  Identify the Claim

**1. Who is the current creditor?**

OU 2 LLC

Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor

**2. Has this claim been acquired from someone else?**

☐ No
☒ Yes. From whom?  Mercuria Energy America, LLC (formerly Mercuria Energy America, Inc.)

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

| Where should notices to the creditor be sent? | Where should payments to the creditor be sent? (if different) |
|---|---|
| Amini LLC<br>Attn: Jeffrey Chubak | OU 2 LLC<br>c/o Cohanzick Management, LLC<br>Attn: David K. Sherman |
| Name<br>131 West 35th Street<br>12th Floor | Name<br>427 Bedford Road<br>Suite 230 |
| Street Address<br>New York  NY  10001<br>City   State   ZIP Code | Street Address<br>Pleasantville  NY  10570<br>City   State   ZIP Code |
| Contact phone  (212) 497-8247 | Contact phone  (914) 741-9600 |
| Contact email  jchubak@aminillc.com | Contact email  david@cohanzick.com |

**4. Does this claim amend one already filed?**

☒ No
☐ Yes.  Claim number on court claims registry (if known) _____   Filed on ___ / ___ / ___
                                                                                MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☒ No
☐ Yes.  Who made the earlier filing? _____



1155605132130000000013

**Proof of Claim**

page 1

| **Part 2:** | **Give Information About the Claim as of the Date the Case Was Filed** |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☒ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____

**7. How much is the claim?**

$ ___875,000.00___ . **Does this amount include interest or other charges?**

☒ No

☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Non-tort claimants should attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c). Tort claimants should attach a signed statement setting forth a basis for the claim and nature of the injury.

Limit disclosing information that is entitled to privacy, such as health care information.

Natural gas sold _____

**If you are asserting a claim based on a tort, select one or more of the below options:**

☐ Property Damage (homes, structures, personal property, and all other property damage)

☐ Owner ☐ Renter ☐ Occupant ☐ Other (Please specify): _____

☐ Personal Injury

☐ Other (Please specify): _____

**9. Is all or part of the claim secured?**

☒ No

☐ Yes. The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim*.

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:** $_____

**Amount of the claim that is secured:** $_____

**Amount of the claim that is unsecured:** $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:** $_____

**Annual Interest Rate** (when case was filed) _____%

☐ Fixed

☐ Variable

**10. Is this claim based on a lease?**

☒ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.** $_____

| 11. | **Is this claim subject to a right of setoff?** | ☒ No |
| | | ☐ Yes. Identify the property: _____ |

| 12. | **Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?** | ☐ No | | **Amount entitled to priority** |
| | | ☒ Yes. *Check all that apply:* | | |

A claim may be partly priority and partly *nonpriority.* For example, in some categories, the law limits the amount entitled to priority.

☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).
$ 0.00

☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7).
$ 0.00

☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4).
$ 0.00

☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8).
$ 0.00

☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5).
$ 0.00

☒ Other. Specify subsection of 11 U.S.C. § 507(a)(__) that applies.
$ 875,000.00

* Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment.

DocuSign Envelope ID: 48E3D325-A586-4BA9-8B5F-78FC87ZBBDD5

| **Part 3:** | **Sign Below** |
|---|---|

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim *electronically*, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☐ I am the creditor.

☒ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date    5/13/2021
               MM / DD / YYYY

*DocuSigned by:*

*Jeffrey Chubak*
────BAAB826C02354B4...
   Signature

**Print the name of the person who is completing and signing this claim:**

Name    Jeffrey Chubak
       First name                Middle name             Last name

Title

Company    Amini LLC
       Identify the corporate servicer as the company if the authorized agent is a servicer.

Address    131 West 35th Street
       12th Floor
       Number        Street
       New York                      NY      10001
       City                             State      ZIP Code

Contact phone    (212) 497-8247             Email    jchubak@aminillc.com

I have supporting documents to upload



# Base Contract for Sale and Purchase of Natural Gas

This Base Contract is entered into as of the following date: August 19, 2016.

The parties to this Base Contract are the following:

| PARTY A **Brazos Electric Power Cooperative, Inc.** | PARTY NAME | PARTY B **Mercuria Energy America, Inc.** |
|---|---|---|
| 7616 Bagby Ave, Waco, TX 76712 | ADDRESS | 20 East Greenway Plaza, Suite 650 Houston, Texas 77046 Attn: Legal Department |
| www.brazoselectric.com | BUSINESS WEBSITE | www.mercuria.com |
| | CONTRACT NUMBER | |
| 00377- 2290 | D-U-N-S® NUMBER | 83-1749127 |
| ■ US FEDERAL:   74-0524729 ☐ OTHER: | TAX ID NUMBERS | ■ US FEDERAL:   61-1600209 ☐ OTHER: |
| **Texas** | JURISDICTION OF ORGANIZATION | Delaware |
| ☐ Corporation          ☐ LLC ☐ Limited Partnership   ☐ Partnership ☐ LLP            ■ Other: Cooperative | COMPANY TYPE | ☐ Corporation          ☐ LLC ☐ Limited Partnership   ☐ Partnership ☐ LLP            ☐ Other: _____ |
| | GUARANTOR (IF APPLICABLE) | Mercuria Energy Group Limited |

## CONTACT INFORMATION

| | | |
|---|---|---|
| *Brazos Electric Power Cooperative, Inc* ATTN:  *Vice President of Power Supply* TEL#:  254-750-6500   FAX#:  254-750-6367 EMAIL: _____ | ▪ COMMERCIAL | 20 East Greenway Plaza, Suite 650 Houston, TX  77046 ATTN:  Jeff Schneider TEL#:   (832) 531-7630    FAX#:   (832) 209-2401 EMAIL:  jschneider@mercuria.com |
| *ACES, 4140 W 99 St., Carmel, IN  46032* ATTN:  *Gas Trading (ACES)* TEL#:  317-344-7230   FAX#:  317-344-7010 EMAIL: _____ | ▪ SCHEDULING | 20 East Greenway Plaza, Suite 650 Houston, TX  77046 ATTN:  East -Gas Scheduling (Joe Casas) TEL#:   ((832) 531-7565    FAX#:  (832) 209-2401 EMAIL:  jcasas@mercuria.com |
| *Brazos Electric Power Cooperative, Inc.* ATTN:  *Vice President of Power Supply* TEL#:  254-750-6500   FAX#:  254-750-6367 EMAIL: _____ | ▪ CONTRACT AND LEGAL NOTICES | 20 East Greenway Plaza, Suite 650 Houston, TX  77046 ATTN:  Contract Administration TEL#:  (832) 209-2391      FAX#: (832) 209-2401 EMAIL:  mflores@mercuria.com |
| *ACES, 4140 W 99 St., Carmel, IN  46032* ATTN:  *Director of Credit (ACES)* TEL#:  317-344-7000   FAX#:  317-344-7001 EMAIL: _____ | ▪ CREDIT | 20 East Greenway Plaza, Suite 650 Houston, TX  77046 ATTN:  Credit Department   (Jason Sohmer) TEL#:  (832) 209-2462      FAX#:  (832) 209-2401 EMAIL:  jsohmner@mercuria.com |
| *ACES, 4140 W 99 St., Carmel, IN  46032* ATTN:  *Trading Control* TEL#:  317-344-7000   FAX#:  317-344-7099 EMAIL: _____ | ▪ TRANSACTION CONFIRMATIONS | 20 East Greenway Plaza, Suite 650 Houston, TX  77046 ATTN:  Physical Confirmations TEL#:  (832) 209-2495      FAX#:  (832) 209-2421 EMAIL:  physconfirmsna@mercuria.com |

## ACCOUNTING INFORMATION

| | | |
|---|---|---|
| *Brazos Electric Power Cooperative, Inc* ATTN:  *General Accounting Supervisor* TEL#:  254-750-6500      FAX#:  254-750-6229 EMAIL: _____ | ▪ INVOICES ▪ PAYMENTS ▪ SETTLEMENTS | 20 East Greenway Plaza, Suite 650 Houston, TX  77046 ATTN:  Physical Settlements TEL#:  (832) 209-2494      FAX#:  (832) 209-2401 EMAIL:  physsettlementsna@mercuria.com |
| BANK:  *Bank of America, Dallas, TX* ABA:  026009593   ACCT:  004770496398 OTHER DETAILS: _____ | WIRE TRANSFER NUMBERS (IF APPLICABLE) | BANK:  Bank of America One Bryant Park, NY1-100-34-05, New York, NY 10036 ABA:   026009593   ACCT:   4451085942 OTHER DETAILS:          SWIFT: BOFAUS6S |
| BANK: _____ ABA: _____   ACCT: _____ OTHER DETAILS: _____ | ACH NUMBERS (IF APPLICABLE) | BANK: _____ ABA: _____   ACCT: _____ OTHER DETAILS: _____ |
| ATTN: _____ ADDRESS: _____ | CHECKS (IF APPLICABLE) | ATTN: _____ ADDRESS: _____ |

Copyright © 2006 North American Energy Standards Board, Inc.
All Rights Reserved

NAESB Standard 6.3.1
September 5, 2006

## Base Contract for Sale and Purchase of Natural Gas

(Continued)

This Base Contract incorporates by reference for all purposes the General Terms and Conditions for Sale and Purchase of Natural Gas published by the North American Energy Standards Board. The parties hereby agree to the following provisions offered in said General Terms and Conditions. In the event the parties fail to check a box, the specified default provision shall apply. Select the appropriate box(es) from each section:

| | | |
|---|---|---|
| **Section 1.2** Transaction Procedure | ■ OR □ | Oral (default) Written |
| **Section 2.7** Confirm Deadline | □ OR ■ | 2 Business Days after receipt (default) 3 Business Days after receipt |
| **Section 2.8** Confirming Party | ■ OR □ □ | Seller (default) Buyer |
| **Section 3.2** Performance Obligation | ■ OR □ | Cover Standard (default) Spot Price Standard |

*Note: The following Spot Price Publication applies to both of the immediately preceding.*

| | | |
|---|---|---|
| **Section 2.31** Spot Price Publication | ■ OR □ | Gas Daily Midpoint (default) |
| **Section 6** Taxes | ■ OR □ | Buyer Pays At and After Delivery Point (default) Seller Pays Before and At Delivery Point |
| **Section 7.2** Payment Date | ■ OR □ | 25th Day of Month following Month of delivery (default) Day of Month following Month of delivery |
| **Section 7.2** Method of Payment | ■ □ □ | Wire transfer (default) Automated Clearinghouse Credit (ACH) Check |
| **Section 7.7** Netting | ■ OR □ | Netting applies (default) Netting does not apply |

| | | |
|---|---|---|
| **Section 10.2** Additional Events of Default | □ ■ | No Additional Events of Default (default) Indebtedness Cross Default |
| | | ■ Party A: $40 million |
| | | ■ Party B: With Respect to Party B or its Guarantor $40 million |
| | □ | Transactional Cross Default Specified Transactions: |
| **Section 10.3.1** Early Termination Damages | ■ OR □ | Early Termination Damages Apply (default) Early Termination Damages Do Not Apply |
| **Section 10.3.2** Other Agreement Setoffs | ■ OR □ | Other Agreement Setoffs Apply (default) ■ Bilateral (default) □ Triangular Other Agreement Setoffs Do Not Apply |
| **Section 15.5** Choice Of Law | | Texas |
| **Section 15.10** Confidentiality | ■ OR □ | Confidentiality applies (default) Confidentiality does not apply |

■ Special Provisions Number of sheets attached:    **Six (6)**
□ Addendum(s):

IN WITNESS WHEREOF, the parties hereto have executed this Base Contract in duplicate.

| Brazos Electric Power Cooperative, Inc. | PARTY NAME | Mercuria Energy America, Inc. |
|---|---|---|
| By: | SIGNATURE | By: |
| Clifton Karnei | PRINTED NAME | Michael Kennedy Head of Physical Natural Gas |
| Executive Vice President and General Manager | TITLE | |

## General Terms and Conditions

# Base Contract for Sale and Purchase of Natural Gas

## SECTION 1.    PURPOSE AND PROCEDURES

1.1.    These General Terms and Conditions are intended to facilitate purchase and sale transactions of Gas on a Firm or Interruptible basis. "Buyer" refers to the party receiving Gas and "Seller" refers to the party delivering Gas. The entire agreement between the parties shall be the Contract as defined in Section 2.9.

