## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| In re:<br><br>BRAZOS ELECTRIC POWER COOPERATIVE, INC.,<br><br>        Debtor.[1] | Chapter 11<br><br>Case No. 21-30725 (DRJ) |
| BRAZOS ELECTRIC POWER COOPERATIVE, INC.,<br>        Plaintiff,<br><br>v.<br><br>507 CAPITAL, LLC, *et al.*,<br>        Defendants. | Adv. Proc. No. 21-04407 (DRJ)<br><br>Response Due: February 7, 2022 |

## DEFENDANT ETC MARKETING, LTD.'S MOTION TO DISMISS ADVERSARY COMPLAINT OF BRAZOS ELECTRIC POWER COOPERATIVE, INC.

Dated: January 7, 2022

**KATTEN MUCHIN ROSENMANN LLP**

John E. Mitchell, TX Bar No. 00797095
Email: john.mitchell@katten.com
Michaela Crocker, TX Bar No. 24031985
Email: michaela.crocker@katten.com
Yelena E. Archiyan, TX Bar No. 24119035
Email: yelena.archiyan@katten.com
2121 North Pearl St., Ste. 1100
Dallas, TX 75201
Telephone: (214) 765-3600

**YETTER COLEMAN LLP**

R. Paul Yetter, TX Bar No. 22154200
Email: pyetter@yettercoleman.com
Bryce L. Callahan, TX Bar No. 24055248
Email: bcallahan@yettercoleman.com
Ali Shan Ali Bhai, TX Bar. No. 24121498
Email: asalibhai@yettercoleman.com
811 Main Street, Suite 4100
Houston, TX 77002
Telephone: (713) 632-8000

***COUNSEL FOR ETC MARKETING LTD.***

---

[1] The Debtor in this Chapter 11 case, along with the last four digits of its federal tax identification number is Brazos Electric Power Cooperative, Inc. (4729). Additional information regarding this case may be obtained on the website of Debtor's claims and noticing agent at http://cases.stretto.com/Brazos. The Debtor's address is 7616 Bagby Avenue, Waco, TX 76712.

## <u>TABLE OF CONTENTS</u>

I.     BACKGROUND ................................................................................................... 1

    A.  Parties' Contractual History ...................................................................... 1

    B.  Winter Storm Uri Transactions ................................................................. 2

    C.  The Texas Legislature's Response to Winter Storm Uri............................ 3

II.    MOTION TO DISMISS STANDARD.................................................................. 3

III.   ARGUMENT ........................................................................................................ 4

    A.  Count 1 of Debtor's Complaint Should Be Dismissed for Failure to Plead a Violation under the Deceptive Trade Practices Protection Act or Unconscionability............................................................................... 4

        a.  The DTPA Does Not Apply to Debtor's Claims. ................................ 5

        b.  Debtor Fails to Properly Plead Unconscionability............................... 6

    B.  Counts 2 and 3 of the Complaint Should Be Dismissed for Failure to Sufficiently Plead the Required Elements for Avoidance of a Constructively Fraudulent Obligation................................................. 8

        a.  The Complaint Fails to Sufficiently Plead that Debtor Failed to Receive Reasonably Equivalent Value in Exchange for the Obligations It Incurred........ 9

        b.  The Complaint Fails to Sufficiently Plead the Solvency-Related Elements of a Constructively Fraudulent Conveyance..................................... 13

    C.  Count 4 of Debtor's Complaint Should Be Dismissed for Failure to Plead that the Gas Sale Transactions in Question Were Outside of the Ordinary Course of Debtor's Business under 11 U.S.C. § 503(b)(9). .................................................. 15

    D.  Count 5 of Debtor's Complaint Should Be Dismissed for Failure to Plead that the Value of the Obligation Debtor Incurred Exceeded the Value of the Goods it Received Under 11 U.S.C. § 503(b)(9). .................................................. 20

IV.   PRAYER FOR RELIEF ................................................................................... 20

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alcan Aluminum Corp. v. BASF Corp.*,
    133 F. Supp. 2d 482 (N.D. Tex. 2001) ...................................................................5

*Amini v. Oberlin College*,
    259 F.3d 493 (6th Cir. 2001) ..............................................................................1

*Arkwright-Bos. Mfrs. Mut. Ins. Co. v. Westinghouse Elec. Corp.*,
    844 F.2d 1174 (5th Cir. 1988) ...........................................................................6

*ASARCO LLC v. Americas Mining Corp.*,
    396 B.R. 278 (S.D. Tex. 2008) .........................................................................12

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009).........................................................................................3, 4

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544 (2007).........................................................................................3, 4

*BFP v. Resolution Trust Corp.*,
511 U.S. 531, 114 S. Ct. 1757 (1994)....................................................................11

*Brazos Elec. Power Coop., Inc. v. Electric Reliability Council of Texas, Inc.*,
    21-3863 ...............................................................................................................15

*Crawford Pro. Drugs, Inc. v. CVS Caremark Corp.*,
    748 F.3d 249 (5th Cir. 2014) ..............................................................................8

*Cushman v. GC Servs., LP*,
    657 F. Supp. 2d 834 (S.D. Tex. 2009) ................................................................5

*El Paso Nat. Gas Co. v. Minco Oil & Gas Co.*,
    964 S.W.2d 54 (Tex. App.—Amarillo 1997), *rev'd in part on other grounds*, 8
    S.W.3d 309 (Tex. 1999)..................................................................................6, 7

*Finkelman v. Nat'l Football League*,
    810 F.3d 187 (3d Cir. 2016)..............................................................................10

*Hogg v. Lynch, Chappell & Alsup, P.C.*,
    553 S.W.3d 55 (Tex. App.—El Paso 2018).........................................................7

*In re Garofalo's Finer Foods, Inc.*,
    186 B.R. 414 (N.D. Ill. 1995) ..........................................................................19

*In re Johns-Manville Corp.*,
    60 B.R. 612 (Bankr. S.D.N.Y 1986) ........................................................................18, 19

*In re Pilgrim's Pride*,
    421 B.R. 231 (Bankr. N.D. Tex. 2009) ..............................................................................16

*In re Roth American, Inc.*,
    975 F.2d 949 (3d Cir. 1992) ........................................................................................18, 19

*In re Sun Valley Prods., Inc.*,
    328 B.R. 147 (Bankr. N.D. 2005) ......................................................................................12

*In re World Imports*,
    516 B.R. 296 (Bankr. E.D. Pa. 2014) ................................................................................16

*Jacoway v. Anderson Cajun's Wharf (In re Ozark Restaurant Equip. Co., Inc.)*,
    850 F.2d 342 (8th Cir. 1988) .............................................................................................11

