UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| BRAZOS ELECTRIC POWER COOPERATIVE INC., | Case No. 21-30725 (DRJ) |
| *Debtor.* | |
| BRAZOS ELECTRIC POWER COOPERATIVE, INC., | |
| *Plaintiff,* | |
| v. | |
| 507 Capital LLC; 507 Summit LLC; Cetus Capital VI, L.P.; Chase Lincoln First Commercial Corporation; Citigroup Financial Products, Inc.; CrossingBridge Low Duration High Yield Fund; Destinations Global Fixed Income Opportunities Fund; Destinations Low Duration Fixed Income Fund; Koch Energy Services, LLC; Leaffilter North Holdings, Inc.; NJR Energy Services Co.; OFM II, LP, OU 2 LLC; RiverPark Short Term High Yield; RiverPark Strategic Income Fund; Total Gas & Power North America, Inc.; and Two Seas Global (Master) Fund LP, | Adv. Proc. No. 21-04407 (DRJ) |
| *Defendants.* | |

## DEFENDANT TOTALENERGIES'S MOTION TO DISMISS

## TABLE OF CONTENTS

Table of Contents ................................................................................................................. ii

Table of Authorities ............................................................................................................ iv

I.    Introduction ................................................................................................................. 1

II.   Factual Overview ........................................................................................................ 2

   A.  Brazos and TotalEnergies negotiated a NAESB Contract to cover the purchase and sale of natural gas. ...................................................................................................... 2

   B.  Winter Storm Uri tragically afflicted Texas in February 2021 ............................... 4

   C.  TotalEnergies only sold gas to Brazos on February 12, 2021, at prices lower than any other gas claimant. ....................................................................................................... 4

   D.  Brazos seeks bankruptcy protection and attempts to avoid paying TotalEnergies for the natural gas. .............................................................................................................. 5

III.  Legal Standard ............................................................................................................ 6

IV.   Argument and Authorities .......................................................................................... 7

   A.  Claim 1: Brazos's allegations cannot establish that the Transaction was unenforceable under Texas law. ................................................................................................... 7

     i.   The Transaction was neither procedurally nor substantively unconscionable. ............... 8

       a.  Because Brazos's allegations do not suggest either the NAESB negotiation or the individual purchase was inequitable, the Transaction is not procedurally unconscionable. ..................................................................................................... 8

       b.  The Transaction was not substantively unconscionable, and enforcement would be neither "shocking" nor "gross." .......................................................................... 10

     ii.  Texas public policy favors the enforcement of the Transaction—and the DTPA does not provide a basis to invalidate them. ...................................................................... 13

     iii. Brazos does not plausibly allege TotalEnergies placed it under duress........................ 15

     iv.  There is no allegation of illegality whatsoever. ............................................................ 16

   B.  Claim 2: Brazos does not plausibly allege receiving less than reasonably equivalent value, and so its claim for constructive fraudulent transfer fails as a matter of law. .................. 16

     i.   Because value is measured at the time of the transaction, Brazos purchased the natural gas at reasonably equivalent value under Bankruptcy Code section 548(a)(1)(B)(i). ... 17

     ii.  The Court cannot consider price fluctuations when determining reasonably equivalent value of a commodity. ............................................................................................... 18

   C.  Claim 3: Because Brazos purchased natural gas from TotalEnergies at market prices, the Transaction cannot be a fraudulent transfer under Texas law. .......................................... 20

i.   As a matter of law, Brazos received "reasonably equivalent value" when it purchased natural gas at market price from TotalEnergies. ............................................................. 20

D.  Claim 4: Brazos has not plausibly pled the Transaction was outside its ordinary course of business to generate electricity under Bankruptcy Code section 503(b)(9). .................... 23

i.   Applying the UCC, the Transaction occurred in the ordinary course of business by following the usual and customary practices of Brazos and TotalEnergies. .................. 23

ii.  The mere fact that the market price for natural gas on February 12 had risen does not transform an ordinary gas sale into something extraordinary. ....................................... 25

E.  Claim 5: According to Brazos's own allegations, TotalEnergies unquestionably provided value to Brazos by supplying it with natural gas, and so retains administrative priority status under Section 503(b)(9). ................................................................................................. 26

V.  Conclusion ......................................................................................................................... 27

Certificate of Service ................................................................................................................. 29

TABLE OF AUTHORITIES

**Cases**

*ASARCO LLC v. Americas Mining Corp.*,
  396 B.R. 278 (S.D. Tex. 2008)................................................................. 17, 19, 22

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ................................................................................. 6

*Ashland Oil, Inc. v. Phillips Petroleum Co.*,
  554 F.2d 381 (10th Cir. 1975)................................................................. 17

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ................................................................................. 6

*Besteman v. Pitcock*,
  272 S.W.3d 777 (Tex. App.—Texarkana 2008, no pet.) ......................... 11

*BMG Direct Mktg., Inc. v. Peake*,
  178 S.W.3d 763 (Tex. 2005)................................................................. 7, 13

*Brand Coupon Network, L.L.C. v. Catalina Mktg. Corp.*,
  748 F.3d 631 (5th Cir. 2014)................................................................. 6, 7

*Brittan Communications Intern. Corp. v. Sw. Bell Tel. Co.*,
  313 F.3d 899 (5th Cir. 2002)................................................................. 14

*Brown v. Aztec Rig Equip., Inc.*,
  921 S.W.2d 835 (Tex. App.—Houston [14th Dist.] 1996, writ denied)................. 16

*Cameron v. Terrell & Garrett, Inc.*,
  618 S.W.2d 535 (Tex.1981)................................................................... 14

*Churchill Forge, Inc. v. Brown*,
  61 S.W.3d 368 (Tex. 2001)................................................................... 13

*Delfingen US-Tex., L.P. v. Valenzuela*,
  407 S.W.3d 791 (Tex. App.—El Paso 2013, no pet.) ............................ 8

*Earman Oil Co., Inc. v. Burroughs Corp.*,
  625 F.2d 1291 (5th Cir. 1980)............................................................. 12, 21

*Financial Federal Credit, Inc. v. Crane Consultants, LLC*,
  21 F. Supp. 3d 264 (W.D.N.Y. 2014) ................................................... 25

*Fleetwood Enterprises, Inc. v. Gaskamp*,
    280 F.3d 1069 (5th Cir. 2002) ........................................................................ 8

*In re Am. Hous. Found.*,
    544 F. App'x 516 (5th Cir. 2013) ................................................................... 17

*In re Big 8 Food Stores, Ltd.*,
    166 S.W.3d 869 (Tex. App.—El Paso 2005, no pet.) ..................................... 11

*In re Chomakos*,
    69 F.3d 769 (6th Cir. 1995) ............................................................................ 19

*In re E. Livestock Co., LLC*,
    544 B.R. 640 (Bankr. S.D. Ind. 2015) ........................................................... 18

*In re Halliburton Co.*,
    80 S.W.3d 566 (Tex. 2002) ............................................................................... 8

*In re Jumer's Castle Lodge, Inc.*,
    338 B.R. 344, 354 (C.D. Ill. 2006) ................................................................. 19

*In re Louisiana Pellets, Inc.*,
    838 F. App'x 45 (5th Cir. 2000) ..................................................................... 19

*In re Morris Commc'ns NC, Inc.*,
    914 F.2d 458 (4th Cir. 1990) .......................................................................... 17

*In re Olshan Found. Repair Co.*,
    328 S.W.3d 883 (Tex. 2010) ........................................................................... 11

*In re Pioneer Home Builders, Inc.*,
    147 B.R. 889 (Bankr. W.D. Tex. 1992) .......................................................... 22

*In re Plastech Engineered Products*,
    397 B.R. 828 (E.D. Mich. 2008) .................................................................... 26

*In re R.M.L., Inc.*,
    92 F.3d 139 (3d Cir. 1996) ............................................................................. 20

*In re SemCrude, L.P.*,
    416 B.R. 399 (Bankr. D. Del. 2009) ......................................................... 23, 25

*In re SemCrude, L.P.*,
    504 B.R. 39 (Bankr. D. Del. 2013) ................................................................. 25

*In re Turner Bros. Trucking Co.*,
   8 S.W.3d 370 (Tex. App.—Texarkana 1999) ..................................................... 7, 8

