**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re: | Chapter 11 |
| BRAZOS ELECTRIC POWER COOPERATIVE, INC.,[1] | Case No.:  21-30725 (DRJ) |
| Debtor. | |
| BRAZOS ELECTRIC POWER COOPERATIVE, INC., | |
| Plaintiff, | Adv. Pro. No.:  21-04407 (DRJ) |
| v. | |
| 507 CAPITAL, LLC, et al., | |
| Defendants. | |

**NJR ENERGY SERVICES COMPANY'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT AND OMNIBUS OBJECTIONS**

Robert K. Malone, Esq.
Mark B. Conlan, Esq.
**GIBBONS P.C.**
One Gateway Center
Newark, NJ 07102
Telephone:  (973) 596-4500
Facsimile:  (973) 596-0545
rmalone@gibbonslaw.com
mconlan@gibbonslaw.com

*Attorneys for NJR Energy Services Company*

---

[1]  The Debtor in this chapter 11 case, along with the last four digits of its federal tax identification number is: Brazos Electric Power Cooperative, Inc. (4729). Additional information regarding this case may be obtained on the website of the Debtor's claims and noticing agent at http://cases.stretto.com/Brazos. The Debtor's address is 7616 Bagby Avenue, Waco, TX 76712.

## <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF AUTHORITIES ................................................................................................... ii

PRELIMINARY STATEMENT ............................................................................................ 1

BACKGROUND ................................................................................................................... 4

A.     The Debtor's Business ................................................................................................ 4

B.     The Gas Claims ......................................................................................................... 5

       1.     The Commodities Market Set the Natural Gas Prices ........................................... 6

       2.     Texas Legislative History Confirms the Market Sets Natural Gas Price................. 7

ARGUMENT ........................................................................................................................ 7

I.     LEGAL STANDARDS ................................................................................................ 7

II.     COUNT ONE SHOULD BE OVERRULED AND DISMISSED BECAUSE THE
DECEPTIVE TRADE PRACTICES ACT IS INAPPLICABLE TO THE DEBTOR ....... 9

       A.     The Debtor Lacks Standing Under the DTPA Because It Does Not Qualify as a
"Consumer."................................................................................................... 9

       B.     The Debtor Does Not (and Cannot) Plead Either Procedural or Substantive
Unconscionability. ......................................................................................... 11

III.     COUNTS TWO & THREE SHOULD BE DISMISSED FOR FAILURE TO PLEAD
THE REQUIRED CONSTRUCTIVELY FRAUDULENT TRANSFER ELEMENTS .. 17

IV.     COUNT FOUR SHOULD BE DISMISSED FOR FAILURE TO PLEAD THE
SUBJECT GAS SALE TRANSACTIONS WERE OUTSIDE OF THE ORDINARY
COURSE OF THE DEBTOR'S BUSINESS ................................................................ 23

V.     COUNT FIVE SHOULD BE DISMISSED FOR FAILURE TO PLEAD THAT NJRES
DID NOT PROVIDE VALUE ........................................................................................ 29

CONCLUSION................................................................................................................... 31

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*In re ADI Liquidation, Inc.*,
   2019 WL 211528 (D. Del. Jan. 16, 2019)...........................................................................24

*Alcan Aluminum Corp. v. BASF Corp.*,
   133 F. Supp. 2d 482 (N.D. Tex. 2001) ...............................................................................11

*In re Allegheny Int'l, Inc.*,
   954 F.2d 167 (3d Cir. 1992).................................................................................................8

*Amstadt v. U.S. Brass Corp.*,
   919 S.W.2d 644 (Tex. 1996)...............................................................................................10

*Arkwright-Boston Mfrs. Mut. Ins. Co. v. Westinghouse Elec. Corp.*,
   844 F.2d 1174 (5th Cir. 1988) ...........................................................................................12

*ASARCO LLC v. Americas Mining Corp.*,
   396 B.R. 278 (S.D. Tex. 2008) ...........................................................................18, 20, 29, 30

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)...................................................................................................7, 8, 9

*In re Bates*,
   570 B.R. 757 (Bankr. W.D. Tex. 2017)................................................................................8

*In re Beaulieu Grp., LLC*,
   2021 WL 4469928 (Bankr. N.D. Ga. Sept. 29, 2021) ........................................................30

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 544 (2007)........................................................................................................7, 8

*Besteman v. Pitcock*,
   272 S.W.3d 777 (Tex. App.—Texarkana 2008, no pet.) .....................................................16

*BFP v. Resolution Tr. Corp.*,
   511 U.S. 531 (1994)...........................................................................................................19

*In re Black Elk Energy Offshore Ops., LLC*,
   2019 WL 3889761 (Bankr. S.D. Tex. Aug. 16, 2019)........................................................19

*Bradford v. Plains Cotton Coop. Ass'n*,
   539 F.2d 1249 (10th Cir. 1986) .........................................................................................16

*In re Brazos Electric Cooperative, Inc.*,
    No. 21-30725 (Bankr. S.D. Tex.) (DRJ) ............................................................1

*Campbell v. Texas Tea Reclamation, LLC*,
    2021 WL 2211690 (S.D. Tex. May 6, 2021) ......................................................18

*Citizens Nat'l Bank v. Allen Rae Invs., Inc.*,
    142 S.W.3d 459 (Tex. App.—Fort Worth, 2004, no pet.) ....................................11

*Crawford Prof'l Drugs, Inc. v. CVS Caremark Corp.*,
    748 F.3d 249 (5th Cir. 2014) ..............................................................................14

*In re Denton Cty. Elec. Coop., Inc.*,
    281 B.R. 876 (Bankr. N.D. Tex. 2002) ...............................................................26

*DeValk Lincoln Mercury, Inc. v. Ford Motor Co.*,
    811 F.2d 326 (7th Cir. 1987) ..............................................................................13

*In re Dual D Health Care Ops., Inc.*,
    2021 WL 3083344 (Bankr. N.D. Tex. July 21, 2021) .........................................18

*E. Hill Marine, Inc. v. Rinker Boat Co.*,
    229 S.W.3d 813 (Tex. App.—Fort Worth, 2007, no pet.) ....................................11

*In re E. Texas Steel Facilities, Inc.*,
    117 B.R. 235 (Bankr. N.D. Tex. 1990) ...............................................................24

*Earman Oil Co., Inc. v. Burroughs Corp.*,
    625 F.2d 1291 (5th Cir. 1980) ............................................................................16

*El Paso Nat. Gas Co. v. Minco Oil & Gas Co.*,
    964 S.W.2d 54 (Tex. App.—Amarillo 1997), *rev'd in part on other grounds*, 8
    S.W.3d 309 (Tex. 1999) ....................................................................13, 14, 15, 16

*In re Essential Fin. Educ., Inc.*,
    629 B.R. 401 (Bankr. N.D. Tex. 2021) ...............................................................18

*Essex Ins. Co. v. Blount, Inc.*,
    72 F. Supp. 2d 722 (E.D. Tex. 1999) ....................................................................9

*In re Fairchild Aircraft Corp.*,
    6 F.3d 1119 (5th Cir. 1993) ..........................................................................18, 30

*In re Garofalo's Finer Foods, Inc.*,
    186 B.R. 414 (N.D. Ill. 1995) .............................................................................28

*In re Halliburton Co.*,
    80 S.W.3d 566 (Tex. 2002) .................................................................................12

*Hertz Corp. v. Attorney Gen. of the State of New York*,
 518 N.Y.S.2d 704 (Sup. Ct. N.Y. Cty. 1987) ...................................................16

*Hugh Symons Grp., plc v. Motorola, Inc.*, 292 F.3d 466, 468-69 (5th Cir. 2002).........................10

*In re Ionosphere Clubs, Inc.*,
 98 B.R. 174 (Bankr. S.D.N.Y. 1989) ..............................................................27

*In re James A. Phillips, Inc.*,
 29 B.R. 391 (S.D.N.Y. 1983)...........................................................................26

*Janvey v. Golf Channel, Inc.*,
 487 S.W.3d 560 (Tex. 2016)......................................................................20, 21

*Joe T. Dehmer Distribs., Inc. v. Murray Owen Temple*,
 826 F.2d 1463 (5th Cir. 1987) ........................................................................17

*in re Johns-Manville Corp.*,
 60 B.R. 612 (Bankr. S.D.N.Y. 1986)......................................................26, 27, 28

*Knox v. Rosenberg*,
 1999 WL 35233291 (S.D. Tex. Sept. 29, 1999) .................................................1

*Lindemann v. Eli Lilly & Co.*,
 816 F.2d 199 (5th Cir. 1987) ...........................................................................21

*In re Louisiana Pellets, Inc.*,
 838 Fed. App'x 45 (5th Cir. 2020) ..............................................................18, 19

*Lyles v. RDP Co.*,
 702 Fed. App'x 385 (6th Cir. 2017) ............................................................15, 16

*Marketic v. U.S. Bank Nat'l Ass'n*,
 436 F. Supp. 2d 842 (N.D. Tex. 2006) .............................................................10

*NML Capital v. Republic of Argentina*,
 621 F.3d 230 (2d Cir. 2010)............................................................................16

*Norris v. Heart Tr.*,
 500 F.3d 454 (5th Cir. 2007) .............................................................................1

*In re Nortel Networks, Inc.*,
 469 B.R. 478 (Bankr. D. Del. 2012) ...................................................................8

*Oden v. Infosys Ltd.*,
 2018 WL 4627099 (N.D. Tex. Aug. 31, 2018)....................................................12

*Office of Pub. Util. Council v. Pub. Util. Comm'n of Texas*,
 131 S.W.3d 314 (Tex. App.—Austin 2004, pet. denied)......................................21

