**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| In re:<br><br>BRAZOS ELECTRIC POWER<br>COOPERATIVE, INC.,<br><br>               Debtor. | Chapter 11<br><br>Case No. 21-30725 (DRJ) |
| BRAZOS ELECTRIC POWER<br>COOPERATIVE, INC.,<br>               Plaintiff,<br><br>v.<br><br>507 CAPITAL LLC, et al.,<br>               Defendants.[1] | Adv. Proc. No. 21-04407 (DRJ) |

**REPLY IN SUPPORT OF MOTION TO DISMISS OF**
**DEFENDANTS 507 CAPITAL LLC, 507 SUMMIT LLC, CETUS**
**CAPITAL VI, L.P., CROSSINGBRIDGE LOW DURATION HIGH YIELD**
**FUND, DESTINATIONS GLOBAL FIXED INCOME OPPORTUNITIES FUND,**
**DESTINATIONS LOW DURATION FIXED INCOME FUND, LEAFFILTER**
**NORTH HOLDINGS, INC., OFM II, LP, OU 2 LLC, RIVERPARK SHORT**
**TERM HIGH YIELD FUND, RIVERPARK STRATEGIC INCOME**
**FUND AND TWO SEAS GLOBAL (MASTER) FUND LP**
**[Relates to Dkt. Nos. 33, 51]**

---

[1] The Defendants in this adversary proceeding are: 507 Capital LLC, 507 Summit LLC, Cetus Capital VI, L.P., Chase Lincoln First Commercial Corporation, Citigroup Financial Products Inc., CrossingBridge Low Duration High Yield Fund, Destinations Global Fixed Income Opportunities Fund, Destinations Low Duration Fixed Income Fund, Koch Energy Services LLC, Leaffilter North Holdings, Inc., NJR Energy Services Co., OFM II, LP, OU 2 LLC, RiverPark Short Term High Yield Fund, RiverPark Strategic Income Fund, Total Gas & Power North America, Inc. and Two Seas Global (Master) Fund LP.

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ............................................................................................................... 1

ARGUMENT ...................................................................................................................... 3

I.      LEGAL STANDARD ............................................................................................... 3

II.     THE COMPLAINT FAILS TO PLEAD THAT THE GAS SALE TRANSACTIONS
ARE UNENFORCEABLE AS CONTRACTS ........................................................... 4

       A.     Texas Deceptive Trade Practices-Consumer Protection Act .................................. 4

       B.     Unconscionability ................................................................................................. 7

             1.     Both Substantive and Procedural Unconscionability Must be Pleaded ...... 7

             2.     Substantive Unconscionability .................................................................... 8

             3.     Procedural Unconscionability ...................................................................... 8

III.    THE FRAUDULENT TRANSFER CLAIMS SHOULD BE DISMISSED FOR
FAILURE TO PLEAD RECEIPT OF LESS THAN REASONABLY EQUIVALENT
VALUE ................................................................................................................... 10

IV.    THE CAUSES OF ACTION CHALLENGING THE GAS CLAIMS' PRIORITY
STATUS SHOULD BE DISMISSED ...................................................................... 13

       A.     The Complaint Fails to Plead that the Gas Was Not Sold in the Ordinary Course
of the Debtor's Business ...................................................................................... 13

       B.     The Complaint Fails to Plead that Value Was Not Given to the Debtor in the 20-
Day Period .......................................................................................................... 15

V.     LEAVE TO AMEND SHOULD BE DENIED ......................................................... 16

CONCLUSION ................................................................................................................. 16

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

<u>Cases</u>

*Am. Stone Diamond, Inc. v. Lloyds of London*,
934 F. Supp. 839 (S.D. Tex. 1996) ...................................................................8

*Amstadt v. U.S. Brass Corp.*,
919 S.W.2d 644 (Tex. 1996) ..........................................................................5, 6

*Arkwright-Boston Mfrs. Mut. Ins. Co. v. Westinghouse Elec. Corp.*,
844 F.2d 1174 (5th Cir. 1988) .......................................................................7, 8

*ASARCO LLC v. Americas Mining Corp.*,
396 B.R. 278 (S.D. Tex. 2008) .........................................................................12

*Belanger v. BAC Home Loans Serv., L.P.*,
839 F. Supp. 2d 873 (W.D. Tex. 2011) ..............................................................7

*Babb v. Dorman*,
33 F.3d 472 (5th Cir. 1994) .............................................................................16

*Blair v. Rent-A-Center, Inc.*,
928 F.3d 819 (9th Cir. 2019) .............................................................................4

*Campbell v. Aerospace Corp.*,
123 F.3d 1308 (9th Cir. 1997) ...........................................................................6

*Castillo v. Tyson Foods*,
No. 14-2354, 2015 WL 6039236 (S.D. Tex. Oct. 15, 2015) ...............................7

*Earman Oil Co., Inc. v. Burroughs Corp.*,
625 F.2d 1291 (5th Cir. 1980) ...........................................................................8

*Elkjer v. Scheef & Stone, L.L.P.*,
8 F. Supp. 3d 845 (N.D. Tex. 2014) ...................................................................7

