## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| In re:<br><br>BRAZOS ELECTRIC POWER COOPERATIVE, INC.,<br><br>Debtor.[1] | Chapter 11<br><br>Case No. 21-30725 (DRJ) |
| BRAZOS ELECTRIC POWER COOPERATIVE, INC.,<br>Plaintiff,<br><br>v.<br><br>507 CAPITAL, LLC, *et al.*,<br>Defendants. | Adv. Proc. No. 21-04407 (DRJ)<br><br>Related to Dkt. Nos. 35 & 51 |

### DEFENDANT ETC MARKETING, LTD.'S REPLY IN SUPPORT OF MOTION TO DISMISS ADVERSARY COMPLAINT OF BRAZOS ELECTRIC POWER COOPERATIVE, INC.

Dated: March 2, 2022

**KATTEN MUCHIN ROSENMANN LLP**

John E. Mitchell, TX Bar No. 00797095
Email: john.mitchell@katten.com
Michaela Crocker, TX Bar No. 24031985
Email: michaela.crocker@katten.com
Yelena E. Archiyan, TX Bar No. 24119035
Email: yelena.archiyan@katten.com
2121 North Pearl St., Ste. 1100
Dallas, TX 75201
Telephone: (214) 765-3600

**YETTER COLEMAN LLP**

R. Paul Yetter, TX Bar No. 22154200
Email: pyetter@yettercoleman.com
Bryce L. Callahan, TX Bar No. 24055248
Email: bcallahan@yettercoleman.com
Ali Shan Ali Bhai, TX Bar No. 24121498
Email: asalibhai@yettercoleman.com
811 Main Street, Suite 4100
Houston, TX 77002
Telephone: (713) 632-8000

*COUNSEL FOR ETC MARKETING LTD.*

---

[1] Debtor in this Chapter 11 case, along with the last four digits of its federal tax identification number is Brazos Electric Power Cooperative, Inc. (4729). Additional information regarding this case may be obtained on the website of Debtor's claims and noticing agent at http://cases.stretto.com/Brazos. Debtor's address is 7616 Bagby Avenue, Waco, TX 76712.

## <u>TABLE OF CONTENTS</u>

I.     APPLICABLE LEGAL STANDARD ............................................................... 1

II.    ARGUMENT ........................................................................................... 2

  A.  Count 1 of Debtor's Complaint Should Be Dismissed for Failure to Plead a Violation under the Deceptive Trade Practices Protection Act or Unconscionability....................... 2

      a.  Debtor Lacks Standing under the DTPA. ......................................... 2

      b.  Debtor's Complaint Does Not Sufficiently Plead Substantive and Procedural Unconscionability. .......................................................... 3

  B.  Counts 2 and 3 of the Complaint Should Be Dismissed for Failure to Sufficiently Plead the Required Elements for Avoidance of a Constructively Fraudulent Obligation. ................................................................................................... 5

      a.  The Complaint Fails to Sufficiently Plead that Debtor Did Not Receive Reasonably Equivalent Value in Exchange for the Obligations Incurred. ....... 5

      b.  Debtor's Failure to Adequately Plead Insolvency is Fatal to Counts 2 and 3 of the Complaint ........................................................................ 10

  C.  Count 4 of Debtor's Complaint Should Be Dismissed for Failure to Plead that the Gas Sale Transactions in Question Were Outside of the Ordinary Course of Debtor's Business under 11 U.S.C. § 503(b)(9). .......................................................... 12

  D.  Count 5 of Debtor's Complaint Should Be Dismissed for Failure to Plead that the Value of the Obligations Debtor Incurred Exceeded the Value of the Goods it Received Under 11 U.S.C. § 503(b)(9)........................................................... 14

III.   LEAVE TO AMEND SHOULD BE DENIED ................................................ 16

IV.   CONCLUSION....................................................................................... 16

151957414

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                 **Page(s)**

*Amstadt v. U.S. Brass Corp.*,
    919 S.W.2d 644 (Tex. 1996)......................................................................................3

*Arkwright-Boston Mfrs. Mut. Ins. Co. v. Westinghouse Elec. Corp.*,
    844 F.2d 1174 (5th Cir. 1988) ................................................................................3

*In re Arts Dairy, LLC*,
    414 B.R. 219 (Bankr. N.D. Ohio 2009)...................................................................12

*ASARCO LLC v. Americas Mining Corp.*,
    396 B.R. 278 (S.D. Tex. 2008) ................................................................................6

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)...........................................................................................5, 12

*Babb v. Dorman*,
    33 F.3d 472 (5th Cir. 1994) ...................................................................................16

*Cushman v. GC Servs. LP*,
    657 F. Supp. 2d 834 (S.D. Tex. 2009) ................................................................2, 3

*El Paso Nat. Gas Co. v. Minco Oil & Gas Co.*,
    964 S.W.2d 54 (Tex. App.—Amarillo 1997), *rev'd in part on other grounds*, 8
    S.W.3d 309 (Tex. 1999)...........................................................................................4

*Firefighters' Ret. Sys. v. Grant Thornton, LLP*,
    894 F.3d 665 (5th Cir. 2018) ............................................................................5, 12

