## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | |
|---|---|
| In re:<br><br>BRAZOS ELECTRIC POWER<br>COOPERATIVE, INC.,<br><br><br>_____ Debtor.[1] | Chapter 11<br><br>Case No.: 21-30725 (DRJ) |
| BRAZOS ELECTRIC POWER<br>COOPERATIVE, INC.,<br><br>Plaintiff,<br><br>v.<br><br>507 CAPITAL, LLC, et al.,<br><br>Defendants. | Adv. Pro. No.: 21-04407 (DRJ) |

## NJR ENERGY SERVICES COMPANY'S (I) STATEMENT IN SUPPORT OF NJR ENERGY SERVICES COMPANY'S MOTION TO DISMISS, AND (II) JOINDER TO THE _REPLY IN SUPPORT OF MOTION TO DISMISS OF DEFENDANTS 507 CAPITAL LLC, 507 SUMMIT LLC, CETUS CAPITAL VI, L.P., CROSSINGBRIDGE LOW DURATION HIGH YIELD FUND, DESTINATIONS GLOBAL FIXED INCOME OPPORTUNITIES FUND, DESTINATIONS LOW DURATION FIXED INCOME FUND, LEAFFILTER NORTH HOLDINGS, INC., OFM II, LP, OU 2 LLC, RIVERPARK SHORT TERM HIGH YIELD FUND, RIVERPARK STRATEGIC INCOME FUND, AND TWO SEAS GLOBAL (MASTER) FUND LP_

Robert K. Malone, Esq.
Mark B. Conlan, Esq.
**GIBBONS P.C.**
One Gateway Center
Newark, NJ 07102
Telephone: (973) 596-4500
Facsimile: (973) 596-0545
rmalone@gibbonslaw.com
mconlan@gibbonslaw.com

_Attorneys for NJR Energy Services Company_

---

[1] The Debtor in this chapter 11 case, along with the last four digits of its federal tax identification number is: Brazos Electric Power Cooperative, Inc. (4729). Additional information regarding this case may be obtained on the website of the Debtor's claims and noticing agent at http://cases.stretto.com/Brazos. The Debtor's address is 7616 Bagby Avenue, Waco, TX 76712.

## <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF AUTHORITIES ................................................................................................. iii

PRELIMINARY STATEMENT .............................................................................................. 1

ARGUMENT ............................................................................................................................. 3

I.     COUNT I.  THE PLAIN LANGUAGE OF THE STATUTE EXCLUDES THE DEBTOR FROM THE DEFINITION OF "CONSUMER" AND IS THEREFORE INAPPLICABLE ........................................................................................... 3

     A.     The Debtor's Opposition Recognizes That It Personally Is Not a "Consumer," and so That Reality Forecloses Any DTPA Claim. ...................................................... 5

     B.     The Debtor Is a Highly Sophisticated Business Entity and Accordingly Fails to Properly Plead Unconscionability ........................................................................... 7

          1.     The Debtor Is Not "Ignorant or Inexperienced" and Therefore Cannot Plead Procedural Unconscionability. ........................................................ 8

          2.     The Debtor Points Only to Prices to Allege Substantive Unconscionability. ................................................................................ 11

     C.     Because the Debtor's "Void Against Public Policy" Allegations Hinge on the Same Legal Maladies, It Too Must Be Dismissed. ................................................. 12

II.     COUNTS II & II.  THE DEBTOR'S COMPLAINT FAILS TO ALLEGE CRITICAL ELEMENTS TO FRAUDULENT TRANSFER CLAIMS ............................................. 13

     A.     Reasonably Equivalent Value for Natural Gas Is Determined by the Then-Prevailing Market Prices Agreed to Between Sophisticated Business Entities in Arm's Length Transactions. ................................................................................. 13

     B.     The Debtor Fails to Allege Specific Details With Respect to When Brazos Became Insolvent. .............................................................................................. 14

III.     COUNT IV.  NJRES'S PROOF OF CLAIM IS ENTITLED TO ADMINISTRATIVE PRIORITY ............................................................................................................. 14

IV.     COUNT V.  THE DEBTOR'S ARGUMENTS ON VALUE UNDER SECTION 503(b)(9) ARE RED-HERRINGS ...................................................................................... 17

CONCLUSION ........................................................................................................................ 18

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Stone Diamond, Inc. v. Lloyds of London*,
   934 F. Supp. 839 (S.D. Tex. 1996) ......................................................................12

*Arkwright-Boston Mfrs. Mut. Ins. Co. v. Westinghouse Elec. Corp.*,
   844 F.2d 1174 (5th Cir. 1988) ..............................................................7, 8, 10, 11

*Atwood Oceanics, Inc. v. Zust Bachmeier of Switzerland, Inc.*,
   2006 WL 734415 (S.D. Tex. Mar. 21, 2006) ......................................................9, 10

*Belanger v. BAC Home Loans Serving, L.P.*,
   839 F. Supp. 2d 873 (W.D. Tex. 2011)................................................................12

*In re Besing*,
   981 F.2d 1488 (5th Cir. 1993) ..............................................................................13

*Colonial Penn Life Ins. Co. v. Parker*,
   362 F. Supp. 3d 380 (S.D. Tex. 2019) ...................................................................4

*Earman Oil Co., Inc. v. Burroughs Corp.*,
   625 F.2d 1291 (5th Cir. 1980) ................................................................................9

*In re Erlewine*,
   349 F.3d 205 (5th Cir. 2003) ................................................................................13

*Gym-N-I Playgrounds, Inc. v. Snider*,
   220 S.W.3d 905, 912 (Tex. 2007).........................................................................7

*In re Heritage Org., LLC*,
   354 B.R. 407 (Bankr. N.D. Tex. 2006).................................................................12

