UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| In re: | Chapter 11 |
| BRAZOS ELECTRIC POWER COOPERATIVE INC., | Case No. 21-30725 (DRJ) |
| *Debtor.* | |
| BRAZOS ELECTRIC POWER COOPERATIVE, INC., | |
| *Plaintiff,* | |
| v. | |
| 507 Capital LLC; 507 Summit LLC; Cetus Capital VI, L.P.; Chase Lincoln First Commercial Corporation; Citigroup Financial Products, Inc.; CrossingBridge Low Duration High Yield Fund; Destinations Global Fixed Income Opportunities Fund; Destinations Low Duration Fixed Income Fund; Koch Energy Services, LLC; Leaffilter North Holdings, Inc.; NJR Energy Services Co.; OFM II, LP, OU 2 LLC; RiverPark Short Term High Yield; RiverPark Strategic Income Fund; Total Gas & Power North America, Inc.; and Two Seas Global (Master) Fund LP, | Adv. Proc. No. 21-04407 (DRJ) |
| *Defendants.* | |

**DEFENDANT TOTALENERGIES'S
REPLY IN SUPPORT OF ITS MOTION TO DISMISS**

**TABLE OF CONTENTS**

TABLE OF CONTENTS ................................................................................................................. i

INTRODUCTION ......................................................................................................................... 1

ARGUMENT ................................................................................................................................. 1

    A.    Brazos argues the wrong standard, essentially admitting it has not pled sufficient factual allegations to state a plausible claim. ............................................................................. 1

        i.    The burden is on Brazos to plead plausible contract defenses. ....................................... 2

        ii.    Brazos cannot escape a pleading deficiency by claiming a fact dispute. ......................... 3

    B.    Brazos essentially concedes it failed to plausibly allege the Transaction was unconscionable. ................................................................................................................ 3

    C.    Brazos concedes that the Texas DTPA does not apply, and it may not be rewritten to make the Transaction illegal or against public policy. ................................................................... 5

        i.    The express exclusion of the Transaction from the DTPA must be applied. .................... 5

        ii.    Brazos's nonprofit structure does not change the DTPA's inapplicability. ...................... 7

    D.    Brazos does not argue fraudulent transfer under Texas law in its Response, and *Janvey v. Golf Channel, Inc.* prevents its claim. ................................................................................ 7

    E.    Brazos likewise has not pleaded a fraudulent transfer under federal law, as the Transaction was at arm's-length and price fluctuations cannot be considered. ........................................ 8

        i.    There is no fact dispute preventing dismissal as a matter of law. .................................... 9

        ii.    Price fluctuations cannot be considered to determine value as a matter of law, and the price at NGPL TEXOK hub is irrelevant to the value of the gas provided locally to Brazos's plant. ............................................................................................................. 10

        iii.    Brazos's allegations fail to plead anything other than a voluntary, arms-length transaction at a market price. ............................................................................................ 11

    F.    Brazos also fails to plead insolvency at the time of the Transaction, providing an additional basis for dismissal under both TUFTA and Section 548(b). ............................ 12

    G.    TotalEnergies' claim is entitled to administrative priority Status because the natural gas was purchased by Brazos in the ordinary course of its business. ...................................... 12

        i.    The UCC should be applied to determine ordinary course of business. ........................ 12

        ii.    Brazos urges the adoption of a new "totality of the circumstances" test but, even if applied, the Transaction was in the ordinary course of business. .................................. 13

    H.    When Brazos received natural gas, it received "value" during the 20-day period prior to filing for bankruptcy. ........................................................................................................ 14

I. Brazos has not stated a sufficient basis on which repleading could cure the defects within its Complaint, and so dismissal should be with prejudice. ................................................. 15

CERTIFICATE OF SERVICE ....................................................................................................... 17

## INTRODUCTION

1. Rather than address Total Gas & Power North America, Inc.'s ("TotalEnergies") legal arguments head on, Brazos Electric Power Cooperative, Inc. ("Brazos") relies on emotional rhetoric, repeating without equivocation that the choice given to Brazos was to "allow Texans to die."[1] But this quite literally has nothing to do with Brazos's legal case in which it seeks to avoid paying TotalEnergies for the natural gas it purchased on the open market. This case is a commercial dispute over whether contractual promises, made at arm's-length, for natural gas sold to a debtor on the eve of bankruptcy will be honored. That's it. While there are some legal questions for the Court to decide, the heart of the dispute is simple: will Brazos pay for the natural gas it purchased to generate electricity or will TotalEnergies be forced to instead, rewriting the industry standard NAESB Contract, the Texas DTPA, or both?