**The parties have selected either the "Oral Transaction Procedure" or the "Written Transaction Procedure" as indicated on the Base Contract.**

**Oral Transaction Procedure:**

1.2.    The parties will use the following Transaction Confirmation procedure. Any Gas purchase and sale transaction may be effectuated in an EDI transmission or telephone conversation with the offer and acceptance constituting the agreement of the parties. The parties shall be legally bound from the time they so agree to transaction terms and may each rely thereon. Any such transaction shall be considered a "writing" and to have been "signed". Notwithstanding the foregoing sentence, the parties agree that Confirming Party shall, and the other party may, confirm a telephonic transaction by sending the other party a Transaction Confirmation by facsimile, EDI or mutually agreeable electronic means within three Business Days of a transaction covered by this Section 1.2 (Oral Transaction Procedure) provided that the failure to send a Transaction Confirmation shall not invalidate the oral agreement of the parties. Confirming Party adopts its confirming letterhead, or the like, as its signature on any Transaction Confirmation as the identification and authentication of Confirming Party. If the Transaction Confirmation contains any provisions other than those relating to the commercial terms of the transaction (i.e., price, quantity, performance obligation, delivery point, period of delivery and/or transportation conditions), which modify or supplement the Base Contract or General Terms and Conditions of this Contract (e.g., arbitration or additional representations and warranties), such provisions shall not be deemed to be accepted pursuant to Section 1.3 but must be expressly agreed to by both parties; provided that the foregoing shall not invalidate any transaction agreed to by the parties.

**Written Transaction Procedure:**

1.2.    The parties will use the following Transaction Confirmation procedure. Should the parties come to an agreement regarding a Gas purchase and sale transaction for a particular Delivery Period, the Confirming Party shall, and the other party may, record that agreement on a Transaction Confirmation and communicate such Transaction Confirmation by facsimile, EDI or mutually agreeable electronic means, to the other party by the close of the Business Day following the date of agreement. The parties acknowledge that their agreement will not be binding until the exchange of nonconflicting Transaction Confirmations or the passage of the Confirm Deadline without objection from the receiving party, as provided in Section 1.3.

1.3.    If a sending party's Transaction Confirmation is materially different from the receiving party's understanding of the agreement referred to in Section 1.2, such receiving party shall notify the sending party via facsimile, EDI or mutually agreeable electronic means by the Confirm Deadline, unless such receiving party has previously sent a Transaction Confirmation to the sending party. The failure of the receiving party to so notify the sending party in writing by the Confirm Deadline constitutes the receiving party's agreement to the terms of the transaction described in the sending party's Transaction Confirmation. If there are any material differences between timely sent Transaction Confirmations governing the same transaction, then neither Transaction Confirmation shall be binding until or unless such differences are resolved including the use of any evidence that clearly resolves the differences in the Transaction Confirmations. In the event of a conflict among the terms of (i) a binding Transaction Confirmation pursuant to Section 1.2, (ii) the oral agreement of the parties which may be evidenced by a recorded conversation, where the parties have selected the Oral Transaction Procedure of the Base Contract, (iii) the Base Contract, and (iv) these General Terms and Conditions, the terms of the documents shall govern in the priority listed in this sentence.

1.4.    The parties agree that each party may electronically record all telephone conversations with respect to this Contract between their respective employees, without any special or further notice to the other party. Each party shall obtain any necessary consent of its agents and employees to such recording. Where the parties have selected the Oral Transaction Procedure in Section 1.2 of the Base Contract, the parties agree not to contest the validity or enforceability of telephonic recordings entered into in accordance with the requirements of this Base Contract.

## SECTION 2.    DEFINITIONS

The terms set forth below shall have the meaning ascribed to them below. Other terms are also defined elsewhere in the Contract and shall have the meanings ascribed to them therein.

2.1.    "Additional Event of Default" shall mean Transactional Cross Default or Indebtedness Cross Default, each as and if selected by the parties pursuant to the Base Contract.

2.2.    "Affiliate" shall mean, in relation to any person, any entity controlled, directly or indirectly, by the person, any entity that controls, directly or indirectly, the person or any entity directly or indirectly under common control with the person. For this purpose, "control" of any entity or person means ownership of at least 50 percent of the voting power of the entity or person.

2.3.    "Alternative Damages" shall mean such damages, expressed in dollars or dollars per MMBtu, as the parties shall agree upon in the Transaction Confirmation, in the event either Seller or Buyer fails to perform a Firm obligation to deliver Gas in the case of Seller or to receive Gas in the case of Buyer.

2.4.     "Base Contract" shall mean a contract executed by the parties that incorporates these General Terms and Conditions by reference; that specifies the agreed selections of provisions contained herein; and that sets forth other information required herein and any Special Provisions and addendum(s) as identified on page one.

2.5.     "British thermal unit" or "Btu" shall mean the International BTU, which is also called the Btu (IT).

2.6.     "Business Day(s)" shall mean Monday through Friday, excluding Federal Banking Holidays for transactions in the U.S.

2.7.     "Confirm Deadline" shall mean 5:00 p.m. in the receiving party's time zone on the second Business Day following the Day a Transaction Confirmation is received or, if applicable, on the Business Day agreed to by the parties in the Base Contract; provided, if the Transaction Confirmation is time stamped after 5:00 p.m. in the receiving party's time zone, it shall be deemed received at the opening of the next Business Day.

2.8.     "Confirming Party" shall mean the party designated in the Base Contract to prepare and forward Transaction Confirmations to the other party.

2.9.     "Contract" shall mean the legally-binding relationship established by (i) the Base Contract, (ii) any and all binding Transaction Confirmations and (iii) where the parties have selected the Oral Transaction Procedure in Section 1.2 of the Base Contract, any and all transactions that the parties have entered into through an EDI transmission or by telephone, but that have not been confirmed in a binding Transaction Confirmation, all of which shall form a single integrated agreement between the parties.

2.10.     "Contract Price" shall mean the amount expressed in U.S. Dollars per MMBtu to be paid by Buyer to Seller for the purchase of Gas as agreed to by the parties in a transaction.

2.11.     "Contract Quantity" shall mean the quantity of Gas to be delivered and taken as agreed to by the parties in a transaction.

2.12.     "Cover Standard", as referred to in Section 3.2, shall mean that if there is an unexcused failure to take or deliver any quantity of Gas pursuant to this Contract, then the performing party shall use commercially reasonable efforts to (i) if Buyer is the performing party, obtain Gas, (or an alternate fuel if elected by Buyer and replacement Gas is not available), or (ii) if Seller is the performing party, sell Gas, in either case, at a price reasonable for the delivery or production area, as applicable, consistent with: the amount of notice provided by the nonperforming party; the immediacy of the Buyer's Gas consumption needs or Seller's Gas sales requirements, as applicable; the quantities involved; and the anticipated length of failure by the nonperforming party.

2.13.     "Credit Support Obligation(s)" shall mean any obligation(s) to provide or establish credit support for, or on behalf of, a party to this Contract such as cash, an irrevocable standby letter of credit, a margin agreement, a prepayment, a security interest in an asset, guaranty, or other good and sufficient security of a continuing nature.

2.14.     "Day" shall mean a period of 24 consecutive hours, coextensive with a "day" as defined by the Receiving Transporter in a particular transaction.

2.15.     "Delivery Period" shall be the period during which deliveries are to be made as agreed to by the parties in a transaction.

2.16.     "Delivery Point(s)" shall mean such point(s) as are agreed to by the parties in a transaction.

2.17.     "EDI" shall mean an electronic data interchange pursuant to an agreement entered into by the parties, specifically relating to the communication of Transaction Confirmations under this Contract.

2.18.     "EFP" shall mean the purchase, sale or exchange of natural Gas as the "physical" side of an exchange for physical transaction involving gas futures contracts. EFP shall incorporate the meaning and remedies of "Firm", provided that a party's excuse for nonperformance of its obligations to deliver or receive Gas will be governed by the rules of the relevant futures exchange regulated under the Commodity Exchange Act.

2.19.     "Firm" shall mean that either party may interrupt its performance without liability only to the extent that such performance is prevented for reasons of Force Majeure; provided, however, that during Force Majeure interruptions, the party invoking Force Majeure may be responsible for any Imbalance Charges as set forth in Section 4.3 related to its interruption after the nomination is made to the Transporter and until the change in deliveries and/or receipts is confirmed by the Transporter.

2.20.     "Gas" shall mean any mixture of hydrocarbons and noncombustible gases in a gaseous state consisting primarily of methane.

2.21.     "Guarantor" shall mean any entity that has provided a guaranty of the obligations of a party hereunder.

2.22.     "Imbalance Charges" shall mean any fees, penalties, costs or charges (in cash or in kind) assessed by a Transporter for failure to satisfy the Transporter's balance and/or nomination requirements.

2.23.     "Indebtedness Cross Default" shall mean if selected on the Base Contract by the parties with respect to a party, that it or its Guarantor, if any, experiences a default, or similar condition or event however therein defined, under one or more agreements or instruments, individually or collectively, relating to indebtedness (such indebtedness to include any obligation whether present or future, contingent or otherwise, as principal or surety or otherwise) for the payment or repayment of borrowed money in an aggregate amount greater than the threshold specified in the Base Contract with respect to such party or its Guarantor, if any, which results in such indebtedness becoming immediately due and payable.

2.24.     "Interruptible" shall mean that either party may interrupt its performance at any time for any reason, whether or not caused by an event of Force Majeure, with no liability, except such interrupting party may be responsible for any Imbalance Charges as set forth in Section 4.3 related to its interruption after the nomination is made to the Transporter and until the change in deliveries and/or receipts is confirmed by Transporter.

2.25.    "MMBtu" shall mean one million British thermal units, which is equivalent to one dekatherm.

2.26.    "Month" shall mean the period beginning on the first Day of the calendar month and ending immediately prior to the commencement of the first Day of the next calendar month.

2.27.    "Payment Date" shall mean a date, as indicated on the Base Contract, on or before which payment is due Seller for Gas received by Buyer in the previous Month.

2.28.    "Receiving Transporter" shall mean the Transporter receiving Gas at a Delivery Point, or absent such receiving Transporter, the Transporter delivering Gas at a Delivery Point.

2.29.    "Scheduled Gas" shall mean the quantity of Gas confirmed by Transporter(s) for movement, transportation or management.

2.30.    "Specified Transaction(s)" shall mean any other transaction or agreement between the parties for the purchase, sale or exchange of physical Gas, and any other transaction or agreement identified as a Specified Transaction under the Base Contract.