*Janvey v. Golf Channel, Inc.*,
    487 S.W.3d 560 (Tex. 2016) ..............................................................................................11

*John Doe I v. Roman Catholic Diocese of Galveston-Houston*,
2007 WL 2817999, *23 n.30 (S.D. Tex. Sept. 26, 2007) .................................................3

*Leilani Hope Rickert v. Specialized Loan Servicing, LLC (In re Rickert)*,
    2021 WL 5985026 (9th Cir. 2021) ......................................................................................1

*Life Partners Creditors' Trust v. Cowley, et al. (In re Life Partners Holdings,*
    *Inc.)*,
    926 F.3d 103 (5th Cir. 2019) ...............................................................................................4

*Matter of Brown Transp. Truckload, Inc.*,
    161 B.R. 735 (Bankr. N.D. Ga. 1993) ...............................................................................17

*Matter of Louisiana Pellets, Inc.*,
    838 Fed. App'x 45 (5th Cir. 2020) (unpublished) .............................................................12

*Muzquiz v. Para Todos, Inc.*,
    624 S.W.3d 263 (Tex. App.—El Paso 2021, pet. filed) .....................................................7

*NML Capital v. Republic of Argentina*,
    621 F.3d 230 (2d Cir. 2010) .................................................................................................8

*Peltz v. Hatten*,
    279 B.R. 710 (D. Del. 2002) .........................................................................................11, 12

*R2 Invs. LDC v. Phillips*,
    401 F.3d 638 (5th Cir. 2005) ................................................................................................4

*Rios v. City of Del Rio, Tex.*,
   444 F.3d 417 (5th Cir. 2006), *cert. denied*, 549 U.S. 825 (2006)..............................................4

*Sergeant Oil & Gas Co., Inc. v. Nat'l Maint. & Repair, Inc.*,
   861 F. Supp. 1351 (S.D. Tex. 1994) .........................................................................................8

*Stettin v. Dan Marino Found., Inc.*,
   483 B.R. 15, 21 (Bankr. S.D. Fla. 2012)...................................................................................11

*Stinger v. Chase Bank, USA, NA*,
   265 Fed. App'x 224 (5th Cir. 2008) ..........................................................................................8

*Systems, Inc. v. Mylex Corp. (In re Northgate Computer Sys., Inc.)*,
   240 B.R. 328 (Bankr. D. Minn. 1999) .....................................................................................12

*Wade v. Austin*,
   524 S.W.2d 79 (Tex. Civ. App.—Texarkana 1975) ...............................................................6, 7

## Statutes

11 U.S.C. § 101(32)(A)...............................................................................................................13

11 U.S.C. § 363 ..........................................................................................................................18

11 U.S.C. § 364 ..........................................................................................................................18

11 U.S.C. § 503(b)(9) ...............................................................................................15, 16, 19, 20

11 U.S.C. § 547(c)(2)(B) ...........................................................................................................17

11 U.S.C. § 548(a)(1)(B) .............................................................................................................9

11 U.S.C. § 548(a)(1)(B)(i).....................................................................................................9, 13

11 U.S.C § 548(a)(1)(B)(ii) .......................................................................................................14

11 U.S.C. § 548(a)(1)(B)(iii) .....................................................................................................14

TEX. BUS. & COM. CODE § 1.201(b)(9)......................................................................................17

TEX. BUS. & COM. CODE § 17.45(4) ............................................................................................5

TEX. BUS. & COM. CODE § 17.45(10) ..........................................................................................5

TEX. BUS. & COM. CODE § 17.49(g)............................................................................................6

TEX. BUS. & COM. CODE § 24.004(a)........................................................................................11

TEX. BUS. & COM. CODE § 24.004(d)........................................................................................11

TEX. BUS. & COM. CODE § 24.005(a)(2) ............................................................9

TEX. BUS. & COM. CODE § 24.005(a)(2)(A).......................................................14

TEX. BUS. & COM. CODE § 24.005(a)(2)(B).......................................................14

TEX. BUS. AND COM CODE § 29.009(a) .............................................................11

TEX. UTILITIES CODE § 104.361(a).....................................................................3

## Rules

FED. R. CIV. P. 8(a) ...........................................................................................4

FED. R. CIV. P. 12(b)(6) ...................................................................1, 3, 10, 20

FED. R. BANKR. P. 3001(f) ...............................................................................4

FED. R. BANKR. P. 7012 ........................................................................1, 3, 20

FED. R. BANKR. P. 7024 ...................................................................................1

## Other Authorities

Restatement on Consumer Contracts § 5 ...........................................................6

Defendant ETC Marketing, Ltd. ("ETC"),[2] through its undersigned counsel, submits this motion to dismiss (the "Motion") the *Complaint for Declaratory Relief and Asserting Omnibus Objections to Proofs of Claims Related to Natural Gas Sales to the Debtor* [Dkt. No. 1] (the "Complaint") filed by Brazos Electric Power Cooperative, Inc. (the "Debtor" or "Brazos") pursuant to Fed. R. Civ. P. 12(b)(6), as made applicable by Fed. R. Bankr. P. 7012.

## I.    BACKGROUND

### A.    Parties' Contractual History

1.      Debtor is a Texas non-profit electric cooperative corporation that supplies wholesale power for its sixteen-member distribution cooperatives. Compl. ¶¶ 1, 27. Debtor sources electricity through a combination of purchased power, owned generation, and forward-energy purchases from different counterparties. *Declaration of Clifton Karnei in Support of Chapter 11 Petition and Emergency First-Day Motions* [Case No. 21-30725, Dkt. 3] ("Karnei Decl.") ¶ 25.[3]

2.      Debtor's owned generation facilities are natural gas-fired, which Debtor fuels through purchases of natural gas utilizing standardized NAESB contracts with various third

---

[2] ETC and Citigroup Financial Products Inc. ("Citigroup") entered into a Transfer of Claims Agreement dated May 27, 2021 that assigned ETC's claims against Debtor to Citigroup. On December 20, 2021, ETC, Citigroup, and Debtor filed a Stipulation and Agreed Order Authorizing Intervention [Dkt. 26] to permit ETC to intervene in this proceeding as an intervenor-defendant under Bankruptcy Rule 7024. The Court has not yet signed the Stipulation and Agreed Order.