*In re Waterford Wedgwood USA, Inc.*,
   500 B.R. 371 (Bankr. S.D.N.Y. 2013) .................................................................. 18

*In re World Imports*, Ltd.,
   862 F.3d 338 (3d Cir. 2017) ................................................................................. 23

*Janvey v. Golf Channel, Inc.*,
   487 S.W.3d 560 (Tex. 2016) ............................................................................ 20, 22

*Jimmy Swaggart Ministries v. Hayes (In re Hannover Corp.)*,
   310 F.3d 796 (5th Cir. 2002) ................................................................................ 17

*Kimbell v. U.S.*,
   371 F.3d 257 (5th Cir. 2004) ................................................................................ 21

*King v. Bishop*,
   879 S.W.2d 222 (Tex. App.—Houston [14th Dist.] 1994, no writ) ...................... 15

*Lawrence v. CDB Services, Inc.*,
   44 S.W.3d 544 (Tex. 2001) ................................................................................... 13

*Lester v. Advanced Envtl. Recycling Techs., Inc.*,
   248 F. App'x 492 (5th Cir. 2007) ......................................................................... 16

*McConnell v. McConnell*,
   2011 WL 286145 (Tex. App.—Houston [1st Dist.] Jan. 27, 2011, no pet.) .......... 11

*Merry Homes, Inc. v. Chi Hung Luu*,
   312 S.W.3d 938 (Tex. App.—Houston [1st Dist.] 2010, no pet.).......................... 13

*Micocina, Ltd. v. Balderas-Villanueva*,
   2017 WL 4857017 (Tex. App.—Dallas Oct. 27, 2017, no pet.) .............................. 9

*Norris v. Hearst Trust*,
   500 F.3d 454 (5th Cir. 2007)................................................................................... 7

*Oden v. Infosys Ltd.*,
   2018 WL 4627099 (N.D. Tex. Aug. 31, 2018) ....................................................... 8

*Osorno v. Osorno*,
   76 S.W.3d 509 (Tex. App.—Houston [14th Dist.] 2002, no pet.) .......................... 16

*Palmer Barge Line, Inc. v. S. Petroleum Trading Co., Ltd.*,
    776 F.2d 502 (5th Cir. 1985) .................................................................. 15

*Peltz v. Hatten*,
    279 B.R. 710 (D. Del. 2002) .................................................................. 18

*Phil. Indem. Ins. Co. v. White*,
    490 S.W.3d 468 (Tex. 2016) .......................................................... 13, 14

*Porterfield v. JP Morgan Chase, NA*,
    2015 WL 1061496 (W.D. Tex. Mar. 10, 2015) ...................................... 8

*Ramirez v. 24 Hour Fitness USA, Inc.*,
    2013 WL 2152113 (S.D. Tex. May 16, 2013) ........................................ 9

*Ridge Nat. Res., L.L.C. v. Double Eagle Royalty, L.P.*,
    564 S.W.3d 105 (Tex. App.—El Paso 2018, no pet.) ........................ 9, 10

*Stettin v. Dan Marino Found., Inc. (In re Rothstein Rosenfeldt Adler, P.A.)*,
    483 B.R. 15 (Bankr. S.D. Fla. 2012) ................................................... 18

*Tex. Commerce Bank, N.A. v. Grizzle*,
    96 S.W.3d 240 (Tex. 2002) ................................................................. 13

*Tijerina v. City of Tyler*,
    846 S.W.2d 825 (Tex. 1992) ............................................................... 14

*Tow v. Amegy Bank N.A.*,
    498 B.R. 757 (S.D. Tex. 2013) ........................................................... 21

*U. S. v. Rutherford*,
    442 U.S. 544 (1979) ............................................................................ 14

*United States v. 100 Acres of Land, More or Less, in Marin Cty., State of Cal.*,
    468 F.2d 1261 (9th Cir. 1972) ............................................................. 17

*VeroBlue Farms USA, Inc. v. Wulf*,
    465 F. Supp. 3d 633 (N.D. Tex. 2020) ............................................... 21

*Williams v. Houston Plants & Garden World, Inc.*,
    508 B.R. 19 (S.D. Tex. 2014) ............................................................. 21

**Statutes**

Tex. Bus. & Com. Code § 1.201(b)(9) .................................................... 24
Tex. Bus. & Com. Code § 2.302 ............................................................. 11
Tex. Bus. & Com. Code § 17.41 ............................................................. 14

Tex. Bus. & Com. Code § 17.45(4) ............................................................. 7, 14, 15

Tex. Bus. & Com. Code § 24.004(d) ..................................................................... 20

Tex. Bus. & Com. Code § 24.005 ........................................................................... 20

UCC § 1-201(9) ........................................................................................................ 24

UCC § 1-204 ............................................................................................................. 26

**Other Authorities**

2021 Tex. H.B. 1520 (NS) ....................................................................................... 22

Restatement of Consumer Contracts § 5 (2019), Cmt. 8 ........................................ 10

# I.  INTRODUCTION

1.      During Winter Storm Uri, ERCOT's decision to increase electricity prices from an average of $21–29/MWh to $9,000/MWh left Brazos with bill of over $2 billion.[1] Now in bankruptcy, Brazos Electric Power Cooperative Inc. ("Brazos") seeks to invalidate a purchase of natural gas from Total Gas & Power North America, Inc. ("TotalEnergies") in the days leading up to Winter Storm Uri (the "Transaction"). The Transaction was made pursuant to the industry standard NAESB Base Contract for Sale and Purchase of Natural Gas ("NAESB"). The Contract at issue is a form created by the North American Energy Standards Board and is the industry established form contract under which the majority of natural gas sales are made in the United States. Brazos's request to invalidate the industry standard NAESB is unprecedented. TotalEnergies was unable to find any other case where the validity of a NAESB has been challenged based on unconscionability, violating public policy, or requiring the performance of an illegal act. The policy implications of Brazos's requested relief are staggering and would upend the natural gas trading industry—calling into question *all* natural gas transactions made during Winter Storm Uri.

2.      Aside from the policy implications, Brazos's claims fail as a matter of law. For Count 1, Brazos requests application of a variety of legally inapplicable statutory and common law consumer protection doctrines. Brazos would have this Court find that the Transaction is either "unconscionable, contrary to public policy, w[as] entered into under duress, or [] require[s] the performance of an illegal act."[2] This is a heavy burden under Texas law and Brazos's allegations do not come close to establishing a plausible claim, especially when the Contract between TotalEnergies and Brazos has been in place for almost *two decades*.

---

[1]    C.A. No. 21-30725, Dkt. 3 ("First Day Decl.") ¶ 54.
[2]    Compl. ¶ 63.

3.      Alternatively, for Counts 2 and 3, Brazos seeks to declare the Transaction constructively fraudulent under either the Bankruptcy Code or Texas state law. But these claims, too, fail as a matter of law. The Transaction with TotalEnergies was made at prices substantially less than Brazos's transactions with the other Defendants in this case. As a result, there can be no question the Transaction was at arm's length and at the market price for natural gas. Brazos received reasonably equivalent value as a matter of law.

4.      In its Counts 4 and 5, Brazos also seeks to strip administrative priority status from TotalEnergies's claim—despite TotalEnergies selling necessary commodities to a debtor on the eve of bankruptcy. But Brazos has no basis to do so. Its own allegations show the Transaction was in the ordinary course of business and for value that was both reflected in the contract price and set by the market.

5.      For all the foregoing reasons, Brazos's Complaint should be dismissed in its entirety.

## II.   FACTUAL OVERVIEW

6.      Brazos is a sophisticated electric cooperative corporation operating in the state of Texas.[3] It boasts of being the "largest and oldest" of any generation and transmission cooperative operating in the state.[4] It provides 2,600 megawatts of power to the Electric Reliability Council of Texas, Inc. ("ERCOT") system—a full 3% of all electricity generated in Texas.[5]

**A.      Brazos and TotalEnergies negotiated a NAESB Contract to cover the purchase and sale of natural gas.**

7.      To generate and provide this power, Brazos contracted with TotalEnergies and others for the purchase of natural gas. To do so, Brazos entered into the Base Contract for Sale and

---

[3]   Compl. ¶ 5.
[4]   Compl. ¶ 27.
[5]   Compl. ¶ 27.