*In re Olshan Found. Repair Co., LLC*,
    328 S.W.3d 883 (Tex. 2010) ........................................................................................14

*Peltz v. Hatten*,
    279 B.R. 710 (D. Del. 2002) ......................................................................................20

*In re Plastech Engineered Prods.*,
    397 B.R. 828 (E.D. Mich. 2008) ................................................................................29

*Pony Express Courier Corp. v. Morris*,
    921 S.W.2d 817 (Tex. App.—San Antonio 1996, no pet.) ........................................13

*Porterfield v. JP Morgan Chase, NA*,
    2015 WL 1061496 (W.D. Tex. Mar. 10, 2015) .........................................................12

*In re Prince*,
    2012 WL 1095506 (Bankr. E.D. Tex. Mar. 30, 2012) ...............................................17

*Richmond Leasing Co. v. Capital Bank, N.A.*,
    762 F.2d 1303 (5th Cir. 1985) ...................................................................................27

*In re Roth Am., Inc.*,
    975 F.2d 949 (3d Cir. 1992) .......................................................................................28

*In re Rothstein Rosenfeldt Adler, P.A.*,
    483 B.R. 15 (Bankr. S.D. Fla. 2012) ..........................................................................19

*In re SemCrude, L.P.*,
    504 B.R. 39 (Bankr. D. Del. 2013) ............................................................................25

*Sorenson v. Secretary of Treasury of U.S.*,
    475 U.S. 851 (1986) ...................................................................................................30

*In re SRC Liquidation, LLC*,
    573 B.R. 537 (Bankr. D. Del. 2017) ..........................................................................24

*In re Starnes*,
    231 B.R. 903 (N.D. Tex. 1998) ...................................................................................8

*Stiel v. Heritage Numismatic Auctions, Inc.*,
    816 Fed. App'x 888 (5th Cir. 2020) ............................................................................1

*Stinger v. Chase Bank, USA, NA*,
    265 Fed. App'x 224 (5th Cir. 2008) ..........................................................................14

*United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*,
    484 U.S. 365 (1988) ...................................................................................................30

*Venture Cotton Coop. v. Freeman*,
   435 S.W.3d 222 (Tex. 2014) .................................................................................14

*Wade v. Austin*,
   524 S.W.2d 79 (Tex. App.—Texarkana 1975, no pet.) .........................................15

**Statutes**

11 U.S.C. 503(b)(9) ....................................................................................................30

11 U.S.C. § 502(a) ........................................................................................................8

11 U.S.C. §§ 503(b)(9) and 507 .................................................................................29

11 U.S.C. § 544(b) ......................................................................................................17

11 U.S.C. § 548(a)(1)(B) ...................................................................................... *passim*

Bankruptcy Code section 361 .....................................................................................30

Bankruptcy Code Sections 363 and 364 .....................................................................25

Bankruptcy Code Section 503(b)(9) .................................................................... *passim*

Bankruptcy Code section 506(a)(1) .............................................................................30

Bankruptcy Code § 546(c) ..........................................................................................24

Bankruptcy Code § 548 ..............................................................................................17

Gas Utility Regulatory Act ...........................................................................................7

TEX. BUS. & COM. CODE § 2.302 .............................................................................9, 12

TEX. BUS. & COM. CODE § 17.45(4) ..........................................................................9, 10

TEX. BUS. & COM. CODE §§ 17.45(4), (10) ..................................................................10

TEX. BUS. & COM. CODE § 17.46(b)(27) ......................................................................10

TEX. BUS. & COM. CODE § 17.49(g) .........................................................................9, 11

TEX. BUS. & COM. CODE § 24.004(d) ...........................................................................21

TEX. BUS. & COM. CODE § 24.005(a)(2) ..................................................................22, 23

TEX. BUS. & COM. CODE § 24.010(a)(2) .......................................................................17

TEX. UTILITIES CODE § 104.361(a) ...............................................................................7

Texas Deceptive Trade Practices Act ............................................................................9

Texas Uniform Fraudulent Transfer Act (TEX. BUS. & COM. CODE § 24.001 *et seq.*) ...............................................................................................................17

TEXAS UTILITIES CODE § 161.059 .............................................................................27

U.C.C. .................................................................................................................21, 24

U.C.C. Article 2 .......................................................................................................24

Uniform Commercial Code Section 1-201(b)(9) .................................................24, 25

**Rules**

FED. R. BANKR. P. 3001(f) ...........................................................................................8

FED. R. CIV. P. 12(b)(6) ..............................................................................................8

**Treatise**

Restatement of the Law, Consumer Contracts § 5 TD, cmt. 8 (2019)...........................14

NJR Energy Services Company ("NJRES") by way of this Motion moves to dismiss *The Debtor's Complaint for Declaratory Relief and Asserting Omnibus Objections to Proofs of Claim Related to Natural Gas Sales to the Debtor* [Dkt. No. 1339 ("Compl." or the "Complaint")],[1] filed by Brazos Electric Power Cooperative, Inc. ("Brazos Electric" or the "Debtor") in the bankruptcy case *In re Brazos Electric Cooperative, Inc.*, No. 21-30725 (Bankr. S.D. Tex.) (DRJ), and respectfully states as follows:

## PRELIMINARY STATEMENT

1.      The Court should overrule the Debtor's omnibus objections/claims and accordingly dismiss the Debtor's Complaint in its entirety.  NJRES's proof of claim under Section 503(b)(9) of the Bankruptcy Code deserves to maintain its administrative priority status.  NJRES offered for sale, and the Debtor voluntarily accepted, over $26 million of natural gas within the twenty-day period preceding the Debtor's chapter 11 petition.  Those sales were made the same way the Debtor always buys natural gas, using the services of Alliances for Cooperative Energy Services Power Marketing, LLC ("ACES") as the Debtor's agent for the acquisition of natural gas, the fuel that has historically fired all of the Debtor's electrical generation plants.  The legally insufficient recurring theme throughout the Complaint alleges "price gouging" in higher-than-usual natural gas prices.  The Debtor's unhappiness with the natural gas prices it voluntarily agreed to pay during

---

[1]  Each of NJRES's exhibits are incorporated into the Complaint by reference or are publicly available documents filed in the underlying bankruptcy case (No. 21-30725) and/or the within adversary proceeding (No. 21-04407).  The Court may therefore take judicial notice of these documents without converting this motion into one for summary judgment.  *See Norris v. Heart Tr.*, 500 F.3d 454, 461 n.9 (5th Cir. 2007) ("[I]t is clearly proper in deciding a 12(b)(6) motion to take judicial notice of matters of public record."); *see also Stiel v. Heritage Numismatic Auctions, Inc.*, 816 Fed. App'x 888, 892 (5th Cir. 2020) (finding Federal Rule of Evidence 201 "authorizes the court to take judicial notice of . . . [the] court's orders, final judgment, and docket as matters of public record attached to the motion to dismiss").  Courts "need not accept the allegations of a complaint as true to the extent that the allegations conflict with such [judicially noticed] facts." *Knox v. Rosenberg*, 1999 WL 35233291, at *6 (S.D. Tex. Sept. 29, 1999).

Winter Storm Uri fails to consider the volatility of the commodities market, and it wholly ignores supply and demand economics.  Indeed, demand rose so dramatically high that Texas's power grid could not handle the customer load, coupled with a plummet in natural gas supply (due to, among other things, frozen wellheads), causing market fluctuations that unsurprisingly drove up natural gas prices.  The Debtor knowingly and intentionally bought natural gas at then-prevailing market prices—notably accomplishing these transactions via ACES, a professional and savvy gas purchaser.  The peaks and valleys of natural gas supply and the related ups and downs of natural gas pricing are nothing new and fundamentally well within the ordinary course of the Debtor's business.  As such, there is no basis for NJRES to lose its administrative priority status in the Debtor's chapter 11 case.

2.     Of course, the Debtor could have avoided this administrative claim priority fight had it waited to commence its chapter 11 case until March 10 or later.  But the Debtor—not the gas suppliers—made a strategic decision to file its petition when it did, thereby knowingly elevating the gas suppliers' claims for Winter Storm Uri deliveries to Section 503(b)(9) administrative priority status.  That choice was completely within the Debtor's control, and the Debtor (or at least its counsel) must have known that it was creating $180 million in administrative priority claims in favor of the gas sellers when it decided to file for relief on March 1, 2021.  Presumably there was a good reason for this decision.  The Debtor's now imprudent decision to file within 20 days of Winter Storm Uri is an injury of its own making and the Complaint is not the appropriate means of correcting the Debtor's ill-timed chapter 11 filing.  Simply stated, after receiving the goods that it needed, the Debtor now wants a "do-over," but it is too late.

3.     Despite all of the Debtor's hyperbole about "price gouging," and purported "lack of reasonably equivalent value," by naming seven (7) of the Debtor's gas suppliers during Winter Storm Uri in the Complaint, and making uniform allegations of excessive pricing by all sellers of

natural gas, the Debtor's Complaint itself shows exactly that the natural gas commodities market in Texas was working as intended at the time, regardless of who was selling gas.

4.     And while the market operated normally, the Debtor failed to appropriately hedge natural gas risks, especially in a commodities market where price run-ups are commonplace.  For example, the Debtor could have purchased a physical call option from NJRES at a *de-minimis* price and had a call on the physical gas purchased during the storm.  The Debtor could have, moreover, purchased financial swaps and/or contracts from financial institutions or insurance companies to lock in price caps.  Instead, the Debtor made its own calculated financial decisions on how to strategically hedge commodities market risks, and now seeks to burden the gas sellers with the fallout from its calculated business decisions.