*In re Erlewine*,
349 F.3d 205 (5th Cir. 2003) ...........................................................................11

*In re Faulkner*,
593 B.R. 263 (Bankr. E.D. Pa. 2018) .................................................................4

*Goldstein v. MCI WorldCom*,
340 F.3d 238 (5th Cir. 2003) ...........................................................................16

*Khoury v. Thota*,
  No. 20-20578, 2021 WL 3919248 (5th Cir. Sept. 1, 2021) ......................................16

*Larchmont Farms, Inc. v. Parra*,
  941 S.W.2d 93 (Tex. 1997)..........................................................................................6

*Lindemann v. Eli Lilly and Co.*,
  816 F.2d 199 (5th Cir. 1987) ......................................................................................10

*McKinney v. Irving Indep. Sch. Dist.*,
  309 F.3d 308 (5th Cir. 2002) ......................................................................................16

*Mission Petroleum Carriers, Inc. v. Kelley*,
  449 S.W.3d 550 (Tex.App.-Houston 2014, no pet.) ...................................................10

*In re Palm Harbor Homes*,
  195 S.W.3d 672 (Tex. 2006).........................................................................................9

*Peltz v. Hatten*,
  279 B.R. 710 (D. Del. 2002).......................................................................................12

*In re Pioneer Home Builders, Inc.*,
  147 B.R. 889 (Bankr. W.D. Tex. 1992).......................................................................13

*Proske v. Barrett Daffin Frappier Truner & Engel, LLP*,
  No. 19-831, 2019 WL 5787739 (S.D. Tex. Nov. 6, 2019) ...........................................7

*In re SemCrude, L.P.*,
  416 B.R. 399 (Bankr. D. Del. 2009) ...........................................................................13

*Ski River Dev., Inc. v. McCalla*,
  167 S.W.3d 121 (Tex.App.-Waco 2005, pet. denied)...................................................7

*Spinelli v. NFL*,
  903 F.3d 185 (2d Cir. 2018)........................................................................................10

*Wade v. Austin*,
  524 S.W.2d 79 (Tex.Civ.App.-Texarkana 1975, no writ) ............................................8

*White v. Ameriquest Mortg.*,
  No. 18-4013, 2019 WL 2297572 (S.D. Tex. May 30, 2019)........................................9

*Young v. Matagorda County Hosp. Dist.*,
  986 F. Supp. 1064 (S.D. Tex. 1997) ............................................................................6

**Statutes and Rules**

11 U.S.C. § 502 ................................................................................................5

11 U.S.C. § 547 ..............................................................................................15

FED. R. BANKR. P. 8 .........................................................................................4

FED. R. BANKR. P. 12 .......................................................................................4

FED. R. BANKR. P. 3001 ...................................................................................3

TEX. BUS. & COM. CODE § 17.43 ......................................................................5

TEX. BUS. & COM. CODE § 17.45 ......................................................................4

TEX. BUS. & COM. CODE § 17.46 ......................................................................4

TEX. BUS. & COM. CODE § 17.49 ......................................................................5

TEX. BUS. & COM. CODE § 17.50 ......................................................................5

TEX. BUS. & COM. CODE § 24.004 ...................................................................11

TEX. UTIL. CODE § 161.059 .............................................................................1

TEX. UTIL. CODE § 161.121 .............................................................................2

TEX. UTIL. CODE § 186.002 .............................................................................2

UCC § 1-201 .................................................................................................13

**Other Authorities**

Jack F. Williams, "Revisiting the Proper Limits of Fraudulent Transfer Law,"
    8 Bankr. Dev. J. 55 (1991) ................................................................12, 13

Defendants 507 Capital LLC, 507 Summit LLC, Cetus Capital VI, L.P., CrossingBridge Low Duration High Yield Fund, Destinations Global Fixed Income Opportunities Fund, Destinations Low Duration Fixed Income Fund, Leaffilter North Holdings, Inc., OFM II, LP, OU 2 LLC, RiverPark Short Term High Yield Fund, RiverPark Strategic Income Fund and Two Seas Global (Master) Fund LP, each a transferee of claims of Concord Energy LLC and/or Mercuria Energy America, LLC, submit this reply in support of their motion to dismiss.[1]

## **INTRODUCTION**

1.      The Debtor's response is based on two red herrings.  The first is that the Debtor's status as a nonprofit cooperative exempts it from the usual rules of contract and bankruptcy law. For example, the Debtor repeatedly states that it should be permitted to dishonor its contractual obligations because it is a nonprofit corporation seeking to avoid passing the cost of natural gas it purchased during Winter Storm Uri to its nonprofit co-op members which in turn would allegedly pass those costs on to their own customers.  (Opp. ¶¶2, 40, 61.)