*Ford v. City State Bank of Palacios*,
    44 S.W.3d 121 (Tex. App.—Corpus Christi 2001, no pet.) .....................................3

*Goldstein v. MCI WorldCom*,
    340 F.3d 238 (5th Cir. 2003) .................................................................................16

*In re Green Tree Servicing*,
    275 S.W.3d 592 (Tex. App.—Texarkana 2008, no pet.).........................................3

*Janvey v. Golf Channel, Inc.*,
    487 S.W.3d 560 (Tex. 2016)....................................................................................9

*In re Johns-Manville, Corp.*,
    60 B.R. 612 (Bankr. S.D.N.Y 1986).......................................................................13

*Khoury v. Thota*,
    No. 20-20578, 2021 WL 3919248 (5th Cir. Sept. 1, 2021) ...................................16

151957414

*Lindemann v. Eli Lilly and Co.*,

   816 F.2d 199, 204 (5th Cir. 1987) ...................................................................5

*Lone Star Fund V (U.S.), L.P. v. Barclays Bank PLC*,
   594 F.3d 383 (5th Cir. 2010) ........................................................................7

*Matter of La. Pellets, Inc.*,
   838 Fed. App'x 45 (5th Cir. 2020) (unpublished) ........................................6

*McKinney v. Irving Indep. Sch. Dist.*,
   309 F.3d 308 (5th Cir. 2002) ......................................................................16

*Morrison v. Amway Corp.*,
   49 F. Supp. 2d 529 (S.D. Tex. 1998) ...........................................................4

*In re Northgate Comput. Sys., Inc.*,
   240 B.R. 328, 365 (Bankr. D. Minn. 1999) ..................................................6

*In re Sun Valley Prods., Inc.*,
   328 B.R. 147 (Bankr. N.D. 2005) .................................................................6

*U.S. Bank Nat. Ass'n ex rel. CWCapital Asset Mgmt. LLC v. Village at Lakeridge*,
   *LLC*, 138 S. Ct. 960 (2018) .........................................................................8

**Statutes**

11 U.S.C. § 503(b)(9) ..................................................................................... *passim*

11 U.S.C. § 547 .........................................................................................................11

TEX. BUS. & COM. CODE § 17.44 ...............................................................................2

TEX. BUS. & COM. CODE § 17.49(g) ...........................................................................2

TEX. BUS. & COM. CODE § 24.003(a) ..........................................................................8

TEX. BUS. & COM. CODE § 24.004(d) ..........................................................................8

Model UCC § 1-201(9) ...............................................................................................13

**Rules**

Fed. R. Bankr. P. 7012 .............................................................................................17

Fed. R. Bankr. P. 7012(b)(6) ......................................................................................1

Fed. R. Bankr. P. 7024 ...............................................................................................1

151957414

Fed. R. Bankr. P. 9014 ................................................................................................................1

Fed. R. Civ. P. 12(b)(6) ............................................................................................................17

151957414

Defendant ETC Marketing, Ltd. ("ETC"),[2] through its undersigned counsel, submits this reply in support of its motion [Dkt. No. 35] (the "Motion to Dismiss")[3] to dismiss the *Complaint for Declaratory Relief and Asserting Omnibus Objections to Proofs of Claims Related to Natural Gas Sales to the Debtor* [Dkt. No. 1] (the "Complaint") filed by Brazos Electric Power Cooperative, Inc. ("Debtor" or "Brazos") and respectfully states as follows:

## I.    APPLICABLE LEGAL STANDARD

1.       Paragraphs 32-36 of Debtor's omnibus response [Dkt. No. 51] (the "**Response**") appear to argue that the legal standards under Rule 7012(b)(6) do not apply to this adversary proceeding. Because Debtor ultimately appears to concede the proper legal standard for the Motion to Dismiss,[4] however, ETC will not respond to this portion of the Response. ETC does note, however, that even if Bankruptcy Rule 7012(b)(6) does not expressly apply to the above-captioned adversary proceeding (though it does), Bankruptcy Rule 9014 governs contested matters and states that a bankruptcy court "may at any stage in a particular matter direct that one or more of the other Rules in Part VII shall apply." FED. R. BANKR. P. 9014. Thus, this Court has the authority to address the party's arguments in the context of the Motion to Dismiss, particularly since all parties have fully briefed the matters at issue.

---

[2] ETC and Citigroup Financial Products Inc. ("Citigroup") entered into a Transfer of Claims Agreement dated May 27, 2021 that assigned ETC's claims against Debtor to Citigroup. On December 20, 2021, ETC, Citigroup, and Debtor filed a *Stipulation and Agreed Order Authorizing Intervention* [Dkt. 26] to permit ETC to intervene in this proceeding as an intervenor-defendant under Bankruptcy Rule 7024. The Court has not yet signed the Stipulation and Agreed Order. Citigroup filed Claim No. 385 against Debtor in the in the amount of $15,472,239 ("Claim No. 385"), comprised of a general unsecured claim of $383,950 and a claim of $15,088,289 entitled to administrative priority under 11 U.S.C. § 503(b)(9).