*Janvey v. Golf Channel, Inc.*,
   487 S.W.3d 560 (Tex. 2016).................................................................................13

*Lindemann v. Eli Lilly & Co.*,
   816 F.2d 199 (5th Cir. 1987) ............................................................................9, 10

*Lost Maples Gen. Store, LLC v. Ascentium Capital, LLC*,
   2019 WL 1966671 (Tex. App.—Houston (14th Dist.) May 2, 2019, no pet.) .........7

*In re Louisiana Pellets, Inc.*,
   838 F. App'x 45 (5th Cir. 2020) ......................................................................13, 17

*In re Magwood*,
    2008 WL 509635 (Bankr. M.D. Ala. Feb. 22, 2008)..............................................15

*In re Olshan Foundation Repair Co., LLC*,
    328 S.W.2d 883 (Tex. 2010)...................................................................................8

*Peltz v. Hatten*,
    279 B.R. 710 (D. Del. 2002)..................................................................................13

*In re Pilgrim's Pride Corp.*,
    421 B.R. 231 (Bankr. N.D. Tex. 2009)..................................................................17

*In re Poly-America, L.P.*,
    262 S.W.3d 337 (Tex. 2008)..............................................................................1, 8

*In re SemCrude, L.P.*,
    416 B.R. 399 (Bankr. D. Del. 2009) ...............................................................15, 17

*United States v. Kay*,
    359 F.3d 738 (5th Cir. 2004) ..................................................................................5

*United States v. Transocean Deepwater Drilling, Inc.*,
    767 F.3d 485 (5th Cir. 2014) ..................................................................................5

*United Teacher's Assocs. Ins. Co. v. MacKeen & Bailey, Inc.*,
    847 F. Supp. 521 (W.D. Tex. 1994).......................................................................7

*White v. Ameriquest Mortgage*,
    2019 WL 2297572 (S.D. Tex. May 30, 2019) ..................................................9, 10

*In re Wilkinson*,
    402 B.R. 756 (Bankr. W.D. Tex. 2009)..................................................................5

**Statutes**

11 U.S.C. § 503(b)(9) ......................................................................................... *passim*

11 U.S.C. § 544(b) ..................................................................................................13

11 U.S.C. § 548(a)(1)(B) ...................................................................................13, 14

11 U.S.C. § 548(a)(1)(B)(ii)(I) ................................................................................14

TEX. BUS. & COM. CODE § 2.302 ........................................................................3, 11

TEX. BUS. & COM. CODE § 2.302 cmt. 1 .................................................................8

TEX. BUS. & COM. CODE § 17.45(4).................................................................3, 4, 6

TEX. BUS. & COM. CODE § 17.45(5)............................................................................3

TEX. BUS. & COM. CODE § 17.49(g)...........................................................................3

TEX. BUS. & COM. CODE § 17.50(a)(1)........................................................................6

TEX. BUS. & COM. CODE § 24.005 .............................................................................13

**Treatises**

Restatement (Second) of Contracts § 208 to note...........................................................8

NJR Energy Services Company ("NJRES") hereby (i) submits this statement in further support of NJRES's Motion to Dismiss [Dkt. No. 41] ("Motion to Dismiss") *The Debtor's Complaint for Declaratory Relief and Asserting Omnibus Objections to Proofs of Claim Related to Natural Gas Sales to the Debtor* [Dkt. No. 1] ("Compl." or the "Complaint"), filed by Brazos Electric Power Cooperative, Inc. ("Brazos Electric" or the "Debtor") commencing the above-captioned adversary proceeding, and in response to *Debtor's Omnibus Response in Opposition to Gas Claimants' Motions to Dismiss* [Dkt. No. 51 ("Opp. Br.")] (the "NJRES Reply"); and (ii) joins and incorporates by reference the *Reply in Support of Motion to Dismiss of Defendants 507 Capital LLC, 507 Summit LLC, Cetus Capital VI, L.P., CrossingBridge Low Duration High Yield Fund, Destinations Global Fixed Income Opportunities Fund, Destinations Low Duration Fixed Income Fund, Leaffilter North Holdings, Inc., OFM II, LP, OU 2 LLC, RiverPark Short Term High Yield Fund, RiverPark Strategic Income Fund, and Two Seas Global (Master) Fund LP* [Dkt. No. 57] (the "Amini Reply"); and respectfully adds as follows:

## PRELIMINARY STATEMENT

1. The Debtor's objection to NJRES's proof of claim and its administrative expense priority status is best summarized in the Debtor's own words:  "Brazos is the only party that has pointed to competent evidence to support ***what it believes to be*** the fair market value of the gas sold."  [Opp. Br. ¶ 4 (emphasis added).]  As is transparently obvious, this adversary proceeding is an *ex post facto* attempt at contract reformation—a highly disfavored tactic—seeking a court-ordered downward modification of agreed-upon invoice prices set not by the seller, but the market at the time the transactions occurred.  The Debtor essentially wishes to establish precedent wherein during any extreme weather event, and corresponding commodities market fluctuations, Texas's non-profit electric cooperative corporations may simply exploit Mother Nature to ultimately pay

whatever price "it believes to be" fair regardless of its contractual obligations.  Such a result is against public policy and thus cannot stand.

2.     Unlike ERCOT's nearly $2 billion unilaterally price-manipulated claim that detoured outside the ordinary course, NJRES merely offered Brazos natural gas for sale in the ordinary course of business at the then-prevailing market rates based on the index prices at the facilities that actually delivered the gas.  There are no allegations of market manipulation or any surcharge or premium assessed by NJRES.  The Gas Claims are thus unlike the peculiar situation surrounding ERCOT's claim (load shed; PUCT orders; changed-on-the-fly protocol pricing algorithms; etc.).  ERCOT artificially raised the price of electricity to the maximum cap level of $9,000/MWh.  Conversely, the Debtor offered to buy and NJRES agreed to sell natural gas at market-determined prices at the point of delivery as set forth in section 4.1 of the parties' governing NAESB contract.  It would be an egregious injustice to treat ERCOT and NJRES the same.