2. The answer is clear: the single transaction agreed on February 12, 2021 to sell natural gas for delivery over four subsequent days to Brazos under the NAESB Contract (the "Transaction") is an enforceable agreement under Texas law. It is not unconscionable, illegal, nor against public policy. Likewise, it is not a fraudulent transfer. TotalEnergies is entitled to administrative priority for selling valuable goods to Brazos at market prices and in the ordinary course of Brazos's business on the eve of bankruptcy. This adversary proceeding should be dismissed with prejudice.

## ARGUMENT

**A. Brazos argues the wrong standard, essentially admitting it has not pled sufficient factual allegations to state a plausible claim.**

3. Rather surprisingly, Brazos spends a full two pages arguing that Rule 12(b)(6) does

---

[1] Dkt. 51, Debtor's Omnibus Response in Opposition to Gas Claimants' Motions to Dismiss (hereinafter "Resp."), at ¶ 5, 53, 73.

not apply. This is, of course, contrary to the Bankruptcy Code. Rule 12(b)(6) is explicitly incorporated into adversary proceedings through Federal Rule of Bankruptcy Procedure 7012.

### i. The burden is on Brazos to plead plausible contract defenses.

4. Because Texas law presumes contracts are enforceable, Brazos has the burden to show that a contract defense applies to invalidate the Transaction. *See, e.g.*, *Kevlin Services, Inc. v. Lexington State Bank*, 46 F.3d 13, 15 (5th Cir. 1995) (holding a "provision in a written contract is prima facie valid and enforceable unless the opposing party shows that" it should not be enforced); *In re Halliburton Co.*, 80 S.W.3d 566, 572 (Tex. 2002) (placing the burden to show contract is unconscionable strictly on the party seeking to invalidate an agreement).

5. Indeed, Brazos's cited caselaw shows that, while the ultimate burden of proof at trial is on TotalEnergies to show entitlement to payment, Brazos must first allege a plausible claim for the various affirmative contract defenses it is seeking. *See In re Waterman S.S. Corp.*, 200 B.R. 770, 774 (Bankr. S.D.N.Y. 1996) (discussing how the burden shifts to the debtor to show with sufficient evidence that the claim should be disallowed).

6. When Brazos finally manages to cite cases in a Rule 12(b)(6) context, those cases are facially inapplicable. For example, Brazos quotes *Gregson v. Zurich American Ins. Co.*, asserting that motions to dismiss are "viewed with disfavor" and so are "rarely granted."[2] 322 F.3d 883, 885 (5th Cir. 2003). This ***was*** true—in 2003. *See Ashcroft v. Iqbal*, 556 U.S. 662 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (switching from notice to plausibility pleading).

7. Unfazed by binding precedent, Brazos argues "[d]ismissal is proper only where there is no cognizable legal theory or an absence of sufficient facts alleged to support a cognizable

---

[2] Resp. ¶ 35.

legal theory" citing an unpublished opinion from 2005.[3] This is not the law. *See Iqbal*, 556 U.S. at 678 ("The plausibility standard . . . asks for more than a sheer possibility that a defendant has acted unlawfully."). Under the current Rule 12(b)(6) standard, dismissal is appropriate.

>    ii.   **Brazos cannot escape a pleading deficiency by claiming a fact dispute.**

8.    Brazos repeatedly refers to the fact intensive nature of several of its claims.[4] This may be a valid reason to deny a motion for summary judgment and send a case to trial, if there is **evidence** creating a material dispute. *See, e.g.*, *Certain Underwriters at Lloyd's, London v. Axon Pressure Products Inc.*, 951 F.3d 248, 272 (5th Cir. 2020) ("This evidence creates a material fact dispute that precludes summary judgment."). But on review of motion to dismiss all factual allegations are taken as true. Thus, there cannot be a dispute of fact.

9.    Rather, the allegations themselves are tested: if they are sufficient to plausibly infer a right to relief then the case can move forward; if they are not, the case is dismissed. *See Heinze v. Tesco Corp.*, 971 F.3d 475, 479 (5th Cir. 2020) ("We accept all well-pleaded facts as true and construe the complaint in the light most favorable to the plaintiff. But we do not accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions.") (internal quotation marks and citations omitted).