2.31.    "Spot Price " as referred to in Section 3.2 shall mean the price listed in the publication indicated on the Base Contract, under the listing applicable to the geographic location closest in proximity to the Delivery Point(s) for the relevant Day; provided, if there is no single price published for such location for such Day, but there is published a range of prices, then the Spot Price shall be the average of such high and low prices.  If no price or range of prices is published for such Day, then the Spot Price shall be the average of the following: (i) the price (determined as stated above) for the first Day for which a price or range of prices is published that next precedes the relevant Day; and (ii) the price (determined as stated above) for the first Day for which a price or range of prices is published that next follows the relevant Day.

2.32.    "Transaction Confirmation" shall mean a document, similar to the form of Exhibit A, setting forth the terms of a transaction formed pursuant to Section 1 for a particular Delivery Period.

2.33.    "Transactional Cross Default" shall mean if selected on the Base Contract by the parties with respect to a party, that it shall be in default, however therein defined, under any Specified Transaction.

2.34.    "Termination Option" shall mean the option of either party to terminate a transaction in the event that the other party fails to perform a Firm obligation to deliver Gas in the case of Seller or to receive Gas in the case of Buyer for a designated number of days during a period as specified on the applicable Transaction Confirmation.

2.35.    "Transporter(s)" shall mean all Gas gathering or pipeline companies, or local distribution companies, acting in the capacity of a transporter, transporting Gas for Seller or Buyer upstream or downstream, respectively, of the Delivery Point pursuant to a particular transaction.

# SECTION 3.    PERFORMANCE OBLIGATION

3.1.    Seller agrees to sell and deliver, and Buyer agrees to receive and purchase, the Contract Quantity for a particular transaction in accordance with the terms of the Contract.  Sales and purchases will be on a Firm or Interruptible basis, as agreed to by the parties in a transaction.

**The parties have selected either the "Cover Standard" or the "Spot Price Standard" as indicated on the Base Contract.**

**Cover Standard:**

3.2.    The sole and exclusive remedy of the parties in the event of a breach of a Firm obligation to deliver or receive Gas shall be recovery of the following: (i) in the event of a breach by Seller on any Day(s), payment by Seller to Buyer in an amount equal to the positive difference, if any, between the purchase price paid by Buyer utilizing the Cover Standard and the Contract Price, adjusted for commercially reasonable differences in transportation costs to or from the Delivery Point(s), multiplied by the difference between the Contract Quantity and the quantity actually delivered by Seller for such Day(s) excluding any quantity for which no replacement is available; or (ii) in the event of a breach by Buyer on any Day(s), payment by Buyer to Seller in the amount equal to the positive difference, if any, between the Contract Price and the price received by Seller utilizing the Cover Standard for the resale of such Gas, adjusted for commercially reasonable differences in transportation costs to or from the Delivery Point(s), multiplied by the difference between the Contract Quantity and the quantity actually taken by Buyer for such Day(s) excluding any quantity for which no sale is available; and (iii) in the event that Buyer has used commercially reasonable efforts to replace the Gas or Seller has used commercially reasonable efforts to sell the Gas to a third party, and no such replacement or sale is available for all or any portion of the Contract Quantity of Gas, then in addition to (i) or (ii) above, as applicable, the sole and exclusive remedy of the performing party with respect to the Gas not replaced or sold shall be an amount equal to any unfavorable difference between the Contract Price and the Spot Price, adjusted for such transportation to the applicable Delivery Point, multiplied by the quantity of such Gas not replaced or sold.  Imbalance Charges shall not be recovered under this Section 3.2, but Seller and/or Buyer shall be responsible for Imbalance Charges, if any, as provided in Section 4.3.  The amount of such unfavorable difference shall be payable five Business Days after presentation of the performing party's invoice, which shall set forth the basis upon which such amount was calculated.

**Spot Price Standard:**

3.2.    The sole and exclusive remedy of the parties in the event of a breach of a Firm obligation to deliver or receive Gas shall be recovery of the following: (i) in the event of a breach by Seller on any Day(s), payment by Seller to Buyer in an amount equal to the difference between the Contract Quantity and the actual quantity delivered by Seller and received by Buyer for such Day(s), multiplied by the positive difference, if any, obtained by subtracting the Contract Price from the Spot Price; or (ii) in the event of a breach by Buyer on any Day(s), payment by Buyer to Seller in an amount equal to the difference between the Contract Quantity

and the actual quantity delivered by Seller and received by Buyer for such Day(s), multiplied by the positive difference, if any, obtained by subtracting the applicable Spot Price from the Contract Price. Imbalance Charges shall not be recovered under this Section 3.2, but Seller and/or Buyer shall be responsible for Imbalance Charges, if any, as provided in Section 4.3. The amount of such unfavorable difference shall be payable five Business Days after presentation of the performing party's invoice, which shall set forth the basis upon which such amount was calculated.

3.3.    Notwithstanding Section 3.2, the parties may agree to Alternative Damages in a Transaction Confirmation executed in writing by both parties.

3.4.    In addition to Sections 3.2 and 3.3, the parties may provide for a Termination Option in a Transaction Confirmation executed in writing by both parties. The Transaction Confirmation containing the Termination Option will designate the length of nonperformance triggering the Termination Option and the procedures for exercise thereof, how damages for nonperformance will be compensated, and how liquidation costs will be calculated.

# SECTION 4.    TRANSPORTATION, NOMINATIONS, AND IMBALANCES

4.1.    Seller shall have the sole responsibility for transporting the Gas to the Delivery Point(s). Buyer shall have the sole responsibility for transporting the Gas from the Delivery Point(s).

4.2.    The parties shall coordinate their nomination activities, giving sufficient time to meet the deadlines of the affected Transporter(s). Each party shall give the other party timely prior Notice, sufficient to meet the requirements of all Transporter(s) involved in the transaction, of the quantities of Gas to be delivered and purchased each Day. Should either party become aware that actual deliveries at the Delivery Point(s) are greater or lesser than the Scheduled Gas, such party shall promptly notify the other party.

4.3.    The parties shall use commercially reasonable efforts to avoid imposition of any Imbalance Charges. If Buyer or Seller receives an invoice from a Transporter that includes Imbalance Charges, the parties shall determine the validity as well as the cause of such Imbalance Charges. If the Imbalance Charges were incurred as a result of Buyer's receipt of quantities of Gas greater than or less than the Scheduled Gas, then Buyer shall pay for such Imbalance Charges or reimburse Seller for such Imbalance Charges paid by Seller. If the Imbalance Charges were incurred as a result of Seller's delivery of quantities of Gas greater than or less than the Scheduled Gas, then Seller shall pay for such Imbalance Charges or reimburse Buyer for such Imbalance Charges paid by Buyer.

# SECTION 5.    QUALITY AND MEASUREMENT

All Gas delivered by Seller shall meet the pressure, quality and heat content requirements of the Receiving Transporter. The unit of quantity measurement for purposes of this Contract shall be one MMBtu dry. Measurement of Gas quantities hereunder shall be in accordance with the established procedures of the Receiving Transporter.

# SECTION 6.    TAXES

**The parties have selected either "Buyer Pays At and After Delivery Point" or "Seller Pays Before and At Delivery Point" as indicated on the Base Contract.**

**Buyer Pays At and After Delivery Point:**

Seller shall pay or cause to be paid all taxes, fees, levies, penalties, licenses or charges imposed by any government authority ("Taxes") on or with respect to the Gas prior to the Delivery Point(s). Buyer shall pay or cause to be paid all Taxes on or with respect to the Gas at the Delivery Point(s) and all Taxes after the Delivery Point(s). If a party is required to remit or pay Taxes that are the other party's responsibility hereunder, the party responsible for such Taxes shall promptly reimburse the other party for such Taxes. Any party entitled to an exemption from any such Taxes or charges shall furnish the other party any necessary documentation thereof.

**Seller Pays Before and At Delivery Point:**

Seller shall pay or cause to be paid all taxes, fees, levies, penalties, licenses or charges imposed by any government authority ("Taxes") on or with respect to the Gas prior to the Delivery Point(s) and all Taxes at the Delivery Point(s). Buyer shall pay or cause to be paid all Taxes on or with respect to the Gas after the Delivery Point(s). If a party is required to remit or pay Taxes that are the other party's responsibility hereunder, the party responsible for such Taxes shall promptly reimburse the other party for such Taxes. Any party entitled to an exemption from any such Taxes or charges shall furnish the other party any necessary documentation thereof.

# SECTION 7.    BILLING, PAYMENT, AND AUDIT

7.1.    Seller shall invoice Buyer for Gas delivered and received in the preceding Month and for any other applicable charges, providing supporting documentation acceptable in industry practice to support the amount charged. If the actual quantity delivered is not known by the billing date, billing will be prepared based on the quantity of Scheduled Gas. The invoiced quantity will then be adjusted to the actual quantity on the following Month's billing or as soon thereafter as actual delivery information is available.

7.2.    Buyer shall remit the amount due under Section 7.1 in the manner specified in the Base Contract, in immediately available funds, on or before the later of the Payment Date or 10 Days after receipt of the invoice by Buyer; provided that if the Payment Date is not a Business Day, payment is due on the next Business Day following that date. In the event any payments are due Buyer hereunder, payment to Buyer shall be made in accordance with this Section 7.2.

7.3.    In the event payments become due pursuant to Sections 3.2 or 3.3, the performing party may submit an invoice to the nonperforming party for an accelerated payment setting forth the basis upon which the invoiced amount was calculated. Payment from the nonperforming party will be due five Business Days after receipt of invoice.

Copyright © 2006 North American Energy Standards Board, Inc.
All Rights Reserved

NAESB Standard 6.3.1
September 5, 2006

DocuSign Envelope ID: 48E3D325-A596-4DA9-8B5E-78FC87BB9BBF

7.4.     If the invoiced party, in good faith, disputes the amount of any such invoice or any part thereof, such invoiced party will pay such amount as it concedes to be correct; provided, however, if the invoiced party disputes the amount due, it must provide supporting documentation acceptable in industry practice to support the amount paid or disputed without undue delay. In the event the parties are unable to resolve such dispute, either party may pursue any remedy available at law or in equity to enforce its rights pursuant to this Section.

7.5.     If the invoiced party fails to remit the full amount payable when due, interest on the unpaid portion shall accrue from the date due until the date of payment at a rate equal to the lower of (i) the then-effective prime rate of interest published under "Money Rates" by The Wall Street Journal, plus two percent per annum; or (ii) the maximum applicable lawful interest rate.

7.6.     A party shall have the right, at its own expense, upon reasonable Notice and at reasonable times, to examine and audit and to obtain copies of the relevant portion of the books, records, and telephone recordings of the other party only to the extent reasonably necessary to verify the accuracy of any statement, charge, payment, or computation made under the Contract. This right to examine, audit, and to obtain copies shall not be available with respect to proprietary information not directly relevant to transactions under this Contract. All invoices and billings shall be conclusively presumed final and accurate and all associated claims for under- or overpayments shall be deemed waived unless such invoices or billings are objected to in writing, with adequate explanation and/or documentation, within two years after the Month of Gas delivery. All retroactive adjustments under Section 7 shall be paid in full by the party owing payment within 30 Days of Notice and substantiation of such inaccuracy.

7.7.     Unless the parties have elected on the Base Contract not to make this Section 7.7 applicable to this Contract, the parties shall net all undisputed amounts due and owing, and/or past due, arising under the Contract such that the party owing the greater amount shall make a single payment of the net amount to the other party in accordance with Section 7; provided that no payment required to be made pursuant to the terms of any Credit Support Obligation or pursuant to Section 7.3 shall be subject to netting under this Section. If the parties have executed a separate netting agreement, the terms and conditions therein shall prevail to the extent inconsistent herewith.