[3] The Complaint refers to the Karnei Declaration as the "First Day Declaration." Complaint ¶ 58 ("Additional information about Debtor's business and affairs, capital structure, prepetition indebtedness, and the events leading up to the Petition Date can be found in the Declaration of Clifton Karnei in Support of Chapter 11 Petition and First Day Motions (the "First Day Declaration") [Dkt. No. 3]."). Even if the Complaint did not integrate the declaration by referring parties to it to obtain additional information, the Court may take judicial notice of public documents filed in the bankruptcy proceeding without converting the Motion into one for summary judgment. *Leilani Hope Rickert v. Specialized Loan Servicing, LLC (In re Rickert)*, 2021 WL 5985026, *1 (9th Cir. 2021) ("The bankruptcy court did not abuse its discretion by considering Rickert's prior bankruptcy court proceedings, and consideration of those proceedings did not convert SLS's Fed. R. Civ. P. 12(b)(6) motion to dismiss into a motion for summary judgment."); *Amini v. Oberlin College*, 259 F.3d 493, 502 (6th Cir. 2001) (holding that "matters of public record, orders, items appearing in the record of the case, and exhibits attached to the complaint" may be considered in a 12(b)(6) motion").

parties. Karnei Decl. ¶¶ 11, 24; Compl. ¶¶ 52-53.

3.      Debtor and ETC are parties to a Base Contract for Sale and Purchase of Natural Gas entered into as of October 1, 2005 (the "ETC NAESB") that establishes certain terms, other than quantity and price, for the purchase and sale of natural gas. Compl. ¶¶ 52-53. The ETC NAESB sets forth the legal relationship between the parties and the procedure to be followed when Debtor chose to purchase natural gas from ETC. The ETC NAESB itself does not require Debtor to purchase any quantity of natural gas from ETC, or require ETC to sell any quantity of gas to Debtor. Compl. ¶ 53. Instead, the agreed-upon quantity and price terms are reflected in a transaction confirmation that accompanies each sale.

4.      Alliance for Cooperative Energy Services Power Marketing, LLC ("ACES") served as Debtor's agent for purposes of purchasing gas from third parties, including ETC. Compl. ¶ 52. ACES would communicate with third parties, including ETC, regarding Debtor's desire to purchase natural gas. Compl. ¶ 53. The parties would then settle on the quantity of gas at a given price for each transaction. *Id.* Because the NAESB form did not establish a set price, the price Debtor would pay when it chose to purchase natural gas would vary in relation to the market price. Karnei Decl. ¶¶ 11, 24; Compl. ¶ 53.

**B.      Winter Storm Uri Transactions**

5.      In February 2021, Texas experienced below-freezing temperatures, causing many to lose power. Surging demand for power and dwindling supply caused the market prices for natural gas to rise accordingly. Karnei Decl. ¶¶ 52-53.

6.      During the storm, Debtor engaged ETC to purchase natural gas through its agent, ACES. Compl. ¶¶ 52-53. Throughout these transactions, Debtor and ETC followed their usual course of dealings. Debtor executed similar transactions with multiple other gas suppliers during that time. *Id.*

7.     On March 1, 2021, due to what it claims are the financial pressures it endured during the storm, Debtor filed for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code"). Following the filing of proofs of claim, Debtor filed its Complaint in the above-captioned adversary proceeding.

**C.     The Texas Legislature's Response to Winter Storm Uri**

8.     In response to the February 2021 winter storm, Texas enacted a new subchapter of the Rates and Services chapter of the Gas Utility Regulatory Act designed "to reduce the cost that customers would otherwise experience because of extraordinary costs that gas utilities incurred to secure gas supply and provide service during Winter Storm Uri . . . by providing securitization financing for gas utilities to recover those costs." TEX. UTILITIES CODE § 104.361(a) (articulating purpose of subchapter).

9.     The Bill Analysis with respect to this new subchapter stated:  "The recent winter storm in Texas resulted in a historic demand for energy," driving gas price increases and demonstrating that "[t]he cost of gas is . . . set by the market." Exhibit A, Texas Bill Analysis, H.B. 1520 (May 21, 2021).[4] This finding resulted after over twenty-five hours of testimony given at the joint hearing on this bill.

## II.     MOTION TO DISMISS STANDARD

10.     A complaint warrants dismissal under Fed. R. Civ. P. 12(b)(6), as incorporated by Fed. R. Bankr. P. 7012, when it does not contain sufficient factual allegations to "state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). To be plausible, a claim must go beyond

---

[4] A bill analysis is part of legislative history and can be the subject of judicial notice. *John Doe I v. Roman Catholic Diocese of Galveston-Houston*, 2007 WL 2817999, *23 n.30 (S.D. Tex. Sept. 26, 2007) (*citing Territory of Alaska v. Am. Can Co.*, 358 U.S. 224, 226-27, 79 S.Ct. 274, 3 L.Ed.2d 257 (1959)).

pleading facts that show a "mere possibility of misconduct," to pleading facts sufficient to permit the "reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678-79. Conclusions, unsupported assertions of fact, and mere labels must be ignored when evaluating the adequacy of the pleading. *Id.* at 678. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. . . . In keeping with these principles[,] a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 678-79.

11.     Fed. R. Civ. P. 8(a) requires a showing—not a bare assertion—of entitlement to relief. *Twombly*, 550 U.S. at 556 n.3; *Life Partners Creditors' Trust v. Cowley, et al.* (*In re Life Partners* Holdings*, Inc.)*, 926 F.3d 103, 116 (5th Cir. 2019). Courts should not strain to find inferences favorable to the plaintiff or accept "conclusory allegations, unwarranted deductions, or legal conclusions." *R2 Invs. LDC v. Phillips*, 401 F.3d 638, 642 (5th Cir. 2005) (quoting *Southland Sec. Corp. v. Inspire Ins. Solutions, Inc.*, 365 F.3d 353, 361 (5th Cir. 2004)). Indeed, dismissal is appropriate if the "complaint lacks an allegation regarding a required element necessary to obtain relief." *Rios v. City of Del Rio, Tex.*, 444 F.3d 417, 421 (5th Cir. 2006), *cert. denied*, 549 U.S. 825 (2006). This standard is particularly notable since Claim No. 385 filed by Citigroup is entitled to a presumption of prima facie validity. Fed. R. Bankr. P. 3001(f).

## III.     ARGUMENT

### A.     Count 1 of Debtor's Complaint Should Be Dismissed for Failure to Plead a Violation under the Deceptive Trade Practices Protection Act or Unconscionability.

12.     Count 1 of Debtor's Complaint alleges that its transactions with ETC are unenforceable because they "are unconscionable, contrary to public policy, were entered into under duress, or . . . require performance of an illegal act." Compl. ¶ 63.

13.     To support its unconscionability and public policy arguments, Debtor contends that its transactions with ETC violate the price-gouging prohibitions of the Texas Deceptive Trade Practices Act ("DTPA"). According to Debtor, its transactions with ETC "are contrary to the spirit of the DTPA, and therefore, unconscionable and against public policy." *Id*. ¶ 66.

14.     But Debtor's claims are not actionable under the DTPA, and Debtor fails to properly plead a claim for unconscionability. Accordingly, Count 1 of Debtor's Complaint should be dismissed.