Purchase of Natural Gas (the "Contract") with TotalEnergies on October 1, 2003.[6] This agreement was made according to the North American Energy Standards Board ("NAESB") standards used industry-wide in purchase and sale contracts for natural gas.[7] The NAESB form Brazos and TotalEnergies used required them to agree to the selection of twelve different options, with Brazos and TotalEnergies selecting the default choice in each instance.[8] Brazos and TotalEnergies also agreed to nine different negotiated "Special Provisions" appended to the Contract.[9] The Contract was signed by Clifton Karnei, the Executive Vice President and General Manager of Brazos, and J. Mark Ingram, the President and General Manager of TotalEnergies.[10]

8.      The Contract contains a force majeure clause. It states in section 11.2 that in the event "weather related events affecting an entire region, such as low temperatures which cause freezing or failure of wells or lines of pipe" that certain contractual obligations would be waived.[11] But importantly under section 11.1, the force majeure clause does not apply "with regard to a party's obligation to make payment(s) due."[12] Although nothing prevented Brazos and TotalEnergies from changing this through a Special Provision, they chose not to do so.[13]

9.      The Contract does not itself mandate the purchase or sale of any amount of natural gas.[14] Instead, it only governs the terms attached to any purchase and sale agreement if and when they later occur.[15] The price and quantity of each specific transaction for natural gas is "discrete."[16]

---

[6]    *See* Ex. 1 (the Contract); *see also* Compl. ¶ 53 ("[E]ach of the Gas Suppliers had a pre-existing NAESB form contract with Brazos.").
[7]    *See* Ex. 1; Compl. ¶ 53.
[8]    *See* Ex. 1 at 1.
[9]    *See* Ex. 1 at 11–12.
[10]   Ex. 1 at 1, 12.
[11]   Ex. 1 at 8.
[12]   Ex. 1 at 8.
[13]   *See* Ex. 1 at 11 (making changes to various provisions but not to section 11.1).
[14]   *See generally* Ex. 1.
[15]   Compl. ¶ 53.
[16]   Compl. ¶ 53.

**B.     Winter Storm Uri tragically afflicted Texas in February 2021**

10.     In early February 2021, various governmental agencies began warning of a weather system approaching Texas (the "Winter Storm"). This included ERCOT, who issued a warning on February 8, 2021;[17] the National Weather Service, who issued a warning the next day on February 9, 2021;[18] and the Public Utility Commission of Texas ("PUC"), who issued a warning the following day on February 10, 2021.[19] The market price of natural gas immediately began to rise in response.[20] On February 12, 2021 Texas Governor Greg Abbott issued a disaster declaration.[21] In turn, basic supply and demand forces caused the market price of natural gas to again shoot up, rising over 6,628% during the twelve-day period.[22] On February 14, 2021 the President of the United States declared an emergency.[23]

11.     Finally, on February 15, 2021, ERCOT declared the highest level of emergency— Level 3. The PUC then entered an Order setting the price of electricity to $9,000 per MWh (from $21 to $29 per MWh before the Storm) and continued this practice until February 19, 2021.[24] During this period, Brazos racked up over $2.1 billion in electric charges.[25]

**C.     TotalEnergies only sold gas to Brazos on February 12, 2021, at prices lower than any other gas claimant.**

12.     During the midst of the Winter Storm, TotalEnergies sold natural gas to Brazos on only one day, February 12.[26] It sold 40,000 MMbtu of natural gas in two different lots for an agreed price of $133.61 per 1MMbtu (the "Transaction").[27] The agreed price was the lowest Brazos has

---

17    Compl. ¶ 33.
18    Compl. ¶ 34.
19    Compl. ¶ 35.
20    Compl. ¶¶ 36, 38.
21    Compl. ¶ 40.
22    Compl. ¶ 42.
23    Compl. ¶ 44.
24    First Day Decl. ¶ 54.
25    First Day Decl. ¶ 8.
26    Compl. ¶ 42.
27    Compl. ¶ 42.

disclosed occurring on that day, with other transactions ranging from $140.00 to $250.50/MMBTU.[28] These transactions constituted the market for gas available for Brazos to purchase. The purchase from TotalEnergies resulted from negotiations between TotalEnergies and individuals at the Alliance for Cooperative Energy Services Power Marketing, LLC ("ACES"), acting as Brazos's agent.[29] Despite the storm, there was nothing special or extraordinary about these negotiations.[30] The total sale price amounted to $5,344,400.[31]

**D.   Brazos seeks bankruptcy protection and attempts to avoid paying TotalEnergies for the natural gas.**

13.    On March 1, 2021, Brazos filed for Chapter 11 bankruptcy protection as a result of a "collateral call" resulting from the *$2.1 billion charge* made by ERCOT for electricity Brazos used during the seven days of the Winter Storm.[32] At the time, Brazos held over $2 billion in debt obligations.[33] These debts were exceeded by ERCOT's charge for electricity.[34] TotalEnergies claim for Brazos's $5.3 million purchase of natural gas makes barely a drop in the bucket as compared to such a gargantuan claim. While Brazos has not provided an exact accounting of its assets, it estimated its assets as ranging between $1 and 10 billion at the time it filed for bankruptcy.[35] The cash Brazos should have paid TotalEnergies for its natural gas would have only reduced its assets by $5 million—reducing Brazos's assets between 0.06% and 0.6%.

14.    Despite the natural gas that TotalEnergies provided to help keep the electricity flowing to Brazos's 1.5 million customers, Brazos now refuses to pay. Brazos seeks to avoid the Transaction, asserting that it was "unconscionable, contrary to public policy, w[as] entered into

---

28   *See* Compl. ¶ 42.
29   Compl. ¶ 53.
30   *See generally* Compl.
31   Compl. ¶ 52.
32   C.A. No. 21-30725, Dkt. 1, ("Petition"); First Day Decl. at ¶¶ 8, 9 56.
33   First Day Decl. at ¶ 36.
34   First Day Decl. at ¶ 8.
35   Petition at 4.

under duress, or [] require[d] the performance of an illegal act."[36] Brazos also asserts that the Transaction was a fraudulent transfer prohibited by both the United States Bankruptcy Code and Texas law.[37] Finally, Brazos also seeks to strip TotalEnergies of its section 503(b)(9) claim even though it indisputably supplied gas to the Debtor within twenty days of the bankruptcy. This adversary proceeding results.

### III.   LEGAL STANDARD

15.     To survive a motion to dismiss, a plaintiff must plead "sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Only non-conclusory factual allegations are entitled to the presumption of truth on review of motion to dismiss—conclusory allegations of law, inferences not supported by facts, and formulaic recitations of the elements of a claim do not satisfy the pleading standard under the Federal Rules and cannot defeat a Rule 12(b)(6) motion to dismiss. *Id.* at 678; *Twombly*, 550 U.S. at 555. A complaint that contains "facts that are 'merely consistent with' a defendant's liability" is insufficient as it "'stops short of the line between possibility and plausibility of entitlement to relief.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).

16.     The Court must generally limit itself to consideration of the Complaint's contents and its attachments. *See, e.g.*, *Brand Coupon Network, L.L.C. v. Catalina Mktg. Corp.*, 748 F.3d 631, 635 (5th Cir. 2014). But a notable exception allows a defendant to attach documents that "are referred to in the pleadings and are central to a plaintiff's claims." *Id.* The Court may, of course, also take notice of other filings in the record from the Chapter 11 case. *See Norris v. Hearst Trust*,

---

[36]   Compl. ¶ 63.
[37]   Compl. ¶¶ 68–76.

500 F.3d 454, 461 n.9 (5th Cir. 2007). TotalEnergies has accordingly attached the Contract at issue and cited matters already in the record.

**IV.     ARGUMENT AND AUTHORITIES**

**A.     <u>Claim 1</u>: Brazos's allegations cannot establish that the Transaction was unenforceable under Texas law.**

17.     Brazos's first cause of action asks this Court to reach far beyond the bounds of Texas law and extend consumer protection law—both common law and statutory—to a sophisticated business consumer that the Texas Legislature excluded from its statutory framework. As such, Brazos would have this Court find that the Transaction is "unconscionable, contrary to public policy, w[as] entered into under duress, or [] require[d] the performance of an illegal act."[38] This is no simple charge, and Brazos does not come close to pleading the elements required by Texas law.