5.     The Debtor fails to carry its initial burden in objecting to a validly filed proof of claim by presenting sufficient evidence to overcome the *prima facie* validity of NJRES's proof of claim.  The Debtor accordingly fails to plausibly allege that it is entitled to a declaratory judgment that NJRES's proof of claim should be reclassified to a general unsecured claim.  Any affirmative ruling for the Debtor regarding its newly initiated adversary proceeding against NJRES flies directly in the face of multiple public policy concerns:  (a) Section 503(b)(9) of the Bankruptcy Code's goal of discouraging abuse by debtors who seek to acquire goods at a time when it is known that bankruptcy is imminent and that payment for the goods will not be tendered;  and (b) avoiding excessive governmental intrusion into private parties' dealings and retroactively reforming contracts.

6.     For these reasons, and those stated below, the Court should overrule the Debtor's objections to NJRES's Section 503(b)(9) proof of claim, dismiss the Complaint in its entirety with prejudice, and allow NJRES's proof of claim as an administrative expense claim in the amount sought, $26,079,125.00.

## BACKGROUND

**A.    The Debtor's Business**

7.      Formed in 1941 [Karnei Decl. ¶ 10], the Debtor is a sophisticated "electric cooperative corporation" that supplies its sixteen cooperative members with all their wholesale power needs.  [Compl. ¶ 5.]  The Debtor's network extends across 68 counties, to over 700,000 electric meters, via 2,713 miles of transmission line, with over 300 substations, and provides these services within the Electric Reliability Council of Texas, Inc. ("ERCOT") system.  [Compl. ¶ 27.] ERCOT is an independent system operator that manages the Texas Interconnection electricity grid, which covers most of Texas, and generates its energy with natural gas (51%), wind and other renewable sources (24.8%), and lignite/coal and nuclear fuel (24.2%).  [Case No. 21.30725, Dkt. No. 3 ("Karnei Decl.") ¶ 44.]  All of Brazos Electric's owned generation facilities are natural gas-fired.  [Karnei Decl. ¶ 11.]  Thus, it is apparent that the Debtor has been buying natural gas in the ordinary course of its business for decades.

8.      The Debtor "sources electricity through a combination of purchased power, owned generation, and forward-energy purchases from a number of different counterparties."  [Karnei Decl. ¶ 25.]  The Debtor acquires purchased power "of additional energy sources . . . in the ERCOT wholesale market to serve a portion of its load."  [Karnei Decl. ¶ 47.]  The Debtor's "owned generation" consists of three gas-fired plants providing "approximately 2,075 megawatts of power."  [Karnei Decl. ¶¶ 25-28.]  The Debtor, moreover, is party to several purchase power agreements ("PPAs"), and these contracted resources help "limit operational risks through diversification of supply."  [Karnei Decl. ¶ 29.]  So, although natural gas is but one "critical" element to electricity generation at the Debtor's plants [Compl. ¶ 1], the Debtor diversifies its energy supply through PPAs and other contracted assets to hedge against unpredictable fluctuations in the commodities market [Karnei Decl. ¶ 29].

4

9.      Indeed, the Debtor "maintains a robust hedging program designed to, among other things, mitigate risk related to wholesale electricity prices." [Karnei Decl. ¶¶ 33-34 ("As of the Petition Date, $349 million of cash collateral was provided to various counterparties.").] The Debtor's hedging program "is focused on ensuring access to power and fuel at reasonable prices . . . which, historically, can be quite volatile; and, without [the hedging program's continuation post-petition], the Debtor would be exposed to potentially significant fluctuations in the real time full-scale power and gas market." [Case No. 21-30725, Dkt. No. 409 (Transcript of Hearing on Hedging Motion) at 7:24-8:4.] ACES, which serves as the Debtor's agent for purchasing natural gas [Compl. ¶ 52] and is "an energy-management company that helps electric cooperatives manage energy-market risks" [Karnei Decl. ¶ 2], "help[s] the Debtor manage risk and . . . its Risk Management Policy" [Case No. 21-30725, Dkt. No. 304 (Hedging Motion) ¶ 11].

10.     Therefore, it is of no surprise that the Debtor is not wholly reliant on any one source when it comes to natural gas purchases for generating power, demonstrating such via "gas transportation agreements with major Texas intrastate pipelines and purchases [of] natural gas through industry standardized NAESB contracts." [Karnei Decl. ¶ 11.]

**B.     The Gas Claims**

11.     The Debtor and NJRES entered into a standard North American Energy Services Board ("NAESB") form contract that, most notably, "did not obligate Brazos to purchase any gas. Nor did [it] obligate [NJRES] to sell any gas." [Compl. ¶ 53.] In other words, neither party was required to transact with the other if either party found the gas-sale deal terms unacceptable for *any* reason—both parties were willing participants to each and every consummated transaction. The NAESB contracts merely "set forth certain terms, *other than quantity and price*, that would apply if Brazos and [NJRES] were to agree to a sale of a given quantity of gas at a given price in a discrete transaction." [Compl. ¶ 53(emphasis added).] The Debtor's professional gas trading

5

agent, ACES, transacted directly with each of the gas sellers, including NJRES, for each of the sales at issue in the Complaint to set the quantity and price for each gas sale.  [Compl. ¶ 52.] Indeed, NJRES's proof of claim is "the result of individual communications between ACES and [NJRES] during February of 2021."  [Compl. ¶ 53.]  Throughout Winter Storm Uri, the Debtor, ACES, and NJRES followed their usual course of dealings for the purchase and sale of natural gas.

### 1.    The Commodities Market Set the Natural Gas Prices

12.    In February 2021, Texas experienced a forecasted winter storm (Winter Storm Uri) that expectedly caused price-point fluctuations in the natural gas commodities market.  [*See* Karnei Decl. ¶ 50 ("prices jumped . . . in anticipation of short gas supply").]  As early as February 8, 2021, ERCOT issued an Operating Condition Notice report "for informational purposes [] in order to inform generators of a possible future need for more resources."  [Compl. ¶ 33.]  And, predictably, Texas' "demand for gas for heating grew" as anticipated.  [*See* Karnei Decl. ¶ 50.]

13.    Economics 101:  in a competitive market, the unit price for a particular good will vary until it settles at a point where the quantity demanded by consumers equals the quantity supplied by producers, resulting in an economic equilibrium of price and quantity.  *See* Amy Hardberger, *Markets & Pricing*, 2020 CHANGING FACE OF WATER RTS. 14.2-II (2020).  When demand increases and supply remains unchanged (or, worse yet, decreases), a shortage occurs, resulting in a higher equilibrium price.  *See id.*  Clearly, this is exactly what happened in February 2021 with the natural gas market in Texas.

14.    The winter storm conditions naturally decreased the availability of some gas supply which, in turn, and in line with elementary economic principles (*supra* ¶ 13), caused foreseeable temporary price spikes.  [*See* Karnei Decl. ¶ 53 ("natural gas prices spiked in response to falling supply").]  The uniqueness of Texas's power grid structure and limited power plants working to supply rising demand enticed ERCOT to take reasonable precautionary measures to prevent

unprecedented power grid failure.  [*See* Compl. ¶ 46 ("ERCOT ordered . . . rolling blackouts to reduce the strain").]  And, even ERCOT set its price point at $9,000 per MWh.  [Karnei Decl. ¶ 53.]  Accordingly, although Texas may not generally by accustomed to winter storm events, there is nothing "extraordinary" or "unprecedented" with how the supply-and-demand economics worked in February 2021—indeed, it did so ***market-wide***.

## 2. Texas Legislative History Confirms the Market Sets Natural Gas Price

15.     In response to the February 2021 winter storm, Texas enacted a new subchapter of the Rates and Services chapter of the Gas Utility Regulatory Act designed "to reduce the cost that customers would otherwise experience because of extraordinary costs that gas utilities incurred to secure gas supply and provide service during Winter Storm Uri . . . by providing securitization financing for gas utilities to recover those costs."  TEX. UTILITIES CODE § 104.361(a) (articulating purpose of subchapter).

16.     The Sponsor's Statement of Intent with respect to this new subchapter stated:  "The recent winter storm in Texas resulted in a historic demand for energy," driving gas price increases and demonstrating that "[t]he cost of gas is . . . set by the market."  Texas Bill Analysis, H.B. 1520 (May 21, 2021).  This finding resulted after over twenty-five hours of testimony given at the joint hearing on this bill.

## <u>ARGUMENT</u>

## I.    LEGAL STANDARDS

17.     To survive a motion to dismiss, a plaintiff must plead "sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  Only non-conclusory factual allegations are entitled to the presumption of truth on review of a motion to dismiss—conclusory allegations of law, inferences not supported by facts, and formulaic

recitations of the elements of a claim do not satisfy the pleading standard under the Federal Rules and cannot defeat a Rule 12(b)(6) motion to dismiss. *Id.* at 678; *Twombly*, 550 U.S. at 555. A complaint that contains "facts that are 'merely consistent with' a defendant's liability" is insufficient as it "'stops short of the line between possibility and plausibility of entitlement to relief.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557).

18.     By timely filing its proof of claim, NJRES introduced *prima facie* evidence that its claim is both valid and supported. *See* 11 U.S.C. § 502(a); FED. R. BANKR. P. 3001(f) ("A proof of claim executed and filed in accordance with these rules shall constitute *prima facie* evidence of the validity and amount of the claim."); *In re Bates*, 570 B.R. 757, 763 (Bankr. W.D. Tex. 2017) ("[A] claim that alleges facts sufficient to support a legal liability to the claimant satisfies the claimant's initial obligation to go forward." (quoting *In re Allegheny Int'l, Inc.*, 954 F.2d 167, 172 (3d Cir. 1992))). The Debtor, as the objecting party, bears the burden to overcome the *prima facie* hurdle. *In re Starnes*, 231 B.R. 903, 912 (N.D. Tex. 1998) ("To rebut the claim, the objector must present evidence sufficient to refute . . . the claim's legal sufficiency." (quotation and citation omitted)). Only then will the burden shift to NJRES. *Id.* In the case at bar, the Debtor falls far short of presenting sufficient evidence to defeat NJRES's prima facie proof of claim validity.