2.      But the Debtor's members are its equityholders and control persons.  For Debtor's management to seek to evade paying the invoices of arm's length, third party creditors so that it would not need to seek reimbursement from its owners and control persons (under whatever contracts govern their relationship) reflects a complete disregard of the fiduciary obligation of a debtor in possession to manage the estate for the benefit of creditors rather than insiders.  As to state law, the requirement under TEX. UTIL. CODE § 161.059(a) that the Debtor operate without profit likewise gives it no different or better rights against its creditors.  Such nonprofit electric co-ops may "make any contracts necessary or convenient for the exercise of the powers granted by"

---

[1] Capitalized terms used but not otherwise defined herein have the definitions ascribed to them in the motion.

1

Chapter 161 of the Utilities Code, governing electric co-ops, "contract indebtedness, issue obligations for its indebtedness", "sue and be sued in its corporate name" and/or "perform any other acts … that may be necessary, convenient or appropriate to accomplish the purpose for which the cooperative is organized." TEX. UTIL. CODE § 161.121.

3.      The second red herring is that the Debtor supposedly had no choice but to buy gas regardless of price, because TEX. UTIL. CODE § 186.002 sets forth a public policy that the primary duty of a public utility is to maintain continuous service.  (Opp. ¶¶5, 53.)  However, said policy did not give the Debtor power to dictate pricing of transactions entered into under TEX. UTIL. CODE § 161.121, nor does it give power to unilaterally revise the price terms of those transactions after-the-fact.  The Debtor again cites no authority for these positions its rhetoric implies but cannot support.[2]

4.      In any event, the Debtor's position ignores that gas-fired generation (with gas purchased ad hoc at current spot prices rather than pre-negotiated prices) is only a portion of the Debtor's overall energy mix, which is predominantly comprised of purchased power and includes coal-fired generation, dual fuel and renewables, and that of the Debtor's gas-fired generation 41% can be run on fuel oil (Karnei Decl. ¶¶24-25); and also, that whether or not the Debtor bought gas, ERCOT had directed "deep cuts in load in the form of rotating outages to reduce the strain and avoid a complete collapse."  (Id. ¶51; see also id. ¶52 (discussing frequency drop in transmission grid that caused power plants to trip offline).)

5.      At bottom, the Debtor's claim is that the Gas Claims are not enforceable against it under the UCC or DTPA, or are subject to reduction as a fraudulent transfer, on the ground that

---

[2] Duress (invoked at Complaint ¶¶2, 63, 66) is a recognized defense to enforcement.  Movants argued that this defense is unavailable as a matter of law.  (Motion ¶¶62-63.)  The Debtor does not address this argument, thus conceding the point.

the Gas Sellers (as a group) were "price gouging."  But significantly, no allegation is made that the Debtor's agent ACES was unaware of pricing at other gas hubs, or that other sellers were offering to sell gas on terms that provided for delivery to the Debtor's generating plants at better prices than those offered by the Gas Sellers at the time of the subject transactions.  Nor does the Complaint allege that Defendants engaged in unlawful coordination to fix the price of gas sold to the Debtor.  (Indeed, the communications log that is annexed to the Concord claims show that it was ACES that proposed to the seller certain of the prices that the Debtor now complains of.)  Rather, the Debtor's failure to purchase gas at the lower market prices that prevailed at the time in *other* geographical locations simply confirms that that was not a commercially viable alternative and is thus not a meaningful benchmark that can be used to criticize the price terms the Debtor in fact agreed to.  Indeed, the Debtor has not cited a single case holding that a contract with price terms negotiated at arm's length with an unaffiliated party did not provide a debtor with reasonably equivalent value.  Having knowingly entered into the subject transactions at prices that were freely agreed to, the Debtor cannot now challenge their enforceability.

## ARGUMENT

### I.    LEGAL STANDARD

6.    The Debtor states that notwithstanding Rule 3001(f), "the Gas Claimants bear the burden to prove the contracts are enforceable—not the Debtor."  (Opp. ¶47; see also id. ¶30 n.25.)  This however is inconsistent with the Debtor's separate, more accurate recitation that "Once [i.e. only after] the allegations underlying the Gas Claims are refuted, the burden reverts back to the Gas Claimants to prove the validity of their claims by a preponderance of the evidence."  (Id. ¶33.)  It also presumes that the Complaint pleads facts that if true would refute the prima facie validity of the challenged proofs of claim.

3

7.     Regardless of whether a claim objection is prosecuted as an adversary proceeding or contested matter, the Debtor bears the burden of coming forward with some viable contract defense.  But an adversary proceeding "allows for an extra layer of pretrial process: a responsive pleading in the form of a motion to dismiss, which challenges the legal sufficiency of the complaint", such that "to survive the motion to dismiss, the [c]omplaint must allege facts that refute at least one of the allegations essential to the legal sufficiency of [the] proof of claim."  *In re Faulkner*, 593 B.R. 263, 275 n.4 (Bankr. E.D. Pa. 2018).[3]

## II.     THE COMPLAINT FAILS TO PLEAD THAT THE GAS SALE TRANSACTIONS ARE UNENFORCEABLE AS CONTRACTS

### A.     Texas Deceptive Trade Practices-Consumer Protection Act

8.     The first cause of action seeks to disallow the Gas Claims on the ground that the underlying transactions are "unenforceable … under … applicable law" in that they supposedly violated TEX. BUS. & COM. CODE § 17.46(b)(27), which declares as unlawful "false, misleading or deceptive acts or practices in the conduct of any trade or commerce," and provides that "false, misleading or deceptive acts or practices" includes "taking advantage of a disaster declared by the governor … by (A) selling or leasing fuel … at an exorbitant or excessive price; or (B) demanding an exorbitant or excessive price in connection with the sale or lease of fuel … or another necessity."