[3] Capitalized terms used, but not defined, herein shall have the meanings ascribed in the Motion to Dismiss.

[4] Compl. ¶ 35.

## II.   <u>ARGUMENT</u>

**A.   Count 1 of Debtor's Complaint Should Be Dismissed for Failure to Plead a Violation under the Deceptive Trade Practices Protection Act or Unconscionability.**

**a.   Debtor Lacks Standing under the DTPA.**

2.      Count 1 of Debtor's Complaint argues that its transactions with ETC "are unconscionable, contrary to public policy, were entered into under duress, or . . . require performance of an illegal act." Compl. ¶ 63. Debtor went on to contend that ETC's transactions run afoul of the price-gouging prohibitions of the Texas Deceptive Trade Practices—Consumer Protection Act ("<u>DTPA</u>").

3.      As explained in ETC's Motion to Dismiss, Debtor's DTPA claims are not actionable. For one thing, "a plaintiff must qualify as a 'consumer'" to bring a DTPA claim; Debtor plainly does not meet that definition. *See Cushman v. GC Servs. LP*, 657 F. Supp. 2d 834, 842 (S.D. Tex. 2009) (citations omitted). Even if it did, the DTPA does not apply to "a transaction, a project, or a set of transactions relating to the same project" exceeding a value of more than $500,000; here, ETC's claims against Debtor total $15,472,239.00. Tex. Bus. & Com. Code § 17.49(g); Compl. ¶ 52.

4.      Nevertheless, the Response urges the Court to adopt a wide-sweeping, "novel" interpretation of the DTPA that no other court has recognized. Namely, Debtor argues that the DTPA's price-gouging prohibition is not limited to *consumer* actions, but is rather "universally applicable," extending to large, sophisticated entities like Debtor. Resp. ¶ 54.

5.      This interpretation is demonstrably erroneous. As the DTPA's text makes clear, the statute's purpose is "to *protect consumers* against false, misleading, and deceptive business practices, unconscionable actions, and breaches of warranty." Tex. Bus. & Com. Code § 17.44 (emphasis added). Indeed, Texas courts have repeatedly emphasized that a DTPA private right of

151957414

action is limited to consumer-plaintiffs. *See, e.g.*, *Ford v. City State Bank of Palacios*, 44 S.W.3d 121, 133 (Tex. App.—Corpus Christi 2001, no pet.) ("To have standing to sue under the DTPA, a party must establish that he is a consumer as defined by the DTPA."); *Cushman*, 657 F. Supp. 2d at 842 ("Plaintiff's standing to bring suit on her DTPA claim hinges on whether she qualifies as a 'consumer' under the DTPA.").

6.      Debtor additionally avers that ETC's transactions lead to *indirect* price-gouging because the costs from Debtor's natural gas transactions during Winter Storm Uri "are passed through to consumers." Resp. ¶ 40. This argument is without merit. The Texas Supreme Court has held that the DTPA was not intended "to reach upstream manufacturers and suppliers"—like ETC. *Amstadt v. U.S. Brass Corp.*, 919 S.W.2d 644, 649 (Tex. 1996). Rather, there must be a connection between the alleged conduct and a consumer transaction. *Id*. Here, Debtor attempts to argue that so long as a consumer falls somewhere within the chain of transactions, the DTPA is implicated. Because the Texas Supreme Court has rebuffed this very argument, it should be rejected by this Court. *See id*. (rejecting a party's argument that DTPA-prohibited conduct "by any entity in the chain of distribution . . . entitles them to recover under the DTPA").

**b.      Debtor's Complaint Does Not Sufficiently Plead Substantive and Procedural Unconscionability.**

7.      As an initial matter, Debtor incorrectly contends that it need only prove *either* procedural or substantive unconscionability, not both. This is wrong. Texas courts have been clear that a party must plead *both* procedural and substantive unconscionability. *See Arkwright-Boston Mfrs. Mut. Ins. Co. v. Westinghouse Elec. Corp.*, 844 F.2d 1174, 1184 (5th Cir. 1988) ("Under Texas law, [a party] must prove *both* substantive and procedural unconscionability to prevail on the unconscionability issue."); *In re Green Tree Servicing*, 275 S.W.3d 592, 603 (Tex. App.—Texarkana 2008, no pet.) ("The party asserting unconscionability bears the burden of proving both

151957414

procedural and substantive unconscionability."); *Morrison v. Amway Corp.*, 49 F. Supp. 2d 529, 534 (S.D. Tex. 1998) ("Under Texas law, Plaintiffs must prove both substantive and procedural unconscionability.").

8.    Count 1 of Debtor's Complaint should be dismissed because it fails to sufficiently plead substantive and procedural unconscionability.

9.    As ETC argued in its Motion to Dismiss, Debtor has not adequately pled procedural unconscionability because it has failed to plead facts demonstrating (1) "the presence of deception, overreaching, and sharp business practices," (2) "the absence of a viable alternative," and (3) "the relative acumen, knowledge, education, and financial ability of the parties involved." *El Paso Nat. Gas Co. v. Minco Oil & Gas Co.*, 964 S.W.2d 54, 61 (Tex. App.—Amarillo 1997), *rev'd in part on other grounds*, 8 S.W.3d 309 (Tex. 1999).