3.     The Debtor's claims are accordingly insufficient as a matter of law, as none require any separate factual inquiry because the law forecloses each claim at the outset.  Each claim contains the common thread that the Debtor was allegedly "price gouged" and, through this overarching concept, each claim alleges that higher-than-usual natural gas prices caused:  (i) unfair prices and unenforceable contracts, (ii) constructively fraudulent transfers and (iii) transactions outside the ordinary course of the Debtor's business solely because of high market-driven prices (and unequal "value").  The Debtor insufficiently pleads "price gouging," however, as the Debtor provides absolutely no legal authority supports its price-gouging allegations.  [*See* Opp. Br. ¶ 37 ("This matter . . . presents the novel issue of whether the Court must allow the Gas Claimants to *indirectly* price gouge [the Debtor's] consumers considering the unique not-for-profit structure of an electric cooperative.").]  Because each of the Debtor's claims require a finding of "price gouging," and the law forecloses such a finding vis-à-vis the Debtor (a multi-billion dollar

2

sophisticated business consumer), all of the Debtor's claims must similarly fail.  Therefore, the Debtor's "price gouging," "ordinary course," and "value" arguments, creative as they may be, also fall flat.

4.     For these reasons, the reasons set forth in the Motion to Dismiss and the Amini Reply incorporated herein by reference, and those stated below, it is respectfully submitted that the Court has no viable alternative presented with the facts and law but to overrule the Debtor's objections to NJRES's Section 503(b)(9) proof of claim, dismiss the Complaint in its entirety with prejudice, and allow NJRES's proof of claim as an administrative expense claim in the amount sought, $26,079,125, and further order that such claim be paid in full, in cash, on the Effective Date of any plan that may be confirmed in the Debtor's chapter 11 case.

## ARGUMENT

**I.     COUNT I.  THE PLAIN LANGUAGE OF THE STATUTE EXCLUDES THE DEBTOR FROM THE DEFINITION OF "CONSUMER" AND IS THEREFORE INAPPLICABLE**

5.     At the outset, the Texas Deceptive Trade Practices Act (the "DTPA") cannot serve as the Debtor's basis for any objection or claim because the Debtor does not qualify as a "consumer" within the DTPA's scope.  TEX. BUS. & COM. CODE § 17.45(4).  Assuming *arguendo* that the Debtor were a "consumer" (which it is not), or that it has standing to indirectly assert a consumer's claim (it does not), the DTPA expressly excludes consumer claims exceeding $500,000.  TEX. BUS. & COM. CODE § 17.49(g).  The Debtor lastly cites to TEX. BUS. & COM. CODE § 2.302 in the hopes that the Court will nonetheless render the agreements unenforceable due to unconscionability, but the Debtor cannot meet that exceedingly high bar.

6.     DTPA unconscionability is defined as follows:  an unconscionable act that "takes advantage of the lack of knowledge, ability, experience, or capacity *of the consumer* to a grossly unfair degree."  TEX. BUS. & COM. CODE § 17.45(5) (emphasis added).  Whereas ordinary

consumers rarely understand market risks, large-scale sophisticated business consumers do.  The Debtor is a sophisticated business consumer and cannot possibly be permitted to shoehorn itself into this very separate and specific definition, applicable to unsophisticated retail consumers, without upending the consumer versus business consumer distinction.  Ultimately, the Debtor is a sophisticated business entity capable of ascertaining—unlike retail consumers—that wholesale market prices could and do fluctuate unpredictably.

7.      The Debtor employs sleight-of-hand tactics to blur the line between "consumer" and "business consumer," utilizing language such as "directly" and "indirectly."  [Opp. Br. ¶¶ 37, 61.]  However, some notable differences persist.  And the only way to square the legislative intent concerning the "consumer" versus "business consumer" distinction is to view the sponsor's statement ("to protect **all** Texans from price gouging") through the purview of "all Texan **consumers**."  [*See* Opp. Br. ¶¶ 39, 55.]  Going outside that scope would render the "consumer" versus "business consumer" distinction completely meaningless.

8.      Fifth Circuit courts "must not interpret the statute in a manner that renders any part of the statute meaningless or superfluous."  *Colonial Penn Life Ins. Co. v. Parker*, 362 F. Supp. 3d 380, 403 (S.D. Tex. 2019).  Section 17.45(4) expressly carves out business consumers with assets of $25 million or more from the definition of "consumers."  Had the Texas Legislature intended non-profit corporations with assets in excess of $25 million to be subject to the DTPA's consumer-based protections, it would have said so, and not left the courts to guess.  The plain language of the DTPA thus unequivocally excludes the Debtor with declared assets in excess of $3 billion.  [ECF No. 353 at 11 of 271.]

9.      A ruling in favor of the Debtor adopting the "we are a nonprofit, so we pass all our costs on to our consumers, and so we deserve consumer status protection" theory [*see* Opp. Br. ¶ 40] would, in effect, rewrite the DTPA to provide consumer-level protections to a sophisticated

*business* consumer.  The legislature expressly excluded business consumers with assets of $25

million or more from the "consumer" definition.  Most notably, there is no distinction in the statute

or reported case law that makes any distinction as between a for profit or not for profit business.

The Debtor's argument that "[our] costs are passed through to consumers" wholly ignores that this

is a highly sophisticated entity that undoubtedly understands how best to allocate costs to insulate

the consumers from the full brunt of natural gas market-price fluctuations.  To say otherwise

simply allows a sophisticated business entity to masquerade as a retail consumer, something it

decidedly is not.