>    B.   **Brazos essentially concedes it failed to plausibly allege the Transaction was unconscionable.**

10.   Brazos makes only a halfhearted attempt to defend its claim that the Transaction was unconscionable. For example, Brazos cites to *In re Olshan Foundation Repair Co.* for the proposition that "Texas further *recognizes* both substantive and procedural unconscionability."[5]

---

[3]   Resp. ¶ 34 (quoting *Singleton v. Thompson*, 2005 WL 8165009, at *1 (S.D. Tex. July 19, 2005)).
[4]   *See, e.g.*, Resp. ¶ 47 ("this a fact issue to be resolved after considering all of the *evidence*...").
[5]   Resp. ¶ 44.

*See* 328 S.W.3d 883, 892 (Tex. 2010). It then suggests *Olshan* creates an either-or test between the two—it doesn't. Binding Fifth Circuit precedent requires that "[u]nder Texas law, [Brazos] must prove **both** substantive and procedural unconscionability to prevail on the unconscionability issue." *Arkwright-Boston Mfrs. Mut. Ins. Co. v. Westinghouse Elec. Corp.*, 844 F.2d 1174, 1184 (5th Cir. 1988) (emphasis added). This was recently followed by the Southern District of Texas. *See Proske v. Barrett Daffin Frappier Truner & Engel, LLP*, 2019 WL 5787739, at *3 (S.D. Tex. Nov. 6, 2019) ("Under Texas law, the party asserting unconscionability of a contract bears the burden of proving both procedural and substantive unconscionability." (quoting *Ski River Dev., Inc. v. McCalla*, 167 S.W.3d 121, 135 (Tex. App.—Waco 2005, pet. denied))).

11. This is crucial because Brazos actually concedes it has not alleged substantive unconscionability by asking the Court to allow it to take discovery first, before sufficiently pleading its claim. Rather than defend its pleading, Brazos asks the Court to apply a summary judgment standard and argues that "this a fact issue to be resolved after considering all of the evidence and certainly inappropriate to consider on a motion to dismiss."[6] This puts the cart before the horse. Before Brazos can argue a fact issue at the summary judgment stage, it has to sufficiently plead a claim. It hasn't, and that ends the inquiry. *See, e.g.*, *Bittick v. JPMorgan Chase Bank, NA*, 2012 WL 1372126, at *8 (N.D. Tex. Apr. 18, 2012) (granting motion to dismiss because plaintiff failed to plead sufficient allegations of substantive unconscionability).

12. Even if Brazos's claim could be based solely on procedural unconscionability, it would still fail. Brazos completely ignores binding caselaw, including *Fleetwood Enterprises, Inc. v. Gaskamp*, limiting procedural unconscionability to "situations in which one of the parties appears to have been incapable of understanding the agreement." 280 F.3d 1069, 1077 (5th Cir.

---

[6] Resp. ¶ 46.

2002) (collecting cases). These typically occurs only when a party is illiterate. *See, e.g.*, *Delfingen US-Tex., L.P. v. Valenzuela*, 407 S.W.3d 791, 800 (Tex. App.—El Paso 2013, no pet.).

13.  Rather than address those points, Brazos relies on a single, unpublished decision, *White v. Ameriquest Mortgage*, to argue there is a multifactor test to evaluate unconscionability claims.[7] *See* 2019 WL 2297572 (S.D. Tex. May 30, 2019). But *White* is not the silver bullet Brazos makes it out to be. For one, the case only lists "factors that **may** be considered." *Id.* at *5 (emphasis added). But more to the point, even after evaluating these factors, the court held that plaintiffs failed to establish unconscionability, in part because they had not "identified or submitted evidence raising an inference that they lacked an opportunity to read the documents." *Id.* In other words, the plaintiffs' failure in *White* is the same as Brazos's failure here: no allegation of inability to understand (or read) the Transaction. That is dispositive of Brazos's claim.

### C.  Brazos concedes that the Texas DTPA does not apply, and it may not be rewritten to make the Transaction illegal or against public policy.

14.  Brazos concedes that it cannot bring a cause of action directly under the Texas DTPA.[8] Nevertheless, Brazos baldly asserts—without any legal support—that the price gouging prohibition under the Texas DTPA is "universally applicable."[9] This is incorrect.