## SECTION 8.     TITLE, WARRANTY, AND INDEMNITY

8.1.     Unless otherwise specifically agreed, title to the Gas shall pass from Seller to Buyer at the Delivery Point(s). Seller shall have responsibility for and assume any liability with respect to the Gas prior to its delivery to Buyer at the specified Delivery Point(s). Buyer shall have responsibility for and assume any liability with respect to said Gas after its delivery to Buyer at the Delivery Point(s).

8.2.     Seller warrants that it will have the right to convey and will transfer good and merchantable title to all Gas sold hereunder and delivered by it to Buyer, free and clear of all liens, encumbrances, and claims. EXCEPT AS PROVIDED IN THIS SECTION 8.2 AND IN SECTION 15.8, ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING ANY WARRANTY OF MERCHANTABILITY OR OF FITNESS FOR ANY PARTICULAR PURPOSE, ARE DISCLAIMED.

8.3.     Seller agrees to indemnify Buyer and save it harmless from all losses, liabilities or claims including reasonable attorneys' fees and costs of court ("Claims"), from any and all persons, arising from or out of claims of title, personal injury (including death) or property damage from said Gas or other charges thereon which attach before title passes to Buyer. Buyer agrees to indemnify Seller and save it harmless from all Claims, from any and all persons, arising from or out of claims regarding payment, personal injury (including death) or property damage from said Gas or other charges thereon which attach after title passes to Buyer.

8.4.     The parties agree that the delivery of and the transfer of title to all Gas under this Contract shall take place within the Customs Territory of the United States (as defined in general note 2 of the Harmonized Tariff Schedule of the United States 19 U.S.C. §1202, General Notes, page 3); provided, however, that in the event Seller took title to the Gas outside the Customs Territory of the United States, Seller represents and warrants that it is the importer of record for all Gas entered and delivered into the United States, and shall be responsible for entry and entry summary filings as well as the payment of duties, taxes and fees, if any, and all applicable record keeping requirements.

8.5.     Notwithstanding the other provisions of this Section 8, as between Seller and Buyer, Seller will be liable for all Claims to the extent that such arise from the failure of Gas delivered by Seller to meet the quality requirements of Section 5.

## SECTION 9.     NOTICES

9.1.     All Transaction Confirmations, invoices, payment instructions, and other communications made pursuant to the Base Contract ("Notices") shall be made to the addresses specified in writing by the respective parties from time to time.

9.2.     All Notices required hereunder shall be in writing and may be sent by facsimile or mutually acceptable electronic means, a nationally recognized overnight courier service, first class mail or hand delivered.

9.3.     Notice shall be given when received on a Business Day by the addressee. In the absence of proof of the actual receipt date, the following presumptions will apply. Notices sent by facsimile shall be deemed to have been received upon the sending party's receipt of its facsimile machine's confirmation of successful transmission. If the day on which such facsimile is received is not a Business Day or is after five p.m. on a Business Day, then such facsimile shall be deemed to have been received on the next following Business Day. Notice by overnight mail or courier shall be deemed to have been received on the next Business Day after it was sent or such earlier time as is confirmed by the receiving party. Notice via first class mail shall be considered delivered five Business Days after mailing.

9.4.     The party receiving a commercially acceptable Notice of change in payment instructions or other payment information shall not be obligated to implement such change until ten Business Days after receipt of such Notice.

---

# SECTION 10.   FINANCIAL RESPONSIBILITY

10.1.     If either party ("X") has reasonable grounds for insecurity regarding the performance of any obligation under this Contract (whether or not then due) by the other party ("Y") (including, without limitation, the occurrence of a material change in the creditworthiness of Y or its Guarantor, if applicable), X may demand Adequate Assurance of Performance. "Adequate Assurance of Performance" shall mean sufficient security in the form, amount, for a term, and from an issuer, all as reasonably acceptable to X, including, but not limited to cash, a standby irrevocable letter of credit, a prepayment, a security interest in an asset or guaranty. Y hereby grants to X a continuing first priority security interest in, lien on, and right of setoff against all Adequate Assurance of Performance in the form of cash transferred by Y to X pursuant to this Section 10.1. Upon the return by X to Y of such Adequate Assurance of Performance, the security interest and lien granted hereunder on that Adequate Assurance of Performance shall be released automatically and, to the extent possible, without any further action by either party.

10.2.     In the event (each an "Event of Default") either party (the "Defaulting Party") or its Guarantor shall: (i) make an assignment or any general arrangement for the benefit of creditors; (ii) file a petition or otherwise commence, authorize, or acquiesce in the commencement of a proceeding or case under any bankruptcy or similar law for the protection of creditors or have such petition filed or proceeding commenced against it; (iii) otherwise become bankrupt or insolvent (however evidenced); (iv) be unable to pay its debts as they fall due; (v) have a receiver, provisional liquidator, conservator, custodian, trustee or other similar official appointed with respect to it or substantially all of its assets; (vi) fail to perform any obligation to the other party with respect to any Credit Support Obligations relating to the Contract; (vii) fail to give Adequate Assurance of Performance under Section 10.1 within 48 hours but at least one  Business Day of a written request by the other party; (viii) not have paid any amount due the other party hereunder on or before the second Business Day following written Notice that such payment is due; or ix) be the affected party with respect to any Additional Event of Default; then the other party (the "Non-Defaulting Party") shall have the right, at its sole election, to immediately withhold and/or suspend deliveries or payments upon Notice and/or to terminate and liquidate the transactions under the Contract, in the manner provided in Section 10.3, in addition to any and all other remedies available hereunder.

10.3.     If an Event of Default has occurred and is continuing, the Non-Defaulting Party shall have the right, by Notice to the Defaulting Party, to designate a Day, no earlier than the Day such Notice is given and no later than 20 Days after such Notice is given, as an early termination date (the "Early Termination Date") for the liquidation and termination pursuant to Section 10.3.1 of all transactions under the Contract, each a "Terminated Transaction".  On the Early Termination Date, all transactions will terminate, other than those transactions, if any, that may not be liquidated and terminated under applicable law ("Excluded Transactions"), which Excluded Transactions must be liquidated and terminated as soon thereafter as is legally permissible, and upon termination shall be a Terminated Transaction and be valued consistent with Section 10.3.1 below.  With respect to each Excluded Transaction, its actual termination date shall be the Early Termination Date for purposes of Section 10.3.1.

> **The parties have selected either "Early Termination Damages Apply" or "Early Termination Damages Do Not Apply" as indicated on the Base Contract.**
>
> **Early Termination Damages Apply:**
>
> 10.3.1.  As of the Early Termination Date, the Non-Defaulting Party shall determine, in good faith and in a commercially reasonable manner, (i) the amount owed (whether or not then due) by each party with respect to all Gas delivered and received between the parties under Terminated Transactions and Excluded Transactions on and before the Early Termination Date and all other applicable charges relating to such deliveries and receipts (including without limitation any amounts owed under Section 3.2), for which payment has not yet been made by the party that owes such payment under this Contract and (ii) the Market Value, as defined below, of each Terminated Transaction. The Non-Defaulting Party shall (x) liquidate and accelerate each Terminated Transaction at its Market Value, so that each amount equal to the difference between such Market Value and the Contract Value, as defined below, of such Terminated Transaction(s) shall be due to the Buyer under the Terminated Transaction(s) if such Market Value exceeds the Contract Value and to the Seller if the opposite is the case; and (y) where appropriate, discount each amount then due under clause (x) above to present value in a commercially reasonable manner as of the Early Termination Date (to take account of the period between the date of liquidation and the date on which such amount would have otherwise been due pursuant to the relevant Terminated Transactions).
>
> For purposes of this Section 10.3.1, "Contract Value" means the amount of Gas remaining to be delivered or purchased under a transaction multiplied by the Contract Price, and "Market Value" means the amount of Gas remaining to be delivered or purchased under a transaction multiplied by the market price for a similar transaction at the Delivery Point determined by the Non-Defaulting Party in a commercially reasonable manner.  To ascertain the Market Value, the Non-Defaulting Party may consider, among other valuations, any or all of the settlement prices of NYMEX Gas futures contracts, quotations from leading dealers in energy swap contracts or physical gas trading markets, similar sales or purchases and any other bona fide third-party offers, all adjusted for the length of the term and differences in transportation costs.  A party shall not be required to enter into a replacement transaction(s) in order to determine the Market Value.  Any extension(s) of the term of a transaction to which parties are not bound as of the Early Termination Date (including but not limited to "evergreen provisions") shall not be considered in determining Contract Values and Market Values.  For the avoidance of doubt, any option pursuant to which one party has the right to extend the term of a transaction shall be considered in determining Contract Values and Market Values.  The rate of interest used in calculating net present value shall be determined by the Non-Defaulting Party in a commercially reasonable manner.
>
> **Early Termination Damages Do Not Apply:**
>
> 10.3.1.  As of the Early Termination Date, the Non-Defaulting Party shall determine, in good faith and in a commercially reasonable manner, the amount owed (whether or not then due) by each party with respect to all Gas delivered and received between the parties under Terminated Transactions and Excluded Transactions on and before the Early Termination Date and all

other applicable charges relating to such deliveries and receipts (including without limitation any amounts owed under Section 3.2), for which payment has not yet been made by the party that owes such payment under this Contract.

**The parties have selected either "Other Agreement Setoffs Apply" or "Other Agreement Setoffs Do Not Apply" as indicated on the Base Contract.**

**Other Agreement Setoffs Apply:**

**Bilateral Setoff Option:**

10.3.2.    The Non-Defaulting Party shall net or aggregate, as appropriate, any and all amounts owing between the parties under Section 10.3.1, so that all such amounts are netted or aggregated to a single liquidated amount payable by one party to the other (the "Net Settlement Amount").  At its sole option and without prior Notice to the Defaulting Party, the Non-Defaulting Party is hereby authorized to setoff any Net Settlement Amount against (i) any margin or other collateral held by a party in connection with any Credit Support Obligation relating to the Contract; and  (ii) any amount(s) (including any excess cash margin or excess cash collateral) owed or held by the party that is entitled to the Net Settlement Amount under any other agreement or arrangement between the parties.

**Triangular Setoff Option:**

10.3.2.    The Non-Defaulting Party shall net or aggregate, as appropriate, any and all amounts owing between the parties under Section 10.3.1, so that all such amounts are netted or aggregated to a single liquidated amount payable by one party to the other (the "Net Settlement Amount").  At its sole option, and without prior Notice to the Defaulting Party, the Non-Defaulting Party is hereby authorized to setoff (i) any Net Settlement Amount against any margin or other collateral held by a party in connection with any Credit Support Obligation relating to the Contract; (ii) any Net Settlement Amount against any amount(s) (including any excess cash margin or excess cash collateral) owed by or to a party under any other agreement or arrangement between the parties; (iii) any Net Settlement Amount owed to the Non-Defaulting Party against any amount(s) (including any excess cash margin or excess cash collateral) owed by the Non-Defaulting Party or its Affiliates to the Defaulting Party under any other agreement or arrangement;  (iv) any Net Settlement Amount owed to the Defaulting Party against any amount(s) (including any excess cash margin or excess cash collateral) owed by the Defaulting Party to the Non-Defaulting Party or its Affiliates under any other agreement or arrangement; and/or (v) any Net Settlement Amount owed to the Defaulting Party against any amount(s) (including any excess cash margin or excess cash collateral) owed by the Defaulting Party or its Affiliates to the Non-Defaulting Party under any other agreement or arrangement.