> **a.     The DTPA Does Not Apply to Debtor's Claims.**

15.     To bring a DTPA claim, "a plaintiff must qualify as a 'consumer.'" *Cushman v. GC Servs., LP*, 657 F. Supp. 2d 834, 842 (S.D. Tex. 2009) (citations omitted). The DTPA's definition of "consumer" includes individuals and corporate entities that "seek[] or acquire[] by purchase or lease, any goods or services." TEX. BUS. & COM. CODE § 17.45(4).

16.     However, the DTPA evinces the Texas legislature's intent to preclude claims by large, sophisticated commercial entities engaging in arm's-length transactions. *See Alcan Aluminum Corp. v. BASF Corp.*, 133 F. Supp. 2d 482, 501 (N.D. Tex. 2001) (observing that the DTPA reflects a legislative judgment that "[t]hose with less wealth are presumably less able to protect themselves adequately against deceptive trade practices and more in need of the additional protection of the DTPA"). To that end, the DTPA expressly excludes from this definition "a business consumer that has assets of $25 million or more, or that is owned or controlled by a corporation or entity with assets of $25 million more." TEX. BUS. & COM. CODE § 17.45(4).

17.     A "business consumer" is defined as "an individual, partnership, or corporation who seeks or acquires by purchase or lease, any goods or services for commercial or business use." *Id*. § 17.45(10). Here, Debtor is plainly not a "consumer" under the DTPA. Indeed, Debtor's total assets are valued at nearly $3.4 billion. Karnei Decl. ¶¶ 25-30 (describing generation and

transmission assets); Schedule A/B [Case 21-30725, Dkt. No. 353 at 11 of 271] (valuing Debtor's assets at $3.352 billion). Because it does not qualify as a "consumer," Debtor does not have standing to bring a DTPA claim.

18.     The magnitude of Debtors' transactions likewise precludes any DTPA-based claim. The DTPA does not "apply to a cause of action arising from a transaction, a project, or a set of transactions relating to the same project, involving total consideration by the consumer of more than $500,000, other than a cause of action involving a consumer's residence." TEX. BUS. AND COM. CODE § 17.49(g). Here, the total value of the parties' related set of transactions is $15,472,239.00. *See* Compl. ¶ 52.

### b.     Debtor Fails to Properly Plead Unconscionability.

19.     "Under Texas law, [Debtor] must prove ***both*** substantive and procedural unconscionability to prevail on the unconscionability issue." *Arkwright-Bos. Mfrs. Mut. Ins. Co. v. Westinghouse Elec. Corp.*, 844 F.2d 1174, 1175 (5th Cir. 1988) (applying Texas law).

20.     Procedural unconscionability arises in the formation of a contract. *Wade v. Austin*, 524 S.W.2d 79, 86 (Tex. Civ. App.—Texarkana 1975). Parties can demonstrate procedural unconscionability by showing (1) "the presence of deception, overreaching, and sharp business practices," (2) "the absence of a viable alternative," and (3) "the relative acumen, knowledge, education, and financial ability of the parties involved." *El Paso Nat. Gas Co. v. Minco Oil & Gas Co.*, 964 S.W.2d 54, 61 (Tex. App.—Amarillo 1997), *rev'd in part on other grounds*, 8 S.W.3d 309 (Tex. 1999). Additionally, it is more difficult to satisfy the procedural-unconscionability test when a party merely argues that the price in a contractual agreement is untenable "because the price is usually the most prominent element of a transaction." Restatement on Consumer Contracts § 5 (2019), Cmt. 8.

21.     "Substantive unconscionability refers to the inherent unfairness of a particular

contract or provision." *Hogg v. Lynch, Chappell & Alsup, P.C.*, 553 S.W.3d 55, 73 (Tex. App.—El Paso 2018). "A contract is substantively unconscionable where its inequity shocks the conscience." *Muzquiz v. Para Todos, Inc.*, 624 S.W.3d 263, 276 (Tex. App.—El Paso 2021, pet. filed). Some suggest that, to be substantively unconscionable, a transaction must be "utterly lopsided, that is, there must be no reasonable or subjective parity between the values exchanged." *El Paso Natural Gas*, 964 S.W.2d at 61-62.

22.     Texas courts have also recognized that "[a] party who knowingly enters a lawful but improvident contract is not entitled to protection by the courts." *Wade*, 524 S.W.2d at 86; *El Paso Natural Gas*, 964 S.W.2d at 62 ("Our court system cannot act as the mother hen watching over its chicks, standing ready to ameliorate every unpleasant circumstance which might befall them.").

23.     Here, Debtor has not—and indeed cannot—establish procedural or substantive unconscionability based on the undisputed facts. Accordingly, its purported claim for unconscionability should be dismissed.

24.     First, Debtor does not and cannot allege deception, overreaching, or sharp business practices. To the contrary, it is apparent from the Complaint that the parties followed their typical practices and procedure to consummate the transactions. Although the price of natural gas swelled in response to supply and demand issues during Winter Storm Uri, Debtor willingly and knowingly negotiated these transactions and was fully aware of the price when it entered the subject transactions. *See Wade*, 524 S.W.2d at 86 ("[T]he fact that a bargain is a hard one does not entitle a party to be relieved therefrom if he assumed it fairly and voluntarily.").

25.     Next, Debtor cannot allege that it lacks sophistication. Debtor is a multi-billion dollar, highly regulated electric cooperative that has routinely entered natural gas transactions with

a multitude of suppliers. Indeed, by Debtor's own admission, it is "the largest and oldest generation and transmission electric cooperative in Texas." Compl. ¶ 27. "[T]his [is] not a situation in which a seller was exerting grossly unfair advantage or power over a defenseless and unsophisticated consumer." *Sergeant Oil & Gas Co., Inc. v. Nat'l Maint. & Repair, Inc.*, 861 F. Supp. 1351, 1364 (S.D. Tex. 1994). For these same reasons, Debtor cannot allege substantive unconscionability. *See NML Capital v. Republic of Argentina*, 621 F.3d 230, 238 (2d Cir. 2010) (noting that the Court could not locate any authority "finding an agreement involving parties of like sophistication unenforceable on substantive unconscionability grounds").

26.     Moreover, the Complaint does not and cannot plausibly allege the absence of a viable alternative. Rather, Debtor concedes that during Winter Storm Uri it purchased natural gas from an array of different suppliers. Courts have routinely held that the availability of the same good from other sellers sufficiently rebuts a party's claim that it lacks viable alternatives. See *e.g.*, *Crawford Pro. Drugs, Inc. v. CVS Caremark Corp.*, 748 F.3d 249, 264 (5th Cir. 2014) (dismissing unconscionability claim because plaintiffs "failed to present any evidence that there were no other [pharmacy benefit management networks] with which they could contract or that it was not economically feasible to refrain from contracting with the Defendants at all"); *Stinger v. Chase Bank, USA, NA*, 265 Fed. App'x 224, 229 (5th Cir. 2008) ("Stinger did have a choice—he could have rejected the terms Chase offered and either adjusted his travel plans or used other forms of payment such as bank-issued check cards").