18.     The doctrine of unconscionability is rarely applied by courts applying Texas law. Indeed, it is typically found only when one party is illiterate. *See, e.g.*, *In re Turner Bros. Trucking Co.*, 8 S.W.3d 370, 377 (Tex. App.—Texarkana 1999). Contrary to Brazos's claim, Texas public policy favors the enforcement of private contracts. *BMG Direct Mktg., Inc. v. Peake*, 178 S.W.3d 763, 767 (Tex. 2005). To argue otherwise, Brazos is forced to look to the DTPA, which does not apply on its face. *See* Deceptive Trade Practices—Consumer Protection Act, TEX. BUS. & COM. CODE § 17.45(4) ("'Consumer' . . . does not include a business consumer that has assets of $25 million or more."). Thus, Brazos is forced to ask this court, under the guise of equity, to rewrite the statute in its favor. Brazos does no better at establishing duress: it equates the enforcement of the Contract—to which Brazos agreed—to loss of life, which is inapt. Finally, Brazos fails to

---

[38]   Compl. ¶ 63.

properly plead that the execution of its natural gas purchase and sale agreement with TotalEnergies required the performance of an illegal act. The Court should dismiss Claim One.

> **i.     The Transaction was neither procedurally nor substantively unconscionable.**

19.     In Texas, unconscionability is a high bar—"a heavy burden to satisfy." *Oden v. Infosys Ltd.*, 2018 WL 4627099, at *4 (N.D. Tex. Aug. 31, 2018); *see also Porterfield v. JP Morgan Chase, NA*, 2015 WL 1061496, at *4 (W.D. Tex. Mar. 10, 2015) (finding the party unable "to bear the heavy burden of proving unconscionability"). This burden is strictly on the party seeking to invalidate an agreement. *See In re Halliburton Co.*, 80 S.W.3d 566, 572 (Tex. 2002). Brazos must meet this burden by plausibly pleading allegations that, if true, establish that the Transaction was both procedurally and substantively unconscionable. But Brazos's allegations do not meet the high burden to establish either prong, let alone both.

> **a.     Because Brazos's allegations do not suggest either the NAESB negotiation or the individual purchase was inequitable, the Transaction is not procedurally unconscionable.**

20.     Procedural unconscionability is almost never found by federal courts applying Texas law. Indeed, the Fifth Circuit reviewed the caselaw and found that "[t]he only cases under Texas law in which an agreement was found procedurally unconscionable involve situations in which one of the parties appears to have been incapable of understanding the agreement." *Fleetwood Enterprises, Inc. v. Gaskamp*, 280 F.3d 1069, 1077 (5th Cir. 2002) (collecting cases). This remains true, and Texas courts have generally only found illiteracy to meet the standard. *See Delfingen US-Tex., L.P. v. Valenzuela*, 407 S.W.3d 791, 800 (Tex. App.—El Paso 2013, no pet.) (finding terms were procedurally unconscionable where a worker was illiterate in English, no Spanish version of the form was available, and some terms were orally misrepresented to him; *In re Turner Bros. Trucking Co.*, 8 S.W.3d at 377 (finding an agreement was procedurally unconscionable where one of the parties was functionally illiterate, no one explained the agreement

to him, and the person who gave him the agreement to sign did not understand the agreement).

Unsurprisingly, Brazos does not allege that anyone at Brazos or its agent ACES was illiterate.

21.     To prevail, Brazos must plausibly allege "something about the negotiation process

that was not merely distasteful, but truly shocking." *Ridge Nat. Res., L.L.C. v. Double Eagle

Royalty, L.P.*, 564 S.W.3d 105, 135 (Tex. App.—El Paso 2018, no pet.) (enforcing a contract that

a party did not read or understand before signing); *see also Ramirez v. 24 Hour Fitness USA, Inc.*,

2013 WL 2152113, at *5 (S.D. Tex. May 16, 2013) (holding party failed to show the process

surrounding the agreement was "shocking"), *aff'd*, 549 F. App'x 262 (5th Cir. 2013). Brazos's

Complaint ignores the negotiation of the Contract underlying the Transaction. As Brazos points

out, the NAESB is a form used by the entire natural gas industry.[39] As far as TotalEnergies is

aware, no court, *anywhere*, has ever found the NAESB unconscionable. A finding of

unconscionability would thus have ramifications far beyond this bankruptcy, upending the market

for natural gas. At minimum, such an unprecedented ruling would invalidate *all* sales of natural

gas that occurred during the Winter Storm, not just by the parties to this litigation.

22.     The specific Contract agreed to by Brazos and TotalEnergies contains nine separate

negotiated terms, as well as numerous selected provisions.[40] There is no allegation that

TotalEnergies "tricked" or defrauded Brazos when making these selections that could support a

finding of unconscionability. *See, e.g.*, *Micocina, Ltd. v. Balderas-Villanueva*, 2017 WL 4857017,

at *5 (Tex. App.—Dallas Oct. 27, 2017, no pet.) (finding "the record does not show he was tricked

or fraudulently induced into signing the Acknowledgment"). This Contract has been in place for

over eighteen years—only now, during a bankruptcy proceeding triggered by another creditor's

billion-dollar claim, does Brazos assert unconscionability.

---

[39]   Compl. ¶ 53.
[40]   *See* Ex. 1 at 1, 11–12 (Special Provisions).

23.     Similarly, with respect to the Transaction, Brazos's Complaint is entirely devoid of allegations that would suggest impropriety by TotalEnergies. Brazos only states that the Transaction was entered into by its agent ACES and was the result of "individual communications" between ACES and TotalEnergies.[41] The only relevant day that TotalEnergies sold gas was on February 12, 2021.[42] No negotiations or "individual communications" are discussed. Brazos only alleges that TotalEnergies "charged" $133.61 per MMBtu.[43] This is *the lowest price* offered by any of the Gas Claimants mentioned in the Complaint.[44] The Restatement of Consumer Contracts cautions that when the sole contract term asserted to be unconscionable is price, "[t]he procedural-unconscionability test may be more difficult to satisfy because the price is usually the most prominent element of a transaction." Restatement of Consumer Contracts § 5 (2019), Cmt. 8. This applies all the more when the consumer at issue is not an unsophisticated individual but the "largest and oldest" electricity generation and transmission cooperative operating in Texas.[45]

> **b. The Transaction was not substantively unconscionable, and enforcement would be neither "shocking" nor "gross."**

24.     Just as with procedural unconscionability, the bar to prove substantive unconscionability "is set very high." *Ridge Nat. Res., L.L.C. v. Double Eagle Royalty, L.P.*, 564 S.W.3d 105, 131 (Tex. App.—El Paso 2018, no pet.). For Brazos to prevail, TotalEnergies's conduct must have been so vile that to enforce the contracts would "shock the conscience." *McConnell v. McConnell*, 2011 WL 286145, at *7 (Tex. App.—Houston [1st Dist.] Jan. 27, 2011, no pet.) (quoting *Besteman v. Pitcock*, 272 S.W.3d 777, 789 (Tex. App.—Texarkana 2008, no pet.). Texas law considers whether "given the parties' general commercial background," the

---

[41]   Compl. ¶¶ 52, 53.
[42]   Compl. ¶ 42.
[43]   Compl. ¶ 42.
[44]   Compl. ¶ 42.
[45]   Compl. ¶ 27.

"clause involved is so one-sided that it is unconscionable under the circumstances." *In re Olshan Found. Repair Co*., 328 S.W.3d 883, 892 (Tex. 2010) (quoting *FirstMerit Bank*, 52 S.W.3d at 757). The Supreme Court of Texas is clear that "[t]he principle is one of the prevention of oppression and unfair surprise and not of disturbance of allocation of risks because of superior bargaining power." *Id*. (quoting TEX. BUS. & COM. CODE § 2.302 cmt. 1). In other words, "[i]n the absence of any mistake, fraud, or oppression, the courts, as such, are not interested in the wisdom or imprudence of contracts and agreements voluntarily entered into between parties." *In re Big 8 Food Stores, Ltd*., 166 S.W.3d 869, 877 (Tex. App.—El Paso 2005, no pet.).