19.     Furthermore, despite the Debtor's procedurally curious choice to classify its objections to the proofs of claim simultaneously as a "Complaint for Declaratory Relief" and initiate an adversary proceeding, the Debtor is only, in substance, asking the Court to "disallow[]" the claims and accordingly "declar[e] that the agreements underlying the Gas Claims are unenforceable against the Debtor." [Compl. § VII (Prayer).] In other words, because the Debtor is ultimately asking the Court to dismiss NJRES's proof of claim, the Court should treat NJRES's proof of claim as a complaint and apply the pleading standards under Federal Rule of Civil Procedure 12(b)(6) against the Debtor. *See In re Nortel Networks, Inc.*, 469 B.R. 478, 496 (Bankr.

8

D. Del. 2012) (applying the motion to dismiss standard to the proofs of claim); *see also* 6A Bankr. Service L. Ed. § 57:317 (Proofs of Claim, same).

20.     However, due to the fact that NJRES's *Rider to the Administrative Proof of Claim of NJR Energy Services Company Pursuant to 503(b)(9) of the Bankruptcy Code* (Claim No. 167)[2] unequivocally establishes $26,079,125.00 in gas sales—at agreed-to terms and rates—with the Debtor within twenty (20) days before the commencement of the Debtor's chapter 11 case, NJRES is entitled to the benefit of all "factual material, accepted as true, to state a claim to relief that is plausible on its face."  *Iqbal*, 556 U.S. at 678.

## II.     COUNT ONE SHOULD BE OVERRULED AND DISMISSED BECAUSE THE DECEPTIVE TRADE PRACTICES ACT IS INAPPLICABLE TO THE DEBTOR

21.     At the outset, the Texas Deceptive Trade Practices Act (the "DTPA") cannot serve as the Debtor's basis for any objection or claim because the Debtor does not qualify as a "consumer" within the DTPA's scope.  TEX. BUS. & COM. CODE § 17.45(4).  Assuming *arguendo* that the Debtor were a "consumer" (which it is not), the DTPA does not apply to consumer claims exceeding $500,000.  TEX. BUS. & COM. CODE § 17.49(g).  The Debtor lastly cites to TEX. BUS. & COM. CODE § 2.302 in the hopes that the Court will nonetheless render the agreements unenforceable due to unconscionability, but the Debtor cannot meet that exceedingly high bar.

### A.     The Debtor Lacks Standing Under the DTPA Because It Does Not Qualify as a "Consumer."

22.     The law is clear and well-established that a multi-billion dollar "business consumer," like the Debtor, cannot assume the status of a "consumer" to bring a consumer claim under the DTPA.  *See, e.g.*, *Essex Ins. Co. v. Blount, Inc.*, 72 F. Supp. 2d 722, 724 (E.D. Tex. 1999) (finding plaintiff's DTPA claim must fail, as the plaintiff "does not qualify as a consumer

---

[2]  A copy of NJR's "Proof of Claim" is available on the Claims Register as Claim No. 167.

under the provisions of the DTPA" because "the term [consumer] does not include a business consumer that has assets of $25 million or more" (quoting TEX. BUS. & COM. CODE § 17.45(4))); *Hugh Symons Grp., plc v. Motorola, Inc.*, 292 F.3d 466, 468-69 (5th Cir. 2002) ("[A] complaining plaintiff under the DTPA must be a consumer meeting the definition of § 17.45(4)," and "'[a]ssets' for the purposes of § 17.45(4) means 'gross assets.'"). The Debtor implicitly acknowledges the inapplicability of "consumer" protections to itself under the DTPA through its own *Schedules of Assets and Liabilities for Brazos Electric Power Cooperative, Inc.*, wherein the Debtor lists $3.352 ***billion*** in gross assets. [Case No. 21-30725, Dkt. No. 353 ("Debtor's Schedules") at 11.] This fact alone therefore carves the Debtor out from the DTPA's scope.

23.     Under the DTPA, "the issue of consumer status is a question of law for the court to decide." *Marketic v. U.S. Bank Nat'l Ass'n*, 436 F. Supp. 2d 842, 854-55 (N.D. Tex. 2006) (finding plaintiff did "not qualify as a DTPA 'consumer' and, therefore, cannot state a claim under the statute"). The Debtor has failed to indicate how—with several billion dollars in gross assets—it qualifies as a "consumer" for purposes of the DTPA. The Debtor's DTPA-based objection/claim fails on this basis alone.

24.     In the same vein, because Texas enacted the DTPA to "protect ***consumers*** against false, misleading, and deceptive business practices, unconscionable actions, and breaches of warranty," and the Debtor is merely a "business consumer that has assets of $25 million or more," the Debtor similarly cannot assert a "price gouging" objection/claim under TEX. BUS. & COM. CODE § 17.46(b)(27). *Amstadt v. U.S. Brass Corp.*, 919 S.W.2d 644, 649 (Tex. 1996) (emphasis added); TEX. BUS. & COM. CODE §§ 17.45(4), (10). Although the Debtor cites to the Texas DTPA Bill Analysis, H.B. 1152 (May 16, 2019) for the proposition that the "Texas Legislature contemplated [] 'price-gouging'" within TEX. BUS. & COM. CODE § 17.46(b)(27), the DTPA's plain language nonetheless excludes business consumers with more than $25 million in assets (like

the Debtor).  *See Alcan Aluminum Corp. v. BASF Corp.*, 133 F. Supp. 2d 482, 501 (N.D. Tex. 2001) (finding that "[a] 'business consumer' with assets in excess of $25 million . . . is specifically excluded from the definition of 'consumer,' and plaintiff "offers no case law . . . pointing out [] that it is 'unfair' . . . [and so plaintiff] cannot sue [defendant] under the DTPA").  Absent "consumer" status, all of the Debtor's DTPA objections and claims—including those for alleged "price gouging"—must fail.

25.    And finally, the DTPA bars claims where the underlying transactions involve total consideration in excess of $500,000.  TEX. BUS. & COM. CODE § 17.49(g) (noting the DTPA shall not apply to transactions "involving total consideration by the consumer of more than $500,000, other than a cause of action involving a consumer's residence");  *E. Hill Marine, Inc. v. Rinker Boat Co.*, 229 S.W.3d 813, 820 (Tex. App.—Fort Worth, 2007, no pet.) ("The purpose of this exemption is to maintain the DTPA as a viable source of relief for consumers in small transactions and to remove litigation between businesses over large transactions from the scope of the DTPA.");  *see also Citizens Nat'l Bank v. Allen Rae Invs., Inc.*, 142 S.W.3d 459, 473-74 (Tex. App.—Fort Worth, 2004, no pet.) (explaining how to measure "total consideration by the consumer").  The pleadings establish NJRES's proof of claim at $26 million—*i.e.*, well above the $500,000 DTPA threshold—and so the Debtor's DTPA objection/claim fails, as a matter of law, for this additional reason.

**B.     The Debtor Does Not (and Cannot) Plead Either Procedural or Substantive Unconscionability.**

26.    The Debtor's argument must equally fail under unconscionability standards because the argument is premised entirely on the DTPA, which is an insufficient legal basis for an entity such as the Debtor to assert legal objections/claims against NJRES.  [*See* Compl. ¶ 66 ("These transactions are contrary to the spirit of the DTPA, and therefore, unconscionable and

against public policy.").]  The Debtor cannot base its unconscionability objection on "the spirit of the DTPA" without rendering the above-discussed "consumer" versus "business consumer that has assets of $25 million or more" distinction entirely meaningless.  Thus, the Debtor should not be permitted to backdoor itself into the DTPA's well-delineated scope.

27.     The Debtor shoulders "a heavy burden to satisfy" for pleading unconscionability.  *Oden v. Infosys Ltd.*, 2018 WL 4627099, at *4 (N.D. Tex. Aug. 31, 2018); *see also Porterfield v. JP Morgan Chase, NA*, 2015 WL 1061496, at *4 (W.D. Tex. Mar. 10, 2015) (finding the party unable "to bear the heavy burden of proving unconscionability").  Before courts undertake the extreme option of invalidating private parties' agreed-upon contracts, the movant (the Debtor) must plausibly allege that NJRES's sales of natural gas were both procedurally *and* substantively unconscionable.  *See In re Halliburton Co.*, 80 S.W.3d 566, 572 (Tex. 2002).

28.     In this case, the Debtor cannot establish either procedural or substantive unconscionability within this highly specialized commercial context, and yet the Debtor must prove **both**.  *Arkwright-Boston Mfrs. Mut. Ins. Co. v. Westinghouse Elec. Corp.*, 844 F.2d 1174, 1184 (5th Cir. 1988) ("Under Texas law, [plaintiff] must prove *both* substantive and procedural unconscionability to prevail on the unconscionability issue.").  The issue of "unconscionability is a question of law for decision by the court."  *Id.*  TEX. BUS. & COM. CODE § 2.302 provides:

> (a)  If the court as a matter of law finds the contract or any clause of the contract to have been unconscionable at the time it was made the court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may limit the application of any unconscionable clause as to avoid any unconscionable result.

> (b)  When it is claimed or appears to the court that the contract or any clause thereof may be unconscionable the parties shall be afforded a reasonable opportunity to present evidence as to its commercial setting, purpose and effect to aid the court in making the determination.