9.     Movants argued this claim fails because the Debtor is not a consumer, under TEX. BUS. & COM. CODE § 17.45(4), and so lacks standing to bring and cannot satisfy a required element

---

[3] The Debtor also argues "Rule 12(b)(6) … does not apply to Brazos's objections strictly speaking because Brazos's objections [the Complaint's five causes of action] are not 'claims for relief'." (Opp. ¶32.)  That is false.  *Blair v. Rent-A-Center, Inc.*, 928 F.3d 819, 831 (9th Cir. 2019) (observing that Rule 8(a) uses "claim" and "claim for relief" interchangeably and citing additional authorities).

of a DTPA claim; and also because the subject gas sale transactions are above the $500,000 limit under TEX. BUS. & COM. CODE § 17.49(g).  (Motion ¶¶39-43.)

10.     The Debtor contends that the DTPA is a valid defense to contractual liability, notwithstanding the foregoing.   (Opp. ¶¶56-58.)

11.     This argument fails.   Bankruptcy Code section 502(b)(1) only permits claim disallowance where the subject claim "is unenforceable against the debtor and property of the debtor, under any agreement or applicable law" (emphasis added).   The underlined text makes clear that the Debtor must satisfy the elements of a DTPA claim to interpose a claim objection premised on the same.   The Debtor admits the elements cannot be met.[4]

12.     In addition, the DTPA is not a free-standing defense to an otherwise enforceable contract, and the Debtor cites no authority for the proposition that it is.   Rather, the DTPA "grants consumers a cause of action for false, misleading, or deceptive practices.  TEX. BUS. & COM. CODE § 17.50(a)(1)."  *Amstadt v. U.S. Brass Corp.*, 919 S.W.2d 644, 649 (Tex. 1996).  *See also* TEX. BUS. & COM. CODE § 17.43 ("remedies under the DTPA are cumulative and in addition to other remedies", but not providing any defensive "remedies" to non-consumers).

13.     The Texas Supreme Court has held that a DTPA claim requires a consumer nexus and cannot be invoked against upstream suppliers:

> Although the DTPA was designed to supplement common-law causes of action, we are not persuaded that the Legislature intended the DTPA to reach upstream manufacturers and suppliers … Despite its broad overlapping prohibitions, we must keep in mind why the Legislature created this simple, nontechnical cause of action: to protect consumers in consumer transactions.  Consistent with that

---

[4] It would be absurd to construe section 502(b)(1) as affording a contract defense to a large corporation under the DTPA, where the legislature expressly limited DTPA standing to consumers who engaged in transactions under $500,000, or governmental units acting on their behalf.

> intent, we hold that the defendant's deceptive conduct must occur in
> connection with a consumer transaction …

*Id*.  The requisite nexus is not and cannot be alleged here because the Complaint alleges that the subject gas was burned to fuel the Debtor's gas-fired plants for the purpose of providing electricity to the Debtor's co-op members.  As noted by the Texas Supreme Court, the DTPA "cannot extend to all entities in the chain of production or distribution when none of those entities' alleged misrepresentations ever reached the consumer." *Id*.  The *Amstadt* court did not deny that plaintiffs had plausibly alleged that the ultimate economic cost of the alleged "upstream" misconduct had been passed through to them; rather, it held that that was irrelevant to the availability of DTPA relief when the consumers had not dealt directly with the alleged wrongdoers.

14.     The Debtor further argues it would be against public policy to limit application of the DTPA, because gas charges get passed through to consumer-customers of the Debtor's co-op members.  (Opp. ¶¶61-62.)  The sole authority cited dealt with pre-injury contractual waivers of future liability for gross negligence.

15.     However, it is black letter law that courts "cannot circumvent settled … law … by using the public policy doctrine as an excuse to reach a more equitable remedy"; or rather, a remedy the Debtor argues is more equitable. *Larchmont Farms, Inc. v. Parra*, 941 S.W.2d 93, 95 (Tex. 1997).  As in *Larchmont Farms*, "[i]t is not our province [that is, the province of the courts] to abrogate this policy choice", limiting DTPA standing to consumers and government actors. *Id*. *See also Young v. Matagorda County Hosp. Dist.*, 986 F. Supp. 1064, 1066 (S.D. Tex. 1997) (quoting *Campbell v. Aerospace Corp.*, 123 F.3d 1308, 1315 (9th Cir. 1997)) ("allowing a state law claim to circumvent the requirements imposed on qui tam litigants in a FCA action 'by generically referencing the 'public policy' of the FCA would contravene the statute … Such a

result would derogate the very detailed requirements Congress chose to impose on qui tam FCA litigants'").