10.    Debtor contends that ETC "engaged in deception, overreaching, or sharp business practices because [ETC] chose to price gouge during a declared natural disaster." Resp. ¶ 52. But Debtor's bare assertions contain no further factual averments about what specific conduct ETC engaged in that satisfied this element. Instead, Debtor merely relies on the conclusory allegation that ETC "chose to price gouge" during Winter Storm Uri. *Id.*

11.    Next, contrary to Debtor's assertions, it did have viable alternatives. Not only did Debtor purchase natural gas from a large swath of suppliers, but also roughly 41% of Debtor's natural gas-fired plants can burn fuel oil "as a backup fuel source." Karnei Decl. ¶ 24.

12.    Finally, Debtor argues that it satisfied factor (3) because it "lacked the financial ability to pay" for its transactions with ETC. But Debtor seems to ignore that this factor also looks to the parties' relative sophistication. And, by its own admission, Debtor is a highly savvy entity with years of experience in this industry. *See* Compl. ¶ 27 ("[T]he Debtor is the largest and oldest

151957414

generation and transmission electric cooperative in Texas."). Parties with such sophistication typically cannot claim procedural unconscionability to avoid their contractual obligations. *See Lindemann v. Eli Lilly and Co.*, 816 F.2d 199, 204 (5th Cir. 1987) (holding that, among other things, the fact that the plaintiffs were "experienced and sophisticated" parties rather than "retail customers purchasing consumer goods" signaled "that no procedural unconscionability exists in this case"). Moreover, Debtor's financial ability to pay for the transactions and its relative sophistication are bulwarked by the fact that it had a nearly $1 billion equity cushion going into Winter Storm Uri. *See* Mot. to Dismiss ¶¶ 38-42.

13.     Moreover, Debtor has failed to plead substantive unconscionability. Debtor argues that substantive unconscionability "is a fact issue to be resolved after considering all of the *evidence*." Resp. ¶ 47 (emphasis in original). But no further evidence is required to find that Debtor did not adequately plead substantive unconscionability. Debtor knowingly and willingly entered contracts with ETC to purchase natural gas, and courts refuse to apply substantive unconscionability in arms-length transactions between sophisticated parties. *See* Mot. to Dismiss ¶ 25 (collecting cases).

**B.     Counts 2 and 3 of the Complaint Should Be Dismissed for Failure to Sufficiently Plead the Required Elements for Avoidance of a Constructively Fraudulent Obligation.**

**a.     The Complaint Fails to Sufficiently Plead that Debtor Did Not Receive Reasonably Equivalent Value in Exchange for the Obligations Incurred.**

14.     ETC moved to dismiss Counts 2 and 3 of the Complaint based on Debtor's failure to sufficiently plead that it did not receive reasonably equivalent value in exchange for the obligations incurred. Debtor's Response raises several points in riposte, each of which fail based on the face of the Complaint.

15.     First, Debtor argues that, to survive a motion to dismiss, it need only plead facts that support a finding that it did not receive reasonably equivalent value. Debtor, though, pled no

5

such facts, and case law is clear that bare recitations of a statute "are not entitled to the assumption of truth." *See Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). Conclusory statements and unsupported allegations will also not suffice to prevent a motion to dismiss. *Firefighters' Ret. Sys. v. Grant Thornton, LLP*, 894 F.3d 665, 669 (5th Cir. 2018) (quoting *Beavers v. Metro. Life Ins. Co.*, 566 F.3d 436, 439 (5th Cir. 2009)).

16.     The Complaint's factual allegations regarding reasonably equivalent value fall into two categories: (a) as temperatures dropped, supply dwindled and the price of natural gas rose, and (b) the prices charged to Debtor were higher than those charged in the past and at a "natural gas hub closest to one of Debtor's relevant facilities, the Natural Gas-East Texas (NGPL TEXOK) hub." Compl. ¶¶ 32-51. These unsupported allegations, however, have no relevance to "reasonably equivalent value" as it pertains to a commodity sold in an arm's-length transaction on the open market.

17.     Addressing the first category, for transactions such as these that are at arm's-length, reasonably equivalent value turns on market value at the time of the transaction. Mot. to Dismiss ¶ 35 (citing cases).[5] Thus, it is inappropriate for courts to consider changes in commodity prices when determining value. *Id.* Debtor cites to no authority in opposition to this standard, which places price fluctuations outside a court's analysis, particularly when there are no allegations that

---

[5] *See In re Sun Valley Prods., Inc.*, 328 B.R. 147, 156 (Bankr. N.D. 2005) ("Despite lip service given to the weighing of other factors, often there is nothing to consider beyond simply comparing the fair market value of what the debtor transferred against the fair market value of what the debtor received.") (quotation omitted); *In re Northgate Comput. Sys., Inc.*, 240 B.R. 328, 365 (Bankr. D. Minn. 1999) (where complaint alleged defendant overcharged the debtor for personal computer motherboards, "[t]he inquiry on this element [reasonably equivalent value] is fundamentally one of common sense, measured against market reality"); *ASARCO LLC v. Americas Mining Corp.*, 396 B.R. 278, 336-37 (S.D. Tex. 2008) ("All jurisdictions agree that courts should measure the value of the property transferred and the consideration received at the time of the transfer."); *see also Matter of La. Pellets, Inc.*, 838 Fed. App'x 45, 50 (5th Cir. 2020) (unpublished) (quoting *In re Chomakos*, 69 F.3d 769, 711 (6th Cir. 1995)) ("Because value is determined at the time of the transfer, '[n]either subsequent depreciation in nor appreciation in value of the consideration affects the question of whether reasonable equivalent value was given'").