     **A.**     **The Debtor's Opposition Recognizes That It Personally Is Not a "Consumer," and so That Reality Forecloses Any DTPA Claim.**

     10.     The Debtor, in essence, admits it has no standing to pursue DTPA claims because

it is not "directly" a "consumer."  [*See* Opp. Br. ¶ 37.]  The Debtor argues that DTPA Section

17.46(b)(27), but only that provision, is "universally applicable," [Opp. Br. ¶ 54], regardless of the

DTPA's express exclusions.  Basic canons of statutory interpretation bar such arguments.

     11.     Courts are bound to "follow the plain and unambiguous meaning of the statutory

language" when construing a statute.  *United States v. Kay*, 359 F.3d 738, 742 (5th Cir. 2004); *In*

*re Wilkinson*, 402 B.R. 756, 763 (Bankr. W.D. Tex. 2009).  And when the statute "provides a

specific definition of a term, we must accept that meaning and limit our analysis to the prescribed

definition."  *United States v. Transocean Deepwater Drilling, Inc.*, 767 F.3d 485, 490 (5th Cir.

2014).  Courts may further interpret statutes according to the "overall policies and objectives of

the statute."  *Kay*, 359 F.3d at 742.

     12.     The term "consumer" is expressly defined by the DTPA to include almost any

purchaser of goods or services, "***except that*** the term does not include a business consumer that

has assets of $25 million or more, or that is owned or controlled by a corporation or entity with

assets of $25 million or more." Tᴇx. Bᴜs. & Cᴏᴍ. Cᴏᴅᴇ § 17.45(4) (emphasis added). Indeed, the statute's title is coined with the term "consumer" in it—the "Deceptive Trade Practices-Consumer Protection Act." *Id.* § 17.41. The deliberately stated policy objective underlying the DTPA is "to protect consumers against false, misleading, and deceptive business practices, unconscionable actions." *Id.* § 17.44(a). The DTPA "grants consumers a cause of action for false, misleading or deceptive practices." Tᴇx. Bᴜs. & Cᴏᴍ. Cᴏᴅᴇ § 17.50(a)(1). It cannot be any more clear that the statute applies only to ***consumers***—*i.e.*, not the Debtor (a business consumer with assets far in excess of $25 million). The Debtor's argument to the contrary may be creative, but it is plainly out of sync with basic statutory interpretation principles and would permit the definition of "consumer" to swallow whole the distinct exclusion of the "business consumer that has assets of $25 million or more." [*See* Opp. Br. ¶¶ 55-56.] If the legislature wished to provide an exception to Section (b)(27), applying it to consumers and non-consumers alike, it would have expressly stated so or would have likely written an entirely separate price-gouging bill applicable to even business consumers with billions of dollars in assets. The Debtor's strained interpretation rewrites the DTPA and cannot stand.

13. In a rather startling concession in its Opp. Br., the Debtor proclaims that Section 17.49(g)'s $500,000 exception is inapplicable "*because this matter does not involve a consumer cause of action under the DTPA*." [Opp. Br. ¶ 58. (emphasis added).] Accordingly, the Debtor apparently simply wishes to read Section 17.46(b)(27) in isolation, which interpretation would be unmoored from statutory construction generally and the DTPA specifically.

14. The Complaint therefore does not adequately allege that the Debtor is a "consumer" under the DTPA and accordingly does not properly allege Section 17.46(b)(27) applies to it, as a business consumer with assets far in excess of $25 million. Because these legal infirmities cannot be corrected by amendment, the Court should dismiss Count One with prejudice.

**B.      The Debtor Is a Highly Sophisticated Business Entity and Accordingly Fails
to Properly Plead Unconscionability.**

15.      The Debtor, as a sophisticated business entity purchasing natural gas from multiple

Gas Suppliers, made a series of arm's length transactions, as a matter of law.   These gas

transactions are essentially about the allocation of risk.   *See Lost Maples Gen. Store, LLC v.
Ascentium Capital, LLC*, 2019 WL 1966671, at *7 (Tex. App.—Houston (14th Dist.) May 2, 2019,

no pet.) ("These arguments essentially complain about the allocation of risk.   But there is nothing

unconscionable or against public policy by allowing sophisticated parties to allocate risks as they

see fit."); *see also Gym-N-I Playgrounds, Inc. v. Snider*, 220 S.W.3d 905, 912 (Tex. 2007) ("Texas

strongly favors parties' freedom of contract . . . and allocate risks as they see fit."); *United

Teacher's Assocs. Ins. Co. v. MacKeen & Bailey, Inc.*, 847 F. Supp. 521, 540 n.28 (W.D. Tex.

1994) ("Finally, because both parties are sophisticated businessmen, the Court concludes they

were fully aware of the risks and ramifications of the agreement and thus their claims of

unconscionability are invalid.").

16.      In its Motion to Dismiss, NJRES argued that in order for the Debtor to have its sale

transactions set aside as "unconscionable," it must plausibly allege that NJRES's sales of natural

gas were *both* procedurally and substantively unconscionable.   [Dkt. No. 41, ¶ 27.]   The Debtor

notably misinterprets the unconscionability standard, incorrectly straining legal analyses within

inapposite case law to assert it "must only prove *either* procedural or substantive

unconscionability."   [Opp. Br. ¶ 44.]   Clearly, "[u]nder Texas law, [the Debtor] must prove *both*

substantive and procedural unconscionability to prevail on the unconscionability issue," which "is

a question of law for decision by the court."   *Arkwright-Boston Mfrs. Mut. Ins. Co. v. Westinghouse

Elec. Corp.*, 844 F.2d 1174, 1184 (5th Cir. 1988).   The Fifth Circuit clearly stated this rule in

*Arkwright*, and it remains good law to this day.