### i.  The express exclusion of the Transaction from the DTPA must be applied.

15.  The statute contains an express exception: "Nothing in this subchapter shall apply to . . . a transaction . . . of more than $500,000." Deceptive Trade Practices—Consumer Protection Act, TEX. BUS. & COM. CODE ("DTPA") § 17.49(g). Brazos acknowledges this exception,[10] but then ignores it, arguing that price gouging are unlawful and against public policy under the DTPA,

---

[7] Resp. ¶¶ 48–53.
[8] Resp. ¶ 56 ("Brazos has not asserted an affirmative cause of action under section 17.50").
[9] Resp. ¶ 55.
[10] Resp. ¶ 58.

even while stating it is not "assert[ing] an affirmative cause of action" under the DTPA.

16. Brazos also admits that "[s]tatutes must be applied as written and accorded the plain meaning of the statutory text,"[11] but ignores the controlling Texas Supreme Court precedent that limits the circumstances in which a contract can be found illegal only to those where it "would create ***an actual conflict*** with the statute." *Phil. Indem. Ins. Co. v. White*, 490 S.W.3d 468, 484 (Tex. 2016) ("We thus adopt a more measured approach that harmonizes the importance of contractual liberty with legislatively enacted public-policy limitations."). The reviewing Court must consider the specific "limitations" of the relevant statute. *Id.* The Texas DTPA contains an express limitation on both its applicability of scope and private right of action. *See* DTPA §§ 17.01, *et seq*. These limitations must be applied when looking at the Transaction between Brazos and Total for the purchase and sale of natural gas. And when applied, it is evident that the DTPA does not make the Transaction illegal or against public policy.

17. To apply this statute would violate Texas law for two reasons: (1) it "necessarily imperils freedom of contract" and (2) it "substitutes the policy views of individual judges for those of the Legislature." *Phil. Indem. Ins. Co.*, 490 S.W.3d at 483–84. Brazos does not allege that the NAESB-governed Transaction was illegal on its face. And this Court may not rewrite the DTPA by striking out express limitations to invalidate the Transaction. *See Merry Homes, Inc. v. Chi Hung Luu*, 312 S.W.3d 938, 945 (Tex. App.—Houston [1st Dist.] 2010, no pet.) ("If the illegality does not appear on the contract's face, a court will not find it void."). Similarly, it "cannot rewrite . . . a plainly worded statute because [it] believe[s] it does not effectuate sound policy." *Tijerina v.*

---

[11] *See* Resp. ¶ 55. Brazos cites to *Estate of Cowart v. Nicklos Drilling Co.* which is a case proceeding under federal law rather than Texas law. *See* 505 U.S. 469, 476–77 (1992). Texas law is, however, similar: "[i]n interpreting statutes, we must look to the plain language, construing the text in light of the statute as a whole." *See, e.g.*, *Silguero v. CSL Plasma, Inc.*, 579 S.W.3d 53, 59 (Tex. 2019).

*City of Tyler*, 846 S.W.2d 825, 828 (Tex. 1992). Even if the Court "do[es] not approve of the wisdom of the Legislature's decision . . . [it is] called upon to apply a statutory command even when it produces a policy of which [the Court] disapprove[s]." *Id.* at 828.

### ii. Brazos's nonprofit structure does not change the DTPA's inapplicability.

18. Brazos's corporate nonprofit structure is a red herring. Brazos offers no legal support for its request that the Court look past its corporate veil to the ultimate purchasers of its electricity, thus entitling Brazos to covered status under the DTPA.[12]

19. Under Tex. Util. Code § 161.059(a) the nonprofit status of Brazos gives it no different or better rights against its creditors. Instead, such nonprofit electric co-ops may "make any contracts necessary or convenient for the exercise of the powers granted by" Chapter 161 of the Utilities Code, governing electric co-ops, "contract indebtedness, issue obligations for its indebtedness," "sue and be sued in its corporate name," or "perform any other acts … that may be necessary, convenient or appropriate to accomplish the purpose for which the cooperative is organized." TEX. UTIL. CODE § 161.121.

### D. Brazos does not argue fraudulent transfer under Texas law in its Response, and *Janvey v. Golf Channel, Inc.* prevents its claim.