**Other Agreement Setoffs Do Not Apply:**

10.3.2.    The Non-Defaulting Party shall net or aggregate, as appropriate, any and all amounts owing between the parties under Section 10.3.1, so that all such amounts are netted or aggregated to a single liquidated amount payable by one party to the other (the "Net Settlement Amount").  At its sole option and without prior Notice to the Defaulting Party, the Non-Defaulting Party may setoff any Net Settlement Amount against any margin or other collateral held by a party in connection with any Credit Support Obligation relating to the Contract.

10.3.3.    If any obligation that is to be included in any netting, aggregation or setoff pursuant to Section 10.3.2 is unascertained, the Non-Defaulting Party may in good faith estimate that obligation and net, aggregate or setoff, as applicable, in respect of the estimate, subject to the Non-Defaulting Party accounting to the Defaulting Party when the obligation is ascertained.  Any amount not then due which is included in any netting, aggregation or setoff pursuant to Section 10.3.2 shall be discounted to net present value in a commercially reasonable manner determined by the Non-Defaulting Party.

10.4.    As soon as practicable after a liquidation, Notice shall be given by the Non-Defaulting Party to the Defaulting Party of the Net Settlement Amount, and whether the Net Settlement Amount is due to or due from the Non-Defaulting Party.  The Notice shall include a written statement explaining in reasonable detail the calculation of the Net Settlement Amount, provided that failure to give such Notice shall not affect the validity or enforceability of the liquidation or give rise to any claim by the Defaulting Party against the Non-Defaulting Party.  The Net Settlement Amount as well as any setoffs applied against such amount pursuant to Section 10.3.2, shall be paid by the close of business on the second Business Day following such Notice, which date shall not be earlier than the Early Termination Date.  Interest on any unpaid portion of the Net Settlement Amount as adjusted by setoffs, shall accrue from the date due until the date of payment at a rate equal to the lower of (i) the then-effective prime rate of interest published under "Money Rates" by The Wall Street Journal, plus two percent per annum; or (ii) the maximum applicable lawful interest rate.

10.5.    The parties agree that the transactions hereunder constitute a "forward contract" within the meaning of the United States Bankruptcy Code and that Buyer and Seller are each "forward contract merchants" within the meaning of the United States Bankruptcy Code.

10.6.    The Non-Defaulting Party's remedies under this Section 10 are the sole and exclusive remedies of the Non-Defaulting Party with respect to the occurrence of any Early Termination Date.  Each party reserves to itself all other rights, setoffs, counterclaims and other defenses that it is or may be entitled to arising from the Contract.

10.7.    With respect to this Section 10, if the parties have executed a separate netting agreement with close-out netting provisions, the terms and conditions therein shall prevail to the extent inconsistent herewith.

# SECTION 11.    FORCE MAJEURE

11.1.    Except with regard to a party's obligation to make payment(s) due under Section 7, Section 10.4, and Imbalance Charges under Section 4, neither party shall be liable to the other for failure to perform a Firm obligation, to the extent such failure was caused by

Force Majeure. The term "Force Majeure" as employed herein means any cause not reasonably within the control of the party claiming suspension, as further defined in Section 11.2.

11.2. Force Majeure shall include, but not be limited to, the following: (i) physical events such as acts of God, landslides, lightning, earthquakes, fires, storms or storm warnings, such as hurricanes, which result in evacuation of the affected area, floods, washouts, explosions, breakage or accident or necessity of repairs to machinery or equipment or lines of pipe; (ii) weather related events affecting an entire geographic region, such as low temperatures which cause freezing or failure of wells or lines of pipe; (iii) interruption and/or curtailment of Firm transportation and/or storage by Transporters; (iv) acts of others such as strikes, lockouts or other industrial disturbances, riots, sabotage, insurrections or wars, or acts of terror; and (v) governmental actions such as necessity for compliance with any court order, law, statute, ordinance, regulation, or policy having the effect of law promulgated by a governmental authority having jurisdiction. Seller and Buyer shall make reasonable efforts to avoid the adverse impacts of a Force Majeure and to resolve the event or occurrence once it has occurred in order to resume performance.

11.3. Neither party shall be entitled to the benefit of the provisions of Force Majeure to the extent performance is affected by any or all of the following circumstances: (i) the curtailment of interruptible or secondary Firm transportation unless primary, in-path, Firm transportation is also curtailed; (ii) the party claiming excuse failed to remedy the condition and to resume the performance of such covenants or obligations with reasonable dispatch; or (iii) economic hardship, to include, without limitation, Seller's ability to sell Gas at a higher or more advantageous price than the Contract Price, Buyer's ability to purchase Gas at a lower or more advantageous price than the Contract Price, or a regulatory agency disallowing, in whole or in part, the pass through of costs resulting from this Contract; (iv) the loss of Buyer's market(s) or Buyer's inability to use or resell Gas purchased hereunder, except, in either case, as provided in Section 11.2; or (v) the loss or failure of Seller's gas supply or depletion of reserves, except, in either case, as provided in Section 11.2. The party claiming Force Majeure shall not be excused from its responsibility for Imbalance Charges.

11.4. Notwithstanding anything to the contrary herein, the parties agree that the settlement of strikes, lockouts or other industrial disturbances shall be within the sole discretion of the party experiencing such disturbance.

11.5. The party whose performance is prevented by Force Majeure must provide Notice to the other party. Initial Notice may be given orally; however, written Notice with reasonably full particulars of the event or occurrence is required as soon as reasonably possible. Upon providing written Notice of Force Majeure to the other party, the affected party will be relieved of its obligation, from the onset of the Force Majeure event, to make or accept delivery of Gas, as applicable, to the extent and for the duration of Force Majeure, and neither party shall be deemed to have failed in such obligations to the other during such occurrence or event.

11.6. Notwithstanding Sections 11.2 and 11.3, the parties may agree to alternative Force Majeure provisions in a Transaction Confirmation executed in writing by both parties.

## SECTION 12. TERM

This Contract may be terminated on 30 Day's written Notice, but shall remain in effect until the expiration of the latest Delivery Period of any transaction(s). The rights of either party pursuant to Section 7.6, Section 10, Section 13, the obligations to make payment hereunder, and the obligation of either party to indemnify the other, pursuant hereto shall survive the termination of the Base Contract or any transaction.

## SECTION 13. LIMITATIONS

FOR BREACH OF ANY PROVISION FOR WHICH AN EXPRESS REMEDY OR MEASURE OF DAMAGES IS PROVIDED, SUCH EXPRESS REMEDY OR MEASURE OF DAMAGES SHALL BE THE SOLE AND EXCLUSIVE REMEDY. A PARTY'S LIABILITY HEREUNDER SHALL BE LIMITED AS SET FORTH IN SUCH PROVISION, AND ALL OTHER REMEDIES OR DAMAGES AT LAW OR IN EQUITY ARE WAIVED. IF NO REMEDY OR MEASURE OF DAMAGES IS EXPRESSLY PROVIDED HEREIN OR IN A TRANSACTION, A PARTY'S LIABILITY SHALL BE LIMITED TO DIRECT ACTUAL DAMAGES ONLY. SUCH DIRECT ACTUAL DAMAGES SHALL BE THE SOLE AND EXCLUSIVE REMEDY, AND ALL OTHER REMEDIES OR DAMAGES AT LAW OR IN EQUITY ARE WAIVED. UNLESS EXPRESSLY HEREIN PROVIDED, NEITHER PARTY SHALL BE LIABLE FOR CONSEQUENTIAL, INCIDENTAL, PUNITIVE, EXEMPLARY OR INDIRECT DAMAGES, LOST PROFITS OR OTHER BUSINESS INTERRUPTION DAMAGES, BY STATUTE, IN TORT OR CONTRACT, UNDER ANY INDEMNITY PROVISION OR OTHERWISE. IT IS THE INTENT OF THE PARTIES THAT THE LIMITATIONS HEREIN IMPOSED ON REMEDIES AND THE MEASURE OF DAMAGES BE WITHOUT REGARD TO THE CAUSE OR CAUSES RELATED THERETO, INCLUDING THE NEGLIGENCE OF ANY PARTY, WHETHER SUCH NEGLIGENCE BE SOLE, JOINT OR CONCURRENT, OR ACTIVE OR PASSIVE. TO THE EXTENT ANY DAMAGES REQUIRED TO BE PAID HEREUNDER ARE LIQUIDATED, THE PARTIES ACKNOWLEDGE THAT THE DAMAGES ARE DIFFICULT OR IMPOSSIBLE TO DETERMINE, OR OTHERWISE OBTAINING AN ADEQUATE REMEDY IS INCONVENIENT AND THE DAMAGES CALCULATED HEREUNDER CONSTITUTE A REASONABLE APPROXIMATION OF THE HARM OR LOSS.

## SECTION 14.    MARKET DISRUPTION

If a Market Disruption Event has occurred then the parties shall negotiate in good faith to agree on a replacement price for the Floating Price (or on a method for determining a replacement price for the Floating Price) for the affected Day, and if the parties have not so agreed on or before the second Business Day following the affected Day then the replacement price for the Floating Price shall be determined within the next two  following Business Days with each party obtaining, in good faith and from non-affiliated market participants in the relevant market, two quotes for prices of Gas for the affected Day of a similar quality and quantity in the geographical location closest in proximity to the Delivery Point and averaging the four quotes. If either party fails to provide two quotes then the average of the other party's two quotes shall determine the replacement price for the Floating Price.  "Floating Price" means the price or a factor of the price agreed to in the transaction as being based upon a specified index.  "Market Disruption Event" means, with respect to an index specified for a transaction, any of the following events: (a) the failure of the index to announce or publish information necessary for determining the Floating Price; (b) the failure of trading to commence or the permanent discontinuation or material suspension of trading on the exchange or market acting as the index; (c) the temporary or permanent discontinuance or unavailability of the index; (d) the temporary or permanent closing of any exchange acting as the index; or (e) both parties agree that a material change in the formula for or the method of determining the Floating Price has occurred. For the purposes of the calculation of a replacement price for the Floating Price, all numbers shall be rounded to three decimal places.  If the fourth decimal number is five or greater, then the third decimal number shall be increased by one and if the fourth  decimal number is less than five, then the third  decimal number shall remain unchanged.

## SECTION 15.    MISCELLANEOUS

15.1.    This Contract shall be binding upon and inure to the benefit of the successors, assigns, personal representatives, and heirs of the respective parties hereto, and the covenants, conditions, rights and obligations of this Contract shall run for the full term of this Contract. No assignment of this Contract, in whole or in part, will be made without the prior written consent of the non-assigning party (and shall not relieve the assigning party from liability hereunder), which consent will not be unreasonably withheld or delayed; provided, either party may (i) transfer, sell, pledge, encumber, or assign this Contract or the accounts, revenues, or proceeds hereof in connection with any financing or other financial arrangements, or (ii) transfer its interest to any parent or Affiliate by assignment, merger or otherwise without the prior approval of the other party.  Upon any such assignment, transfer and assumption, the transferor shall remain principally liable for and shall not be relieved of or discharged from any obligations hereunder.

15.2.    If any provision in this Contract is determined to be invalid, void or unenforceable by any court having jurisdiction, such determination shall not invalidate, void, or make unenforceable any other provision, agreement or covenant of this Contract.

15.3.    No waiver of any breach of this Contract shall be held to be a waiver of any other or subsequent breach.

15.4.    This Contract sets forth all understandings between the parties respecting each transaction subject hereto, and any prior contracts, understandings and representations, whether oral or written, relating to such transactions are merged into and superseded by this Contract and any effective transaction(s).  This Contract may be amended only by a writing executed by both parties.