27.     Accordingly, Count 1 of the Complaint should be dismissed for failure to state a claim.

**B.     Counts 2 and 3 of the Complaint Should Be Dismissed for Failure to Sufficiently Plead the Required Elements for Avoidance of a Constructively Fraudulent Obligation.**

28.     To adequately state a claim for the avoidance of a constructively fraudulent

obligation, Debtor must sufficiently plead that it failed to receive reasonably equivalent value in exchange for the obligation incurred and that, at the time the obligation was incurred, certain solvency-related events had occurred or were about to occur. The Complaint fails on both fronts.

> **a.    The Complaint Fails to Sufficiently Plead that Debtor Failed to Receive Reasonably Equivalent Value in Exchange for the Obligations It Incurred.**

29.    Counts 2 and 3 of the Complaint seek to avoid certain obligations that Debtor incurred under the ETC NAESB in the days leading up to and including Winter Storm Uri as constructively fraudulent under Bankruptcy Code § 548(a)(1)(B) and Tex. Bus. & Com. Code ("TUFTA") § 24.005. Each statute premises avoidance on a finding that Debtor failed to receive "reasonably equivalent value" in exchange for the obligation incurred. 11 U.S.C. § 548(a)(1)(B)(i); TUFTA § 24.005(a)(2).

30.    But Debtor fails to allege any facts in support of its allegations that value of the natural gas it received was not equivalent to the price it agreed to pay, instead relying on boilerplate recitations of the statutes supported by nothing more than the fact that natural gas prices increased during the winter storm. Indeed, Counts 2 and 3 contain only the following allegations regarding reasonably equivalent value, none of which are specific to ETC:

| 11 U.S.C. § 548(a)(1)(B) | TUFTA § 24.005 |
|---|---|
| As temperatures dropped, supply dwindled and demand and prices increased. Compl. ¶¶ 32-51. | As temperatures dropped, supply dwindled and demand and prices increased. Compl. ¶¶ 32-51. |
| "Not only did the prices charged to Debtor during Winter Storm Uri far exceed the prices that Debtor had been previously charged, they were far higher than the reported index prices for one of the natural gas hubs closest to Debtor's relevant facilities, the Natural Gas-East Texas (NGPL TEXOK) hub." *Id.* ¶ 50. | "Not only did the prices charged to Debtor during Winter Storm Uri far exceed the prices that Debtor had been previously charged, they were far higher than the reported index prices for one of the natural gas hubs closest to Debtor's relevant facilities, the Natural Gas-East Texas (NGPL TEXOK) hub." *Id.* ¶ 50. |
| "[T]he claims ostensibly created by the Gas Claimants' price-gouging constitute fraudulent obligations because (a) the Debtor did not receive | "[T]he claims ostensibly created by the Gas Claimants' price-gouging constitute fraudulent obligations because (a) the Debtor did not receive |

| 11 U.S.C. § 548(a)(1)(B) | TUFTA § 24.005 |
|---|---|
| reasonably equivalent value in exchange[.]" *Id.* ¶ 3 (Nature of Claim). | reasonably equivalent value in exchange[.]" *Id.* ¶ 3 (Nature of Claim). |
| "Under Bankruptcy Code Section 548(a)(1)(B), a debtor may avoid any obligation incurred by the debtor on or within two years prior to the Petition Date, if the debtor voluntarily or involuntarily received less than a reasonably equivalent value in exchange for such obligation . . . ." *Id.* ¶ 69 (Count 2, reciting elements of claim). | "Under TEX. BUS. & COM. CODE § 24.005 . . . an obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or within a reasonable time after the obligation was incurred, if the debtor incurred the obligation (1) without receiving a reasonably equivalent value in exchange for the obligation . . . ." *Id.* ¶ 73 (Count 3, reciting elements of claim) |
| "The Gas Claims for approximately $180 million are based on exorbitant and excessive prices for which the Debtor voluntarily or involuntarily received less than reasonably equivalent value in exchange. . . . Accordingly, these obligations are avoidable pursuant to Bankruptcy Code Section 548 to the extent that such obligations exceed the reasonably equivalent value of what the Debtor received." *Id.* ¶ 70 (Count 2). | "The Debtor received less than reasonably equivalent value in exchange for the Gas Claims." *Id.* ¶ 74 (Count 3). |

31.     To have facial plausibility, the plaintiff must plead factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. As to ETC, the Complaint merely describes the upward trend of natural gas prices during the relevant period, followed by a boilerplate recitation of the statutes. But, as case law shows, there is a critical difference between allegations that stand on well-pleaded facts and allegations that rest on nothing more than supposition: the latter fail to "nudge[] their claims across the line from conceivable to plausible," and, as such, fail to state a claim under Fed. R. Civ. P. 12(b)(6). *See Finkelman v. Nat'l Football League*, 810 F.3d 187, 201 (3d Cir. 2016) (alteration in original) (citing *Twombly*, 550 U.S. at 570). The Complaint's allegations regarding reasonably equivalent value fall far short of meeting this standard, making no credible attempt to plead any facts regarding why the natural gas Debtor received was not of reasonably equivalent value to the obligation it incurred.

32.     For example, under TUFTA, "value" is given for a transfer or obligation if property

is transferred in exchange. TUFTA § 24.004(a). In turn, "reasonably equivalent value" includes, without limitation, "a transfer or obligation that is within the range of values for which the transferor would have sold the assets in *an arm's length transaction*." *Id.* § 24.004(d) (emphasis added). Thus, TUFTA's reasonably equivalent value requirement can be satisfied by showing that the transferee "(1) fully performed under a lawful, arm's length contract for fair market value, (2) provided consideration that had objective value at the time of the transaction, and (3) made the exchange in the ordinary course of the transferee's business." *Janvey v. Golf Channel, Inc.*, 487 S.W.3d 560, 564 (Tex. 2016). Indeed, in *Janvey*, the Texas Supreme Court held that, for purposes of the reasonably equivalent value requirement of § 29.009(a), an exchange for market-value rates in an arm's-length transaction *conclusively established* that the value exchanged was "reasonably equivalent." *Id.* at 582.