25.    Brazos alleges no facts even approaching this standard. Brazos does not allege that it is in any way unsophisticated or lacks a commercial background. To the contrary, Brazos alleges that it "is the largest and oldest generation and transmission electric cooperative in Texas."[46] It boasts that it owns electrical generation capacity equal to "approximately 3% of the total ERCOT installed generation capacity."[47] Any substantive inequity in terms would have to be all the higher given its sophistication.

26.    Similarly, Brazos does not allege any substantive inequity or one-sided-ness in the NAESB Contract governing the sale of gas to Brazos from TotalEnergies. By Brazos's own admission, the Contract "did not obligate Brazos to purchase any gas. Nor did [it] obligate [TotalEnergies] to sell any gas."[48] If the market price offered by TotalEnergies was too high, under the Contract Brazos could have simply not purchased the gas or sought to purchase it from another

---

[46]   Compl. ¶ 27.
[47]   Compl. ¶ 27.
[48]   Compl. ¶ 53.

party.[49] Brazos did, in fact, purchase gas from at least six other parties—all at *higher* prices than offered by TotalEnergies.[50]

| Gas Claimant | Low Price/MMBtu | High Price/MMBtu | % Increase from prior trading day |
|---|---|---|---|
| NJR | $149.66 | $149.66 | 797% |
| ETC | $175.00 | $200.00 | 1043% |
| Mercuria | $140.00 | $250.40 | 763% to 1515% |
| Concord | $150.00 | $250.00 | 880% to 1289% |
| Tenaska | $175.00 | $175.00 | 900% to 961% |
| Koch | $200.00 | $200.00 | 1011% to 1805% |
| Total | $133.61 | $133.61 | n/a |

27.    Brazos was thus a "willing party to the transaction" who is not entitled to post-hoc protection. *Earman Oil Co., Inc. v. Burroughs Corp.*, 625 F.2d 1291, 1299 (5th Cir. 1980) (rejecting assertion of unconscionability). From the perspective of the Transaction, Brazos makes no allegation that the gas was available at a lower market price than the $133.61/MMBt it paid to TotalEnergies—to the contrary, Brazos indicates that TotalEnergies actually *underbid its competitors*.[51]

28.    Brazos accordingly fails to allege facts sufficient to plausibly establish either procedural or substantive unconscionability—both of which are necessary to invalidate the Transaction.

---

[49]    *See generally* Ex. 1.
[50]    Compl. ¶ 42.
[51]    *See* Compl. ¶ 42 (table).

ii.  **Texas public policy favors the enforcement of the Transaction—and the DTPA does not provide a basis to invalidate them.**

29.      Texas law places a high value on the sanctity of the right to contract. The Supreme Court of Texas has repeatedly reinforced the state's "strong commitment to the principle of contractual freedom." *Churchill Forge, Inc. v. Brown*, 61 S.W.3d 368, 371 (Tex. 2001). "Allowing parties to contractually allocate th[e] risk of uncertainty carries out Texas's public policy strongly favoring the freedom of parties to contract." *BMG Direct Mktg., Inc. v. Peake*, 178 S.W.3d 763, 767 (Tex. 2005). Accordingly, the Supreme Court of Texas has repeatedly instructed that "[c]ourts must exercise judicial restraint in deciding whether to hold arm's-length contracts void on public policy grounds." *Lawrence v. CDB Services, Inc.*, 44 S.W.3d 544, 553 (Tex. 2001).

30.      Because public policy "pertains to the law-making power to define, [] courts are apt to encroach upon the domain of [the legislature] if they characterize a transaction as invalid" in the absence of a statute instructing them to do so. *Tex. Commerce Bank, N.A. v. Grizzle*, 96 S.W.3d 240, 250 (Tex. 2002). Accordingly, a trial court may only find a contract void for public policy when there is a statutory violation, illegality, or relevant judicial decision requiring it to do so. *Phil. Indem. Ins. Co. v. White*, 490 S.W.3d 468, 484 (Tex. 2016) (warning against using "public policy to mechanically jettison the parties' agreement" and to "refuse enforcement only when doing so would create an actual conflict with the statute"). And so, "[i]f the illegality does not appear on the contract's face, a court will not find it void." *Merry Homes, Inc. v. Chi Hung Luu*, 312 S.W.3d 938, 945 (Tex. App.—Houston [1st Dist.] 2010, no pet.).

31.      Yet this is precisely what Brazos asks this Court to do—invalidate the Contract between two private parties in the absence of a legislative directive to do so. Brazos attempts to overcome this hurdle by impermissibly looking to the Texas Deceptive Trade Practices–Consumer

Protection Act. But the very title of the Act[52] gives the game away. In enacting this statute, the Texas Legislature intended to give additional legal protections to Texan *consumers*. It extended this to some business consumers, but with an important exception—the Legislature expressly excluded from the Act any company "that has assets of $25 million or more" thus *explicitly excluding* businesses like Brazos from protection. DTPA § 17.45(4). Brazos does not, and cannot, allege that it falls below the maximum assets threshold, and so is not under the protections of the DTPA. *See Brittan Communications Intern. Corp. v. Sw. Bell Tel. Co.*, 313 F.3d 899, 907 (5th Cir. 2002) ("If [the] requirement is lacking, the person aggrieved by a deceptive act or practice must look to the common law or some other statutory provision for redress." (quoting *Cameron v. Terrell & Garrett, Inc.*, 618 S.W.2d 535, 539 (Tex.1981)).

32.     Brazos appears to understand that the DTPA does not apply, and so does not bring its claim under the statute specifically.[53] Instead, it seeks to invalidate the otherwise lawful Transaction because they "are contrary to the spirit of the DTPA, and therefore, [are] against public policy."[54] But to extend the protections of the DTPA to Brazos in the name of "public policy" would "deprive[] the Legislature of its role as the policy-making body" *See, e.g.*, *Phil. Indem. Ins. Co.*, 490 S.W.3d at 484 (instructing courts to "defer to the Legislature's policy choices"). This is forbidden under Texas law. *Id*. This Court may not step into the Texas Legislature's shoes, attempt to divine the "spirit" of the Act, and rewrite the statue to match. *Tijerina v. City of Tyler*, 846 S.W.2d 825, 828 (Tex. 1992) (holding a court "cannot rewrite . . . a plainly worded statute because [it] believe[s] it does not effectuate sound policy"); *see also U. S. v. Rutherford*, 442 U.S. 544, 555 (1979) ("[F]ederal courts do not sit as councils of revision, empowered to rewrite legislation in

---

[52]     *See* Tex. Bus. & Com. Code § 17.41 ("This subchapter may be cited as the Deceptive Trade Practices-Consumer Protection Act").

[53]     *See generally* Compl.

[54]     Compl. ¶ 66.

accord with their own conceptions of prudent public policy."). Indeed, what Brazos is asking is not only not the "spirit" of the Act but would contradict the express plain language of the legislature—excluding entities like Brazos. *See* DTPA § 17.45(4).

       **iii.**    **Brazos does not plausibly allege TotalEnergies placed it under duress.**

      33.     Brazos fails to allege that TotalEnergies placed Brazos under duress when it engaged in the Transaction. Texas law does provide a doctrine of "economic duress," which "requires: (1) a threat to do something which a party threatening has no legal right to do; (2) some illegal exaction or some fraud or deception; and (3) imminent restraint such as to destroy free agency without present means of protection." *King v. Bishop*, 879 S.W.2d 222, 223 (Tex. App.—Houston [14th Dist.] 1994, no writ); *see also Palmer Barge Line, Inc. v. S. Petroleum Trading Co., Ltd.*, 776 F.2d 502, 505 (5th Cir. 1985) ("The party seeking to establish economic duress must show that a wrongful threat was made which was of such character as to destroy the free agency of the party to whom the threat was directed."). But these elements are clearly absent from Brazos's Complaint. Brazos does not even make a conclusory assertion that it lacked "free agency."[55]

      34.     Instead, Brazos seems to blame the Winter Storm itself for causing the duress. It pulls no punches in this regard, stating without qualification that Brazos was forced to choose between buying gas or "letting Texans literally freeze to death."[56] Setting this litigation aside, the 2021 Winter Storm was unquestionably a terrible tragedy. But Brazos's position would actually work to *reduce* access to natural gas during times of disaster if sellers of vital resources had to be worried that their counterparties would simply take the goods and avoid payment. Regardless, the background conditions are not a basis for invalidating the Transaction for duress—that requires TotalEnergies "threaten to do something that it had no legal right to do." *Lester v. Advanced Envtl.*

---

[55]  *See generally* Compl.
[56]  Compl. ¶ 66.