29.     For starters, the Debtor must (and yet, here, cannot) meet an exceptionally high unconscionability bar, such that the parties invite "excessive governmental intrusion into our dealings." *El Paso Nat. Gas Co. v. Minco Oil & Gas Co.*, 964 S.W.2d 54, 62 (Tex. App.— Amarillo 1997) (noting the grounds proffered in support of both procedural and substantive abuse "must be sufficiently shocking or gross to compel the courts to intercede"), *rev'd in part on other grounds*, 8 S.W.3d 309 (Tex. 1999). And the unconscionability doctrine becomes additionally limited in commercial contexts. *Id.* at 64 ("Indeed, the expertise, knowledge, financial strength and such possibly garnered by a businessman may be enough to warrant the conclusion that he or she did not fall prey to supposedly unconscionable activity." (citing *DeValk Lincoln Mercury, Inc. v. Ford Motor Co.*, 811 F.2d 326, 333 (7th Cir. 1987))).

### 1.     Procedural Unconscionability

30.     In the instant case, the unconscionability inquiry ends at "procedural abuse," as the Debtor cannot make the required unconscionability showing regarding shocking or gross "facts surrounding the bargaining process." *Pony Express Courier Corp. v. Morris*, 921 S.W.2d 817, 821 (Tex. App.—San Antonio 1996, no pet.). By the Debtor's own admission, "each of the Gas Suppliers had a pre-existing NAESB form contract with Brazos, [yet] those agreements did not obligate Brazos to purchase any gas. Nor did they obligate the Gas Suppliers to sell any gas." [Compl. ¶ 53.] In other words, neither party was required to transact with the other if either party found the gas-sale deal terms unacceptable for any reason—both parties were willing participants to each and every consummated transaction. This acknowledgement by the Debtor runs contrary to unconscionable procedural abuse by itself, which "is illustrated through such things as 1) the presence of deception, overreaching and sharp business practices, 2) the absence of a viable alternative, and 3) the relative acumen, knowledge, education, and financial ability of the parties

involved." *El Paso Nat. Gas*, 964 S.W.2d at 61 (citations omitted).   Indeed, the Debtor's

Complaint is entirely devoid of any facts showing such procedural-unconscionability defects.

31.     By way of illustration, the Complaint is silent on viable alternatives and, rather,

indicates throughout that the Debtor purchased gas from a multitude of other sources.  [*See* Compl.

¶ 52 (identifying seven different Gas Suppliers in the Complaint).]   The Debtor does not allege

that NJRES "had 'undisputed' control over the [] business for a large swatch of [Texas] citizens,"

but rather merely lodges objections based on its unhappiness with the market's price points during

an unprecedented winter storm.   Courts, however, have routinely held that the availability of a

good from other sellers rebuts a party's claim that it lacks a viable alternative.   *See, e.g.*, *Crawford*

*Prof'l Drugs, Inc. v. CVS Caremark Corp.*, 748 F.3d 249, 264 (5th Cir. 2014) ("The Plaintiffs have

failed to present any evidence that they were prevented from contracting with another PBM or

could not have abstained from contracting with the Defendants at all.");  *Stinger v. Chase Bank,*

*USA, NA*, 265 Fed. App'x 224, 229 (5th Cir. 2008) (finding the plaintiff "did have a choice—he

could have rejected the terms [] offered").   That the Debtor's primary gripe here centers on price,

this  refocuses  the  analysis  not  on  procedural  unconscionability,  but  on  substantive

unconscionability.   *See, e.g.*, *In re Olshan Found. Repair Co., LLC*, 328 S.W.3d 883, 892 (Tex.

2010) (finding because complaint centered on "the prohibitive cost . . ., their claim is grounded in

substantive unconscionability");  *Venture Cotton Coop. v. Freeman*, 435 S.W.3d 222, 229 (Tex.

2014) (finding agreement unconscionable where it forced party "to forego substantive rights and

remedies  afforded  by  statute"—and  disregarding/dismissing  the  "too  expensive"

unconscionability argument);  *see also* Restatement of the Law, Consumer Contracts § 5 TD, cmt.

8 (2019) ("The procedural-unconscionability test may be more difficult to satisfy because the price

is usually the most prominent element of a transaction and a critical factor in the consumer's

contracting decision.").

32.     It is for these same reasons that the Debtor cannot (and does not) plead deception, overreaching, or sharp business practices. *See El Paso Nat. Gas*, 964 S.W.2d at 61. Although natural gas prices rose in line with elementary supply and demand economics during the winter storm, the Debtor, through its highly sophisticated gas-purchasing agent, ACES, knowingly and willingly entered into four (4) separate natural gas transactions with NJRES. *Wade v. Austin*, 524 S.W.2d 79, 86 (Tex. App.—Texarkana 1975, no pet.) ("[T]he fact that a bargain is a hard one does not entitle a party to be relieved therefrom if he assumed it fairly and voluntarily."). Nor does the Debtor plead a lack of acumen, knowledge, education, or financial ability. *See id.* Rather, the Debtor boasts its "robust hedging program designed to, among other things, mitigate risk," citing its understanding relating to both "a given contract and the market price of the commodity" and "[s]ignificant movements in market prices." [Karnei Decl. ¶ 33.] The Debtor has no legal argument to forward on these points, other than to point out the steep price increases—driven by market influences reflecting ordinary notions of supply and demand, intermixed with a commercially sophisticated entity knowledgeable on the natural gas trade. The Debtor has therefore failed to plead any procedural unconscionability.

## 2.     Substantive Unconscionability

33.     As discussed above, the Debtor's objections suggest only that *alleged* excessive prices dictate the unenforceability of NJRES's proof of claim. [Compl. ¶ 64.] However, outside the DTPA, excessive price alone cannot be the impetus for a court to reform a contract between two commercially savvy entities. *See Wade*, 524 S.W.2d at 86 ("A party who knowingly enters a lawful but improvident contract is not entitled to protection by the courts. In the absence of fraud, mistake, or oppression, the courts, as such, are not interested in the wisdom or impolicy of contracts and agreements voluntarily entered into between parties."); *Lyles v. RDP Co.*, 702 Fed. App'x

15

385, 400 (6th Cir. 2017) (refusing to reform natural gas lease that "relies solely on the [increase in price]").[3]

34.    A contractual term is substantively unconscionable only if "the inequity of the term is so extreme as to shock the conscience." *Besteman v. Pitcock*, 272 S.W.3d 777, 789 (Tex. App.—Texarkana 2008, no pet.).  There is nothing shocking about commodity market price increases during extreme weather events when supply inevitably dips, let alone when the party asserting substantive unconscionability "was a willing party to the transaction."  *See Earman Oil Co., Inc. v. Burroughs Corp.*, 625 F.2d 1291, 1299 (5th Cir. 1980) (rejecting unconscionability defense); *El Paso Nat. Gas*, 964 S.W.2d at 62 ("Our court system cannot act as the mother hen watching over its chicks, standing ready to ameliorate every unpleasant circumstance which might befall them.").  Both NJRES and the Debtor contemplated the rising natural gas prices (as set by the market), and the Debtor expressly agreed to accept delivery at those prices—while acknowledging that "those agreements did not obligate Brazos to purchase any gas." [Compl. ¶ 53.]  The Debtor therefore "can hardly profess surprise or prejudice at the consequences of its decision."  *NML Capital v. Republic of Argentina*, 621 F.3d 230, 238 (2d Cir. 2010) ("Argentina has pointed to no

---

[3] The *Lyles* decision is emblematic of courts' general refusal to upend the bargaining process and reform ill-advised contracts.  And that is even where prices rise **after** contract execution.  *See also Bradford v. Plains Cotton Coop. Ass'n*, 539 F.2d 1249, 1255 (10th Cir. 1986) (rejecting unconscionability challenge where "the price of cotton increased substantially" post-execution); *Hertz Corp. v. Attorney Gen. of the State of New York*, 518 N.Y.S.2d 704, 709-10 (Sup. Ct. N.Y. Cty. 1987) ("We live in a quasi-capitalist society, where the economy is generally controlled by the law of supply and demand.  With respect to certain services and commodities prices are regulated, *i.e.* electricity, insurance rates, residential rents, etc.  However, such regulation is the exception, not the rule, and in the absence of an explicitly declared intention to regulate prices or profits, it is not for the courts at the behest of the Attorney General, to set policy on permissible profits and thus encroach on what is clearly a legislative function.").  Thus, if courts are generally unwilling to reform contracts with post-execution price surges, the Court here should be wholly unreceptive to reforming contracts entered into by the Debtor, using its professional gas-purchasing agent, ACES, with full knowledge of the *current* prices and the related commodities market influences.

authority—and we are aware of none—finding an agreement involving parties of like sophistication unenforceable on substantive unconscionability grounds").

35.     Count One of the Debtor's Complaint should accordingly be dismissed on unconscionability grounds.

## III.   COUNTS TWO & THREE SHOULD BE DISMISSED FOR FAILURE TO PLEAD THE REQUIRED CONSTRUCTIVELY FRAUDULENT TRANSFER ELEMENTS

36.     Adequately stating a constructively fraudulent avoidance claim requires the Debtor to sufficiently plead a couple threshold items that are notably missing here:  (1) that the Debtor did not receive reasonably equivalent value in exchange for the obligation incurred; and (2) that, at the time the obligation was incurred, certain solvency-related events had occurred or were about to occur.  The Complaint's threadbare nature pleads neither.