### B.    Unconscionability

#### 1.    Both Substantive and Procedural Unconscionability Must be Pleaded

16.    Movants argued that the Debtor must plead and prove both substantive and procedural unconscionability.  (Motion ¶49, citing *Arkwright-Boston Mfrs. Mut. Ins. Co. v. Westinghouse Elec. Corp.*, 844 F.2d 1174, 1184 (5th Cir. 1988) ("Under Texas law, Arkwright must prove *both* substantive and procedural unconscionability to prevail on the unconscionability issue") (emphasis in original).)

17.    The Debtor contends that it "must only prove *either* procedural or substantive unconscionability." In support, it cites case law noting that Texas "recognizes both substantive and procedural unconscionability."  (Opp. ¶44 (citations omitted).)

18.    But recognition of both does not mean, that a person asserting an unconscionability defense need only prove one or the other to prevail on the matter, and there is ample additional authority reiterating the holding of *Arkwright.  E.g.*, *Proske v. Barrett Daffin Frappier Truner & Engel, LLP*, No. 19-831, 2019 WL 5787739, at *3 (S.D. Tex. Nov. 6, 2019) (observing "Texas recognizes both substantive and procedural unconscionability" but going on to state that "[t]he party raising an unconscionability defense must plead and prove both procedural and substantive unconscionability", citing *Belanger v. BAC Home Loans Serv., L.P.*, 839 F. Supp. 2d 873, 880 (W.D. Tex. 2011)); *Castillo v. Tyson Foods*, No. 14-2354, 2015 WL 6039236, at *8 (S.D. Tex. Oct. 15, 2015) (quoting *Ski River Dev., Inc. v. McCalla*, 167 S.W.3d 121, 136 (Tex.App.-Waco 2005, pet. denied)) ("Under Texas law, the party asserting unconscionability of a contract bears the burden of proving *both* procedural and substantive unconscionability"); *Elkjer v. Scheef &*

7

*Stone, L.L.P.*, 8 F. Supp. 3d 845, 856 (N.D. Tex. 2014) (similar); *Am. Stone Diamond, Inc. v. Lloyds of London*, 934 F. Supp. 839, 844 (S.D. Tex. 1996) (similar).

        2.    <u>Substantive Unconscionability</u>

19.    Movants argued substantive unconscionability is not plausibly alleged, because the Complaint pleads that the Debtor knowingly entered into and was a willing party to the subject transactions. (Motion ¶¶54-55.)

20.    The Debtor does not address this, but instead argues substantive unconscionability is "a fact issue to be resolved after considering all of the evidence." (Opp. ¶47.)

21.    This argument fails. "Unconscionability is a question of law for decision by the court." *Arkwright*, 844 F.2d at 1184. The Debtor affirmatively pleaded that it knowingly bought the gas because it faced a Hobson's choice. (Complaint ¶79.) This precludes a claim of substantive unconscionability. *Earman Oil Co., Inc. v. Burroughs Corp.*, 625 F.2d 1291, 1299 (5th Cir. 1980) (rejecting unconscionability defense where party "was a willing party to the transaction"); *Wade v. Austin*, 524 S.W.2d 79, 86 (Tex.Civ.App.-Texarkana 1975, no writ) ("A party who knowingly enters a lawful but improvident contract is not entitled to protection by the courts").

        3.    <u>Procedural Unconscionability</u>

22.    Movants argued that procedural unconscionability is not plausibly alleged, because the Debtor does not plead any of the factors bearing on the inquiry; namely, (a) deception, overreaching or sharp business practices on the part of the Gas Sellers, (b) absence of viable alternatives, in that the Complaint pleads that "ACES purchased gas from 11 gas suppliers in February, including NJR, Koch, Total, Mercuria, Tenaska, Concord and ETC" (Complaint ¶52) and (c) relative sophistication of the parties. (Motion ¶¶57-59.)

23.    As to (a), the Debtor argues that the Complaint pleads "the Gas Sellers engaged in deception, overreaching or sharp business practices because they chose to price gouge during a

declared natural disaster." (Opp. ¶52.) However, no deception is articulated, nor are any acts of "overreaching" or "sharp business practices" other than negotiating prices that the Debtor agreed to at the time and seeks to repudiate now; and as noted above, the Debtor has not otherwise alleged actionable misconduct or a cognizable contract defense based on price gouging.

24.     As to (b), the Debtor argues that it did not have a viable alternative in light of the above-referenced policy of the Utilities Code; namely, maintaining continuous service to support the life, health and safety of the public. (Opp. ¶53.) Putting aside that gas-fired generation is but one component of the Debtor's overall energy mix (Karnei Decl. ¶¶24-26), the Debtor's argument is not that it lacked viable alternatives but rather that it lacked adequate bargaining power. However, this argument fails in commercial contexts (Motion ¶¶50, 60) and is insufficient to support a claim of procedural unconscionability where, as here, the Debtor has conceded that the subject gas was sold at arm's length (¶28, *infra*) and acknowledged other power generation companies including two of Texas's largest had difficulty securing gas supply during the storm. (Karnei Decl. Exhibit A.)