ETC colluded to influence that pricing. *See* Resp. ¶¶ 64-69.

18.     The latter category of allegations fare no better.  The Complaint alleges that ACES, on Debtor's behalf, transacted with nearly a dozen gas sellers in purchasing gas during the storm and, in that capacity, ACES reached agreement as to quantity and price with each seller, including ETC, on multiple occasions. Compl. ¶¶ 52-53. As temperatures dropped, the demand and pricing for natural gas increased and were allegedly higher than prices charged in 2020 and the reported index price for a hub closest to Debtor's relevant facilities. *Id*. ¶¶ 32-51. The Complaint, however, does not and cannot allege that ETC and Debtor did not transact at arm's-length, that ETC and the other Gas Claimants colluded to set the price of natural gas sold, that Debtor could have purchased natural gas delivered to the same points in the same timeframe at a lower cost, or that ETC (or Debtor) would have been unable to immediately sell the purchased natural gas to a third party for the same price Debtor paid. Indeed, ACES was clearly aware of the price of natural gas at each relevant hub and accepted the prices charged.

19.     Moreover, allegations that the price of natural gas at a single hub was lower than the price paid by Debtor for natural gas delivered to its designated delivery point does not give rise to a plausible inference that Debtor did not receive reasonably equivalent value in exchange for the obligations it incurred, especially given Debtor's acknowledgement that gas lines had frozen during the storm and other power generation companies had difficulty securing natural gas at all. Karnei Decl. ¶¶ 6, 52-53. Debtor clearly did not view natural gas delivered to/from all locations to be fungible in nature, otherwise it could have purchased gas from, and requested delivery to, areas unaffected by the storm.

20.     Finally, Debtor completely ignores the unique aspects of Texas law in relation to the determination of reasonably equivalent value. Under TUFTA, "value" is given for a transfer

or obligation if property is transferred in exchange. TUFTA § 24.003(a). In turn, "reasonably equivalent value" includes, without limitation, "a transfer or obligation that is *within the range of values for which the transferor would have sold the assets in an arm's length transaction*." *Id.* § 24.004(d) (emphasis added). TUFTA does not define "arm's length" but "the widely (universally?) understood definition of arm's-length transaction [is]: a transaction conducted as though the two parties were strangers." *U.S. Bank Nat. Ass'n ex rel. CWCapital Asset Mgmt. LLC v. Village at Lakeridge*, *LLC*, 138 S. Ct. 960, 968 (2018).

21.     The Complaint does not allege (nor can it) that Debtor did not receive value in exchange for the obligations it incurred to ETC during the storm. The question is whether the value of the obligations Debtor incurred was "reasonably equivalent" to the value of the natural gas it received, as defined by TUFTA. Even a cursory review of the Complaint affirms the answer is "yes."

22.     First, there is no allegation in the Complaint (nor can there be) that the subject transactions between Debtor and ETC were anything other than arm's-length transactions between commercially sophisticated companies conducted as if the parties were strangers. There are no allegations that ETC had control over Debtor, that it was an insider, or that the parties are affiliates. ETC and Debtor (through ACES) conducted business and that business was at arm's-length.

23.     Second, the Complaint itself establishes the range of values for the sale of natural gas at all relevant times. Compl. ¶¶ 32–50. According to the Complaint, on February 11, 2021, for gas to be delivered the next day, ACES transacted business with the nearly dozen gas suppliers who charged between $15.50 per MMBtu and $29.00 per MMBtu, with ETC charging $17.50 per MMBtu. Compl. ¶ 39. On February 12, 2021, for gas to be delivered between February 13 and 16, the price for natural gas was between $133.61 per MMBtu and $250.00 per MMBtu, with ETC

8

charging between $175-$200 per MMBTU. *Id.* ¶ 42.[6] According to the Complaint, each and every time ETC purchased gas from third parties and resold it to Debtor, the price was squarely within the range charged by every other Gas Claimant from which Debtor purchased natural gas. Notably, there are no allegations (nor could there be) that any of the gas suppliers that ACES contracted with during February 2021, including the nearly dozen Gas Claimants: (a) colluded to set these prices; (b) would not have received the same price had it sold the natural gas to an entity other than Debtor; or (c) that Debtor would not have been able to resell in an arm's-length transaction the same natural gas for at least the amount of the obligation it incurred or, alternatively, sold the electricity it generated from utilizing natural gas into the ERCOT market at $9,000 per MWh.