17.     The Debtor, in Opposition, seeks to perversely twist the reasoning in *In re Olshan Foundation Repair Co., LLC*, which involved arbitration clauses in the repair contracts between a national home foundation repair company and four separate homeowners, to argue it "must only prove *either* procedural or substantive unconscionability."  [Opp. Br. ¶ 44 (citing 328 S.W.2d 883, 886 (Tex. 2010)).]  Due to the "superior bargaining power" of the national company vis-à-vis the homeowners, a procedural unconscionability aspect, the court focused its analysis primarily on substantive unconscionability.  *See id.* at 892 (quoting Tex. Bus. & Com. Code § 2.302 cmt. 1); *see also In re Poly-America, L.P.*, 262 S.W.3d 337, 348-49 (Tex. 2008) (quoting Restatement (Second) of Contracts § 208 to note that procedural unconscionability such as "weaknesses in the contracting process . . . overlap with rules which render particular bargains or terms unenforceable on grounds of public policy").  Indeed, every case cited by the Debtor for its proposition that it must only prove *either* procedural *or* substantive unconscionability concerns facts where an inherent asymmetrical bargaining power relationship existed.  [Opp. Br. ¶ 44.]  The *Arkwright* court, on the other hand, determined unconscionability between two sophisticated entities (like here), and the analysis therefore compelled a finding of *both* procedural *and* substantive unconscionability.  844 F.2d at 1180, 1184.  The Debtor can prove neither.

1.     **The Debtor Is Not "Ignorant or Inexperienced" and Therefore Cannot Plead Procedural Unconscionability**.

18.     At the outset, the Debtor points to zero authority supporting procedural unconscionability between two sophisticated business entities.  The sole focus centers on dissatisfaction with the then-prevailing market prices and the Debtor's unilateral belief (via ACES) that it needed to purchase NJRES's gas, among others.  As a general rule, courts find "procedural unconscionability if the plaintiff presents evidence of the seller's 'overreaching or sharp practices' **combined with** the buyer's 'ignorance or inexperience.'"  *Arkwright*, 844 F.2d at 1184 (emphasis

added) (quoting *Earman Oil Co., Inc. v. Burroughs Corp.*, 625 F.2d 1291, 1300 (5th Cir. 1980) (requiring overreaching/sharp practices **and** buyer ignorance/inexperience, adding further "[i]n commercial settings such as the instant one, businessmen are presumed to act at arms length")); *Lindemann v. Eli Lilly & Co.*, 816 F.2d 199, 204 (5th Cir. 1987) (finding the debtor was "not [a] retail customer[] purchasing consumer goods" but rather is an "experienced and sophisticated" business entity operating "since the early 1960's.").  The Complaint fails to adequately plead procedural unconscionability, especially between two sophisticated business entities.  The Debtor completely dodges any discussion on this issue in its Opposition.

19.     The Debtor also inexplicably casually tosses aside the NAESB contracts as "irrelevant."  [Opp. Br. ¶ 50.]  This is particularly concerning because the NAESB contracts "did not obligate Brazos to purchase any gas.  Nor did [it] obligate [NJRES] to sell any gas."  [Compl. ¶ 53.]  Such initial contracting, when analyzing procedural unconscionability, "establishes a course of dealing between the parties and leads to the inference that the [Debtor] did know, or should have known, of the contractual [terms]."  *Lindemann*, 816 F.2d at 204; *see also Atwood Oceanics, Inc. v. Zust Bachmeier of Switzerland, Inc.*, 2006 WL 734415, at *4 (S.D. Tex. Mar. 21, 2006) ("Both parties to this agreement were sophisticated business enterprises and neither possessed disparate bargaining power."); *Earman Oil*, 625 F.2d at 1297 n.14 ("A course dealing is a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct.").  It would therefore be clear error to disregard the NAESB contracts in the procedural unconscionability analysis.

20.     Moreover, the legal authority the Debtor relies upon in its "three factor" procedural unconscionability inquiry is inapposite.  [*See* Opp. Br. ¶ 51.]  Like each and every case cited by the Debtor, *White v. Ameriquest Mortgage* concerns a knowledgeable business entity entering into

a contract with unknowledgeable individuals (*i.e.*, inherent unequal bargaining power in the contract-making process). 2019 WL 2297572, at *1-2 (S.D. Tex. May 30, 2019). The *White* court highlighted that procedural unconscionability "[d]epend[s] on context" and, considering the facts of that particular case, found "factors that may be considered include the commercial atmosphere in which the agreement was made, the alternatives available to the parties, the parties' ability to bargain, any illegality or public-policy concerns, and the agreement's oppressive or shocking nature." *Id.* at *5 (citation omitted) (finding no procedural unconscionability). This non-exhaustive list has limited application to the Debtor's current adversary proceeding, as the high-level acumen of both the Debtor (and its professional gas trading agent ACES) and NJRES place the parties within a much different "context." *See Arkwright*, 844 F.2d at 1184; *Lindemann*, 816 F.2d at 204. Therefore, the Debtor's hyperbolic assertions, that NJRES "chose to price gouge," that "Brazos did not have a viable alternative," and that "Brazos lacked the financial ability to pay," [Opp. Br. ¶ 52], within this highly technical and specialized industry, overlook past the Debtor's sophistication and do not sufficiently plead procedural unconscionability.