20. Brazos appears to have dropped its third cause of action under the Texas Uniform Fraudulent Transfer Act ("TUFTA").[13] It has certainly provided no basis to dispute the dispositive application of *Janvey v. Golf Channel, Inc.* to this litigation. *See* 487 S.W.3d 560 (Tex. 2016). The *Janvey* court emphasized that if "an exchange occurred for market-value rates in an arm's-length transaction," then this "conclusively establishes that the value exchanged was 'reasonably equivalent.'" *Id.* at 582 (citing Texas Uniform Fraudulent Transfer Act, TEX. BUS. & COM. §§

---

[12] *See* Resp. ¶ 61.
[13] *See generally* Resp. (Brazos makes no arguments in support of its claim under TUFTA separate from its claim for constructive fraudulent transfer under the Bankruptcy Code).

24.004(d), 24.009(a)). That the Transaction occurred at "arm's-length" is both uncontested and legally presumed. *See Earman Oil Co., Inc. v. Burroughs Corp.*, 625 F.2d 1291, 1300 (5th Cir. 1980) ("In commercial settings such as the instant one, businessmen are presumed to act at arms [sic] length."). The *Janvey* court also clarified that "both value and reasonable equivalency are determined as of the time of the transaction, not in hindsight." *Id.* at 569.

21.     With "arm's-length transaction" established, the only remaining question is whether Brazos received value in the form of actual, useable natural gas from Total. *See id.* at 581 ("We ask whether the debtor received value (i.e. whether the debtor received consideration with objective, economic value, not merely consideration with some subjective, ephemeral, or emotional value) and whether the value exchanged was reasonably equivalent."). In other words, "value exists when the debtor took consideration that had objective value at the time of the transfer, even if the consideration neither preserved the debtor's estate nor generated an asset or benefit that could be levied to satisfy unsecured creditors." *Id.* at 577. Brazos's allegations show that TotalEnergies not only sold incredibly valuable natural gas to Brazos during the Winter Storm, but that it did so at a lower price than contemporaneous arm's-length transactions.[14]

### E. Brazos likewise has not pleaded a fraudulent transfer under federal law, as the Transaction was at arm's-length and price fluctuations cannot be considered.

22.     Brazos's constructive fraudulent transfer theory under the Bankruptcy Code is similarly flawed. Brazos alleges just two supporting facts: (1) the prices Brazos willingly agreed to pay during Winter Storm Uri were higher than the index price at the Natural Gas-East Texas ("NGPL TEXOK") hub and (2) the prices Brazos willingly agreed to pay for natural gas exhibited an "approximately 35,000% increase in natural gas prices from February 1, 2021 to February 16,

---

[14]     *See* Compl. ¶ 43

2021."[15] This, it argues, "is more than enough."[16] But that is incorrect for several reasons.[17]

### i. There is no fact dispute preventing dismissal as a matter of law.

23.     Brazos does not dispute that a market price is evidence of "reasonably equivalent value" but asserts that it is a "fact-intensive" inquiry that may not be determined on a motion to dismiss.[18] Brazos does not, however, cite a single case supporting its proposition in the context of a publicly traded commodity, sold at arms-length, between sophisticated market participants. Instead, Brazos cites only one case, arguing that the reasonably equivalent value test is "at least fact-intensive."[19] *In re Erlewine*, 349 F.3d 205, 209 (5th Cir. 2003). Again, Brazos gets ahead of itself. That point may be true—on summary judgment. *Id.* (reviewing grant of summary judgment). But this is the pleading stage. And at this stage, Brazos asks the Court to overlook the opinion's very next sentence: "[c]ertain transactions, however, can give the debtor reasonably equivalent value as a matter of law." *In re Erlewine*, 349 F.3d at 209. The Fifth Circuit ***then went on to find that reasonably equivalent value had been received***. *Id.* at 211–12. In other words, even Brazos's caselaw supports dismissal in favor of TotalEnergies.

---

[15] Resp. ¶ 65.
[16] Resp. ¶ 65.
[17] TotalEnergies is not relying on the Texas Legislature's committee report for its argument that Brazos's Complaint fails to plead a plausible claim under Rule 12(b)(6) and the Court does not need to reach this issue to grant TotalEnergies's Motion. But Brazos's assertion that the Court cannot consider it is incorrect. The Court is allowed to consider legislative facts when evaluating a motion and does not even need to take judicial notice. See Fed. R. Evid. 201(a) ("This rule governs judicial notice of an adjudicative fact only, not a legislative fact."); cmt. ("Legislative facts . . . are those which have relevance to legal reasoning and . . . ruling by a judge"). Regardless, the report is not being referenced for the truth of the matter asserted and so is not hearsay.
[18] Resp. ¶ 65.
[19] Resp. ¶ 65.