15.5.    The interpretation and performance of this Contract shall be governed by the laws of the jurisdiction as indicated on the Base Contract, excluding, however, any conflict of laws rule which would apply the law of another jurisdiction.

15.6.    This Contract and all provisions herein will be subject to all applicable and valid statutes, rules, orders and regulations of any governmental authority having jurisdiction over the parties, their facilities, or Gas supply, this Contract or transaction or any provisions thereof.

15.7.    There is no third party beneficiary to this Contract.

15.8.    Each party to this Contract represents and warrants that it has full and complete authority to enter into and perform this Contract. Each person who executes this Contract on behalf of either party represents and warrants that it has full and complete authority to do so and that such party will be bound thereby.

15.9.    The headings and subheadings contained in this Contract are used solely for convenience and do not constitute a part of this Contract between the parties and shall not be used to construe or interpret the provisions of this Contract.

15.10.    Unless the parties have elected on the Base Contract not to make this Section 15.10 applicable to this Contract, neither party shall disclose directly or indirectly without the prior written consent of the other party the terms of any transaction to a third party (other than the employees, lenders, royalty owners, counsel, accountants and other agents of the party, or prospective purchasers of all or substantially all of a party's assets or of any rights under this Contract, provided such persons shall have agreed to keep such terms confidential) except (i) in order to comply with any applicable law, order, regulation, or exchange rule, (ii) to the extent necessary for the enforcement of this Contract , (iii) to the extent necessary to implement any transaction, (iv) to the extent necessary to comply with a regulatory agency's reporting requirements including but not limited to gas cost recovery proceedings; or (v) to the extent such information is delivered to such third party for the sole purpose of calculating a published index.  Each party shall notify the other party of any proceeding of which it is aware which may result in disclosure of the terms of any transaction (other than as permitted hereunder) and use reasonable efforts to prevent or limit the disclosure.  The existence of this Contract is not subject to this confidentiality obligation.  Subject to Section 13, the parties shall be entitled to all remedies available at law or in equity to enforce, or seek relief in connection with this confidentiality obligation.  The terms of any transaction hereunder shall be kept confidential by the parties hereto for one year from the expiration of the transaction.

In the event that disclosure is required by a governmental body or applicable law, the party subject to such requirement may disclose the material terms of this Contract to the extent so required, but shall promptly notify the other party, prior to disclosure, and shall cooperate (consistent with the disclosing party's legal obligations) with the other party's efforts to obtain protective orders or similar restraints with respect to such disclosure at the expense of the other party.

DocuSign Envelope ID: 48E3D325-A598-4BA9-8B5E-78FC87BBBBBE

15.11.    The parties may agree to dispute resolution procedures in Special Provisions attached to the Base Contract or in a Transaction Confirmation executed in writing by both parties

15.12.    Any original executed Base Contract, Transaction Confirmation or other related document may be digitally copied, photocopied, or stored on computer tapes and disks (the "Imaged Agreement"). The Imaged Agreement, if introduced as evidence on paper, the Transaction Confirmation, if introduced as evidence in automated facsimile form, the recording, if introduced as evidence in its original form, and all computer records of the foregoing, if introduced as evidence in printed format, in any judicial, arbitration, mediation or administrative proceedings will be admissible as between the parties to the same extent and under the same conditions as other business records originated and maintained in documentary form. Neither Party shall object to the admissibility of the recording, the Transaction Confirmation, or the Imaged Agreement on the basis that such were not originated or maintained in documentary form. However, nothing herein shall be construed as a waiver of any other objection to the admissibility of such evidence.

---

**DISCLAIMER:** The purposes of this Contract are to facilitate trade, avoid misunderstandings and make more definite the terms of contracts of purchase and sale of natural gas.  Further, NAESB does not mandate the use of this Contract by any party.  **NAESB DISCLAIMS AND EXCLUDES, AND ANY USER OF THIS CONTRACT ACKNOWLEDGES AND AGREES TO NAESB'S DISCLAIMER OF, ANY AND ALL WARRANTIES, CONDITIONS OR REPRESENTATIONS, EXPRESS OR IMPLIED, ORAL OR WRITTEN, WITH RESPECT TO THIS CONTRACT OR ANY PART THEREOF, INCLUDING ANY AND ALL IMPLIED WARRANTIES OR CONDITIONS OF TITLE, NON-INFRINGEMENT, MERCHANTABILITY, OR FITNESS OR SUITABILITY FOR ANY PARTICULAR PURPOSE (WHETHER OR NOT NAESB KNOWS, HAS REASON TO KNOW, HAS BEEN ADVISED, OR IS OTHERWISE IN FACT AWARE OF ANY SUCH PURPOSE), WHETHER ALLEGED TO ARISE BY LAW, BY REASON OF CUSTOM OR USAGE IN THE TRADE, OR BY COURSE OF DEALING. EACH USER OF THIS CONTRACT ALSO AGREES THAT UNDER NO CIRCUMSTANCES WILL NAESB BE LIABLE FOR ANY DIRECT, SPECIAL, INCIDENTAL, EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGES ARISING OUT OF ANY USE OF THIS CONTRACT.**

TRANSACTION CONFIRMATION                                         EXHIBIT A
FOR IMMEDIATE DELIVERY

| Letterhead/Logo | Date: _____, ____ |
| | Transaction Confirmation #: _____ |

This Transaction Confirmation is subject to the Base Contract between Seller and Buyer dated _____.
The terms of this Transaction Confirmation are binding unless disputed in writing within 2 Business Days of receipt unless otherwise specified in the Base Contract.

| **SELLER:** | **BUYER:** |
|---|---|
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| Attn: _____ | Attn: _____ |
| Phone: _____ | Phone: _____ |
| Fax: _____ | Fax: _____ |
| Base Contract No. _____ | Base Contract No. _____ |
| Transporter: _____ | Transporter: _____ |
| Transporter Contract Number: _____ | Transporter Contract Number: _____ |

Contract Price:  $_____/MMBtu or _____

Delivery Period:  Begin: _____, ____          End: _____, ____

**Performance Obligation and Contract Quantity:**  (Select One)

| **Firm (Fixed Quantity):** | **Firm (Variable Quantity):** | **Interruptible:** |
|---|---|---|
| _____ MMBtus/day | _____ MMBtus/day Minimum | Up to _____ MMBtus/day |
| ☐ EFP | _____ MMBtus/day Maximum | |
| | subject to Section 4.2. at election of | |
| | ☐ Buyer or ☐ Seller | |

**Delivery Point(s):** _____
(If a pooling point is used, list a specific geographic and pipeline location):

**Special Conditions:**

| Seller: _____ | Buyer: _____ |
|---|---|
| By: _____ | By: _____ |
| Title: _____ | Title: _____ |
| Date: _____ | Date: _____ |

DocuSign Envelope ID: 8E2D325-A5031A0A9-8B9F-78C687DBD22F

**SPECIAL PROVISIONS to the**
**Base Contract for Sale and Purchase of Natural Gas**
**(NAESB Standard 6.3.1 dated September 5, 2006)**

**Between**
**Brazos Electric Power Cooperative, Inc. ("Party A")**
**and**
**Mercuria Energy America, Inc. ("Party B")**

**Dated August 19, 2016.**

Brazos Electric Power Cooperative, Inc. ("Brazos") and Mercuria Energy America, Inc. ("Mercuria") hereby agree, effective the 19th day of August 2016, to amend, modify and supplement the NAESB Standard 6.3.1 Base Contract for Sale and Purchase of Natural Gas ("Base Contract") dated the same date between the parties hereto with the following special provisions ("Special Provisions"). All capitalized terms not otherwise defined herein shall have the meaning set forth in the Base Contract.

1. The first sentence of the paragraph following the "Account Information" section on the cover sheet is revised by inserting the phrase "(NAESB Standard 6.3.1)" immediately after the word "Gas", and insert the date "September 5, 2006" immediately after the word "published".

2. Section 1.2 shall be amended by adding the clause "in writing" after the phrase "but must be expressly agreed to by both parties" in the last sentence.

3. Section 1.4 shall be amended by adding the following as a new last sentence: "However, nothing herein shall be construed as a waiver of any objection to the admissibility of such evidence."

4. The text of Section 2.6 shall be amended by deleting in its entirety and replacing with the following: ""Business Day(s)" shall mean Monday through Friday, excluding Federal Banking Holidays for transactions in the U.S., and shall begin at 8:00 a.m. and end at 5:00 p.m. Central time, where Federal Banking Days is defined as any day not observed by the Federal Reserve Board as a holiday."

5. Section 2.10 shall be amended by adding the following sentence to the end of the section: "The Contract Price includes reimbursement to Seller for any production or severance taxes owed by Seller with respect to Gas delivered hereunder."

6. Section 2.13 is amended by adding the following at the end thereof:  "For the avoidance of doubt, the following also shall be Credit Support Obligations under the Contract:  the guaranty issued by Party B's Guarantor for the benefit of Party A substantially in the form of Exhibit B attached hereto and made a part hereof."

7. Section 3.4 shall be amended as follows:  In the second sentence, immediately after the word "calculated" insert the following: ", provided, however, if a Termination Option is not otherwise specified in a Transaction Confirmation, the parties hereby agree that each party shall have, pursuant to this Section 3.4, a Termination Option for such Transaction Confirmations and shall have (a) the right to exercise its Termination Option in the event of the nonperformance by the other party for a period of five (5) consecutive Days for the specific transaction affected by such nonperformance and (b) damages and liquidated costs calculated pursuant to Section 10 of the Base Contract, as amended by the Special Provisions."

8. Section 7.1 shall be amended by adding the following phrase after the word "Buyer" in the first sentence of the section: "by the tenth (10th) of the Month".

9. Section 7.2 is amended by inserting the following phrase at the beginning of the first sentence:

   "Subject to the netting provisions in Section 7.7 of this Contract,"

10. Section 7.7 is hereby amended by inserting the following sentence at the end of the section:  "Each party acknowledges and agrees that (i) this Contract constitutes a "master netting agreement" and the parties are "master netting agreement participants" as defined in the United States Bankruptcy Code and (ii) the parties are entitled to all rights under, and protections afforded by, the United States Bankruptcy Code, including without limitation, those contained in Sections 362, 546, 556, 561, 562, 753 and 767."

11. The text of Section 8.4 shall be amended by deleting in its entirety and replacing with "Reserved".

DocuSign Envelope ID: 8E3D325A586A8A9-8B5F-786G8Z7RBBD2F

12. A new Section 8.6 shall be inserted by adding the following:

"8.6. The parties represent and warrant to each other that to the extent Gas is sold or purchased under this Contract and such Gas will be transported by an Energy Transfer company, an Atmos company, and/or other Texas intrastate transporters ("Intrastate Transporters"), then such transportation will be undertaken pursuant to, and in full compliance with, the warranty provisions of the agreements of Intrastate Transporters that prevent the imposition on Intrastate Transporters of jurisdiction under the Natural Gas Act of 1938, as amended ("NGA"), except for NGA Sections 4A and 23 or the application of any other NGA section, but only to the extent that such other section is used to enforce or implement NGA Section 4A or 23. The parties represent and warrant to each other that if the Delivery Point for Gas sold or purchased under this Contract is a point of interconnection between an interstate pipeline and any gas pipeline facilities owned by Brazos Electric Power Cooperative, Inc., transportation of Gas to such Delivery Point will be pursuant to Section 311 of the Natural Gas Policy Act. In addition to and without excluding any remedy the aggrieved party may have at law or in equity, the party that breaches a warranty set forth in this Section 8.6 shall (a) be liable to the aggrieved party for all damages, injuries, and reasonable expenses the aggrieved party may sustain by reason of any breach hereof, and (b) indemnify the aggrieved party with respect to any liability the aggrieved party may incur by reason of any breach hereof.