33.    Although the Bankruptcy Code does not define reasonably equivalent value, courts interpreting the phrase give deference to arm's-length transactions at market-value rates. *See BFP v. Resolution Trust Corp.,* 511 U.S. 531, 538, 114 S. Ct. 1757, 1766 (1994) (outside foreclosure context, fair market value is the "benchmark" for determining reasonably equivalent value); *Stettin v. Dan Marino Found., Inc.,* 483 B.R. 15, 21 (Bankr. S.D. Fla. 2012) ("participating in a competitive auction in an open market establishes that reasonably equivalent value was provided. If a competitive market set the price by the bidding procedures of the auction, it establishes the reasonably equivalent value."); *Peltz v. Hatten*, 279 B.R. 710, 738 (D. Del. 2002) (evidence regarding comparable sales close in time to debtor's acquisition demonstrated that the price paid for company was in line with then prevailing values in the marketplace); *Jacoway v. Anderson Cajun's Wharf (In re Ozark Restaurant Equip. Co., Inc.)*, 850 F.2d 342, 345 (8th Cir. 1988) (reasonably equivalent value depends on the market conditions faced by a willing seller and a

willing buyer); *Systems, Inc. v. Mylex Corp. (In re Northgate Computer Sys., Inc.)*, 240 B.R. 328

(Bankr. D. Minn. 1999) (noting that the inquiry of "reasonable equivalence" is fundamentally one

of common sense, measured against market reality).

34.     As explained by the District of Delaware:

> [I]n determining whether a value is objectively "reasonable" the court gives
> significant deference to marketplace values. When sophisticated parties make
> reasoned judgements about the value of assets that are supported by then prevailing
> marketplace values and by the reasonable perceptions about growth, risks, and the
> market at the time, it is not the place of fraudulent transfer law to reevaluate or
> question those transactions with the benefit of hindsight. . . . The evidence regarding
> comparable sales close in time to [the] acquisition . . . demonstrates that the price
> paid . . . was in line with then prevailing values that the marketplace placed on such
> companies.

*Peltz*, 279 B.R. at 738.

35.     Absent allegations that a transaction was not at arm's-length (an allegation that does

not and cannot appear in the Complaint), reasonably equivalent value turns on market value at the

time of the transaction. *See In re Sun Valley Prods., Inc.*, 328 B.R. 147, 156 (Bankr. N.D. 2005)

("Despite lip service given to the weighing of other factors, often there is nothing to consider

beyond simply comparing the fair market value of what the debtor transferred against the fair

market value of what the debtor received") (quotation omitted); *In re Northgate Computer Sys.,

Inc.*, 240 B.R. at 365 (where complaint alleged defendant overcharged the debtor for personal

computer motherboards, "[t]he inquiry on this element [reasonably equivalent value] is

fundamentally one of common sense, measured against market reality"); *ASARCO LLC v.

Americas Mining Corp.*, 396 B.R. 278, 336-37 (S.D. Tex. 2008) ("All jurisdictions agree that

courts should measure the value of the property transferred and the consideration received at the

time of the transfer."); *see also Matter of Louisiana Pellets, Inc.*, 838 Fed. App'x 45, 50 (5th Cir.

2020) (unpublished) (*quoting In re Chomakos*, 69 F.3d 769, 711 (6th Cir. 1995)) ("Because value

is determined at the time of the transfer, '[n]either subsequent depreciation in nor appreciation in

value of the consideration affects the question of whether reasonable equivalent value was given'").

36.     Here, Debtor alleges that ACES transacted with nearly a dozen gas sellers in purchasing gas during Winter Storm Uri and, in that capacity, ACES reached agreement as to quantity and price with each seller, including ETC, on multiple occasions. Compl. ¶¶ 52-53. As temperatures dropped, the demand and pricing for natural gas increased and were allegedly higher than the reported index price for a hub closest to Debtor's relevant facilities (though it is not alleged that all gas purchased by Debtor was based on that hub price). *Id.* ¶¶ 32-51. The Complaint, however, does not and cannot allege that ETC and Debtor did not transact at arm's-length or that the rates ETC charged Debtor for natural gas were not market-based rates. *See, e.g.,* Texas Bill Analysis, H.B. 1520 (May 21, 2021) ("[t]he cost of gas is . . . set by the market).

37.     Debtor pleads no facts giving rise to a reasonable inference that the value of the natural gas at the time of each transfer was anything other than the result of an arm's-length transaction occurring at then-prevailing market rates, the epitome of reasonably equivalent value. Debtor's failure to sufficiently plead reasonably equivalent value is fatal; Counts 2 and 3 must be dismissed.

**b.      The Complaint Fails to Sufficiently Plead the Solvency-Related Elements of a Constructively Fraudulent Conveyance.**

38.     In addition to failing to adequately plead that Debtor did not receive reasonably equivalent value in exchange for the obligations incurred, the Complaint also fails to allege the solvency-related elements required by the Bankruptcy Code and TUFTA, including that Debtor:

- Was insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation. 11 U.S.C. § 548(a)(1)(B)(i). A debtor is insolvent under the Bankruptcy Code when the sum of its debts is greater than all of its property at a fair valuation. *Id.* § 101(32)(A);

- Was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital. *Id.* § 548(a)(1)(B)(ii); TUFTA § 24.005(a)(2)(A); *or*

- Intended to incur, or believed that the debtor would incur, debts that would be beyond the debtor's ability to pay as such debts matured. 11 U.S.C. § 548(a)(1)(B)(iii); TUFTA § 24.005(a)(2)(B).

(collectively, the "Solvency-Related Elements"). The relevant Solvency-Related Element must be

shown as of the date the subject obligation was incurred.

39.     The Complaint fails to meet that standard. It only alleges in a conclusory fashion:

Prior to the unprecedented and catastrophic energy crisis in February 2021, when Winter Storm Uri blanketed the entire State of Texas with snow, ice, and sub-freezing temperatures, the Debtor was a model of financial stability. By aggregating the distribution needs of its electric cooperative Members to obtain best-in-class generation and transmission facilities through low-cost financing, the Debtor maintained an "A+" and "A" issuer credit ratings from Fitch and S&P, respectively, prior to the events leading to the Chapter 11 filing.

During the eight decades prior to Winter Storm Uri, the Debtor consistently met the generation, transmission, and distribution substation needs of its Members and maintained an impeccable financial record, even as Texas's population exploded during this period.

The Debtor's Chapter 11 filing was precipitated by the exorbitant prices ERCOT and the Gas Suppliers charged the Debtor for the energy and natural gas required to serve its Members' during Winter Storm Uri.

Compl. ¶¶ 28-30. The only other allegations regarding the Solvency-Related Elements are

Debtor's boilerplate recitation of the statutes, where it fails to identify which element(s) applies

and when it was satisfied. *Id.* ¶¶ 3, 69-70, 73. This is particularly notable since Debtor alleges that

it has traditionally been a solvent company that paid its debts when due and had adequate capital

to run its business. *Id.* ¶¶ 28-30.