*Recycling Techs., Inc*., 248 F. App'x 492, 495 (5th Cir. 2007) (citing *Osorno v. Osorno*, 76 S.W.3d 509, 511 (Tex. App.—Houston [14th Dist.] 2002, no pet.); *see also Brown v. Aztec Rig Equip., Inc*., 921 S.W.2d 835, 845 (Tex. App.—Houston [14th Dist.] 1996, writ denied) ("Duress is a threat to some act which the threatening party has no legal right to do."). There is no allegation that TotalEnergies ever threatened Brazos.

35.     Selling natural gas to an electricity producer during a disaster is not illegal. Brazos fails to establish duress under Texas law. *Osorno*, 76 S.W.3d at 511 (acknowledging a party "was faced with difficult choices, but we cannot find her decision to sign the agreement was involuntary").

> **iv.     There is no allegation of illegality whatsoever.**

36.     Brazos also asserts that "Texas Courts do not enforce agreements . . . that require the performance of an illegal act . . . which is true of the Gas claims."[57] It is not clear if Brazos is actually making the argument that the purchase of natural gas from TotalEnergies on February 12, 2021 required the performance of an illegal act.[58] To the extent it is, there is simply no supporting allegation. Claim 1 should be dismissed.

**B.     <u>Claim 2</u>: Brazos does not plausibly allege receiving less than reasonably equivalent value, and so its claim for constructive fraudulent transfer fails as a matter of law.[59]**

37.     The Complaint contains no allegations that the price at which Brazos purchased natural gas from TotalEnergies was anything but the market price. To the contrary, Brazos acknowledges the price increases occurred as a result of the economic forces of increased demand

---

[57]  Compl. ¶ 63.
[58]  *Compare* Compl. ¶ 66 (asserting "the Gas Claims are not enforceable because they are unconscionable, contrary to public policy, and were entered into under duress" without mentioning illegality).
[59]  Additionally, Brazos fails to sufficiently plead the solvency-related elements of a constructively fraudulent conveyance under § 548(a)(1)(B). The Complaint only makes conclusory statements regarding the Debtor's "impeccable financial record" prior to Winter Storm Uri. *See* Compl. ¶¶ 28–30.

and decreased supply of natural gas due to the Winter Storm.[60] Yet it now requests that this Court disregard the market price for a commodity in favor of some presumably lower price selected by this Court. That a bankruptcy court would legislate the "fair" price for a commodity has no support in the law and for good reason: such a judicial fiat would not only undermine free market transactions for the supply of goods to a debtor on the eve of bankruptcy but would also open the floodgates to challenges of commodity transactions—often subject to high market volatility—of any debtor who purchases commodities.

       i.    **Because value is measured at the time of the transaction, Brazos purchased the natural gas at reasonably equivalent value under Bankruptcy Code section 548(a)(1)(B)(i).**

38.      The Fifth Circuit is clear that "reasonably equivalent value," must be determined at the time the transfer was made. *See, e.g.*, *In re Am. Hous. Found.*, 544 F. App'x 516, 520 (5th Cir. 2013) ("[T]he bankruptcy court determines reasonably equivalent value at the time of the exchange.").[61] Courts have found that "comparable sales or current market price is the best" method to value an asset. *See, e.g.*, *In re Morris Commc'ns NC, Inc.*, 914 F.2d 458, 469 (4th Cir. 1990) ("[I]t has been often declared by the courts that the method of 'comparable sales' in the relevant time frame is 'more appropriate than any other method in determining market value of the property taken.'" (quoting *United States v. 100 Acres of Land, More or Less, in Marin Cty., State of Cal.*, 468 F.2d 1261, 1265 (9th Cir. 1972))).[62] Further, when evaluating avoidance actions under Section 548, where a market value is readily available and is the product of an arm's length

---

[60]  First Day Decl. ¶ 50.

[61]  *See also Jimmy Swaggart Ministries v. Hayes (In re Hannover Corp.)*, 310 F.3d 796, 802 (5th Cir. 2002) ("Thus, consistent with economic reality, this and other circuits unequivocally hold that for purposes of § 548 the value of an investment, even a risky one, such as we have before us now, is to be determined at the time of purchase."); *ASARCO LLC v. Americas Mining Corp.*, 396 B.R. 278, 337 (S.D. Tex. 2008) ("All jurisdictions agree that courts should measure the value of the property transferred and the consideration received *at the time of the transfer*.") (emphasis added).

[62]  *See also Ashland Oil, Inc. v. Phillips Petroleum Co.*, 554 F.2d 381, 387 (10th Cir. 1975) (discussing how to value helium in an action to recover the reasonable value of helium extracted by a natural gas purchaser).

transaction with no allegations of actual fraud, courts will defer to the value set by the market. *See, e.g.*, *In re Waterford Wedgwood USA, Inc.*, 500 B.R. 371, 381 (Bankr. S.D.N.Y. 2013) ("Courts give 'significant deference to marketplace values' and to values reached in the context of 'an arm's length transaction between a willing buyer and a willing seller.'" (quoting *Peltz v. Hatten*, 279 B.R. 710, 736 (D. Del. 2002))).[63] Courts have also found that the price set by bidding in an open market auction establishes that the transfer was made for reasonably equivalent value. *Stettin v. Dan Marino Found., Inc. (In re Rothstein Rosenfeldt Adler, P.A.)*, 483 B.R. 15, 21 (Bankr. S.D. Fla. 2012) (finding that "if a competitive market set the price by the bidding procedures of the auction, it establishes the reasonably equivalent value.").

39.     Here, Brazos's own allegations clearly establish that the February 12, 2021 price agreed by Brazos with TotalEnergies was entirely consistent with the market price for gas. Indeed, Brazos's Complaint goes to great lengths to describe a market-wide price increase as a result of the Winter Storm.[64] The list of prices charged by seven gas suppliers in the market on February 12 not only highlights that the price at which TotalEnergies supplied gas was consistent with the market but, in fact, that it was substantially lower than the market price charged by the six other gas suppliers.[65] In other words, Brazos's purchase of natural gas from TotalEnergies was made on the open market between a willing buyer and seller at arm's length.

### ii.     The Court cannot consider price fluctuations when determining reasonably equivalent value of a commodity.

40.     Fluctuations in price before or after those sales are *irrelevant as a matter of law* with respect to determining whether Brazos received fair value for the property transferred at the

---

[63]   *See also In re E. Livestock Co., LLC*, 544 B.R. 640, 648 (Bankr. S.D. Ind. 2015) (granting summary judgment on a fraudulent transfer claim under Section 548 where there was "no evidence of fraud and no suggestion that the price paid for the cattle was anything other than the going fair market price.")
[64]   Comp. ¶¶ 31, 41, 43 and 51.
[65]   Compl. ¶42.

time the Transaction occurred. *See In re Louisiana Pellets, Inc.*, 838 F. App'x 45, 50 (5th Cir. 2000). The Fifth Circuit has found that "[n]either subsequent depreciation in nor appreciation in value of the consideration affects the question whether reasonably equivalent value was given." *Id.* (quoting *In re Chomakos*, 69 F.3d 769, 711 (6th Cir. 1995)). When it comes to commodities in particular, where value is readily determinable by reference to relevant commodities markets, the Southern District of Texas has similarly held that subsequent changes in the price of a commodity are irrelevant to the determination of "reasonably equivalent value." *See ASARCO*, 396 B.R. at 337 ("The Court should not consider subsequent events [such as an increase in the price of a commodity] . . . [and] avoid valuing an asset 'through the 20/20 vision of hindsight.'" (quoting *In re Jumer's Castle Lodge, Inc.*, 338 B.R. 344, 354 (C.D. Ill. 2006))). The *Asarco* court further instructed that in determining whether reasonably equivalent value was provided, "courts should use the industry standards in place *at the time of the transaction* to determine the fair market value of the [good] because these standards determine what a hypothetical sale of such property would yield for the company." *Id.* (emphasis added). Here, Brazos's Complaint makes clear that the industry standards in place and Brazos's existing NAESB contracts at the time of the sale resulted in market prices of natural gas ranging from $133.61 to $250.50/MMBTU with TotalEnergies providing the *lowest* price among the suppliers of $133.61.[66]

41.      Moreover, after TotalEnergies's sale to Brazos, gas prices increased.[67] This subsequent price increase underscores that Brazos received full value of the gas from TotalEnergies at the time of the transfer, as Brazos could have profited had it sold the gas it received from TotalEnergies on the market.[68] *ASARCO*, 396 B.R. at 337 ("The [reasonably

---

[66]     Compl. ¶ 42.
[67]     Comp. ¶¶ 47, 48.
[68]     Compl. ¶¶ 47, 48.

equivalent value] inquiry is focused on the value that the debtor received in exchange for the property transferred." (citing *In re R.M.L., Inc.*, 92 F.3d 139, 149 (3d Cir. 1996))).