### A.     The Debtor Failed to Plead Receipt of Less Than Reasonably Equivalent Value.

37.     Both of the Debtor's constructively fraudulent transfer claims fail for the same reason, *i.e.*, the Debtor fails to plausibly allege that it received less than reasonably equivalent value in exchange for the natural gas delivered.  *See* 11 U.S.C. § 548(a)(1)(B).  The Debtor brings these two (2) avoidance claims under both the Bankruptcy Code § 548(a)(1)(B) (Count 2), and under the Texas Uniform Fraudulent Transfer Act (TEX. BUS. & COM. CODE § 24.001 *et seq.*) ("<u>TUFTA</u>")[4] (Count 3).  The primary thrust of the Debtor's constructively fraudulent transfer claims again hinges on the oft-cited faulty foundational allegation regarding natural gas sales "based on exorbitant and excessive prices."  [Compl. ¶¶ 70, 73.]  These claims are bereft of the

---

[4]  Under 11 U.S.C. § 544(b), a transfer may also be set aside in accordance with state law (*i.e.*, the TUFTA).  *Joe T. Dehmer Distribs., Inc. v. Murray Owen Temple*, 826 F.2d 1463, 1466 (5th Cir. 1987).  The TUFTA provides for the avoidance and recovery of constructively fraudulent transfers on a showing "substantially the same as § 548 of the Bankruptcy Code," *In re Prince*, 2012 WL 1095506, at *6 (Bankr. E.D. Tex. Mar. 30, 2012), except that the lookback period under TUFTA is four years, TEX. BUS. & COM. CODE § 24.010(a)(2).

legal implications concerning "value" as it pertains to a commodity such as natural gas and must therefore be dismissed as a matter of law.

38.     The fraudulent transfer claims both fail because ***value must be measured at the time of the transfer***, and courts "should not consider subsequent events, such as [dramatic changes in commodity] prices." *ASARCO LLC v. Americas Mining Corp.*, 396 B.R. 278, 336-37 (S.D. Tex. 2008); *In re Fairchild Aircraft Corp.*, 6 F.3d 1119, 1126 n.8 (5th Cir. 1993) (noting the "appropriate time to evaluate the value given for a payment is at the time the payment is made" (citing Collier on Bankruptcy § 548.09 at 116 (15th ed.) (same))); *see also In re Louisiana Pellets, Inc.*, 838 Fed. App'x 45, 49 (5th Cir. 2020) ("Value is determined as of the date of transfer . . . of the transferred property." (citations omitted)).   Accordingly, because receipt of less than reasonably equivalent value is a *required* element under both 11 U.S.C. § 548(a)(1)(B) and the TUFTA, the Debtor's inability to plead this element is fatal to its constructively fraudulent transfer claims.  *See, e.g.*, *In re Essential Fin. Educ., Inc.*, 629 B.R. 401, 443 (Bankr. N.D. Tex. 2021) (denying trustee's constructively fraudulent transfer claims for failure to demonstrate that the debtor did not receive reasonably equivalent value); *Campbell v. Texas Tea Reclamation, LLC*, 2021 WL 2211690, at *6 (S.D. Tex. May 6, 2021) (dismissing TUFTA constructively fraudulent transfer claims for failure "to establish that transfers were made without an exchange of 'reasonably equivalent value'"); *In re Dual D Health Care Ops., Inc.*, 2021 WL 3083344, at *11 (Bankr. N.D. Tex. July 21, 2021) ("[B]ecause the Debtor's receipt of less than reasonably equivalent value is an essential element . . . on constructive fraud grounds and the Complaint fails to plausibly state a basis upon which such element may be satisfied, Counts II and III (as to constructive fraud) will be dismissed.").   The same is true here, the Debtor has utterly failed to plausibly plead any facts showing why the natural gas received in exchange of the payment

obligations incurred was not of reasonably equivalent value *at the time* the obligations were incurred.

39.     The "reasonably equivalent value in exchange" analysis is the same under both 11 U.S.C. § 548(a)(1)(B) and the TUFTA.  *See In re Black Elk Energy Offshore Ops., LLC*, 2019 WL 3889761, at *5 (Bankr. S.D. Tex. Aug. 16, 2019).  Lack of reasonably equivalent value is a necessary, but not sufficient, condition for a constructively fraudulent transfer claim.  5 COLLIER ON BANKRUPTCY, ¶ 548.05 (16th ed.).  But the Debtor cannot meet this initial hurdle, as "value is determined at the time of the transfer," and "neither subsequent depreciation in nor appreciation in value of the consideration affects the question of whether reasonable equivalent value was given."  *Louisiana Pellets*, 838 Fed. App'x at 50.

40.     In the instant case, as evidenced by NJRES's proof of claim, NJRES supplied the Debtor with natural gas pursuant to four (4) separate confirmed transactions.  [*See* Proof of Claim ¶ 4.]  On February 12, 2021, NJRES offered its natural gas for sale at $16.685 per MMBtu, and the Debtor purchased 25,000 MMBtus at that agreed-upon price.  During the period of February 13-16, 2021, NJRES offered its natural gas for sale at $149.660 per MMBtu, and the Debtor purchased 75,000 MMBtus at that agreed-upon price.  On February 17, 2021, NJRES offered its natural gas for sale at $725.000 per MMBtu, and the Debtor purchased only 18,750 MMBtus at that agreed-upon price.  And during the period of February 20-22, 2021, NJRES offered its natural gas for sale at $15.000 per MMBtu, and the Debtor purchased 56,250 MMBtus at that agreed-upon price.  [Proof of Claim ¶ 4 & Ex. B.].  Despite the winter storm , there was nothing extraordinary about the sale negotiations.  *See, e.g.*, *In re Rothstein Rosenfeldt Adler, P.A.*, 483 B.R. 15, 21 (Bankr. S.D. Fla. 2012) ("If a competitive market set the price by the bidding procedures of the auction, it establishes the reasonably equivalent value."); *see also BFP v. Resolution Tr. Corp.*,

511 U.S. 531, 548 (1994) (measuring value as "comparable to the worth of the transferred property").

41.     Critically, NJRES did not unilaterally set these prices in a vacuum—the commodities market during a winter storm resulted in a higher equilibrium price.  NJRES, thereafter, (1) "performed under a lawful, arm's-length contract for fair market value," (2) delivered goods with an "objective value at the time of the transaction," and (3) "made the exchange in the ordinary course of the transferee's business." *Janvey v. Golf Channel, Inc.*, 487 S.W.3d 560, 564 (Tex. 2016).  The objectively sophisticated nature of the parties, in conjunction with naturally occurring marketplace influences, is the single-most determinative factor on "reasonably equivalent value":

> [I]n determining whether a value is objectively "reasonable" the court gives significant deference to marketplace values.  When sophisticated parties make reasoned judgments about the value of assets that are supported by then prevailing marketplace values and by the reasonable perceptions about growth, risks, and the market at the time, it is not the place of fraudulent transfer law to reevaluate or question those transactions with the benefit of hindsight. . . .  The evidence regarding comparable sales close in time to [the] acquisition . . . demonstrates that the price paid . . . was in line with then prevailing values that the marketplace placed on such companies.

*Peltz v. Hatten*, 279 B.R. 710, 738 (D. Del. 2002).

42.     Courts may also consider other factors to assist in its analysis, such as:  "(1) the disparity between the fair value of the transferred property and what the debtor received; (2) the good faith of the parties; and (3) whether the transaction was at arm's length." *ASARCO*, 396 B.R. at 338.  Indeed, in *Janvey*, the Texas Supreme Court held that an obligation incurred at "market-value rates in an arm's length transaction **conclusively establishes** that the value exchanged was 'reasonably equivalent.'"  487 S.W.3d at 582.  The Debtor does not plead that NJRES's transactions were not at arm's length, but rather the Debtor only pleads hyperbole—*i.e.*, that the

Debtor chose "between paying grossly disproportionate prices" versus "letting Texans literally freeze to death." [Compl. ¶ 66.] At bottom, then, the Debtor's objections/claims fall short of meeting the requisite legal standards and therefore should be overruled and dismissed.

43. Due to the fact that the Debtor does not plead that the underlying natural gas sales were not arm's length transactions, the Court should at minimum overrule and dismiss the Debtor's TUFTA objection/claim (Count 3). *See* TEX. BUS. & COM. CODE § 24.004(d) ("'Reasonably equivalent value' includes without limitation, a transfer or obligation that is within the range of values for which ***the transferor*** would have sold the assets in an arm's length transaction" (emphasis added)); *see also Janvey*, 487 S.W.3d at 573 (noting that TUFTA "is unique among fraudulent-transfer laws because it provides a specific market-value definition of 'reasonably equivalent value'"); *Lindemann v. Eli Lilly & Co.*, 816 F.2d 199, 204 (5th Cir. 1987) ("An arm's-length relationship is presumed in a commercial transaction covered by the UCC."). Rather, the Debtor admits that: (i) "natural gas prices spiked in response to falling supply as lines froze up, [and] the cost to produce electricity from gas-fueled power plants increased dramatically"; (ii) ERCOT responded and accordingly "set prices at the System Wide Offer Cap ($9,000 per MWh)" and "continued this practice until 9:00 a.m. on February 19"; and (iii) for comparison, ERCOT generally "clocks prices for wholesale electricity . . . in the range of $21 to $29 per MWh." [Karnei Decl. ¶ 53.] NJRES's natural gas sale prices are therefore clearly linked to this market flux, which is not the product of "less than a reasonably equivalent value in exchange" but rather is driven by market forces. *See, e.g.*, *Office of Pub. Util. Council v. Pub. Util. Comm'n of Texas*, 131 S.W.3d 314, 331 (Tex. App.—Austin 2004, pet. denied) ("The available data continues to demonstrate that natural gas prices and electricity prices in ERCOT are significantly correlated." (citation omitted)).