25.     As to (c), the Debtor did not address the parties' relative sophistication but instead states the relevant consideration is "the parties' ability to bargain." (Opp. ¶¶48, 51, citing *White v. Ameriquest Mortg.*, No. 18-4013, 2019 WL 2297572, at *5 (S.D. Tex. May 30, 2019).) However, the Texas Supreme Court has held that "principles of unconscionability do not negate a bargain because one party to the agreement may have been in a less advantageous bargaining position." *In re Palm Harbor Homes*, 195 S.W.3d 672, 679 (Tex. 2006). And the Fifth Circuit has held an arm's length transaction between commercial parties precludes procedural unconscionability, even where the person asserting the defense had "no choice but to accept" the offending contractual provision; and as previously discussed (Motion ¶¶76-77) and as discussed below, the Debtor does

not dispute that the subject transactions were at arm's length, and an arm's length relationship is in any event presumed in commercial transactions covered by the UCC.  *Lindemann v. Eli Lilly and Co.*, 816 F.2d 199, 204-05 (5th Cir. 1987).[5]

26.     Finally, it is too late for the Debtor to allege unconscionability because it did not repudiate the challenged transactions prior to delivery of the purchased gas and instead accepted the benefit of those transactions by burning the gas to generate electricity.  *E.g.*, *Spinelli v. NFL*, 903 F.3d 185, 208 (2d Cir. 2018) ("a party can ratify an unconscionable agreement … and does so by accepting benefits under the agreement with knowledge of its terms instead of promptly repudiating it"); *Mission Petroleum Carriers, Inc. v. Kelley*, 449 S.W.3d 550, 551 (Tex.App.-Houston 2014, no pet.) ("David Kelley ratified the arbitration agreement by accepting benefits under the plan, rendering any procedural unconscionability in the formation of the agreement moot").

## III.   THE FRAUDULENT TRANSFER CLAIMS SHOULD BE DISMISSED FOR FAILURE TO PLEAD RECEIPT OF LESS THAN REASONABLY EQUIVALENT VALUE

27.     Movants argued that the second and third causes of action should be dismissed, because the Complaint fails to plead any disparity between the obligations incurred and the value of the property received measured at the time of the challenged transactions, or that the transactions were not at arm's length.  (Motion ¶¶65-78.)

---

[5] As to actual bargaining ability, the Debtor does not point to any allegation to show it had none but instead states only that the Debtor lacked the subsequent ability to pay the prices to which it agreed (Opp. ¶52) which of course has nothing to do with the issue.  If anything, movants' willingness to deliver gas to Debtor without requiring upfront payment or other security shows their willingness to take on credit risk to help Debtor continue operating in extreme weather conditions.  Movants should not now be penalized for their willingness to extend the Debtor credit during a crisis despite the objective uncertainty as to the crisis' impact on its creditworthiness.

28.     The Debtor does not dispute that the challenged transactions were at arm's length, thus triggering application of TEX. BUS. & COM. CODE § 24.004(d) but contends that disparity between price and value at the time of the transaction is a fact issue that is not appropriately resolved on a motion to dismiss "so long as the Complaint pleads facts that could support a finding that the Debtor did not receive reasonably equivalent value." (Opp. ¶65, citing *In re Erlewine*, 349 F.3d 205, 209 (5th Cir. 2003), which itself held "[c]ertain transactions, however, can give the debtor reasonably equivalent value as a matter of law".)

29.     There is nothing wrong with that standard, but the Complaint pleads no such facts. The sole allegations in support, are (a) that prices charged the Debtor "were far higher than the reported index prices for one of the natural gas hubs closest to the Debtor's relevant facilities, the Natural Gas-East Texas (NGPL TEXOK) hub" and (b) "that prices for natural gas delivered to Brazos reflect an approximately 35,000% increase in natural gas prices." (Opp. ¶65.)

30.     The former allegation is insufficient.  The NAESB Base Contract contemplates pricing being premised not just on quantity, but on actual delivery at the specified location as well. Section 4.1 provides that "Seller shall have the sole responsibility for transporting the Gas to the Delivery Point", defined as "such point(s) as are agreed to by the parties in a transaction."  The price of natural gas at a hub hundreds of miles from the Debtor's gas-fired plants does not give rise to a plausible inference that the natural gas charges at issue herein were not reasonably equivalent in value, to the value of gas delivered to the Debtor or a location agreed to by it, at the time of the subject transactions, particularly given the Debtor's acknowledgment that some gas lines had frozen up and other power generation companies had difficulty securing gas supplies during the storm. (Karnei Decl. ¶¶52-53, Exhibit A.)