24.     Third, Debtor glosses over TUFTA's unique definition of "reasonably equivalent value"[7] by focusing blindly on ETC's argument that the commodity market, by definition, establishes the market value of natural gas. Resp. ¶¶ 65-69. But the Response misses the larger point, conflating the use of "reasonably equivalent value" in both TUFTA and the Bankruptcy Code. By definition, "reasonably equivalent value" under TUFTA is any value within the range of values that natural gas could have been sold in an arm's-length transaction during the relevant period. The Complaint is void of any allegation that the transactions between ETC and Debtor were not arm's-length or that the price ETC charged was anything other than the amount other third parties would pay ETC in a similarly arm's-length transaction (or that Debtor would receive if it resold the gas to a third party in an arm's-length transaction). Indeed, Debtor freely admits that other power generation companies were faced with situations where their gas-fired power

---

[6] The Complaint contains a third chart alleging prices for natural gas sold February 16, 2021 to be delivered February 17; however, it is not alleged that ETC sold natural gas to Debtor during that period. Compl. ¶ 48.

[7] *Janvey v. Golf Channel, Inc.*, 487 S.W.3d 560, 573 (Tex. 2016) (interpreting TUFTA § 24.009(a) ("TUFTA is unique among fraudulent-transfer laws because it provides a specific market-value definition of 'reasonably equivalent value.'").

plants were left with *no* fuel, a situation Debtor avoided because Gas Claimants agreed to extend it significant credit during the storm. *See* Karnei Decl. ¶ 52 ("[N]atural gas wells froze at the wellheads, leaving much of Texas's large fleet of gas-fired power plants without fuel"). Debtor freely entered into arm's-length transactions with ETC during a time when natural gas supply was low and demand high, purchasing what it needed and agreeing to pay the associated price that fell well within the range of prices charged by other Gas Claimants. Debtor may not like that the price of natural gas increased, but that is no ground to avoid the subject transactions.

25.     Because the Complaint fails to allege (nor can it allege) that the transaction between ETC and Debtor were anything other than arm's-length or that the price of the natural gas that ETC sold to Debtor was outside the range of value that the same natural gas would have been sold to a third party in an arm's-length transaction, Count 3 of the Complaint must be dismissed for failure to state a claim.

### b.     Debtor's Failure to Adequately Plead Insolvency is Fatal to Counts 2 and 3 of the Complaint

26.     Citigroup purchased ETC's claim in this case and thereafter filed Claim No. 385 in the amount of $15,472,239, comprised of a general unsecured claim of $383,950 and a claim of $15,088,289 entitled to administrative priority under 11 U.S.C. § 503(b)(9). The claim covers natural gas purchased by ETC from third parties, at ACES's request, with trade dates ranging from approximately February 1 through February 13, 2021. Debtor has objected to Claim No. 385 in its entirety.

27.     As detailed in the Motion to Dismiss, Debtor's Schedules indicate that it had an equity cushion of nearly $1 billion leading into the storm. *See* Mot. to Dismiss ¶¶ 38-42. But then, sometime presumably around mid-February 2021, that $1 billion equity cushion eroded and Debtor went from an "A+" and "A" issuer credit ratings from Fitch and S&P to a debtor in bankruptcy.

*Id.*

28.     Despite going into great detail regarding the events during the winter storm and the rise and fall of natural gas prices, at no point does the Complaint allege the date on which Debtor met one of the Solvency-Related Elements necessary to state a constructively fraudulent transfer claim. Instead, Debtor merely states it was insolvent at all relevant times and seeks to avoid all obligations incurred to ETC, even those incurred nearly two weeks before the storm and before the first weather advisory was even issued.

29.     Since Debtor cannot cite to a paragraph in the Complaint that alleges the date of a Solvency-Related Element, the Response (as did the Complaint) relies on generalized allegations, including that "this bankruptcy case was filed because Debtor did not have sufficient liquidity to pay the debts that were incurred as a result of Winter Storm Uri" and "Debtor incurred numerous claims during and throughout Winter Storm Uri, including the Gas Claims, at a time when Debtor had insufficient liquidity and capital to pay those claims." Resp. ¶ 71. The allegation that Debtor may have met a Solvency-Related Element on March 1, 2021 (the petition date), is wholly insufficient to state a claim for relief under either 11 U.S.C. § 547 or TUFTA. This is particularly so in relation to the portions of Claim 385 that arose *prior* to the storm and before any alleged Insolvency-Related Element could have occurred. Indeed, Debtor freely admits that it did not feel pricing pressure before February 12, 2021. Karnei Decl. ¶ 50 ("Price shocks in Texas were felt *as early as February 12* when natural-gas prices jumped….") (emphasis added).

30.     Debtor's conclusion that the allegedly inflated prices charged by the Gas Claimants contributed to its financial difficulties during the storm and led to its bankruptcy are insufficient to state a claim to avoid all obligation it incurred to ETC from approximately February 1, 2021 forward. Without supporting factual allegations, these legal conclusions regarding the occurrence

of a Solvency-Related Element "are not entitled to the assumption of truth," *Iqbal*, 556 U.S. at 679, and will not suffice to prevent a motion to dismiss. *Firefighters' Ret. Sys.,* 894 F.3d at 669 (quoting *Beavers*, 566 F.3d at 439). Accordingly, Counts 2 and 3 of the Complaint must be dismissed.