21.    Finally, the Debtor asserts the "humanitarian issues at stake" as a reason why it would have paid any price to save Texans. [Opp. Br. ¶ 53.] This emotional plea distracts from the real issue at hand; the reality of market unpredictability. The Debtor indicates that "[h]ospitals, jails, police stations, nursing homes, and families all rely on the power Brazos generates and/or procures, and the Gas Claimants knew that Brazos had no bargaining power." [Opp. Br. ¶ 53.] This suggests, however, that the Debtor never has any bargaining power—ever—because it must always pay the market prices no matter what. This further suggests, for example, if some unanticipated external event adversely impacted natural gas supply and prices, causing them to rise dramatically during a non-disaster event (*e.g.*, during notably hot/cold weather), the Debtor would simply buy the gas at the market prices and then later on simply seek to unilaterally reform

10

the contract prices and argue that not doing so would have risked the lives of Texans.  It would be procedurally unconscionable every time natural gas prices spiked during inclement weather, and so the Debtor could purchase whatever it felt it needed and then implement a workaround to paying market prices.  The reason the Debtor's argument is unsupported by any legal authority is because Texas courts are unwilling to fall into this retrospective-contract-reforming slippery slope.

2. <strong><u>The Debtor Points Only to Prices to Allege Substantive<br>Unconscionability</u></strong>.

22. The Debtor's short argument in support of alleged substantive unconscionability, which unwittingly shrugs off supply-and-demand market realities and inaccurately concludes without a scintilla of evidence to support its claim that:  the Gas Claimants sought "to extract excessive prices from those most vulnerable," so therefore "the Complaint sufficiently pleads substantive unconscionability."  [Opp. Br. ¶ 47.]  The Debtor, a multi-billion dollar entity, thus looks only to alleged "excessive prices" in its effort to disallow NJRES's $26 million claim for natural gas sales and to disallow NJRES's  priority status under section 503(b)(9).  This is simply legally insufficient.  And contrary to the Debtor's assertion that "this is a fact issue to be resolved after considering all of the evidence," [Opp. Br. ¶ 47], Texas law says otherwise—"Section 2.302 [of the DTPA] provides that ***unconscionability is a question of law*** for decision by the court." *Arkwright*, 844 F.2d at 1184 (emphasis added).  Because the Debtor's Complaint ineffectually focuses on price only, with the red-herring that the Debtor will pass these prices on to its customers (so, *therefore*, the Debtor is itself an ordinary consumer), the Court should dismiss this claim as legally insufficient.

23. Moreover, in an apparent cascade of misinterpretations on well-settled and relatively clear Texas law, the Debtor mistakenly asserts that "*the Gas Claimants* bear the burden to prove the contracts are enforceable—not the Debtor."  [Opp. Br. ¶ 47.]  The Debtor cites

absolutely no authority for this proposition because, once again, Texas authority on this point says precisely the opposite—*i.e.*, that "[t]he party raising an unconscionability defense must plead ***and prove*** both procedural and substantive unconscionability." *Belanger v. BAC Home Loans Serving, L.P.*, 839 F. Supp. 2d 873, 880 (W.D. Tex. 2011) (emphasis added); *In re Heritage Org., LLC*, 354 B.R. 407, 438 (Bankr. N.D. Tex. 2006) ("[U]nder Texas law, the party asserting unconscionability of a contract bears the burden of proving both procedural and substantive unconscionability."); *Am. Stone Diamond, Inc. v. Lloyds of London*, 934 F. Supp. 839, 844 (S.D. Tex. 1996) ("Under Texas law, the party asserting unconscionability of contract bears the burden of proving both the substantive unconscionability and the procedural unconscionability of the contract at issue.").  It is therefore abundantly clear that the Debtor must sufficiently plead ***and prove*** unconscionability.

### C.  Because the Debtor's "Void Against Public Policy" Allegations Hinge on the Same Legal Maladies, It Too Must Be Dismissed.

24.  In a recycled version of its "we get consumer protection under the DTPA because we pass costs on to our consumers" argument, the Debtor argues that "because Brazos and its Members are nonprofits, the only way for the Gas Claims to be paid is for those costs to be passed through to the customers," and because "it would be unlawful for them to directly charge such exorbitant prices to those customers," the "doctrine against enforcing contracts that are against public policy exists to prevent this." [Opp. Br. ¶ 61.]  As this is not a separate argument, but rather is part and parcel of the Debtor's DTPA-"consumer" arguments, it fails for the above-cited reasons.

25.  Moreover, the Debtor again fails to cite any authority whatsoever in support of the argument that a multi-million contract between sophisticated parties should be void against public policy.  The answer is quite simple—because none exists.  The Debtor's public policy claims seek

relief where relief cannot be granted, and therefore the Court should dismiss such claims with prejudice.

**II.    COUNTS II & II.  THE DEBTOR'S COMPLAINT FAILS TO ALLEGE CRITICAL ELEMENTS TO FRAUDULENT TRANSFER CLAIMS**

26.    Adequately alleging a constructively fraudulent avoidance claim requires the Debtor to sufficiently plead a couple threshold items that are notably missing here:  (1) that the Debtor did not receive reasonably equivalent value in exchange for the obligation incurred; and (2) that, at the time the obligation was incurred, certain solvency-related events had occurred or were about to occur.  The Complaint's threadbare nature pleads neither, and the Court should dismiss Counts Two (11 U.S.C. § 548(a)(1)(B)) and Three (11 U.S.C. § 544(b) and TEX. BUS. & COM. CODE § 24.005) for failure to adequately plead both elements.