      **ii.** **Price fluctuations cannot be considered to determine value as a matter of law, and the price at NGPL TEXOK hub is irrelevant to the value of the gas provided locally to Brazos's plant.**

24. Both of Brazos's attempts to construct an issue of fact where none exists fail. Brazos relies on the increase in prices prior to the Transaction to assert that the value of the natural gas was lower than the amount Brazos agreed to pay.[20] But courts in the Fifth Circuit are clear that reasonably equivalent value is determined at the time the transfer was made. *In re Am. Hous. Found.*, 544 F. App'x 516, 520 (5th Cir. 2013). Indeed, the price fluctuations for natural gas surrounding the Transaction are irrelevant to whether reasonably equivalent value was received ***as a matter of law***. *See In re Louisiana Pellets*, Inc., 838 F. App'x 45, 50 (5th Cir. 2000); *see also ASARCO LLC v. Americas Mining Corp.*, 396 B.R. 278, 337 (S.D. Tex. 2008) ("The Court should not consider subsequent events [such as an increase in the price of a commodity] . . . [and] avoid valuing an asset 'through the 20/20 vision of hindsight.'" (quoting *In re Jumer's Castle Lodge, Inc.*, 338 B.R. 344, 354 (C.D. Ill. 2006))).

25. Brazos's reference to the NGPL TEXOK hub price is another red herring. If gas was available to Brazos at these lower prices, why didn't Brazos purchase it? This question is left unanswered, but it is telling that Brazos does not allege either that it was able to purchase and receive gas at the NGPL TEXOK hub price or that TotalEnergies could have purchased and received gas at the NGPL TEXOK hub price *for delivery at Brazos's plant*. Indeed, the NAESB Contract reflects that the market prices of natural gas are a function of both time and location, as evidenced by the inclusion of a "Delivery Location" term. In other words, the market for natural

---

[20] *See* Resp. ¶ 65.

gas here consisted of the natural gas that Brazos could obtain and put to productive use (*i.e.*, by actually taking possession of it at its plant).[21] There is no allegation of any such natural gas.

### iii. Brazos's allegations fail to plead anything other than a voluntary, arms-length transaction at a market price.

26. Further, while Brazos characterizes the Gas Claimants as "multiple price gougers," Brazos alleges no collusion or coordination among these competitors to artificially raise or fix the price of natural gas. Brazos's Complaint shows each competitor independently charged disparate prices ranging from $133.61 to $250.40, with TotalEnergies's price being the lowest. An increase in price, resulting from market forces of increased demand and reduced supply, does not constitute price-gouging; it is fundamental economics 101.

27. Other courts have affirmed that "[a]n open market value, or simply, market value, has been further defined as that value that a prudent business person can obtain from the sale of an asset when there is a willing buyer and a willing seller." *In re Pioneer Home Builders, Inc.*, 147 B.R. 889, 892 (Bankr. W.D. Tex. 1992). There are no allegations in Brazos's Complaint that it was anything other than a willing (and sophisticated) buyer and TotalEnergies a willing seller.

28. Despite being a willing buyer in an open market, Brazos now seeks to have this Court annul and re-price the market transaction Brazos entered into in February 2020. This argument, which has dramatic policy implications for market participants who trade in goods in volatile markets, rests on the Court substituting its own judgment for that of Brazos and TotalEnergies, both sophisticated and experienced market participants, who entered into a voluntary arms-length transaction without any allegation of market manipulation or collusion. This is an incredible ask. The Court should find as a matter of law that Brazos received reasonably

---

[21] Brazos has acknowledged that certain gas lines throughout the state had frozen up during the storm. *See* C.A. No. 21-30725, Dkt. 3, "Karnei First Day Decl." ¶¶52–53.

equivalent value and dismiss counts 2 and 3 of its Complaint.

### F. Brazos also fails to plead insolvency at the time of the Transaction, providing an additional basis for dismissal under both TUFTA and Section 548(b).