13. Section 9.2. shall be amended by adding the following language prior to the period at the end of the section: "; provided, however, that any Notice delivered pursuant to Section 10.2, 10.3 or 10.4 shall not be delivered by electronic means, and if any such Notice is delivered via facsimile, then a copy of such Notice shall also be sent via overnight courier service, first class mail or hand delivery."

14. Section 10.1 shall be amended by adding the following sentence as the second sentence of the section: "Reasonable grounds for insecurity shall also include, but not be limited to, the downgrade of Y's or Y's guarantor's senior unsecured debt rating, if any, by either Standard & Poor's or Moody's, to a rating below an investment grade rating (BBB- or Baa3, respectively)."

15. Section 10.1 shall be further modified by adding the following at the end of the section: "The parties recognize that Brazos and its assets are subject to certain mortgages and other debt agreements, (collectively, the "Debt Covenants") and in particular, nothing contained in the Contract shall be construed or deemed to require Brazos to grant any security interest inconsistent with its obligations under the Debt Covenants. Brazos shall not be deemed in breach of this Base Contract by virtue of its compliance with the requirements of its Debt Covenants. Nothing contained in this Base Contract shall be construed or deemed to require Brazos to post cash as collateral if, instead, it is able to provide a standby irrevocable letter of credit, or other form of security, in a form, amount and for a term reasonably acceptable to the other party."

16. Section 10.2 is amended by:

   a) inserting "repudiate, withdraw or" immediately following "(vi)" in the sixth line; and

   b) deleting the word "or" before "(ix)" in the ninth line, and adding the following as new Sections 10.2(x) and 10.2(xi), after the "Default;" in the tenth line:

      "(x) have made any representation or warranty which is false or misleading in any material respect when made or when deemed made or repeated; or (xi) breach the intrastate warranty set out in Section 8.6;"

17. Section 10.3 shall be amended by adding after the words "under applicable law" in the second sentence the following "or that are, in the reasonable opinion of the Non-Defaulting Party, commercially impracticable to liquidate and terminate" and deleting the words "legally permissible" and replacing them with "reasonably practicable".

18. Section 10.3.2, "Other Agreement Setoffs Apply: Bilateral Setoff Option", shall be amended by deleting it in its entirety and replacing it with the following:

"10.3.2. The Non-Defaulting Party shall net or aggregate, as appropriate, any and all amounts owing between the parties under this Contract, so that all such amounts are netted or aggregated to a single liquidated amount payable by one party to the other (the "Net Settlement Amount"). Upon the designation of an Early Termination Date, the Non-Defaulting Party ("X") may, at its option and in its sole discretion, setoff any Net Settlement Amount (including by setoff, offset, combination of accounts, deduction, retention, counterclaim or withholding), against (i) any margin or other collateral held by a party in connection with any Credit Support Obligation relating to the Contract; (ii) any amounts owed in U.S. Dollars by X to the Defaulting Party ("Y") under any other agreements between X and Y, and (iii) any amounts owed in U.S. Dollars by Y to X under any other agreements between X and Y. The obligations of Y and X under this Contract or such other agreements in respect of such amounts shall be deemed satisfied and discharged to the extent of any such setoff. X will give Y Notice of any setoff effectuated under this Section 10.3.2., but failure to give such Notice shall not affect the validity of the setoff. Nothing herein shall be effective to create a

charge or other security interest. This setoff provision shall be in addition to but without duplication of, and not in limitation of, any other right or remedy available to the Non-Defaulting Party (including, without limitation, any right of setoff, offset, combination of accounts, deduction, counterclaim, retention or withholding), whether arising under this Contract, any guaranty, any other agreement, under applicable law, in equity, or otherwise."

19. Section 10.4 shall be amended by deleting in the third sentence the clause "The Net Settlement Amount as well as any setoffs applied against such amount pursuant to Section 10.3.2," and inserting in its place the following clause: "The Net Settlement Amount, as adjusted by any setoffs pursuant to Section 10.3.2,".

20. The A new Section 10.8 shall be inserted by adding the following:

"10.8 Upon request, each party shall deliver to the other party documentation reasonably requested to evidence the authority and power of such party and/or its Guarantor, as the case may be, to enter into this Contract or any guaranty, as the case may be, which may include, without limitation, a certification of the signature and authority of the individual(s) executing this Contract or such guaranty, as the case may be and to the extent applicable and requested certificates, documents or other evidence sufficient to confirm the sales tax exempt status of such party for each jurisdiction in which the purchase, sale and/or delivery of any physical commodity takes place under this Contract, such that the other party will bear no obligation in relation to such purchase, sale and/or delivery for charging, collecting or remitting sales, use or other excise taxes to any local, municipal, state or federal taxing authority or agency."

21. A new Section 10.9 shall be inserted by adding the following:

"10.9. Notwithstanding any provision to the contrary contained in the Contract, the Non-Defaulting Party shall not be required to pay to the Defaulting Party any amount under this Section 10 until the Non-Defaulting Party receives confirmation satisfactory to it in its reasonable discretion (which may include an opinion of its counsel) that all other obligations of any kind whatsoever of the Defaulting Party to make any payments to the Non-Defaulting Party under the Contract or otherwise have been fully and finally performed."

22. The text of Section 11.6 shall be amended by deleting in its entirety and replacing with "Reserved".

23. Section 12 shall be amended by adding the word "prior" immediately before the phrase "written Notice" in the first sentence.

24. The text of Section 14 shall be amended by deleting in its entirety and replaced with the following:

"14.1.    Market Disruptions. If a Market Disruption Event occurs during a Determination Period, the Floating Price for the affected Trading Day(s) shall be determined by reference to the Floating Price specified in the Transaction Confirmation for the first Trading Day thereafter on which no Market Disruption Event exists; provided, however, if the Floating Price is not so determined within three (3) Business Days after the first Trading Day on which the Market Disruption Event occurred or existed, then the parties shall negotiate in good faith to agree on a Floating Price (or a method for determining a Floating Price), and if the parties have not so agreed on or before the twelfth Business Day following the first Trading Day on which the Market Disruption Event occurred or existed, then each party shall reasonably and in good faith obtain a calculation of the relevant Floating Price from a Reference Market-maker, and the Floating Price shall be the average of the two calculations.

"Determination Period" means each calendar month a part or all of which is within the Delivery Period of a Transaction Confirmation.

"Exchange" means, in respect of a Transaction Confirmation, the exchange or principal trading market specified in the relevant Transaction Confirmation.

"Floating Price" means the Contract Price specified in a Transaction Confirmation that is based upon a Price Source.

"Market Disruption Event" means, with respect to any Price Source, any of the following events: (a) the failure of the Price Source to announce or publish the specified Floating Price or information necessary for determining the Floating Price; (b) the failure of trading to commence or the permanent discontinuation or material suspension of trading in the relevant options contract or commodity on the Exchange or in the market specified for determining a Floating Price; (c) the temporary or permanent discontinuance or unavailability of the Price Source; (d) the temporary or permanent closing of any Exchange specified for determining a Floating Price; or (e) a material change in the formula for or the method of determining the Floating Price.

"Price Source" means, in respect of a Transaction Confirmation, the publication (or such other origin of reference, including an Exchange) containing (or reporting) the specified price (or prices from which the specified price is calculated) specified in the relevant Transaction Confirmation.

"Reference Market-maker" means a leading dealer in the relevant market selected by a party in good faith from among dealers of the highest credit standing which satisfy all the criteria that such party applies generally at the time in deciding whether to offer or to make an extension of credit.

"Trading Day" means a day in respect of which the relevant Price Source published the relevant Floating Price information.

14.2.    Corrections to Published Prices.  For purposes of determining the relevant price for any day, if the price published or announced on a given day and used or to be used to determine a relevant price is subsequently corrected and the correction is published or announced by the person responsible for that publication or announcement within one hundred eighty (180) days of the original publication or announcement, either party may notify the other party, not later than sixty (60) days after publication or announcement, of (i) that correction and (ii) the amount (if any) that is payable as a result of that correction.  If a party gives notice that an amount is so payable, the party that originally either received or retained such amount will, not later than three (3) Business Days after the effectiveness of that notice, pay, subject to any applicable conditions precedent, to the other party that amount, together with interest at the interest rate calculated in accordance with Section 7.5 for the period from and including the day on which payment originally was (or was not) made to but excluding the day of payment of the refund or payment resulting from that correction.

14.3.    Calculation of Floating Price.  For the purposes of the calculation of a Floating Price, all numbers shall be rounded to three (3) decimal places.  If the fourth (4th) decimal number is five (5) or greater, then the third (3rd) decimal number shall be increased by one (1), and if the fourth (4th) decimal number is less than five (5), then the third (3rd) decimal number shall remain unchanged."

25.  Section 15.3 shall be amended by deleting in its entirety and replacing it with the following: "15.3  No waiver of any breach of this Contract, or delay, failure or refusal to exercise or enforce any rights under this Contract, shall be held to be a waiver of any other or subsequent breach, or be construed as a waiver of any such right then existing or arising in the future."

26.  Section 15.5 is hereby amended by the deletion thereof and the substitution of the following provisions therefor: "This Base Contract, all transactions and Transaction Confirmations and the rights and duties of the parties arising therefrom shall be governed by, interpreted and construed in accordance with the laws of the State of Texas (without reference to its choice of law doctrine).  With respect to any suit, action or proceedings relating to the foregoing ("Proceedings") each party irrevocably submits to the non-exclusive jurisdiction of the federal and state courts located in McLennan County, Waco, Texas, waives any objection which it may have to the laying of venue of any Proceedings brought in any such court, and waives any claim that any such Proceedings have been brought in an inconvenient forum.  **EACH PARTY HEREBY IRREVOCABLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS BASE CONTRACT OR ANY TRANSACTION AND ACKNOWLEDGES THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO THE OTHER PARTY'S ENTERING INTO THIS BASE CONTRACT.**

27.  Section 15.8 is hereby amended by inserting at the end thereof the following:

"Each party will be deemed to represent to the other party on the date on which it enters into a Transaction Confirmation that (absent a written agreement between the parties that expressly imposes affirmative obligations to the contrary for that Transaction Confirmation):

(i)    Non-Reliance.  It is acting for its own account, and it has made its own independent decisions to enter into that Transaction Confirmation and as to whether that Transaction Confirmation is appropriate or proper for it based upon its own judgment and upon advice from such advisers as it has deemed necessary.  It is not relying on any communication (written or oral) of the other party as a recommendation to enter into that Transaction Confirmation; it being understood that information and explanations related to the terms and conditions of a Transaction Confirmation shall not be considered a recommendation to enter into that Transaction Confirmation.  No communication (written or oral) received from the other party shall be deemed to be an assurance or guarantee as to the expected results of that Transaction Confirmation.

(ii)    Assessment and Understanding.  It is capable of assessing the merits of and understanding (on its own behalf or through independent professional advice), and understands and accepts the terms, conditions and risks of that Transaction Confirmation.  It is also capable of assuming, and assumes, the risks of that Transaction Confirmation.

(iii)    Status of Parties.  The other party is not acting as a fiduciary for or an adviser to it in respect of that Transaction Confirmation. Each party understands and acknowledges that the other party may, either in connection with entering into that Transaction Confirmation or from time to time thereafter, engage in open market transactions that are designed to hedge or reduce the risks incurred by it in connection with such Transaction Confirmation and that the effect of such open market transactions may be to affect or reduce the value of such transaction.