40.     Debtor's Schedule A/B lists total assets as of the Petition Date of $3.352 billion and

debt of $5.061 billion. The debt, however, includes the approximately $180 million of gas-related

obligations that Debtor is seeking to avoid and the approximately $1.9 billion of obligations owed

to ERCOT that Debtor is seeking to avoid in a separate adversary proceeding. Schedule A/B [Case 21-30725, Dkt. 353] at 11 of 271, Schedule E/F; *see also Brazos Elec. Power Coop., Inc. v. Electric Reliability Council of Texas, Inc.*, 21-3863. It appears that the substantial majority of the obligations Debtor is seeking to avoid were incurred in the 20 days preceding the Petition Date.

41.     Based on its Schedules, 21 days prior to the Petition Date, Debtor's assets totaled approximately $3,352,454,414.60 and its liabilities totaled approximately $2,676,946,955.98,[5] leaving an equity cushion of nearly $1 billion. The Complaint implies that Debtor satisfied one or more of the Solvency-Related Elements during the following 20 days as a result of incurring obligations, but nothing more. Was an Insolvency-Related Element satisfied on February 11, 2021 when Debtor alleges that ETC sold it gas for delivery the next day for $17.50 MMBtu? *See* Compl. ¶ 39. On February 12, 2021, when ETC allegedly sold gas to Debtor for delivery February 13 and 16 for between $175 - $200 MMBtu? *See id.* ¶ 42. Later? If so, which element?

42.     Debtor's allegations are woefully insufficient to permit the Court to make a reasonable inference that Debtor fell within one or more of the Insolvency-Related Elements at the time each obligation was incurred. Accordingly, Counts 2 and 3 of the Complaint must be dismissed.

**C.     Count 4 of Debtor's Complaint Should Be Dismissed for Failure to Plead that the Gas Sale Transactions in Question Were Outside of the Ordinary Course of Debtor's Business under 11 U.S.C. § 503(b)(9).**

43.     Bankruptcy Code § 503(b)(9) provides administrative priority for "the value of any goods received by the debtor within 20 days before the date of commencement of a case under this title in which *the goods have been sold to the debtor in the ordinary course of such debtor's business.*" 11 U.S.C. § 503(b)(9) (emphasis added). The elements of a § 503(b)(9) claim are: (1) a

---

[5] Calculated as $5,061,971,740.46 (scheduled debt) - $2,205,024,784.48 (ERCOT's claim per Schedule F (3.134)) - $180,000,000 (estimated gas obligations Debtor seeks to avoid).

creditor sold goods to the debtor; (2) the goods were received by the debtor within twenty days

prior to filing; and (3) the goods were sold to the debtor in the ordinary course of business. *In re*

*World Imports*, 516 B.R. 296, 297 (Bankr. E.D. Pa. 2014); *In re Pilgrim's Pride*, 421 B.R. 231,

235 (Bankr. N.D. Tex. 2009). The only element of the three that Debtor disputes is whether the

natural gas ETC delivered to Debtor was in the ordinary course of Debtor's business.

44.     In this regard, the Complaint's sole allegation is that market-based price

fluctuations caused the transactions to fall outside Debtor's ordinary course of business:

> The Gas Claims are not entitled to priority status because the gas at issue was not
> purchased in the ordinary course of the Debtor's business as required by
> Bankruptcy Code Section 503(b)(9). During Winter Storm Uri, the Gas Suppliers
> charged exorbitant and unprecedented prices knowing that the Debtor faced a
> Hobson's choice: Buy gas at extortionate prices or allow Texans to die. This is the
> antithesis of the ordinary course of business, and therefore, the entirety of any
> allowed portion of the Gas Claims should be reclassified as general unsecured
> claims.

Compl. ¶ 79.

45.     There is no allegation, nor can there be, that ETC and Debtor negotiated,

documented, or consummated the subject transactions not at arm's-length or in a manner that

varied from their ordinary course of business developed over the past 15 plus years. Instead,

Debtor's allegations are linked solely to market-based fluctuations in price.

46.     Although there is no statutory test for what constitutes ordinary course of business

under § 503(b)(9), the tests developed to determine ordinary course under other sections of the

Bankruptcy Code and the Uniform Commercial Code (the "UCC") look to whether the transaction

was commonplace for the debtor.

47.     For example, under the model UCC,[6] a "buyer in the ordinary course of business":

---

[6] *In In re Pilgrim's Pride Corp.*, 421 B.R. 231, 236-37 (Bankr. N.D. Tex. 2009), the bankruptcy court
applied the model UCC under the reasoning that: "To apply differing state laws to determine entitlement to
priority treatment under § 503(b)(9) would run contrary to the constitutional mandate for uniformity as well

> [B]uys goods in good faith, without knowledge that the sale violates the rights of
> another person in the goods, and in the ordinary course from a person, other than a
> pawnbroker, in the business of selling goods of that kind. A person buys goods in
> the ordinary course if the sale to the person comports with the usual or customary
> practices in the kind of business in which the seller is engaged or with the seller's
> own usual or customary practices. A person that sells oil, gas, or other minerals at
> the wellhead or minehead is a person in the business of selling goods of that kind.
> A buyer in ordinary course of business may buy for cash, by exchange of other
> property, or on secured or unsecured credit, and may acquire goods or documents
> of title under a preexisting contract for sale. Only a buyer that takes possession of
> the goods or has a right to recover the goods from the seller under Article 2 may be
> a buyer in ordinary course of business. "Buyer in ordinary course of business" does
> not include a person that acquires goods in a transfer in bulk or as security for or in
> total or partial satisfaction of a money debt.

Model UCC ¶ 1-201(b)(9) (emphasis added).

48.     Stated differently, the UCC looks to the *conduct* of the parties, rather than merely

the underlying circumstances, to determine whether parties' dealings are in the ordinary course of

business. Relatedly, courts interpreting the definition of "ordinary course of business" in other

provisions of the Bankruptcy Code have likewise examined the parties' actions to determine

whether a transaction fell outside the ordinary course of business. *See, e.g.*, *Matter of Brown

Transp. Truckload, Inc.*, 161 B.R. 735, 738 (Bankr. N.D. Ga. 1993) (noting that, when interpreting

§ 547(c)(2)(B) of the Bankruptcy Code, "[c]ourts generally compare the parties' pre-performance

period course of conduct with the parties' course of conduct during the preference period").