42.     Thus, the second cause of action should be dismissed as a matter of law.

**C.     Claim 3: Because Brazos purchased natural gas from TotalEnergies at market prices, the Transaction cannot be a fraudulent transfer under Texas law.**

43.     Brazos mischaracterizes the legitimate, market-rate transactions for the purchase of natural gas from TotalEnergies as a fraudulent transfer in violation of the Texas Uniform Fraudulent Transfer Act.[69] But because the Transaction occurred at arm's-length and at market value, there is no legal basis for this claim. Brazos's TUFTA claim should be dismissed with prejudice.

     **i.     As a matter of law, Brazos received "reasonably equivalent value" when it purchased natural gas at market price from TotalEnergies.**

44.     The first element of section 24.005 requires Brazos to establish that it did not receive "reasonably equivalent value." *See* Uniform Fraudulent Transfer Act, Tex. Bus. & Com. Code § 24.005. Helpfully, the Texas Legislature did not leave parties guessing about what this phrase means. It defined "reasonably equivalent value" in plain language: "a transfer or obligation that is within the range of values for which the transferor would have sold the assets in an arm's length transaction." TUFTA § 24.004(d). Following Legislature's clear instruction, the Supreme Court of Texas held that under TUFTA, if "an exchange occurred for market-value rates in an arm's-length transaction" then this "conclusively establishes that the value exchanged was 'reasonably equivalent.'" *Janvey v. Golf Channel, Inc.*, 487 S.W.3d 560, 582 (Tex. 2016). Brazos alleges no facts to the contrary.

---

[69]   Compl. ¶¶ 71–76.

45.     Under binding Fifth Circuit precedent, "[i]n commercial settings such as the instant one, businessmen are presumed to act at arms [sic] length." *Earman Oil Co., Inc. v. Burroughs Corp.*, 625 F.2d 1291, 1300 (5th Cir. 1980). This ends this Court's inquiry. And Brazos's complaint reveals no allegation nor inference that Brazos and TotalEnergies engaged in anything other than a commercial, arm's-length transaction. Only one sentence describes an action taken by TotalEnergies: "Total sold natural gas to the Debtor."[70] All other allegations lump TotalEnergies in with other gas claimants. *See VeroBlue Farms USA, Inc. v. Wulf*, 465 F. Supp. 3d 633, 654–55 (N.D. Tex. 2020) (holding it impermissible to use group pleading in non-securities fraud cases). But setting that aside, there is no allegation that any of the gas claimants (even collectively) did not engage in arm's-length transactions.[71] Certainly, there is no allegation of collusion between executives at TotalEnergies and Brazos or that the traders were engaged in a conspiracy to defraud. *Tow v. Amegy Bank N.A.*, 498 B.R. 757, 769–770 (S.D. Tex. 2013) (finding insufficient evidence of "collusion" to establish constructive fraud under TUFTA). An arm's-length transaction is one "[o]f, relating to, or involving dealings between two parties who are not related or not on close terms and who are presumed to have roughly equal bargaining power; not involving a confidential relationship." Black's Law Dictionary (11th ed. 2019); *see also Kimbell v. U.S.*, 371 F.3d 257, 261–62 (5th Cir. 2004); *Williams v. Houston Plants & Garden World, Inc.*, 508 B.R. 19, 32 (S.D. Tex. 2014). There is no allegation that Brazos and TotalEnergies (or any of their agents or employees) had a confidential relationship or were anything other than unrelated and unaffiliated parties. If anything, Brazos's other causes of action, alleging that the gas companies attempted to take advantage of it, undercut any assertion that the Transaction was not made at arm's length.

---

[70]     Compl. ¶ 21.

[71]     *See generally* Compl.; *compare* Compl. ¶ 53 ("The Gas Claims are the result of individual communications between ACES and the Gas Suppliers during February of 2021.").

46.      Brazos similarly does not establish that the Transaction took place at anything other than market prices. *See In re Pioneer Home Builders, Inc.*, 147 B.R. 889, 892 (Bankr. W.D. Tex. 1992) (defining market value "as that value that a prudent business person can obtain from the sale of an asset when there is a willing buyer and a willing seller"). Brazos goes to great lengths to detail the change in market price for natural gas, from just under $3/MMBtu on February 1[72] to just under $5/MMBtu on February 10[73] all the way to prices in the $600s and $700s per MMBtu on February 16.[74] All of these prices, at least according to the Texas Legislature (responding to the Winter Storm), occurred at market prices. *See* 2021 Tex. H.B. 1520 (NS) (Apr. 14, 2021), also available at https://capitol.texas.gov/tlodocs/87R/analysis/html/HB01520H.htm, (Background and Purpose: "The cost of gas . . . is set by the market . . . . High demand for energy during the storm caused gas prices to rise."). Indeed, Brazos has not alleged that it was able to procure gas at any other prices (or from any other sellers) on February 12, making the prices offered by the Gas Claimants the relevant market. For TotalEnergies's Transaction, Brazos agreed to pay $133.61/MMBtu.[75] This price may have been historically high—but there is no basis for asserting the February 12th price was not the market price and, if anything, contemporaneous transactions suggest it was *below the market price*.[76] *ASARCO*, 396 B.R. at 336–37 (measuring value at the time of the transfer, as courts "should not consider subsequent events, such as [dramatic changes in commodity] prices").

---

[72]  Compl. ¶ 54.
[73]  Compl. ¶ 36.
[74]  Compl. ¶ 48.
[75]  Compl. ¶ 42.
[76]  *Compare* Compl. ¶ 42 (showing Total's price was lower than the rates charged by other Gas Claimants).

47.     Accordingly, TotalEnergies has "conclusively established" that under Texas law the Transaction was made for reasonably equivalent value. *See Janvey*, 487 S.W.3d at 582. This claim should be dismissed with prejudice.

**D.     Claim 4: Brazos has not plausibly pled the Transaction was outside its ordinary course of business to generate electricity under Bankruptcy Code section 503(b)(9).**

48.     The fourth cause of action should be dismissed because the Complaint contains no well-pleaded allegations that establish the natural gas was not "sold to the debtor in the ordinary course of such debtor's business" under Bankruptcy Code section 503(b)(9).

     **i.     Applying the UCC, the Transaction occurred in the ordinary course of business by following the usual and customary practices of Brazos and TotalEnergies.**

49.     Courts look to the Uniform Commercial Code to define "ordinary course of business" and other terms contained in section 503(b)(9). *See, e.g.*, *In re SemCrude, L.P.*, 416 B.R. 399, 403 (Bankr. D. Del. 2009) (noting "[t]here is nothing in the Code or in the legislative history accompanying the recent enactment of § 503(b)(9) suggesting that Congress intended that bankruptcy courts should look beyond the Uniform Commercial Code to construe or define [the terms "received," "sold," and "ordinary course of business"] as they apply to sales of goods); *see also In re World Imports*, Ltd., 862 F.3d 338, 342 (3d Cir. 2017) (using the UCC to define the word "received" in the context of § 503(b)(9)).