21

44.     Ironically, the Complaint itself, which names seven (7) different gas sellers, rather than showing a lack of reasonably equivalent value, clearly shows that natural gas was uniformly trading at higher prices during the February winter weather event in Texas.  Due to the weather-induced supply shortage of natural gas and the increased demand, the market price for natural gas rose dramatically.  Of course, during the period of time that ERCOT raised energy prices to $9,000 MWh, Brazos could have burned the purchased gas and sold it into the ERCOT market at a handsome profit.  Of course it did not do that because its members had effectively hedged their power costs by having an ownership stake in the physical generation assets owned by Brazos.  Nevertheless, the market for natural gas during the winter storm had maximum value as it could be converted to electricity and sold at $9,000 MWh.

45.     On balance, the Debtor's objections/claims do not plausibly allege the Debtor received less than reasonably equivalent value under the applicable legal standards, and the Court should accordingly dismiss Counts Two and Three.

**B.     The Debtor Fails to Plead Insolvency.**

46.     The Complaint contains no allegations whatsoever plausibly alleging insolvency.  Rather, the Complaint only recites generally and in a conclusory fashion that it "became insolvent."  [Compl. ¶¶ 3, 69-70, 73.]   More is required under the *Twombly-Iqbal* pleading standards, however, than a rote formulaic conclusions of law.

47.     Both the Bankruptcy Code and the TUFTA similarly require some demonstration on the Debtor's part that it was (i) insolvent on the date of transfer, or became insolvent as a result of the transfer, (ii) the transaction left the Debtor with unreasonably small capital, or (iii) the Debtor incurred debts beyond its ability to pay as those debts matured.  11 U.S.C. § 548(a)(1)(B); TEX. BUS. & COM. CODE § 24.005(a)(2).  The Debtor merely recites these elements in Paragraphs 3, 69, 70 & 73 of the Complaint, but then becomes distracted by the $180 million obligation it

willingly occurred.  And that is it on the issue of insolvency.  The Debtor's insolvency arguments (or rather lack thereof) speak only to its dissatisfaction with the "exorbitant and excessive prices" and wholly ignore the statutory elements under the Bankruptcy Code and the TUFTA.  This is an obvious pleading defect that cannot be overlooked by this Court.

48.      If the Debtor wishes to claim insolvency due to $180 million in natural gas claims, basic pleading requirements require the Debtor to more thoroughly address the statutory elements under 11 U.S.C. § 548(a)(1)(B) and TEX. BUS. & COM. CODE § 24.005(a)(2).

49.      Because the Complaint entirely lacks any plausible allegation related as to insolvency, Counts Two and Three of the Complaint must be dismissed on this basis alone.

## IV.  COUNT FOUR SHOULD BE DISMISSED FOR FAILURE TO PLEAD THE SUBJECT GAS SALE TRANSACTIONS WERE OUTSIDE OF THE ORDINARY COURSE OF THE DEBTOR'S BUSINESS

50.      The Debtor's fourth objection/claim is a bridge too far, asserting that its purchase (as an "electric cooperative corporation" within Texas's "public-power sector") of additional supply of natural gas during inclement weather somehow transformed these particular natural gas sales outside "the ordinary course of [the Debtor's] business."  This interpretation, however, undermines the Debtor's entire business model and, indeed, such an interpretation would strip administrative priority of legitimate priority claims under the guise that such debtor's business experienced tumultuous events and should not be held to account for any debt accumulated, even within the twenty-day lookback window under Bankruptcy Code Section 503(b)(9).  Obviously, this would severely undercut the public policy implications underlying Section 503(b)(9),[5] making it all too easy for a business that suddenly experienced an adverse commercial climate to stand

---

[5]  *See* 4 COLLIER ON BANKRUPTCY ¶ 503.16 (15th ed.) (discouraging abuse by debtors who seek to acquire goods at a time when it is known that bankruptcy is imminent and that payment for the goods will not have to be tendered).

behind "this wasn't in the ordinary course."  Therefore, the Debtor's strained interpretation of "outside of the ordinary course" should not be recognized and adopted by this Court.

51.    The Debtor disputes the third prong of Section 503(b)(9),[6] specifically alleging that the natural gas NJRES sold to the Debtor was not sold "in the ordinary course of such debtor's business" due to the winter storm.  11 U.S.C. § 503(b)(9).  The Bankruptcy Code does not define the term "in the ordinary course of such debtor's business."  Where a phrase is not defined in the Bankruptcy Code, "case law teaches that courts may look to Article 2 of the U.C.C. when analyzing section 503(b)(9) claims."  *In re SRC Liquidation, LLC*, 573 B.R. 537, 540 (Bankr. D. Del. 2017);; *In re E. Texas Steel Facilities, Inc.*, 117 B.R. 235, 238 n.1 (Bankr. N.D. Tex. 1990) (adopting U.C.C. definition of "seller" to interpret Bankruptcy Code § 546(c)).  Section 1-201(b)(9) of the Uniform Commercial Code defines "buyer in the ordinary course" to mean:

> a person that buys goods in good faith, without knowledge that the sale violates the rights of another person in the goods, and in the ordinary course from a person, other than a pawnbroker, in the business of selling goods of that kind.  A person buys goods in the ordinary course if the sale to the person comports with the usual or customary practices in the kind of business in which the seller is engaged or with the seller's own usual or customary practices.  A person that sells oil, gas, or other minerals at the wellhead or minehead is a person in the business of selling goods of that kind.

52.    The Debtor again mistakenly resorts to the limited parameters of the DTPA to invoke consumer "price-gouging . . . that exceeds 15% of the price in the ordinary course of business."  [Compl. ¶ 2 ("The Gas Suppliers chose to exacerbate this disaster by charging as much [as] 35,000% above the average price of gas charged to the Debtor in the ordinary course of business.").]  Indeed, whenever the Debtor's objections to NJRES's proof of claim allege actions

---

[6]  *See In re ADI Liquidation, Inc.*, 2019 WL 211528, at *1 (D. Del. Jan. 16, 2019) ("To receive such priority, a creditor must demonstrate that:  (1) the goods in question were received by the debtor within 20 days before the petition date, (2) the goods were sold to the debtor, and (3) the goods were sold in the ordinary course of business."  (citing 11 U.S.C. § 503(b)(9))).

outside the ordinary course of business, such objections are only about price.  [*See, e.g.*, Compl. ¶ 32 ("During the entirety of calendar year 2020, gas prices charged to the Debtor in the ordinary course of the Debtor's business averaged $1.80/MMBtu and never exceeded $3.10/MMBtu.").] The Debtor moreover admits that NJRES sold gas to the Debtor (via ACES) under a pre-existing NAESB contract.  [Compl. ¶ 53.]  Because the Debtor's price-based objections, in addition to the above-referenced DTPA law, do not place the Debtor outside the scope of a "buyer in the ordinary course" pursuant to U.C.C. § 1-201(b)(9), the goods are deemed to "have been sold to the debtor in the ordinary course of such debtor's business."  11 U.S.C. § 503(b)(9); *see also In re SemCrude, L.P.*, 504 B.R. 39, 65 (Bankr. D. Del. 2013) (noting that oil and gas transactions were "a core part of the Debtor's business" and therefore finding that "[e]ven if [the increases in crude oil purchases were at odds with the parties' past trading history], these transactions were real purchases of oil, and not sham transactions . . . [a]n increase in sales, by itself, does not operate to turn otherwise ordinary course transactions out of the ordinary").

53.     In the instant case, the transactions at issue did not deviate from the practices and customs of the parties' prior dealings.  In previous transactions, the Debtor worked through its professional trading agent, ACES, to negotiate individual transaction confirmations for natural gas.  That practice is customary for Brazos and the industry as a whole, and it continued unchanged during the winter storm.  [Compl. ¶ 52.]  That the price and quantity of gas differed between sales is expected—market prices are naturally subject to fluctuations based on supply and demand pressures.  In sum, there was no difference between the parties' conduct that would warrant finding these transactions outside the ordinary course of business.

54.     The Court may additionally look to Sections 363 and 364 of the Bankruptcy Code as interpretive guidance on the "ordinary course of business" standard (*i.e.*, by reference to the vertical and horizontal dimension tests), which constitute further indicia to overrule and dismiss

the Debtor's objection/claim.  *See In re Denton Cty. Elec. Coop., Inc.*, 281 B.R. 876, 882 n.12

(Bankr. N.D. Tex. 2002) (citing *in re Johns-Manville Corp.*, 60 B.R. 612, 616-18 (Bankr. S.D.N.Y.

1986)).  Two important undisputed facts to consider are:  (1) the Debtor is an "electric cooperative

corporation" within Texas's "public-power sector" that regularly purchased natural gas to operate

at least three separate gas-fired plants, with the oldest dating back to 1997; and (2) NJRES is in

the business of selling natural gas.  [Karnei Decl. ¶¶ 1-2, 25-28.]