31.     Indeed, there is no dispute that the Debtor was well aware at the time of the lower market prices at the NGPL TEXOK hub but chose not to purchase gas for delivery there, because gas delivered there would have been of no practical use to the Debtor at the time.  That hub is where the TEXOK A/G and TEXOK Gulf Coast (G.C.) lines meet, as shown on the NGPL System Map attached hereto as <u>Exhibit 1</u>, near Atlanta, Texas, hundreds of miles from the Debtor's plants in Jack, Palo Pinto and Johnson Counties.  Significantly, neither line runs in the direction of the Debtors' plants; thus, it would be impossible to transport gas purchased at NGPL TEXOK hub prices to the Debtor's plants without buying transportation capacity on pipelines running across the state, and there is no dispute that the Debtor had not done so ahead of or during Winter Storm Uri.

32.     Because the Debtor showed by its contemporaneous conduct that it did not view gas available for purchase at the NGPL TEXOK hub as fungible with gas actually accessible to it, it cannot now claim in hindsight that that the market price of the latter ought to have been the same as the market price of the former.

33.     As to the allegation that natural gas prices had increased 35,000% relative to pre-Winter Storm Uri levels, movants had cited authority for the proposition that value must be determined at the time of the transfer (Motion ¶67), and that courts "should not consider" changes in commodity prices before/after the subject transactions in measuring market value.  *ASARCO LLC v. Americas Mining Corp.*, 396 B.R. 278, 337 (S.D. Tex. 2008).  *See also Peltz v. Hatten*, 279 B.R. 710, 738 (D. Del. 2002) ("the court gives significant deference to marketplace values.  When sophisticated parties make reasoned judgments about the value of assets that are supported by then prevailing marketplace values … it is not the place of fraudulent transfer law to reevaluate or question those transactions"); Jack F. Williams, "Revisiting the Proper Limits of Fraudulent

Transfer Law," 8 Bankr. Dev. J. 55, 86 (1991) ("the purpose of fraudulent transfer law is not to allow the debtor to re-trade a transaction struck in good faith and arrived at by arm's length negotiations.  Such a transfer should not be a viable target of fraudulent transfer law").  Movants had also cited authority that market value at any given time is that which "a prudent business person can obtain from the sale of an asset when there is a willing buyer and a willing seller."  *In re Pioneer Home Builders, Inc.*, 147 B.R. 889, 892 (Bankr. W.D. Tex. 1992).

34.     The Debtor cites no authority in response, for its position that the mere fact of material price increase can support a plausible fraudulent conveyance claim based on an overcharge theory.  (Opp. ¶¶65.)  Thus, while reasonably equivalent value could, on the right set of well pleaded allegations, present fact issues not appropriately resolvable on a motion to dismiss, the Debtor has not pleaded facts that warrant denial of the motion as to the fraudulent transfer claims.  Doubtless, if the Debtor had surplus natural gas to sell at the time and place of the challenged transactions, it could have sold that gas on the market at the same prices it now complains of.

## IV.     THE CAUSES OF ACTION CHALLENGING THE GAS CLAIMS' PRIORITY STATUS SHOULD BE DISMISSED

### A.     The Complaint Fails to Plead that the Gas Was Not Sold in the Ordinary Course of the Debtor's Business

35.     Movants argued that the term "in the ordinary course of such debtor's business" in Bankruptcy Code section 503(b)(9) should be interpreted by reference to the definition of the term "buyer in the ordinary course of business" in UCC § 1-201(9), given courts' holdings that UCC definitions should be used to interpret section 503(b)(9).  (Motion ¶¶83-85.)  *See also In re SemCrude, L.P.*, 416 B.R. 399, 405 (Bankr. D. Del. 2009) ("There is nothing in the Code or in the legislative history accompanying the recent enactment of § 503(b)(9) suggesting that Congress

intended that bankruptcy courts should look beyond the Uniform Commercial Code to construe or define these terms", including ordinary course of business).

36.     The Debtor states this standard should not be applied, because the second sentence of the UCC definition refers to the ordinary course of the seller's business, whereas section 503(b)(9) refers to the ordinary course of business of the debtor-buyer.  (Opp. ¶74.)

37.     Not only does the Debtor offer no coherent and principled alternative construction of the Bankruptcy Code's language, this argument ignores that the actual definition is in the first sentence ("'Buyer in the ordinary course of business' means a person that buys in good faith, without knowledge that the sale violates the rights of another person in the goods, and in the ordinary course from a person, other than a pawnbroker, in the business of selling goods of that kind") and the second sentence merely provides an example ("A person buys goods in the ordinary course if the sale to the person comports with the usual or customary practices in the kind of business in which the seller is engaged or with the seller's own usual or customary practices"). Thus, the first sentence defines ordinary course by reference to the debtor-buyer's business, consistent with the language of section 503(b)(9), and it is not disputed that all elements of that definition are satisfied; and so the Debtor's argument against application of the UCC definition fails.

38.     The Debtor argues that because section 503(b)(9) employs language that is supposedly unique within the Bankruptcy Code, the Court should not apply the horizontal- or vertical-dimension tests applicable to determining if a transaction is "in the ordinary course of business" of the debtor under sections 363-64 (which movants had alternatively proposed to use), but should instead apply an ad hoc totality of the circumstances test that explicitly considers price, in determining if the transactions were "in the ordinary course of such debtor's business" under

section 503(b)(9).  (Opp. ¶¶75.)  The Debtor, however, has been unable to locate a single reported

decision to support such a results-oriented standard.[6]  In short, there is no justification for the

Debtor's proposed totality of the circumstances test and the Court should instead simply apply the

UCC definition.