C.   **Count 4 of Debtor's Complaint Should Be Dismissed for Failure to Plead that the Gas Sale Transactions in Question Were Outside of the Ordinary Course of Debtor's Business under 11 U.S.C. § 503(b)(9).**

31.   Bankruptcy Code § 503(b)(9) provides administrative priority for "the value of any goods received by the debtor within 20 days before the date of commencement of a case under this title in which *the goods have been sold to the debtor in the ordinary course of such debtor's business.*" 11 U.S.C. § 503(b)(9) (emphasis added). The purpose behind this priority is two-fold: it both encourages trade creditors to continue to extend credit to a debtor in difficult times and discourages debtors from acquiring goods on the eve of a petition with the intent to not repay the debt in full. *See In re Arts Dairy, LLC,* 414 B.R. 219, 221 (Bankr. N.D. Ohio 2009) (citing 4 Collier on Bankruptcy ¶503.16 (15th ed.)). Here, Debtor admits that one of the biggest issues facing it and other power generators was obtaining gas supply during the storm. Karnei Decl. ¶ 52 ("natural gas wells froze at the wellheads, leaving much of Texas's large fleet of gas-fired power plants without fuel"). Despite this, ETC continued to locate and sell natural gas to Debtor, and Debtor accepted and used the gas, in the same manner as prior to the storm. Stripping Claim 385 of its priority based on ETC's decision to sell natural gas to Debtor on credit, as opposed to others, would serve the very abuse that § 503(b)(9) was intended to curb.

32.   The Bankruptcy Code does not articulate a test to determine ordinary course. As explained in the Motion to Dismiss, however, courts traditionally interpret the phrase either in reference to (a) UCC § 1-201(9), given that courts hold that UCC definitions should be used to interpret § 503(b)(9), or (b) the tests used to determine ordinary course in regard to other sections

of the Bankruptcy Code (the "<u>Code-Based Tests</u>"). Mot. to Dismiss ¶¶ 43-54. Regardless of which test is used, however, the analysis boils down to the debtor's conduct to determine whether the dealings were in the ordinary course. *Id.*

33.     This concept is reflected in both lines of tests. The main distinction is that, although the UCC and Code-Based Tests look to the conduct of both parties to the transaction, or even an industry as a whole, the language of § 503(b)(9) appears to require the court to focus on the debtor and whether the goods were sold to the debtor in the ordinary course of its business (in other words, ignoring the non-debtor portion of each test).

34.     For example, under the model UCC, a "buyer in the ordinary course of business" "buys goods in good faith, without knowledge that the sale violates the rights of another person in the goods, and in the ordinary course from a person, other than a pawnbroker, in the business of selling goods of that kind." UCC § 1-201(9). Similarly with the vertical dimension test, courts "focus . . . on the debtor's internal, operation and workings" and its "prepetition business practices and conduct," including whether creditors of the estate would reasonably expect the debtor to make the transaction at issue. *In re Johns-Manville, Corp.*, 60 B.R. 612, 616-17 (Bankr. S.D.N.Y 1986); Mot. to Dismiss ¶ 51.

35.     Contrary to these established tests, Debtor argues that § 503(b)(9) employs language unique to that provision so that a new test must be cut from whole cloth. That unique language, however, merely focuses the court's analysis on the debtor, potentially obviating the need for the "horizontal" test or bilateral application of the UCC test. It does not warrant the application of a different test that would consider outside factors, such as weather, market demand and pricing fluctuations, when determining whether goods were sold to Debtor in the ordinary course of its business. Indeed, Debtor does not cite to a single reported decision in support of such

a results-oriented approach.

36.     Here, the sole allegation is that pricing changes caused by weather conditions prevented the natural gas from being sold to Debtor in the ordinary course of its business. But there are no allegations that ETC manipulated that pricing, that the Gas Claimants colluded in setting the pricing, that Debtor could not have resold the same natural gas to a third party for at least the price it paid, or that Debtor could not have used the natural gas to generate electricity that it could have sold for $9,000 per MWh.

37.     In its Response, Debtor argues that the ERCOT market was in disarray and that the natural gas market was not working "effectively," but there are no such allegations in the Complaint, nor is this argument even relevant to gas sold *before* ERCOT intervened into the electricity market (which appeared to have occurred *after* the last trade date between ETC and Debtor). There is simply nothing in the Complaint that would permit this Court to make a reasonable inference that the natural gas was not sold to Debtor in the ordinary course of Debtor's business.

**D.     Count 5 of Debtor's Complaint Should Be Dismissed for Failure to Plead that the Value of the Obligations Debtor Incurred Exceeded the Value of the Goods it Received Under 11 U.S.C. § 503(b)(9).**

38.     Count 5 of the Complaint seeks to strip Claim No. 385 of its administrative priority based on the conclusory allegation that the claim "far exceed[s] the 'value' of the goods received by the Debtor" and is "orders of magnitude beyond the actual value of the gas supplied." Compl. ¶¶ 81-82. Debtor, however, gives no indication of what "value" should be if not the price established in a non-collusive, arm's-length transaction in an open market.