**A.    Reasonably Equivalent Value for Natural Gas Is Determined by the Then-Prevailing Market Prices Agreed to Between Sophisticated Business Entities in Arm's Length Transactions.**

27.    The Debtor is correct that determining "reasonably equivalent value" is *generally* "a question of fact, or is at least fact-intensive."  [Opp. Br. ¶ 65 (citing *In re Erlewine*, 349 F.3d 205, 209 (5th Cir. 2003)).]  In transactions where the law is settled, however, courts can find that "the Debtor's claims constituted a transfer for reasonably equivalent value ***as a matter of law***." *See, e.g.*, *In re Besing*, 981 F.2d 1488, 1496 (5th Cir. 1993) (emphasis added).  Further, "[v]alue is determined as of the date of the transfer," *In re Louisiana Pellets, Inc.*, 838 F. App'x 45, 49 (5th Cir. 2020), and "courts give significant deference to marketplace values . . . and the market at the time, [and] it is not the place of fraudulent transfer law to reevaluate or question those transactions." *Peltz v. Hatten*, 279 B.R. 710, 738 (D. Del. 2002); *Janvey v. Golf Channel, Inc.*, 487 S.W.3d 560, 582 (Tex. 2016) ("For purposes of the 'reasonably equivalent value' requirement in section 24.009(a), proof that an exchange occurred for market-value rates in an arm's-length

transaction conclusively establishes that the value exchanged was 'reasonably equivalent.'").  So, the court can (and should) determine, as a matter of law, that the Debtor's purchase of natural gas from the Gas Suppliers at the then-prevailing market rates *conclusively establishes* its reasonably equivalent value—to the detriment of the Debtor's constructively fraudulent transfer claims.

28.     Therefore, because receipt of less than reasonably equivalent value is a required element under both 11 U.S.C. § 548(a)(1)(B) and the TUFTA, the Debtor's inability to plead this element is fatal to its constructively fraudulent transfer claims.

**B.      The Debtor Fails to Allege Specific Details With Respect to When Brazos Became Insolvent.**

29.     Regarding the insolvency prong to constructively fraudulent transfer claims, the Debtor notably fails to allege exactly when the Debtor became insolvent.  The Debtor began February 2021 in a "financially stable" position with historical "A+" and "A" credit ratings from Fitch and S&P, respectively.  [Karnei Decl., ¶¶ 5-6.]  By the end of February 2021, the Debtor was preparing for bankruptcy.  [*Id.* ¶ 6.]  The law requires that the Debtor show that it was "insolvent on the date that such transfer was made or such obligation was incurred, or became insolvent as a result of such transfer or obligation."  11 U.S.C. § 548(a)(1)(B)(ii)(I).  The Complaint however is devoid of sufficient allegations with respect to when the Debtor, an entity with $3.352 *billion* in assets, became insolvent.  It is therefore inadequately pled how the Gas Suppliers created the Debtor's insolvency conditions, and more is required under the *Twombly-Iqbal* pleading standards than rote formulaic conclusions of law.

**III.      COUNT IV.  NJRES'S PROOF OF CLAIM IS ENTITLED TO ADMINISTRATIVE PRIORITY**

30.     The main focus before this Court via the Debtor's Complaint related to Section 503(b)(9) of the Bankruptcy Code is whether the natural gas NJRES sold to the Debtor was sold "in the ordinary course of such debtor's business."  [Opp. Br. ¶ 72.]

31.     In Opposition, the Debtor cites to *In re Magwood*, 2008 WL 509635 (Bankr. M.D. Ala. Feb. 22, 2008) for the proposition that "the Court should not utilize the Uniform Commercial Code when analyzing what is in the ordinary course of business." [Opp. Br. ¶ 74]; *cf. In re SemCrude, L.P.*, 416 B.R. 399, 405 (Bankr. D. Del. 2009) ("There is nothing in the Code or in the legislative history accompanying the recent enactment of § 503(b)(9) suggesting that Congress intended that bankruptcy courts should look beyond the Uniform Commercial Code to construe or define these terms," and "such that adoption of these definitions should thus be consistent with commercial expectations in the marketplace."). The *Magwood* court pointed out, however, that "[t]he debtor purchased the [good at issue] for her own personal use, and she is not in the business of buying or selling [that particular good]," and for that reason found that such transaction was not "in the ordinary course of business." 2008 WL 509635, at *1 (analyzing "ordinary course" under the Bankruptcy Code). The *Magwood* decision, therefore, forecloses against the Debtor's allegations because the Debtor *is in the business of purchasing natural gas*—indeed, the Debtor admittedly regularly purchases natural gas to operate its three gas-fired plants. [Karnei Decl. ¶¶ 25-28.]

32.     Despite these undisputed facts, the Debtor asserts "that the Gas Claims were incurred ***at times and circumstances*** that were far outside of the Debtor's ordinary course of business." [Opp. Br. ¶ 76. (emphasis added).] This mere temporal aspect says nothing about "such debtor's business." Truly, it would be absurd to permit large-scale multi-billion dollar businesses to simply sidestep contractual payments incurred during a temporary, yet difficult, business climate. That "[t]he Debtor did not have an ordinary course of business when it came to buying natural gas during Winter Storm Uri" is a non-sequitur. [Opp. Br. ¶ 76.] The purchase of natural gas is inherent to "such debtor's business" and is *often* purchased "in ordinary course."

33.     For perspective, the Gas Claimants' proofs of claims are completely unlike the almost-$2 billion ERCOT claim.  ERCOT *itself* ordered extraordinary load shed during the storm.  The PUCT then ordered ERCOT to reflect load shed in its scarcity pricing.  ERCOT even manipulated its own protocols to ***unilaterally*** raise the price of electricity to $9,000/MWh.  The Gas Suppliers, on the other hand, had no ability (and did not) control load shed requirements or scarcity pricing determinations—the Gas Suppliers merely sold gas at agreed to market prices that reflected increased demand and reduced supply.  That is how the market works, and the Debtor purchased whatever quantities it wanted based on these independently established market prices in the ordinary course of its generation business.  The natural gas market was working like it always works, with unanticipated market-influenced increases that can and do affect the volatility of the market over the course of any given year.