29. Section 548(b) requires Brazos to have been insolvent at the time of the Transaction or to have become insolvent as a result. 11 U.S.C. § 548(b)(ii)(I). Similarly, Brazos's TUFTA claim requires it to plead allegations supporting a plausible inference that it was insolvent or about to become so. *See* TUFTA § 24.005. TotalEnergies only entered into a sale transaction with Brazos on one day of Winter Storm Uri—February 12, 2021.[22] Brazos makes numerous allegations relating to conditions during the Storm, including increased natural gas prices, much of which occurred after February 12.[23] But Brazos does not allege that it was insolvent on February 12, 2021. As such, this failure provides an additional and independent ground for the dismissal of Counts 2 and 3 of Brazos's Complaint.

### G. TotalEnergies' claim is entitled to administrative priority Status because the natural gas was purchased by Brazos in the ordinary course of its business.

30. There is no credible dispute that it is in the ordinary course of Brazos's business to purchase natural gas from sellers like TotalEnergies and use that natural gas to produce electricity.

#### i. The UCC should be applied to determine ordinary course of business.

31. Brazos's argument that this Court should not apply the UCC's definition of "ordinary course of business" is both incorrect and inapposite because the sale of gas in this case was in the ordinary course of business of both the buyer and the seller. Brazos argument that "the Uniform Commercial Code focuses on the seller's business" requirements reading only at a fragment of the UCC's definition.[24] Reading at the entire definition, it is clear that the "ordinary

---

[22] Compl. ¶ 42.
[23] *See* Compl. ¶¶ 1–2, 28, 30, 50–51, 56.
[24] Resp. ¶ 74.

course" analysis is focused squarely on the buyer:

> Buyer in the ordinary course of business' means a person that buys in good faith, without knowledge that the sale violates the rights of another person in the goods, and in the ordinary course from a person, other than a pawnbroker, in the business of selling goods of that kind.

UCC § 1-201(b)(9). Brazos focuses on the second sentence, which simply provides a further clarification of a buyer in the ordinary course of business, as being a purchaser who buys from a seller who makes a sale that comports with the usual or customary practices in the kind of business in which the seller is engaged. *See id*. Accordingly, other bankruptcy courts, including the District of Delaware, instruct that the UCC definition of ordinary course of business should be applied to a section 510(b)(9) claim. *See In re SemCrude, L.P.*, 416 B.R. 399 (Bankr. D. Del. 2009) ("There is nothing in the Code or in the legislative history accompanying the recent enactment of § 503(b)(9) suggesting that Congress intended that bankruptcy courts should look beyond the Uniform Commercial Code to construe or define [the terms "received," "sold," and "ordinary course of business"] as they apply to sales of goods.").

32. Keeping the focus squarely on Brazos, it is clear that Brazos's Complaint alleges it routinely engaged in similar natural gas purchases in the ordinary course of its business generating electricity.[25] Not only does Brazos not allege any material deviation from the "usual or customary practices" of TotalEnergies during the Transaction, it also does not allege any deviation from its "usual or customary practices" when negotiating the Transaction. *See* UCC § 1-201(b)(9).

    **ii.** **Brazos urges the adoption of a new "totality of the circumstances" test[26] but, even if applied, the Transaction was in the ordinary course of business.**

---

[25] *See* Compl. ¶¶ 1, 32.
[26] Resp. ¶ 75. Brazos does not rely on any caselaw in support of this test. The Court should not adopt this test as it is contrary to the plain language of section 503(b)(9) expressing legislative intent to provide greater rights to companies selling debtors vital goods on the eve of bankruptcy without worrying about credit risk or requiring cash. *See* 11 U.S.C 503(b)(9).

– 13 –

33. Even if this Court were to focus its analysis on the ordinary course of the "debtor's business" or any sort of "totality of the circumstances" test, the transactions were in the ordinary course of business. Brazos's business requires buying natural gas, and the Transaction was a purchase of natural gas. The market purchase of natural gas, the use of Brazos' regular agent for the purchases (ACES), and the fact that the sale was made pursuant to the parties' pre-existing NAESB contract, which had been in place for nearly 20 years, all demonstrate that the Transaction was in the ordinary course of business.[27] Indeed, Brazos cannot point to anything other than price, which fluctuated based on market conditions pursuant to the NAESB contract, exactly as it had for the prior decades, to assert that the Transaction was outside the ordinary course of its business.