(iv)      Eligible Contract Participant. Each party represents to the other (which representation will be deemed to be repeated by each party on the date on which a Transaction Confirmation is entered into) that it is an "eligible contract participant" as defined in Sections 1a(18) of the Commodity Exchange Act, as amended.

28.   Section 15.10 shall be amended by striking the word "or" in the seventh line and adding the following after the word "index" prior to the period: "(vi) information that is or becomes generally available to the public other than as a result of a disclosure by the receiving party, (vii) information that was already in a party's files on a nonconfidential basis prior to disclosure, or (viii) information that becomes available to a party on a nonconfidential basis from a source other than the other party if such source was not known by such party to be subject to any confidentiality obligation."

29.   The text of Section 15.11 shall be amended by deleting in its entirety and replacing it with "Reserved".

30.   Section 15.12 is amended by replacing the second to last sentence with "Neither party shall object to the admissibility of a recording, the Transaction Confirmation, or the Imaged Agreement (or photocopies of the transcription of the recording, the Transaction Confirmation or the Imaged Agreement) on the basis that such were not originated or maintained in documentary form under the hearsay rule, the best evidence rule or other similar rules of evidence."

31.   A new Section 15.13 shall be amended by adding the following:

"15.13. This Contract shall be considered for all purposes as prepared through the joint efforts of the parties and shall not be construed against one party or the other as a result of the manner in which this Contract was negotiated, prepared, drafted or executed."

32.   A new Section 16 shall be inserted by adding the following:

"**SECTION 16.** RESOLUTION OF DISPUTES

16.1. Resolution of Disputes. Any dispute ("Dispute") arising under this Contract shall be referred for resolution to a senior representative of each party, where such senior representative has the authority to resolve such Dispute. Upon receipt of a notice describing the Dispute and designating the notifying party's senior representative and that the Dispute is to be resolved by the parties' senior representatives under this Contract, the other party shall promptly designate its senior representative to the notifying party. The senior representatives so designated shall attempt to resolve the Dispute on an informal basis as promptly as practicable. If the Dispute has not been resolved within thirty (30) days after the notifying party's notice was received by the other party, or within such other period as the parties may jointly agree, the parties may mutually agree to submit the Dispute to arbitration in accordance with the arbitration procedure set forth in Section 16.2. In the event the parties are unable to mutually agree to submit the Dispute to the arbitration procedure in Section 16.2, either party may pursue any remedy available at law or in equity to enforce its rights provided in the Contract.

16.2. Arbitration. Any Dispute arising out of this Contract may be submitted, upon mutual agreement of the parties, to binding arbitration by one arbitrator who has not previously been employed by either party, is qualified by education or experience to decide the matters relating to the questions in dispute, and does not have a direct or indirect interest in either party or the subject matter of the arbitration. Such arbitrator shall either be as mutually agreed by the parties within thirty (30) days after the parties have mutually agreed to submit the Dispute to binding arbitration, or failing agreement to select an arbitrator, shall be selected under the Commercial Arbitration Rules of the American Arbitration Association ("AAA"). Unless otherwise agreed to by the Parties, all arbitration hearings will be held in either Waco, Texas or Houston, Texas, as follows: all arbitration proceedings initiated by the Parties hereunder shall be numbered consecutively (e.g., Arbitration #1, Arbitration #2, etc.); all hearings for the odd-numbered arbitration proceedings initiated by the Parties shall be held in Waco, Texas; all hearings for even-numbered arbitration proceedings initiated by the parties shall be held in Houston, Texas. The Commercial Arbitration Rules of the AAA shall apply to the extent not inconsistent with the arbitration provisions specified as follows: (A) Either party may propose binding arbitration by written notice to the other party; (B) If the parties mutually agree to submit a dispute to binding arbitration, the arbitration shall be conducted according to the following: (i) the hearing shall be conducted on a confidential basis; (ii) at the conclusion of the hearing, each party will present one suggested resolution to the arbitrator; (iii) the arbitrator may only select either party's suggested resolution; (iv) the arbitrator shall issue a confidential written opinion containing his or her decision; (v) each party shall be responsible for 50% of the cost of the arbitrator and the hearing and each party shall be responsible for its own expenses and those of its counsel and representatives; and (iv) any offer made or the details of any negotiation regarding the dispute prior to arbitration and the cost to the parties of their representatives and counsel shall not be admissible. Any monetary award of the arbitrator may be enforced in any court of competent jurisdiction by the party in whose favor such monetary award is made. The arbitrator is not empowered to and shall not award any type of damages except those described in Section 13."

**IN WITNESS WHEREOF**, the parties hereto agree to the terms and conditions set forth herein and have executed these Special Provisions in duplicate as of the date shown on Page 1.

BRAZOS ELECTRIC POWER COOPERATIVE, INC.

By: _____

Name: Clifton Karnei

Title: Executive Vice President and General Manager Date:

MERCURIA ENERGY AMERICA, INC.

By: _____

Name: **Michael Kennedy**

Title: Head of Physical Natural Gas

Date: August 19, 2016

CONFIDENTIAL AND PROPRIETARY INFORMATION OF MERCURIA ENERGY AMERICA, LLC

| Setlement for February 2021 | Transaction # | Mercuria Legal Entity | External Legal Entity | Trade Date | Buy/Sell | Delivery Start | Delivery End | Product Type | UOM | Quantity Delivered |
|---|---|---|---|---|---|---|---|---|---|---|
| **Settlement Value for 3/25/21 Pymt** | | **MEA** | **BRAZOS ELE POW - LE** | | | | | | | |
| | 14667784 | MEA | BRAZOS ELE POW - LE | 29-Jan-2021 | Sell | 01-Feb-2021 | 01-Feb-2021 | Firm | MMBtu | 15,000 |
| **20 Days pre-Bankruptcy** | | **MEA** | **BRAZOS ELE POW - LE** | | | | | | | |
| | 14710582 | MEA | BRAZOS ELE POW - LE | 08-Feb-2021 | Sell | 09-Feb-2021 | 09-Feb-2021 | Firm | MMBtu | 8,000 |
| | 14717292 | MEA | BRAZOS ELE POW - LE | 09-Feb-2021 | Sell | 09-Feb-2021 | 09-Feb-2021 | Firm | MMBtu | 15,000 |
| | 14717405 | MEA | BRAZOS ELE POW - LE | 09-Feb-2021 | Sell | 10-Feb-2021 | 10-Feb-2021 | Firm | MMBtu | 25,000 |
| | 14717424 | MEA | BRAZOS ELE POW - LE | 09-Feb-2021 | Sell | 10-Feb-2021 | 10-Feb-2021 | Firm | MMBtu | 5,000 |
| | 14719159 | MEA | BRAZOS ELE POW - LE | 09-Feb-2021 | Sell | 09-Feb-2021 | 09-Feb-2021 | Firm | MMBtu | 12,000 |
| | 14723711 | MEA | BRAZOS ELE POW - LE | 10-Feb-2021 | Sell | 11-Feb-2021 | 11-Feb-2021 | Firm | MMBtu | 10,000 |
| | 14723722 | MEA | BRAZOS ELE POW - LE | 10-Feb-2021 | Sell | 11-Feb-2021 | 11-Feb-2021 | Firm | MMBtu | 30,000 |
| | 14723733 | MEA | BRAZOS ELE POW - LE | 10-Feb-2021 | Sell | 11-Feb-2021 | 11-Feb-2021 | Firm | MMBtu | 17,000 |
| | 14724175 | MEA | BRAZOS ELE POW - LE | 10-Feb-2021 | Sell | 10-Feb-2021 | 10-Feb-2021 | Firm | MMBtu | 15,000 |
| | 14729460 | MEA | BRAZOS ELE POW - LE | 11-Feb-2021 | Sell | 12-Feb-2021 | 12-Feb-2021 | Firm | MMBtu | 35,000 |
| | 14729468 | MEA | BRAZOS ELE POW - LE | 11-Feb-2021 | Sell | 12-Feb-2021 | 12-Feb-2021 | Firm | MMBtu | 15,000 |
| | 14729550 | MEA | BRAZOS ELE POW - LE | 11-Feb-2021 | Sell | 12-Feb-2021 | 12-Feb-2021 | Firm | MMBtu | 12,500 |
| | 14734090 | MEA | BRAZOS ELE POW - LE | 12-Feb-2021 | Sell | 13-Feb-2021 | 16-Feb-2021 | Firm | MMBtu | 13,675 |
| | 14734888 | MEA | BRAZOS ELE POW - LE | 12-Feb-2021 | Sell | 12-Feb-2021 | 12-Feb-2021 | Firm | MMBtu | 81,000 |
| | 14744059 | MEA | BRAZOS ELE POW - LE | 16-Feb-2021 | Sell | 17-Feb-2021 | 17-Feb-2021 | Firm | MMBtu | 11,875 |
| | 14745028 | MEA | BRAZOS ELE POW - LE | 16-Feb-2021 | Sell | 17-Feb-2021 | 17-Feb-2021 | Firm | MMBtu | 10,000 |
| | 14745461 | MEA | BRAZOS ELE POW - LE | 16-Feb-2021 | Sell | 17-Feb-2021 | 17-Feb-2021 | Firm | MMBtu | 17,500 |
| | 14758589 | MEA | BRAZOS ELE POW - LE | 19-Feb-2021 | Sell | 20-Feb-2021 | 22-Feb-2021 | Firm | MMBtu | 31,000 |
| | 14768967 | MEA | BRAZOS ELE POW - LE | 22-Feb-2021 | Sell | 22-Feb-2021 | 22-Feb-2021 | Firm | MMBtu | 15,000 |
| | 14797266 | MEA | BRAZOS ELE POW - LE | 25-Feb-2021 | Sell | 26-Feb-2021 | 26-Feb-2021 | Firm | MMBtu | 15,000 |
| | 14812286 | MEA | BRAZOS ELE POW - LE | 01-Mar-2021 | Buy | 21-Feb-2021 | 21-Feb-2021 | Firm | MMBtu | (9,750) |

CONFIDENTIAL AND PROPRIETARY INFORMATION OF MERCURIA ENERGY AMERICA, LLC

| Price | Current Settle Amount | Party Agreement |
|---|---|---|
| | 61,177,852.50 | |
| 2.675 | 40,125.00 | NAESB |
| | 61,137,727.50 | |
| 3.23 | 25,840.00 | NAESB |
| 3.85 | 57,750.00 | NAESB |
| 3.4 | 85,000.00 | NAESB |
| 3.25 | 16,250.00 | NAESB |
| 3.9 | 46,800.00 | NAESB |
| 6.3 | 63,000.00 | NAESB |
| 4.225 | 126,750.00 | NAESB |
| 5.21 | 88,570.00 | NAESB |
| 5.95 | 89,250.00 | NAESB |
| 27 | 945,000.00 | NAESB |
| 29 | 435,000.00 | NAESB |
| 22.395 | 279,937.50 | NAESB |
| 250.4 | 13,696,880.00 | NAESB |
| 140 | 11,340,000.00 | NAESB |
| 950 | 11,281,250.00 | NAESB |
| 775 | 7,750,000.00 | NAESB |
| 710 | 12,425,000.00 | NAESB |
| 25 | 2,325,000.00 | NAESB |
| 2.87 | 43,050.00 | NAESB |
| 2.85 | 42,750.00 | NAESB |
| 2.6 | (25,350.00) | NAESB |