49.     Here, the transactions at issue did not deviate from the practices and customs of the

parties' prior dealings. In previous transactions, Debtor would work through its agent, ACES, to

negotiate individual transaction confirmations for natural gas. That the price and quantity of gas

differed between sales is expected—market prices are naturally subject to fluctuations based on

---

as violate this cardinal principle [that similarly situated claims should receive the same treatment.]" The
distinction is immaterial, however, since the model UCC and the Texas UCC have adopted identical
definitions. *See* TEX. BUS. COMM. CODE § 1.201(b)(9).

supply and demand pressures. In sum, there was no difference between the parties' conduct that would warrant finding these transactions outside the ordinary course of business.

50.     Similarly, the tests for ordinary course under Bankruptcy Code §§ 363 and 364 apply the "horizontal" and "vertical" dimension tests, which consider the debtor's practices and those of the relevant industry in general.

51.     Under the vertical dimension test, courts "focus . . . on the debtor's internal operation and workings" and its "prepetition business practices and conduct." *In re Johns-Manville Corp.*, 60 B.R. 612, 617 (Bankr. S.D.N.Y 1986); *see also In re Roth American, Inc.*, 975 F.2d 949, 952-53 (3d Cir. 1992) (the vertical test analyzes the transaction "from the vantage point of a hypothetical creditor and . . . whether the transaction subjects a creditor to economic risk of a nature different from those he accepted when he decided to extend credit") (quotation omitted). This test asks whether creditors of the estate would reasonably expect the debtor to make the transaction at issue. *Johns-Manville*, 60 B.R. at 616-17. Here, there can be no dispute that creditors would expect Debtor to make purchases of natural gas, as needed, to fuel its gas-fired plants to provide electricity to its co-op members, particularly during a winter storm. *See* Karnei Decl. ¶¶ 11, 24; Complaint ¶¶ 52-53 (explaining Debtor's custom of purchasing natural gas to provide fuel to its gas fired plants).

52.     The focus of the horizontal dimension test, on the other hand, is industry wide, asking whether the transaction at issue is ordinary for "this business vis-à-vis similar businesses." *Johns-Manville*, 60 B.R. at 618; *In re Roth American, Inc.*, 975 at 953 (the horizontal test analyzes the transaction from an industry-wide perspective, whether the transaction is of the sort commonly

undertaken in that industry). Based on the plain meaning of § 503(b)(9)[7] it is questionable whether the horizontal test would apply; however, it if did, there can be no dispute that, during a winter storm, other electrical co-ops would make purchases of natural gas, as needed, to generate electricity for its members.

53.     Notably, none of the tests utilized by Courts consider market-based price fluctuations as determinative of whether the transaction occurred in the ordinary course of the debtor's business, nor should they. Increases in market-based pricing do not render a transaction outside the ordinary course. *See, e.g., In re Roth American, Inc.*, 975 at 954 (the inquiry includes whether "the nature of the [transaction] ventures beyond the domain of transactions that a hypothetical creditor would reasonably expect to be undertaken *in the circumstances"*) (emphasis added); *Johns-Manville*, 60 B.R. at 617 ("The 'ordinary course of business' standard is purposely not defined so narrowly as to deprive a debtor of the flexibility it needs to run its business and respond quickly to changes in the business climate. Title 11 procedures are not meant to straitjacket a debtor, and a debtor must be allowed to marshal assets on an 'as needed basis'"); *In re Garofalo's Finer Foods, Inc.*, 186 B.R. 414, 424 (N.D. Ill. 1995) ("in applying this test [creditor's expectations test], the court must also consider the changing circumstances that are inherent in a debtor's efforts to operate its business").

54.     Accordingly, Count 4 of the Complaint should be dismissed for failure to state a claim upon which relief may be granted.

---

[7] Under § 503(b)(9), the focus is on whether "the goods have been sold to the debtor in the ordinary course of such debtor's business." 11 U.S.C. § 503(b)(9). Thus, whether a transaction is otherwise commonplace falls outside the plain meaning of the statute.

**D.** **Count 5 of Debtor's Complaint Should Be Dismissed for Failure to Plead that the Value of the Obligation Debtor Incurred Exceeded the Value of the Goods it Received Under 11 U.S.C. § 503(b)(9).**

55.    Count 5 of the Complaint seeks to strip ETC's § 503(b)(9) claim of its administrative priority based on the conclusory allegation that the claim "far exceed[s] the 'value' of the goods received by the Debtor" and are "orders of magnitude beyond the actual value of the gas supplied." Compl. ¶¶ 81-82.

56.    Despite alleging that the obligations incurred to ETC "far exceed" the value of the gas received from ETC, the Complaint fails to allege what the proper value should be. Is Debtor attacking the priority of *all* § 503(b)(9) amounts included in ETC's proof of claim, even those before Winter Storm Uri? Is it only challenging some of the transactions? Which ones? ETC cannot formulate a complete response without this basic information.

57.    Moreover, Debtor has not—and cannot—plead facts giving rise to a reasonable inference that the value of the natural gas at the time of each transfer was anything other than the result of an arm's-length transaction occurring at then-prevailing market rates. Accordingly, Count 5 of the Complaint should be dismissed for failure to state a claim upon which relief may be granted.

## IV.    <u>PRAYER FOR RELIEF</u>

For the foregoing reasons, ETC respectfully requests that this Court grant ETC's Motion to dismiss the Complaint pursuant to Fed. R. Civ. P. 12(b)(6), as incorporated by Fed. R. Bankr. P. 7012, and grant ETC such other and further relief to which it is justly entitled.

Dated: January 7, 2022

Respectfully submitted,

**KATTEN MUCHIN ROSENMANN LLP**

*/s/ John E. Mitchell*
John E. Mitchell
State Bar No. 00797095
Email: john.mitchell@katten.com
Michaela Crocker
State Bar No. 24031985
Email: michaela.crocker@katten.com
Yelena E. Archiyan
State Bar No. 24119035
Email: yelena.archiyan@katten.com
2121 North Pearl St., Ste. 1100
Dallas, TX 75201
Telephone: (214) 765-3600


**YETTER COLEMAN LLP**
R. Paul Yetter
State Bar No. 22154200
Email: pyetter@yettercoleman.com
Bryce L. Callahan
Email: bcallahan@yettercoleman.com
State Bar No. 24055248
Ali Shan Ali Bhai
Email: asalibhai@yettercoleman.com
State Bar. No. 24121498
811 Main Street, Suite 4100
Houston, TX 77002
Telephone: (713) 632-8000

**COUNSEL TO ETC MARKETING, LTD.**

## **CERTIFICATE OF SERVICE**

I certify that on January 7, 2022, a true and correct copy of the foregoing document was electronically filed with the Clerk of the Court using the CM/ECF system, which automatically sends notifications of such filings to all attorneys of record.

*/s/ John E. Mitchell*
John E. Mitchell

22

151576602