50.     Brazos was squarely a "[b]uyer in the ordinary course of business" under the UCC with respect to its gas purchases from TotalEnergies. The UCC defines "buyer in the ordinary course of business" as one that buys in good faith and follows the usual or customary practices of sale:

> [A] person that buys goods in good faith, without knowledge that the sale violates the rights of another person in the goods, and in the ordinary course from a person . . . in the business of selling goods

of that kind. A person buys goods in the ordinary course if the sale
to the person comports with the *usual or customary practices* in the
kind of business in which the seller is engaged or with the seller's
own usual or customary practices.

U.C.C. § 1-201(9) (emphasis added); *see also* TEX. BUS. & COM. CODE § 1.201(b)(9) (same). The
Complaint clearly shows Brazos previously engaged in similar open market gas purchase
transactions.[77] In fact, Brazos routinely purchased natural gas, as it uses natural gas to generate
electricity at its plants.[78]

     51.    Brazos does not allege that TotalEnergies was not "in the business of selling goods
of that kind." U.C.C. § 1-201(9). Nor can it—Brazos acknowledges that the sale was made
pursuant to the parties' "pre-existing NAESB contract"—a contract that was entered into on
October 1, 2003, eighteen years prior.[79] Brazos also does not allege that the February 12, 2021 gas
sale transaction was unusual or not customary, whether for TotalEnergies's industry or relative to
TotalEnergies's "own usual or customary practices." It does not even allege that the sale contained
a single term or condition that was different from the parties' pre-existing NAESB Contract. The
parties negotiated the terms and entered into the sale through instant messaging with Brazos's
representative at ACES.[80] This practice was customary for Brazos and the industry as a whole—
Brazos's Complaint demonstrates this by noting that all seven natural gas sellers engaged in the
same negotiation and sale process with ACES.[81] In sum, Brazos makes no allegations whatsoever
that the sales of natural gas from TotalEnergies to Brazos failed to comport with the "usual or
customary practices in the kind of business in which the seller is engaged." U.C.C. § 1-201(9).

---

[77]  Compl. ¶ 32.
[78]  Compl. ¶ 1.
[79]  Compl. ¶ 53; Ex. 1.
[80]  Compl. ¶ 53.
[81]  Compl. ¶ 52.

ii.    **The mere fact that the market price for natural gas on February 12 had risen does not transform an ordinary gas sale into something extraordinary.**

52.    Courts have found that even where contracts include certain terms that are "somewhat unusual," or even unique (which the sale transaction between TotalEnergies and Brazos did not), that does not render the buyer anything other than a buyer in the ordinary course. *Financial Federal Credit, Inc. v. Crane Consultants, LLC*, 21 F. Supp. 3d 264, 272 (W.D.N.Y. 2014). For example, the *In re SemCrude* court, reviewing an increase in the *amount* (versus the price) of commodities purchased, held this did not "render [the Transaction] outside of the ordinary course of business." *In re SemCrude, L.P.*, 504 B.R. 39, 66–67 (Bankr. D. Del. 2013). It rejected the debtor's claim because "[a]n increase in sales, by itself, does not operate to turn otherwise ordinary course transactions out of the ordinary." *Id*. at 66. The court relied on the customary nature of the terms of the agreements between the parties both in terms of industry and the specific parties. *Id*. ("Even if the Producers' allegations were true, these transactions were real purchases of oil, and not sham transactions."). Here, the market price increased, rather than the quantity. But the customary nature of the Transaction remained the same, consistent with the parties' decades-long, routine practice of buying and selling natural gas at the market price and pursuant to the terms of an industry-wide, standard NAESB contract.[82]

53.    Because the Transaction at issue was conducted in the "ordinary course of business," Claim Four of the Complaint should be dismissed.[83]

---

[82]   *See* Compl. ¶ 53.

[83]   The tests for ordinary course under Bankruptcy Code sections 363 and 364 which look at the "horizontal" and "vertical" dimensions of a transaction are also satisfied here. With respect to the horizontal test, other electrical co-ops similarly situated to Brazos with gas-fired power plants would make purchases of natural gas, as needed, to generate electricity for its members. With respect to the vertical test, creditors would expect Brazos to make purchases of natural gas, as needed, to fuel its gas-fired plants and in accordance with the industry-wide, standard NAESB contract in place for nearly two decades.

E.    <u>Claim 5</u>: **According to Brazos's own allegations, TotalEnergies unquestionably provided value to Brazos by supplying it with natural gas, and so retains administrative priority status under Section 503(b)(9).**

54.    Brazos's fifth cause of action seeks to strip TotalEnergies's claim of its administrative priority on the ground that "[t]he Gas Claims far exceed the 'value' of the goods received by the Debtor."[84] As discussed above,[85] undefined terms in Section 503(b)(9) are defined by reference to the UCC. It defines "value" as either the contract price or "any consideration" sufficient to support a contract. U.C.C. § 1-204 ("[A] person gives value for rights if the person acquires them . . . (3) by accepting delivery under a preexisting contract for purchase; or (4) in return for any consideration sufficient to support a simple contract."); *see also In re Plastech Engineered Products*, 397 B.R. 828 (E.D. Mich. 2008) (defining "value" as the invoice price of goods sold for purposes of Section 503(b)(9)). By Brazos's own allegations, TotalEnergies unquestionably provided "value" by supplying gas at the contract price, and clearly provided "consideration to support a simple contract."[86]

55.    Even if TotalEnergies were required to meet a standard for "value" other than as this term is defined under the UCC, which it does not, TotalEnergies has also already argued at length that the Transaction was made at arm's-length and at the market price.[87] Accordingly, there are no allegations to support Brazos's conclusory statement that it received anything other than the "value" of the natural gas it purchased on February 12, 2021 for purposes of Section 503(b)(9). This cause of action should be dismissed for the reasons articulated above and with respect to Claim Two.

---

[84]    Compl. ¶¶ 77–78.
[85]    *See supra* ¶ 49.
[86]    Compl. ¶¶ 21, 42.
[87]    *See supra* §§ IV (B), (C).

## V.   CONCLUSION

56.     Brazos has failed to plausibly allege facts supporting its claims. For cause one, there are no allegations supporting unconscionability or duress, and the doctrines of public policy and illegality are inapplicable as a matter of law. Brazos's claims for constructive fraudulent transfer fair no better, given Brazos's inability to overcome its own allegations showing the Transaction was made at arm's-length for market value. Likewise, Brazos's administrative priority status cannot be voided. Brazos has not alleged facts showing the Transaction was outside its ordinary course of business—and cannot, given that its business is the purchase of natural gas to generate electricity. Similarly, Brazos's allegations do not establish that the value of the natural gas received was anything other than the agreed price. To the contrary, Brazos's own allegations suggest that TotalEnergies, if anything, *undercharged* Brazos, pricing its natural gas from $6.39 to $116.79/MMBtu below its competitors.[88] And the opportunity to replead will not save Brazos's claims. For the reasons stated above, Brazos's Complaint should be dismissed in its entirety.

---

[88]   Compl. ¶ 42.

Case 21-04407   Document 36   Filed in TXSB on 01/07/22   Page 36 of 37

Dated: January 7, 2022

Respectfully submitted,

**AHMAD, ZAVITSANOS, ANAIPAKOS,
ALAVI & MENSING PC**

*/s/ Monica Uddin*
Demetrios Anaipakos
State Bar No. 00793258
Federal I.D. 20323
Monica Uddin
State Bar No. 24075195
Federal I.D. 1138459
Alexander M. Dvorscak
State Bar No. 24120461
Federal I.D. 3610557
1221 McKinney Street, Suite 2500
Houston, Texas 77010
Tel: (713) 655-1101
Fax: (713) 655-0062
danaipakos@azalaw.com
muddin@azalaw.com
advorscak@azalaw.com

**CLEARY GOTTLIEB STEEN & HAMILTON
LLP**

Jane VanLare (*pro hac vice* pending)
John Veraja (*pro hac vice* pending)
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999
jvanlare@cgsh.com
jveraja@cgsh.com

**COUNSEL TO TOTAL GAS & POWER
NORTH AMERICA, INC.**

**CERTIFICATE OF SERVICE**

I certify that on January 7, 2022, a true and correct copy of the foregoing document was electronically filed with the Clerk of the Court using the CM/ECF system, which automatically sends notifications of such filings to all attorneys of record.

*/s/ Alexander M. Dvorscak*
Alexander M. Dvorscak