      55.    The vertical dimension test "examines the debtor's transaction from the vantage

point of a hypothetical creditor and inquires whether the transaction subjects a creditor to economic

risks of a nature different from those [that might be expected to take place]." *In re Johns-Manville*,

60 B.R. at 616 (citing *In re James A. Phillips, Inc.*, 29 B.R. 391, 394 (S.D.N.Y. 1983)).  The *James

A. Phillips* court examined the "in the ordinary course of business" standard in the context of

allegedly "extraordinary" accelerated payments made under exigent circumstances and

nonetheless found them to "appear a reasonable response to business exigencies."  29 B.R. at 394-

95 (explaining the purpose of the "notice requirement" in such circumstances with a debtor-in-

possession "would avoid preferential payments that may be commercially unsupportable or

downright fraudulent").  The *Johns-Manville* court drew upon this reasoning in *James A. Phillips*

to conclude that "[t]he primary focus of the vertical dimension is thus on the debtor's internal

operation and workings."  60 B.R. at 617 ("The 'ordinariness' of actions taken by a debtor depends

upon the nature, type and size of its business.  A debtor which is a large, multinational corporation

engages in activities of a magnitude that would likely be considered extraordinary for a smaller

business.").[7]

---

[7]  It should also be noted, the gas claims being challenged herein total $178,752,342.  Although a
seemingly large amount, it is a small percentage (around 5%) of the Debtor's total scheduled
liabilities.  [*See* Debtor's Schedules at 11.]  Given this, it cannot reasonably be inferred, and it is

56.     In this case, the vertical dimension test is satisfied.  The Debtor admits it is an "electric cooperative corporation pursuant to Section 161.059 of the Texas Utilities Code"; that it "owns and operates more than 2,713 miles of transmission line and over 300 substations . . . in the [ERCOT] system" (which is "approximately 51% [] natural gas-fueled generation" [Karnei Decl. ¶ 44]); and that "NJR sold natural gas to the Debtor."  [Compl. ¶¶ 5, 27, 16.]  Moreover, the Debtor even evidences its sophisticated understanding of the "pervasive market uncertainty" that "take[s] its toll on the public power sector.  [Karnei Decl. ¶ 48 (citing the COVID-19 pandemic, for example).]  The Debtor counteracts commodities market uncertainty with:  (i) being party to several PPAs; (ii) maintaining "a robust hedging program"; and (iii) "the acquisition of additional energy resources" and reserves.  [Karnei Decl. ¶¶ 29, 33, 47.]  The Debtor also acknowledges that: (i) "natural-gas prices jumped from $3 to over $150/MMBtu in anticipation of short gas supply"; (ii) "supply plummeted as power plants tripped offline and demand threatened to exceed supply"; and (iii) "natural gas prices spiked in response to falling supply as lines froze up."  [Karnei Decl. ¶¶ 50, 52-53.]  Plainly stated, only the winter storm was extraordinary—but the "internal operation and workings" of both the Debtor and NJRES were operating under standards of commercial sophistication (*i.e.*, within the ordinary course of business).  *See In re Johns-Manville*, 60 B.R. at 617; *see also In re Ionosphere Clubs, Inc.*, 98 B.R. 174, 175 (Bankr. S.D.N.Y. 1989) (noting a debtor need only "articulate some business justification" to find expenditure of funds within the ordinary course of business); *Richmond Leasing Co. v. Capital Bank, N.A.*, 762 F.2d 1303, 1312 n.11 (5th Cir. 1985) (considering whether, for purposes of "in the ordinary course of business, "the purchase was a valid business decision").

---

not facially plausible, that the subject gas sale transactions presented meaningful economic risk to a hypothetical creditor.

57.     Based on the foregoing, the horizontal dimension test, to the extent it applies,[8] is similarly satisfied.   This test involves "a comparison of *this* debtor's business to other like businesses."   *Id.* at 618 ("[T]he primary focus of the horizontal analysis is external.").   For example, "raising a crop would not be in the ordinary course of business for a widget manufacturer because that is not a widget manufacturer's ordinary business."   *Id.* (citation omitted).   Here, the Debtor owns and operates three natural gas-fired plants within an ERCOT system, and so it would be logically expected to purchase natural gas from NJRES in the ordinary course of business.   And, like businesses within Texas's nationally unique power grid system would similarly purchase natural gas during a winter storm, including paying higher-than-normal prices considering the storm's adverse impact on supply and demand.

58.     Finally, it is noteworthy that market-based pricing increases do not render transactions outside the "ordinary course."   *See, e.g.*, *In re Roth Am., Inc.*, 975 F.2d 949, 954 (3d Cir. 1992) (noting inquiry centers on whether "the nature of the [transaction] ventures beyond the domain of transactions that a hypothetical creditor would reasonably expect to be undertaken *in the circumstances*" (emphasis added)).   In fact, courts do not consider any market-based fluctuations as singularly determinative of whether the transaction occurred in the ordinary course of the debtor's business, nor should they.   *See Johns-Manville*, 60 B.R. at 617 ("The 'ordinary course of business' standard is purposely not defined so narrowly as to deprive a debtor of the flexibility it needs to run its business and respond quickly to changes in the business climate."); *see also In re Garofalo's Finer Foods, Inc.*, 186 B.R. 414, 424 (N.D. Ill. 1995) ("[I]n applying this [creditor's expectations] test, the court must also consider the changing circumstances that are inherent in a debtor's efforts to operate its business.").   Therefore, market-based price fluctuations

---

[8]  Based on the plain meaning of section 503(b)(9), the focus is on whether "the goods have been sold to the debtor in the ordinary course of such debtor's business."   11 U.S.C. § 503(b)(9).

cannot be the determinative factor (as the Debtor would have this Court hold) in converting these transactions to outside the ordinary course.

59.     Accordingly, Count Four of the Complaint should be dismissed.

## V.     COUNT FIVE SHOULD BE DISMISSED FOR FAILURE TO PLEAD THAT NJRES DID NOT PROVIDE VALUE

60.     The Debtor's fifth cause of action builds on Counts Two and Three, namely the conclusory allegation that "[t]he Gas Claims far exceed the 'value' of the goods received by the Debtor."   [Compl. ¶ 81 (citing 11 U.S.C. §§ 503(b)(9) and 507).][9]   This is obviously not an allegation of fact giving rise to a plausible inference that it might be true.  The Debtor simply hopes to strip NJRES's claim of administrative priority as "orders of magnitude beyond the actual value of the gas supplied." [Compl. ¶ 82.]  The Debtor and NJRES, having agreed to terms in accordance with the applicable commodities market pricing index, together set the values identified in NJRES's Section 503(b)(9) proof of claim.  This objection/claim should therefore be dismissed for the reasons discussed above in Section III, *supra*, as "value" is measured at the time of the transfer between two parties dealing at arm's length.  *ASARCO*, 396 B.R. at 336-37.

61.     The definition of "value" in Section 548(d)(2) ("property, or satisfaction or securing of a present or antecedent debt of the debtor") is quite different from the commonly understood definition of "reasonably equivalent value," discussed above.  In light of this, "the value of any goods received" in Section 503(b)(9) is appropriately interpreted as the dollar amount of property received, determined by reference to the parties' agreement at the time of the agreement.  *See, e.g.*, *In re Plastech Engineered Prods.*, 397 B.R. 828, 838-39 (E.D. Mich. 2008)

---

[9]  The word "value" does not appear in Sections 101 or 507, but it does appear in Section 503(b)(9), and so this section will focus primarily on Section 503(b)(9).

(defining "value" as the invoiced price of goods for purposes of section 503(b)(9)). This would also be consistent with the legislative purpose.

62. The Court may also look to other subsections of the Bankruptcy Code for comparable guidance on the definition of "value." *See Sorenson v. Secretary of Treasury of U.S.*, 475 U.S. 851, 860 (1986) ("The normal rule of statutory construction assumes that identical words used in different parts of the same act are intended to have the same meaning." (quotation and citation omitted)); *United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd.*, 484 U.S. 365, 371 (1988) (reasoning "the value of such creditor's interest" in Bankruptcy Code section 506(a)(1), and "value of such entity's interest" in Bankruptcy Code section 361, should be interpreted similarly). Although "value" is not defined in 11 U.S.C. 503(b)(9), there is a substantial body of law providing useful instruction on how to measure value—*i.e.*, "at the time of the transfer." *ASARCO*, 396 B.R. at 336-37; *In re Fairchild*, 6 F.3d at 1126 n.8; *see also In re Beaulieu Grp., LLC*, 2021 WL 4469928, at *45 (Bankr. N.D. Ga. Sept. 29, 2021) (ruling on 503(b)(9) claims concerning, among other things, "overcharging allegation[s]" measured against "the fair market value" of the goods, the valuation of which the court based on its earlier three-part "reasonably equivalent value" test, *id.* at *28).

63. As discussed at length above, the Debtor's central thesis centers on unhappiness with the gas commodities market conditions, specifically with the price volatility in response to a winter storm and a corresponding supply shortage of natural gas. While understandable, it is nonetheless legally insufficient to demonstrate that the Debtor did not receive the "value" of the gas sold and received by the Debtor during the height of Winter Storm Uri. Certainly, if Brazos had surplus natural gas and sought to sell it back into the natural gas market during Winter Storm Uri, it would have done so without complaint at the same prices charged by the gas sellers.

64.    Thus, NJRES's proof of claim is not "beyond the value of the gas supplied" but rather, NJRES's proof of claim embodies the exact "value" of the natural gas supplied to the Debtor.  Count Five of the Complaint should be dismissed.

## CONCLUSION

For the reasons set forth above, the Debtor's Complaint for declaratory relief and omnibus objections should be overruled and dismissed in its entirety with prejudice and the claim of NJRES should be "allowed" in the amount of $26,079,125.00 as an administrative priority claim pursuant to 11 U.S.C. § 503(b)(9).

Respectfully submitted,

Dated:  January 7, 2022

**GIBBONS P.C.**

By: */s/ Mark B. Conlan*
Robert K. Malone, Esq. (*admitted pro hac vice*)
Mark B. Conlan, Esq. (Bar No. NJ0270120)
One Gateway Center
Newark, NJ 07102
Telephone:  (973) 596-4500
Facsimile:  (973) 596-0545
rmalone@gibbonslaw.com
mconlan@gibbonslaw.com

*Attorneys for NJR Energy Services Company*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on January 7, 2022, a true and correct copy of the foregoing document was electronically filed with the Clerk of the Court using the CM/ECF system, which automatically sends notifications of such filings to all attorneys of record.

<u>/s/ Mark B. Conlan</u>
Mark B. Conlan