> **B.** **The Complaint Fails to Plead that Value Was Not Given to the Debtor in the 20-Day Period**

39.     Movants agree with the Debtor (see Opp. ¶79), that value must be determined in

light of the purpose of the valuation (determining value of gas delivered to the Debtor, at the time

of the subject transactions) and the proposed disposition or use of [the] property (fueling gas fired

plants, at the time of the subject transactions).

40.     The Debtor contends this value is "the price at which it [natural gas] could be

purchased during the relevant period on the commodity market." (Opp. ¶82, citing Complaint ¶50,

which in turn refers to pricing at the NGPL TEXOK hub.)

41.     This again ignores the reality, however (¶¶30-32, *supra*), that the Debtor elected

not to buy natural gas for delivery to that hub during Winter Storm Uri despite being well-aware

of the lower prices available there.  That is because gas delivered hundreds of miles away from the

Debtor's generating plants would have been of no practical use for actually generating electricity,

especially under the circumstances of Winter Storm Uri.  By agreeing to pay more than the hub

spot price to acquire gas at a delivery point accessible to the Debtor, the Debtor confirmed by its

contemporaneous actions that the concrete benefit of delivery to its generating plants was worth

---

[6] The Debtor notes that the language of Bankruptcy Code section 547(c)(2) ("ordinary course of business or financial affairs of the debtor and the transferee") differs from that in section 503(b)(9) and goes on to cite a Fifth Circuit decision summarizing the preference defense as in effect pre-BAPCPA.  (Opp. ¶75.)  In any event, we have been unable to locate a single reported decision holding that price is a relevant consideration under section 547(c)(2), which has no UCC analog and has even more restrictive language than section 503(b)(9).

that price difference.  Given the Debtor's intended and actual use for the gas, the appropriate valuation must be that for gas delivered to a location that permitted it to fuel its gas-fired plants, and the best (and only) evidence of that value at the time of the challenged transactions is the price the Debtor agreed to pay for those gas deliveries at that time.

## V.    LEAVE TO AMEND SHOULD BE DENIED

42.    The Debtor has not attempted to show how it could or would cure the pleading deficiencies identified by the motion.  Rather, it simply tacked a boilerplate request in the alternative for leave to amend to the end of its response.  The Fifth Circuit has held denial of leave to amend is appropriate when no showing of the details of a proposed amendment that would enable an assessment of its viability has been offered.  *E.g.*, *Khoury v. Thota*, No. 20-20578, 2021 WL 3919248, at *4 (5th Cir. Sept. 1, 2021) ("Without addressing the insufficiencies in his complaint [in his opposition to the motion to dismiss], granting Khoury leave to amend would be futile"); *Goldstein v. MCI WorldCom*, 340 F.3d 238, 255 (5th Cir. 2003); *McKinney v. Irving Indep. Sch. Dist.*, 309 F.3d 308, 315 (5th Cir. 2002) (no abuse of discretion in denying leave where "the plaintiffs did not demonstrate to the court how they would … cure the pleading defects raised"); *Babb v. Dorman*, 33 F.3d 472, 479 (5th Cir. 1994) (similar).  Further, leave to amend should be denied because the pleading defects raised are incurable, for reasons set forth above and in the motion.

## CONCLUSION

43.    The motion should be granted, the Complaint should be dismissed as against the movants with prejudice and movants' claims should be allowed in their filed amounts and afforded administrative priority.

Dated:  March 2, 2022

Respectfully submitted,

/s/  Robert M. Corn
    Robert M. Corn
    Southern District of Texas Bar No. 2064
    State Bar of Texas No. 0482600
3131 Eastside Street, Suite 440
Houston, Texas 77098-1947
Tel: (713) 229-0055
Fax: (713) 229-0057
rcorn@corn-law.com

Of counsel:

Avery Samet (pro hac vice)
Jeffrey Chubak (pro hac vice)
Amini LLC
131 West 35th Street, 12th Floor
New York, New York 10001
Tel: (212) 490-4700
Fax: (212) 497-8222
asamet@aminillc.com
jchubak@aminillc.com

Attorneys for Defendants 507 Capital LLC,
507 Summit LLC, Cetus Capital VI, L.P.,
CrossingBridge Low Duration High Yield
Fund, Destinations Global Fixed Income
Opportunities Fund, Destinations Low
Duration Fixed Income Fund, Leaffilter North
Holdings, Inc., OFM II, LP, OU 2 LLC,
RiverPark Short Term High Yield Fund,
RiverPark Strategic Income Fund and Two
Seas Global (Master) Fund LP

17

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 2, 2022, a true and correct copy of the above and foregoing was served upon all counsel of record using the Court's electronic filing system.

<u>/s/  Robert M. Corn</u>
Robert M. Corn