39.     Debtor is correct that, under § 503(b)(9), the value of the natural gas ETC purchased from third parties and delivered to Debtor must be judged at the time of the transaction and be determined in light of the purpose of the valuation and the disposition of the property (here,

establishing the value of fuel obtained during a period of high demand to fuel Debtor's natural gas plants). Resp. ¶¶ 79-80. In this regard, Debtor argues that this price should be determined based on the price it could have obtained had it purchased the natural gas in the past or for delivery at a single hub, apparently the NGPL TEXOK Hub.

40.     This argument, though, ignores the fact that Debtor chose not to buy natural gas for delivery to that single hub during the storm, despite Debtor's apparent contention that the hub represented the true price of natural gas, likely because gas delivered to that location during a storm would have no practical use for actually generating electricity. Instead, ACES contracted with nearly a dozen gas supplier to purchase natural gas in arm's-length transactions, where the gas was available and at agreed-upon prices, to be delivered to where it was needed. Given Debtor's intended and actual use of the natural gas, the appropriate valuation must be for gas purchased from and delivered to a location that permitted it to fuel its gas-fired plants. The best (and only) evidence of that value at the time of the challenged transactions is the price Debtor (through ACES) agreed to pay. Notably, the Complaint is void of any allegation that the transactions between ETC and Debtor were not arm's-length or that the price ETC charged was anything other than the amount other third parties would pay ETC in a similarly arm's-length transaction (or that Debtor would receive if it then resold the gas to a third party in an arm's-length transaction). Indeed, Debtor freely admits that other power generation companies were faced with situations where their gas-fired power plants were left with *no* fuel, a situation Debtor avoided through the subject purchases from the Gas Claimants. *See* Karnei Decl. ¶ 52 ("[N]atural gas wells froze at the wellheads, leaving much of Texas's large fleet of gas-fired power plants without fuel").

41.     Debtor has not—and cannot—plead facts giving rise to a reasonable inference that the value of the natural gas at the time it incurred each obligation was anything other than the result

of arm's-length transactions occurring at then-prevailing rates delivered to a point chosen by Debtor. Accordingly, Count 5 of the Complaint should be dismissed for failure to state a claim upon which relief may be granted.

### III.   LEAVE TO AMEND SHOULD BE DENIED

42.    Debtor has not attempted to show how it could or would cure the pleading deficiencies identified by the Motion to Dismiss. Instead, it simply makes a boilerplate request in the alternative for leave to amend to the end of its Response. The Fifth Circuit has held denial of leave to amend is appropriate when no showing of the details of a proposed amendment that would enable an assessment of its viability has been offered. *E.g., Khoury v. Thota*, No. 20-20578, 2021 WL 3919248, at *4 (5th Cir. Sept. 1, 2021) ("Without addressing the insufficiencies in his complaint [in his opposition to the motion to dismiss], granting Khoury leave to amend would be futile."); *Goldstein v. MCI WorldCom*, 340 F.3d 238, 255 (5th Cir. 2003); *McKinney v. Irving Indep. Sch. Dist*., 309 F.3d 308, 315 (5th Cir. 2002) (no abuse of discretion in denying leave where "the plaintiffs did not demonstrate to the court how they would . . . cure the pleading defects raised"); *Babb v. Dorman*, 33 F.3d 472, 479 (5th Cir. 1994). Further, leave to amend should be denied because the pleading defects raised are incurable, for reasons set forth above and in the Motion to Dismiss.

### IV.   CONCLUSION

For the foregoing reasons, ETC respectfully requests that this Court grant ETC's Motion to dismiss the Complaint with prejudice pursuant to Fed. R. Civ. P. 12(b)(6), as incorporated by Fed. R. Bankr. P. 7012, and grant ETC such other and further relief to which it is justly entitled.

151957414

Dated: March 2, 2022

Respectfully submitted,

**KATTEN MUCHIN ROSENMANN LLP**

*/s/ Michaela Crocker*
John E. Mitchell
State Bar No. 00797095
Email: john.mitchell@katten.com
Michaela Crocker
State Bar No. 24031985
Email: michaela.crocker@katten.com
Yelena E. Archiyan
State Bar No. 24119035
Email: yelena.archiyan@katten.com
2121 North Pearl St., Ste. 1100
Dallas, TX 75201
Telephone: (214) 765-3600


**YETTER COLEMAN LLP**
R. Paul Yetter
State Bar No. 22154200
Email: pyetter@yettercoleman.com
Bryce L. Callahan
Email: bcallahan@yettercoleman.com
State Bar No. 24055248
Ali Shan Ali Bhai
Email: asalibhai@yettercoleman.com
State Bar. No. 24121498
811 Main Street, Suite 4100
Houston, TX 77002
Telephone: (713) 632-8000

**COUNSEL TO ETC MARKETING, LTD.**



## CERTIFICATE OF SERVICE

I hereby certify that on March 2, 2022, a true and correct copy of the forgoing pleading was served upon all counsel of record using the Court's electronic filing system.

*/s/ Michaela Crocker*
Michaela Crocker

151957414