34.     On the other end of the spectrum, ERCOT argued that the PUCT directed it to peg the price of energy at $9,000/MWh because Texas's regulatory framework was not performing as designed, a concession that the price was not set in the ordinary course.  [Jan. 31, 2022 Hearing Tr., Adv. Pro. No. 21-3863, ECF No. 366.]  ERCOT allegedly "manipulat[ed]" and "manually adjusted" its protocol-pricing algorithms "upward" to facilitate the $9,000/MWh price point.  [*Id.* at 29:5-30:10.]  At the time of Winter Storm Uri, ERCOT's scarcity pricing triggers did not include load shed—ERCOT allegedly made that change three months after the storm.  [*Id.*]  Thus, the $9,000/MWh fixed price was arguably not in the ordinary course of ERCOT's or the Debtor's business with each other.

35.     The Debtor's Complaint fails to allege similar extraordinary ***business practices*** that created dealings outside of the ordinary course with respect to the Debtor's dealings with the Gas Suppliers.  NJRES continued to supply natural gas, and the Debtor continued to purchase that natural gas, even as the market fluctuated.  For NJRES's part, its proof of claim is less than 1% of

the Debtor's total assets (unlike ERCOT's proof of claim, which is approximately **55% of the Debtor's total assets**). The Opposition makes it abundantly clear that the Debtor screwed up and simply failed to prepare for the cold weather.  [Opp. Br. ¶ 76 ("The Debtor did not have an ordinary course of business when it came to buying natural gas during Winter Storm Uri.").]  But the Debtor did have an ordinary course, and that was to purchase natural gas, via its gas purchasing agent ACES, to supply its gas-fired generating plants.  Unlike with ERCOT, there were no extraordinary unilateral algorithm manipulations to take the gas transactions outside the ordinary course.

36.     The Complaint therefore insufficiently pleads any factual allegations that the Gas Claims were outside "the ordinary course of such Debtor's business," and the Court should dismiss Count Four with prejudice.

## IV.     COUNT V.  THE DEBTOR'S ARGUMENTS ON VALUE UNDER SECTION 503(b)(9) ARE RED-HERRINGS

37.     Contrary to the Debtor's assertion that "[t]he 'value' of the natural gas delivered is a factual issue," [Opp. Br. ¶ 78], courts are free to determine value, and "there is ample and convincing authority to support the proposition that the invoice or purchase price is presumptively the best determinant of value."  *In re SemCrude*, 416 B.R. at 405.  It does not matter that the Debtor is unhappy with the price it agreed to pay because value, under these circumstances, is very simply measured "as of the date of the transfer."  *In re Louisiana Pellets*, 838 F. App'x at 49.  Combining the dates of transfer and the agreed-upon purchase prices, there is no further inquiry that needs to be had relative to "value."  *See In re Pilgrim's Pride Corp.*, 421 B.R. 231, 243 (Bankr. N.D. Tex. 2009) ("Natural gas is a commodity traded on the commodity markets. One method for valuing a commodity for the purpose of section 503(b)(9) claims might be to value the commodity based on the price at which it could be purchased during the relevant period on the commodity market.").  Because the purchase prices underlying NJRES's natural gas sales to the Debtor are reflective of

17

the natural gas commodity market linked with the Tolar hub and the Worsham Steed storage facility (*i.e.*, the two relevant transaction points), the "value" of NJRES's natural gas sales to the Debtor during the 20-day period preceding the Petition Date is well settled as a matter of law.

38.     It is yet another red-herring to compare prices at the Tolar and Worsham Steed index prices with those at the Natural Gas-East Texas (NGPL TEXOK) hub ("<u>TEXOK</u>").  [*See* Opp. Br. ¶ 82.]  Of course various different regional delivery points will be higher, and others lower, than the TEXOK hub, but what impacts premiums and discounts at TEXOK is a wholly separate analysis—and an irrelevant analysis for our purposes.  The Debtor did not buy gas at TEXOK because there was no way to physically move the gas from NGPL's system going west to Brazos's service area at the time.  And the Debtor's desire to apply TEXOK's index prices to Tolar and Worsham Steed's index prices inherently recognizes that ***index prices are objectively reliable prices***.  Indeed, it would be shaky precedent to permit a multi-billion dollar company to, *ex post facto*, pick and choose its preferred index prices based on nothing more than they "like the price."

<u>**CONCLUSION**</u>

For the reasons set forth in the Motion to Dismiss, the Amini Reply, and above, the Debtor's Complaint for declaratory relief and omnibus objections should be overruled and dismissed in its entirety with prejudice and the claim of NJRES should be "allowed" in the amount of $26,079,125 as an administrative priority claim pursuant to 11 U.S.C. § 503(b)(9), and the Court should further order that such claim be paid in full, in cash, on the effective date of any plan that may be confirmed in the Debtor's chapter 11 case.

Respectfully submitted,

Dated:  March 2, 2022                    **GIBBONS P.C.**


By: */s/ Mark B. Conlan*
Robert K. Malone, Esq. (*admitted pro hac vice*)
Mark B. Conlan, Esq. (Bar No. NJ0270120)
One Gateway Center
Newark, NJ 07102
Telephone:  (973) 596-4500
Facsimile:  (973) 596-0545
rmalone@gibbonslaw.com
mconlan@gibbonslaw.com

*Attorneys for NJR Energy Services Company*

## CERTIFICATE OF SERVICE

I certify that on March 2, 2022, a true and correct copy of the foregoing document was electronically filed with the Clerk of the Court using the CM/ECF system, which automatically sends notifications of such filings to all attorneys of record.

/s/ Mark B. Conlan
Mark B. Conlan, Esq.