### H. When Brazos received natural gas, it received "value" during the 20-day period prior to filing for bankruptcy.

34. "Value" should be defined in reference to the UCC, which in turn defines it as either the contract price or "any consideration sufficient to support a simple contract." UCC § 1-204. The Transaction clearly meets this definition. But even if the Court adopted Brazos's definition and decided to "value the commodity based on the price at which it could be purchased during the relevant period on the commodity market,"[28] the test is satisfied.

35. Brazos argues that the value of the natural gas purchased from TotalEnergies must be based on "the proposed disposition or use of [the] property."[29] *In re Pilgrim's Pride Corp.*, 421 B.R. 231, 242–43 (Bankr. N.D. Tex. 2009). Even if this were the correct standard, Brazos used the natural gas purchased from TotalEnergies to produce electricity. There can be no dispute that electricity prices at the time of the Transaction were incredibly high.[30] Thus, based on Brazos's

---

[27] *See* Mot. ¶ 51, Ex. A.
[28] Resp. ¶ 80.
[29] Resp. ¶ 78.
[30] *See* Karnei First Day Decl. ¶ 7 (describing the high price of electricity).

own allegations and supporting caselaw, the Transaction was for "value."

36. Brazos also quotes *Pilgrim's Pride* as stating that "the debtor 'should also pay as an administrative expense under section 503(b)(9) what it would have cost [debtor] to acquire similar goods.'"[31] *Id.* This fully supports TotalEnergies's position. Brazos alleges the prices it was able to acquire natural gas for on February 12 ranged from $140.00 to $250.40 per MMBtu.[32] All of these prices were higher than the $133.61 per MMBtu that TotalEnergies agreed to sell natural gas at in the Transaction.[33] Although Brazos refers to the price listed at the NGPL TEXOK Hub, as discussed above, there is no allegation that Brazos had any ability to acquire or use natural gas from the NGPL TEXOK Hub at the time of the Transaction.

### I. Brazos has not stated a sufficient basis on which repleading could cure the defects within its Complaint, and so dismissal should be with prejudice.

37. Brazos has not even attempted to show how it could or would cure the pleading deficiencies identified by TotalEnergies, offering only a boilerplate request for the leave to replead. The Fifth Circuit has held that denying leave to amend is appropriate when a plaintiff fails to show how it could cure the identified deficiencies and plead a plausible claim. *See, e.g., McKinney v. Irving Indep. Sch. Dist.*, 309 F.3d 308, 315 (5th Cir. 2002) (holding denial of leave to amend proper where "the plaintiffs did not demonstrate to the court how they would . . . cure the pleading defects raised"). Brazos has not shown how it could cure the deficiencies in its pleading. Nor can it, because they are incurable. Accordingly, dismissal should be with prejudice.

---

[31] Resp. ¶ 80.
[32] *See* Compl. ¶ 42.
[33] *See* Compl. ¶ 42.

Dated: March 2, 2022                                    Respectfully submitted,

**AHMAD, ZAVITSANOS, ANAIPAKOS,
   ALAVI & MENSING PC**

*/s/ Jason S. McManis*
Demetrios Anaipakos
State Bar No. 00793258
Federal I.D. 20323
Monica Uddin
State Bar No. 24075195
Federal I.D. 1138459
Jason S. McManis
State Bar No. 24088032
Federal I.D. 3138185
Alexander M. Dvorscak
State Bar No. 24120461
Federal I.D. 3610557
1221 McKinney Street, Suite 2500
Houston, Texas 77010
Tel: (713) 655-1101
Fax: (713) 655-0062
danaipakos@azalaw.com
muddin@azalaw.com
jmcmanis@azalaw.com
advorscak@azalaw.com

**CLEARY GOTTLIEB STEEN & HAMILTON LLP**

Jane VanLare (*pro hac vice*)
John Veraja (*pro hac vice*)
One Liberty Plaza
New York, New York 10006
Telephone: (212) 225-2000
Facsimile: (212) 225-3999
jvanlare@cgsh.com
jveraja@cgsh.com

**COUNSEL TO TOTAL GAS & POWER NORTH AMERICA, INC.**

## CERTIFICATE OF SERVICE

    I certify that on March 2, 2022, a true and correct copy of the foregoing document was electronically filed with the Clerk of the Court using the CM/ECF system, which automatically sends notifications of such filings to all attorneys of record.

*/s/ Alexander M. Dvorscak*
Alexander M. Dvorscak
