**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | |
|---|---|
| In re:<br><br>BRAZOS ELECTRIC POWER<br>COOPERATIVE, INC.,<br><br>Debtor.[1] | Chapter 11<br><br>Case No. 21-30725 (DRJ) |
| BRAZOS ELECTRIC POWER<br>COOPERATIVE, INC.,<br><br>Plaintiff,<br><br>v.<br><br>507 Capital LLC; 507 Summit LLC; Cetus<br>Capital VI, L.P.; Chase Lincoln First<br>Commercial Corporation; Citigroup Financial<br>Products Inc.; CrossingBridge Low Duration<br>High Yield Fund; Destinations Global Fixed<br>Income Opportunities Fund; Destinations Low<br>Duration Fixed Income Fund; Koch Energy<br>Services LLC; Leaffilter North Holdings, Inc.;<br>NJR Energy Services Co.; OFM II, LP; OU 2<br>LLC; RiverPark Short Term High Yield;<br>RiverPark Strategic Income Fund; Total Gas<br>& Power North America, Inc.; and Two Seas<br>Global (Master) Fund LP,<br><br>Defendants. | Adv. Proc. No. 21-04407 (DRJ) |

**THE DEBTOR'S FIRST AMENDED COMPLAINT OBJECTING TO PROOFS OF
CLAIM RELATED TO CERTAIN NATURAL GAS SALES TO THE DEBTOR**

Brazos Electric Power Cooperative, Inc. ("Brazos" or the "Debtor") files this omnibus

objection (this "Objection") objecting to the amounts and classification of the proofs of claim filed

---

[1] The Debtor in this Chapter 11 case, along with the last four digits of its federal tax identification number is Brazos Electric Power Cooperative, Inc. (4729). Additional information regarding this case may be obtained on the website of the Debtor's claims and noticing agent at http://cases.stretto.com/Brazos. The Debtor's address is 7616 Bagby Avenue, Waco, TX 76712.

by 507 Capital LLC (216); 507 Summit LLC (106); Cetus Capital VI, L.P. (113, 110, 214); Chase Lincoln First Commercial Corporation (335); Citigroup Financial Products Inc. (385); CrossingBridge Low Duration High Yield Fund (115, 207); Destinations Global Fixed Income Opportunities Fund (213); Destinations Low Duration Fixed Income Fund (114, 208); Leaffilter North Holdings, Inc. (110, 210); NJR Energy Services Co. ("NJR") (167); OFM II, LP (108, 110, 114, 115, 215); OU 2 LLC (211); RiverPark Short Term High Yield (113, 206); RiverPark Strategic Income Fund (212); Total Gas & Power North America, Inc. ("Total") (350); and Two Seas Global (Master) Fund LP (106)  (collectively the "Gas Claimants" and the "Gas Claims").[2]   A chart of the Gas Claims subject to the objections herein is attached as **Exhibit A**, which is incorporated herein for all purposes.

## I.    NATURE OF THE ACTION

1.    In February of 2021, Brazos purchased natural gas from 11 different suppliers that it then used to generate electricity at its Jack County power plant.  Those trades were entered into by Brazos's agent, Alliance for Cooperative Energy Services Power Marketing, LLC ("ACES").  Of the approximately $180 million in claims asserted against Brazos for natural gas it received in February of 2021, almost $170 million (94%) are for gas trades executed in the seven days from February 12th to February 18th (the "Contested Period"), during the height of Winter Storm Uri.  About $60 million of these claims are for gas trades executed on February 16th alone—the day after the Electric Reliability Council of Texas, Inc. ("ERCOT") intervened in the electricity market by artificially setting electricity prices at $9,000/MWh.

2.    In this Objection, Brazos objects to certain portions of the Gas Claims that are attributable to gas sales by 6 of the 11 gas suppliers that sold it gas during February of 2021:  NJR,

---

[2] Numbers in the parentheticals denote the claim number in the Debtor's official Claims Register.

Total, Mercuria Energy America, LLC ("Mercuria"), Concord Energy LLC ("Concord"), Tenaska Marketing Ventures ("Tenaska"), and ETC Marketing, Ltd. ("ETC") (collectively the "Gas Suppliers"). Each of the Gas Suppliers charged Brazos prices ranging from a low of $133.61/MMBtu on February 12, 2021 to a high of $950/MMBtu on February 16, 2021. For context, such prices are about 5,000% to 35,000% above the average price that Brazos was charged for gas on February 1, 2021 ($2.72/MMBtu). Moreover, this price range is $120.00/MMBtu to $925.69/MMBtu (882% to 3,837%) above the relevant market index price (NGPL TX-OK) that Brazos, ACES, and the Gas Suppliers traditionally keyed their prices to during times where business was carried out in its ordinary course. In other words, the Gas Claimants seek to impose obligations on Brazos that are for $120.00/MMBtu to $925.69/MMBtu above the fair market value of the gas delivered to Brazos.

3.     While Brazos does not yet know exactly what each of the Gas Suppliers paid for the relevant gas, about 80% of the gas delivered to Brazos during the Contested Period was from gas storage facilities that are connected to the Debtor's Jack County power plant. This indicates that the Gas Suppliers are likely seeking windfall profits for gas that they purchased at more normal prices and stored well before the Contested Period.[3] Typically, gas that is held in a storage facility is purchased at relatively low prices and stored so that it can later be used or sold when prices increase. For example, Nortex Midstream Partners LLC, who owns the Worsham-Steed gas storage facility from which most of the relevant gas was withdrawn, estimates that the average cost of the gas delivered from the Worsham-Steed gas storage facility during Winter Storm Uri was originally delivered into such storage facility at a price of just $2.50/MMBtu.[4] None of the Gas Suppliers have

---

[3] In other words, the Gas Claimants did not "buy high and sell high," but rather "bought low and sold very high," extracting enormous profits.
[4] See https://www.nortexmidstream.com/sites/default/files/2021-08/NorTexWhitePaper_August2021.pdf.

3

claimed to have just been passing along exorbitant prices to Brazos and at least one of the Gas Suppliers (i.e., NJR) concedes that it seeks windfall profits on gas it purchased prior to Winter Storm Uri.

4.      Brazos is not objecting to claims by four other gas suppliers that charged prices as high as $25.00/MMBtu, which is almost ten times the pre-Uri price.  Brazos has already settled claims by a fifth gas supplier.  Brazos is also not objecting to trades with Gas Suppliers that were executed before or after the Contested Period, even though those trades also seek windfall profits and were for as much as $29.00/MMBtu (more than ten times the pre-Uri price).  Brazos is only objecting to the portions of the Gas Claims that are seeking as much as 5,000% to 35,000% above the pre-Uri price.  **Exhibit B** attached hereto and incorporated herein for all purposes lists the twenty (20) trades with the Gas Suppliers to which Brazos objects (the "Contested Trades") and the amount of each overcharge objected to.

5.      Brazos is objecting to the most extreme prices charged by the Gas Suppliers because those suppliers chose to extort Brazos during the Contested Period knowing that Brazos was only buying gas at such high prices because it had a duty to provide as much electricity as possible to support the Electric Reliability Council of Texas ("ERCOT") grid and to protect the lives of power consumers in ERCOT, including the customers of its sixteen non-profit electric cooperative distribution members (the "Members").  Each of the Gas Claims arises out of an egregious price-gouging scheme that occurred during a once in a life-time storm. The Gas Suppliers knew that Brazos had no choice but to pay extortionate prices and took advantage of the situation.  For these reasons, Brazos asserts five (5) objections to each of the relevant claims.

6.      In Count 1, Brazos objects to the Gas Claims pursuant to 11 U.S.C. § 502(b)(1) because the purported agreements underlying the Gas Claims are not enforceable for at least three

independent reasons: (i) they are unconscionable, (ii) they are contrary to public policy, and (iii) they require the performance of an illegal act.

    a.    <u>Unconscionable</u>.  The Gas Suppliers knew that Brazos faced a Hobson's choice during Winter Storm Uri: Buy gas at extortionate prices or allow Texans to die.  The Gas Suppliers chose to charge shockingly high prices knowing that Brazos had no viable alternative to paying those prices.

    b.    <u>Contrary to Public Policy</u>.  Price-gouging *consumers* during a declared disaster is illegal under the Texas Deceptive Trade Practices Act ("<u>DTPA</u>").  As the Gas Claimants are well aware, Brazos, a non-profit, can only pay the exorbitant Gas Claims by passing the relevant costs on to its non-profit Members, which would then have to further pass them along to their consumer members in the form of increased rates.  It is contrary to public policy to force Brazos to pass along exorbitant costs to Texas consumers.

    c.    <u>Require the Performance of an Illegal Act</u>.  Moreover, because enforcing the obligations asserted in the Gas Claims would necessarily lead to the price-gouging of consumers, enforcing the underlying agreements would require the performance of an illegal act.

7.    In Counts 2 and 3, Brazos objects to the Gas Claims because certain obligations that the Gas Suppliers seek to enforce constitute constructively fraudulent obligations under both 11 U.S.C. § 548 and the Texas Uniform Fraudulent Transfer Act, TEX. BUS. & COM. CODE § 24.005, as incorporated by 11 U.S.C. § 544(b).  Each of the Contested Trades seek to impose obligations on Brazos for which Brazos did not receive reasonably equivalent value.  The Contested Trades were not arm's length transactions entered into in the ordinary course of the Debtor's business.  The amounts of the Contested Trades seek prices that are far higher than the relevant market value, as further detailed in **<u>Exhibit B</u>**.  Moreover, during the Contested Period, Brazos (i) became insolvent, (ii) was engaged in or was about to engage in transactions for which its remaining assets were unreasonably small capital, or (iii) was incurring debts, or intended to incur debts, it could not pay in an effort to protect consumers from life threatening conditions.

5

8.     Finally, Counts 4 and 5 object to the Gas Claimants' assertions that their claims are entitled to administrative priority under 11 U.S.C. § 503(b)(9).  As further described herein, most of the Gas Claimants acquired their claims from direct Gas Suppliers and assert not only claims for exorbitant gas prices that constitute price gouging, but audaciously twist the knife in contending that the majority of such claims qualify under Section 503(b)(9) of the Bankruptcy Code for priority administrative expense status—a status (above all other unsecured creditors) that is held only for the *value* of goods received by the Debtor within 20 days of the bankruptcy filing that were sold to the Debtor *in the ordinary course of the Debtor's business*.  Nothing that happened during the Winter Storm Uri state of emergency (as proclaimed by both the President of the United States and the Governor of the State of Texas) was in Brazos's ordinary course of business.  Moreover, price gouging to the tune of 35,000% above normal gas prices[5] does not reflect the true "value" of the gas received by Brazos. This kind of flagrant price-gouging of natural gas, which is critical to the generation of electricity at Brazos's plants, is patently unjust to Brazos, its Members, the Texas consumers who would ultimately have to bear the burden of such unconscionable prices, and many of Brazos's other creditors that charged fair prices for their goods and services and did not use Winter Storm Uri as an excuse to pillage.

9.     For these reasons, Brazos objects to the portion of each Gas Claim that is unenforceable, as further detailed in Exhibit B, and asks the Court to reclassify the allowed portion of the Gas Claims related to the Contested Period as general unsecured claims that do not qualify for administrative expense status under Section 503(b)(9) of the Bankruptcy Code.

---

[5] Discussions of gas prices on a given date in this Objection refer to the date on which an order for gas was made not the date of delivery of that gas.

## II.      THE PARTIES

10.      Plaintiff Brazos Electric is a Texas non-profit electric cooperative corporation pursuant to Section 161.059 of the Texas Utilities Code, located at 7616 Bagby Ave. Waco, Texas 76712.  It is owned by its sixteen member cooperatives, which are also Texas non-profit electric cooperative corporations.  On March 1, 2021 (the "Petition Date"), Brazos filed a petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").  Brazos is operating its business and managing its properties as debtor-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

11.      507 Capital LLC has purchased claims that derive from natural gas sales to the Debtor by Mercuria.  This entity has appeared in this Adversary Proceeding.

12.      507 Summit LLC has purchased claims that derive from natural gas sales to the Debtor by Concord.  This entity has appeared in this Adversary Proceeding.

13.      Cetus Capital VI, L.P. has purchased claims that derive from natural gas sales to the Debtor by Concord and Mercuria.  This entity has appeared in this Adversary Proceeding.

14.      Chase Lincoln First Commercial Corporation has purchased claims that derive from natural gas sales to the Debtor by Tenaska.  This entity has appeared in this Adversary Proceeding.

15.      Citigroup Financial Products Inc. has purchased claims that derive from natural gas sales to the Debtor by ETC.  This entity has appeared in this Adversary Proceeding.

16.      CrossingBridge Low Duration High Yield Fund has purchased claims that derive from natural gas sales to the Debtor by Concord. This entity has appeared in this Adversary Proceeding.

17.     Destinations Global Fixed Income Opportunities Fund has purchased claims that derive from natural gas sales to the Debtor by Mercuria.  This entity has appeared in this Adversary Proceeding.

18.     Destinations Low Duration Fixed Income Fund has purchased claims that derive from natural gas sales to the Debtor by Concord. This entity has appeared in this Adversary Proceeding.

19.     Leaffilter North Holdings, Inc. has purchased claims that derive from natural gas sales to the Debtor by Concord.  This entity has appeared in this Adversary Proceeding.

20.     NJR sold natural gas to the Debtor.  This entity has appeared in this Adversary Proceeding.

21.     OFM II, LP has purchased claims that derive from natural gas sales to the Debtor by Concord and Mercuria.  This entity has appeared in this Adversary Proceeding.

22.     OU 2 LLC has purchased claims that derive from natural gas sales to the Debtor by Mercuria.  This entity has appeared in this Adversary Proceeding.

23.     RiverPark Short Term High Yield has purchased claims that derive from natural gas sales to the Debtor by Concord and Mercuria.  This entity has appeared in this Adversary Proceeding.

24.     RiverPark Strategic Income Fund has purchased claims that derive from natural gas sales to the Debtor by Mercuria.  This entity has appeared in this Adversary Proceeding.

25.     Total sold natural gas to the Debtor.  This entity has appeared in this Adversary Proceeding.

26.     Two Seas Global (Master) Fund LP has purchased claims that derive from natural gas sales to the Debtor by Concord. This entity has appeared in this Adversary Proceeding.

4896-1399-9138.8

### III.    JURISDICTION, VENUE, AND AUTHORITY

27.    This Court has jurisdiction over the subject matter of this proceeding pursuant to 28 U.S.C. § 1334 because this is a civil proceeding arising under the Bankruptcy Code, or arising in or related to the Debtor's case under Chapter 11 of the Bankruptcy Code.

28.    Venue in this District and Division is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

29.    The bases for the relief requested herein are Sections 105(a), 501, 502, 503, 544, 548, 558, and 1107 of the Bankruptcy Code, Rules 3007, 3012, and 7001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rule 3007-1 of the Bankruptcy Local Rules (the "Local Rules").

30.    This matter is a core proceeding pursuant to 28 U.S.C. § 157(b), and this Court may enter a final order consistent with Article III of the United States Constitution.  This Court has constitutional authority to enter final orders with respect to the relief requested herein.  The Debtor further confirms its consent to this Court's entry of final orders or judgments on these Objections if it is later determined that, in the absence of the consent of the parties, this Court does not have constitutional authority to enter final orders or judgments.

### IV.    FACTUAL BACKGROUND

A.    **The Debtor**

31.    Headquartered in Waco, Texas and founded in 1941, Brazos is the largest and oldest generation and transmission electric cooperative in Texas.  It supplies wholesale power for its sixteen Member distribution cooperatives, which in turn provide power to approximately 1.5 million Texans.  Brazos's Members' service territory extends across 68 counties from the Texas Panhandle to Houston, ultimately delivering electricity to over 700,000 electric meters.  Brazos owns and operates more than 2,713 miles of transmission line and over 300 substations and wholesale metered

points of delivery and is the seventh largest transmission provider in the ERCOT system. Brazos owns approximately 2,600 megawatts ("MW") of generation capacity to be dispatched by ERCOT,[6] which amounts to approximately 3% of the total ERCOT installed generation capacity.

32.     Prior to the unprecedented and catastrophic energy crisis in February 2021, when Winter Storm Uri blanketed the entire State of Texas with snow, ice, and sub-freezing temperatures, Brazos was a model of financial stability. By aggregating the distribution needs of its electric cooperative Members to obtain best-in-class generation and transmission facilities through low-cost financing, Brazos maintained an "A+" and "A" issuer credit ratings from Fitch and S&P, respectively, prior to the events leading to the Chapter 11 filing.[7]

33.     During the eight decades prior to Winter Storm Uri, Brazos consistently met the generation, transmission, and distribution substation needs of its Members and maintained an impeccable financial record, even as Texas's population exploded during this period.

34.     Brazos's Chapter 11 filing was precipitated by the exorbitant prices ERCOT[8] and the Gas Suppliers charged Brazos for the energy and natural gas required to serve its Members' during Winter Storm Uri.

35.     In the aggregate, the Gas Claims add up to approximately $180 million in charges for natural gas, almost all of which occurred during Winter Storm Uri, when the Gas Suppliers raised prices as much as 35,000% during the Contested Period.

---

[6] ERCOT's rules, known as "Protocols," "provide the framework for the administration of the Texas electricity market." *BP Chems., Inc. v. AEP Tex. Cent. Co.*, 198 S.W.3d 449, 452 (Tex. App.—Corpus Christi 2006, no pet.).

[7] *See* S&P Global Ratings, Brazos Electric Power Cooperative Inc., Brazos Sandy Creek Electric Cooperative Inc.; Rural Electric Coop, Jan. 26, 2021; Fitch Ratings, Fitch Affirms Brazos Electric Power Cooperative, Inc. TX IDR at 'A+' – Outlook Positive, dated June 18, 2020.

[8] On August 18, 2021, the Debtor filed Adversary Proceeding No. 21-03863 contesting ERCOT's $1.9 billion proof of claim.

4896-1399-9138.8

B.      **Natural Gas Pricing in Debtor's Ordinary Course of Business**

36.      As mentioned above, ACES is Debtor's agent for purposes of procuring natural gas.

37.      All of the gas purchases at issue in this Objection were for gas to be burned at Debtor's Jack County power plant, a 1,210-megawatt, natural gas-fired, combined-cycle power plant located near Jacksboro, Texas.

38.      In the ordinary course of its business, Debtor buys gas for delivery at the Worsham-Steed gas storage facility, a depleted oil and gas reservoir that is directly connected to Debtor's Jack County power plant.

39.      Worsham-Steed is connected to major natural gas pipelines.  Typically, Brazos buys gas based on the NGPL TX-OK natural gas index price plus some addition or subtraction, called the "basis," to account for the distance between NGPL TX-OK and Worsham-Steed.  In its internal analyses, both Brazos and ACES most often refer to TX-OK as the most relevant data point in determining an appropriate market price for gas to be delivered to its Jack County power plant. Between February 1, 2021 and February 10, 2021, Debtor entered into at least 30 separate trades for natural gas to be delivered to Worsham-Steed that were keyed to the TX-OK index price with a basis of minus $0.02 to plus $0.40.  In other words, during this period, Debtor agreed to prices that ranged from "TX-OK - $0.02" to "TX-OK + $0.40."  ETC, Tenaska, Mercuria, and Total all entered into trades with Debtor that were keyed to TX-OK plus or minus some basis within this range during this period (February 1-10, 2021).

40.      Besides Worsham-Steed, during early February 2021, other delivery points that were used in Debtor's gas trades were also keyed to TX-OK, including deliveries to the Hill Lake gas storage facility and the EnLink Midstream LLC's Bridgeport gas processing plant.  These trades ranged from TX-OK + $0.01 to TX-OK + $0.48.

4896-1399-9138.8

41.     During January 2021, the total gas prices charged to Brazos by the Gas Suppliers averaged approximately $2.58/MMBtu.   During the entirety of calendar year 2020, gas prices charged to Brazos in the ordinary course of Brazos's business averaged $1.80/MMBtu and never exceeded $3.10/MMBtu, even during the heat of summer and the cold of winter.   As of February 1, 2021, the gas prices charged to Brazos averaged $2.72/MMBtu.   These prices drastically and unexpectedly increased shortly thereafter as Winter Storm Uri approached—and crescendoed during the Contested Period.

**C.     Price Gouging During Winter Storm Uri**

42.     Late in the afternoon on Monday, February 8, 2021, ERCOT issued an emergency Operating Condition Notice ("OCN")[9] report for "an extreme cold weather system approaching Thursday, February 11, 2021."   An OCN is only for informational purposes and is used to notify generators of a possible future need for more resources. An OCN does not give ERCOT the authority to require more resources to be available due to the possibility of an emergency.

43.     The next day, on Tuesday, February 9, 2021, the National Weather Service issued a State of Texas Weather Briefing warning of dangerously cold winter weather, including freezing rain.[10]

44.     On Wednesday, February 10, 2021, ERCOT issued an "Advisory" for the "predicted extreme cold weather event for the ERCOT region."[11]   On this same date, the Emergency

---

[9] An "Operating Condition Notice" is the first of three levels of communication issued by ERCOT in anticipation of a possible emergency condition. Protocol 2.1; Protocol 6.5.9.3.1.

[10] Attachment to Email from Shawn Hazard, Emergency Management Coordinator, PUCT to Kasey Feldman *et al* (Feb. 10, 2021 09:58 CST) (Response by Public Utility Commission of Texas to Texas Public Information Act Request, Bates labeled PUCT 0000352-64).

[11] An "Advisory" is the second of three levels of communication in anticipation of a possible emergency condition, but it is not the establishment of an emergency condition. Protocols 2.1; Protocols 6.5.9.3.2. Advisory *available at* http://www.ercot.com/services/comm/mkt_notices/notices/2021/02 (issued at 17:09:45 on Feb. 10, 2021).

4896-1399-9138.8

Management Coordinator of the Public Utility Commission of Texas (the "<u>PUCT</u>") sent an email to several market participants warning that "this Arctic Air Mass is expected to make it all the way down to the [Rio Grande] Valley!"[12]

45.     After the foregoing news from ERCOT and PUCT broke on February 10, 2021, the gas prices charged to Brazos by the Gas Suppliers jumped approximately 38% on average, from $3.36/MMBtu on February 9, 2021, to $4.63 on February 10th.

46.     North Texas experienced freezing rain on the evening of Wednesday, February 10, 2021, into Thursday, February 11, 2021. On Thursday, February 11, 2021, ERCOT issued a "Watch" for an extreme cold weather event.[13]  By the evening of February 11, 2021, the cold air had pushed into the entire state of Texas, and freezing rain and sleet reached almost as far south as San Antonio.

47.     Beginning February 11, 2021, natural gas supplies began to fall as "unplanned outages of natural gas wellheads due to freeze-related issues, loss of power and facility shut-ins to prevent imminent freezing issues, as well as unplanned outages of gathering and processing facilities, resulted in a decline of natural gas production."[14]

48.     From Wednesday, February 10, 2021, to Thursday, February 11, 2021, the gas prices charged to Brazos by the Gas Suppliers approximately jumped another 289% on average.

49.     On February 11, 2021, the contract execution date for gas to be delivered on February 12, 2021, the Gas Claimants charged the following amounts:

---

[12] Email from Shawn Hazard, Emergency Management Coordinator, PUCT to Kasey Feldman *et al* (Feb. 10, 2021 09:58 CST) (PUCT 0000352-64).

[13] A "Watch" is the third of three levels of communication in anticipation of a possible emergency condition, but it is not the establishment of an emergency condition. Protocols 2.1; Protocols 6.5.9.4.

[14] "FERC - NERC - Regional Entity Staff Report: The February 2021 Cold Weather Outages in Texas and the South Central United States" at p. 82, available at https://www.ferc.gov/sites/default/files/2021-11/Cold%20Weather%20Report_%20November%202021.pdf.

| Gas Claimant | Low Price/MMBtu | High Price/MMBtu |
|---|---|---|
| NJR | $16.685 | $16.685 |
| ETC | $17.50 | $17.50 |
| Mercuria | $15.50 | $29.00 |
| Concord | $25.50 | $25.50 |
| Tenaska | $16.50 | $16.50 |
| Total Gas & Power | n/a | n/a |

50.    On Friday, February 12, 2021, Texas Governor Greg Abbott issued a Disaster Declaration pursuant to Section 418.014 of the Texas Government Code, stating that "severe winter weather poses an imminent threat of widespread and severe property damage, injury, and loss of life due to prolonged freezing temperatures, heavy snow, and freezing rain statewide."[15]

51.    On February 12, 2021, the gas prices charged to Brazos by the Gas Suppliers rose an additional 880% on average from the prior day, which was a cumulative price increase of 6,628% over a 12-day period commencing February 1, 2021.

52.    On February 12, 2021, for gas to be delivered between February 13, 2021, and February 16, 2021, the Gas Claimants charged the following amounts:

| Gas Claimant | Low Price/MMBtu | High Price/MMBtu | % Increase from prior trading day |
|---|---|---|---|
| NJR | $149.66 | $149.66 | 797% |
| ETC | $175.00 | $200.00 | 1043% |
| Mercuria | $250.40 | $250.40 | 1515% |
| Concord | $150.00 | $250.00 | 488% to 880% |

---

[15]  Available at: https://gov.texas.gov/news/post/governor-abbott-issues-disaster-declaration-in-response-to-severe-winter-weather-in-texas.

4896-1399-9138.8

| Gas Claimant | Low Price/MMBtu | High Price/MMBtu | % Increase from prior trading day |
|---|---|---|---|
| Tenaska | $175.00 | $175.00 | 961% |
| Total Gas & Power | $133.61 | $133.61 | n/a |

53.     The prices above range from $120.00/MMBtu to $236.79/MMBtu above the most relevant market price at the TX-OK hub for February 12, 2021 ($13.61/MMBtu ) and $119.52 to $236.31 above the TX-OK price plus the highest basis seen in February 2021 prior to the Contested Period (+ $0.48 for a total of $14.09/MMBtu).  At the same time, the North American benchmark spot price (Henry Hub)[16] was only $6.12/MMBtu on February 12, 2021.[17]  Accordingly, the Gas Suppliers are seeking to impose obligations at amounts above the fair market value of the gas provided.

54.     But, the price increases were not over. On Saturday, February 13, 2021, ERCOT issued an emergency notice for an extreme cold weather event, which it posted on its website.[18]  The same day, ETC charged Brazos $200/MMBtu for gas to be delivered that day.  This price was $185.91 above the TX-OK price plus the highest basis seen in February 2021 prior to the Contested Period (+ $0.48).  Concord charged Brazos $145/MMBtu for gas to be delivered that same day.  This price was $130.91 above the TX-OK price plus the highest basis seen in February 2021 prior to the Contested Period (+ $0.48).

---

[16] Henry Hub is the benchmark price for natural gas spot transactions. *See In re Pilgrim's Pride Corp*., 421 B.R. 231, 243-244, n.15 (Bankr. N.D. Tex. 2009) (noting that "[n]atural gas is a commodity traded on the commodity markets.  One method of valuing a commodity for the purpose of section 503(b)(9) claims might be to value the commodity based on the price at which it could be purchased during the relevant period on the commodity market" and further stating "[i]n the case of natural gas, for example, an appropriate market would be the New York Mercantile Exchange (N.Y.MEX)."  Notably, the N.Y.MEX. prices during the Contested Period ranged from $ 2.91/MMBtu on February 12, 2021, to $3.08 on February 18, 2021.

[17] Energy Information Administration. Henry Hub Natural Gas Spot Price. Accessed May 27, 2022. https://www.eia.gov/dnav/ng/NG_PRI_FUT_S1_D.htm

[18] Review of February 2021 Extreme Cold Weather Event – ERCOT Presentation, dated February 25, 2021, *available at* http://www.ercot.com/content/wcm/lists/226521/Texas_Legislature_Hearings_2-25-2021.pdf.

4896-1399-9138.8

55.     On Sunday, February 14, 2021, the President of the United States declared that an emergency existed in the State of Texas and ordered that federal assistance be provided.[19]

56.     Also on February 14, 2021, Concord charged Brazos $175/MMBtu for gas to be delivered that day.  This price was $160.91/MMBtu above the TX-OK price plus the highest basis seen in February 2021 prior to the Contested Period (+ $0.48).

57.     In the early hours of Monday, February 15, 2021, ERCOT declared an Energy Emergency Alert ("EEA") "Level 1," urging consumers to conserve power.  Within an hour, ERCOT elevated to an EEA "Level 2." Thirteen minutes later, at 1:25 a.m., ERCOT elevated to an EEA "Level 3."  Level 3 is the highest level of emergency in ERCOT, under which ERCOT "[a]s a last resort, instruct[s] transmission companies to reduce demand on the electric system; typically in the form of controlled outages."[20]

58.     With the grid stressed to within minutes of a catastrophic failure during the very early morning hours of February 15, 2021, ERCOT ordered transmission operators to implement deep cuts in load in the form of rolling blackouts to reduce the strain on the ERCOT transmission grid and avoid a complete collapse of the ERCOT system.  Due to the rolling blackouts and forced load shed, the frequency of the ERCOT grid was eventually stabilized on February 15, 2021.  Nevertheless, during the afternoon of February 15, 2021, ERCOT and the PUCT (at a six-minute hastily called virtual PUCT Open Meeting) set the price of electricity in ERCOT system at $9,000/MWh (the President's Day holiday).

---

[19] Available at:  https://www.whitehouse.gov/briefing-room/statements-releases/2021/02/14/president-joseph-r-biden-jr-approves-texas-emergency-declaration.

[20] 2021 Energy Emergency Alert Overview, dated May 2021, *available at* http://www.ercot.com/content/wcm/lists/230330/2021_EEA_Overview_Final.pdf.

59.     Thereafter, on Tuesday, February 16, 2021, the next gas-trading day following the President's Day holiday, the gas prices charged to Brazos by the Gas Suppliers jumped another 329% on average from the average gas prices on Friday, February 12, 2021, with prices as high as 35,000% above the prices seen on February 1, 2021.

60.     On February 16, 2021, for gas to be delivered February 17, 2021, the Gas Suppliers charged Brazos the following amounts:

| Gas Claimant | Low Price/MMBtu | High Price/MMBtu | Increase from average[21] |
|---|---|---|---|
| NJR | $725.00 | $725.00 | 26,554% |
| ETC | n/a | n/a | n/a |
| Mercuria | $710.00 | $950.00 | 34,826% |
| Concord | n/a | n/a | n/a |
| Tenaska | $675.00 | $700.00 | 25,635% |
| Total Gas & Power | n/a | n/a | n/a |

61.     The prices on February 16, 2021, for delivery on February 17, 2021, ranged from $650.21/MMBtu to $925.21/MMBtu above the TX-OK price plus the highest basis seen in February 2021 prior to the Contested Period (+ $0.48).   Henry Hub spot prices were $11.32/MMBtu on February 16, 2021.[22]

62.     On February 18, 2021, Concord charged Brazos $500/MMBtu for gas to be delivered that same day.  This price was $476.05/MMBtu above the TX-OK price plus the highest basis seen

---

[21] Percentage increase from average price of $2.72/MMBtu on February 1, 2021.

[22] Energy Information Administration. Henry Hub Natural Gas Spot Price. Accessed May 27, 2022. https://www.eia.gov/dnav/ng/NG_PRI_FUT_S1_D.htm.

prior to the Contested Period (+ $0.48). Spot prices at Henry Hub were $8.56/MMBtu.[23]

63.     More than $60 million of the approximately $180 million sought by the Gas Claimants are for the trades entered into on February 16, 2021, during the period following the PUCT Orders in which ERCOT and the PUCT artificially set electricity prices at $9,000/MWh.[24]

64.     Not only did the prices charged to Debtor during Winter Storm Uri far exceed the prices that Debtor had previously been charged, they were far higher than the reported index prices for the TX-OK hub and Henry Hub.

**D.     The Contested Trades.**

65.     During the Contested Period of February 12, 2021 to February 18, 2021, the Gas Suppliers entered into 20 trades to which Brazos objects.   Each of these trades is listed on **Exhibit B** and incorporated herein by reference for all purposes.  The Contested Trades seek a total of $167,658,280.00, but they include overcharges of at least $157,484,613.25 when compared to the most relevant market price (TX-OK) plus the highest basis seen in February 2021 prior to the Contested Period (+ $0.48).

66.     Mercuria, Tenaska, Concord, and ETC have sold their claims to certain of the Gas Claimants as detailed in the chart below listing the relevant information for each of the Gas Claims filed before the Claims Bar Date (defined below).  The Gas Claimants who purchased their claims are assignees of the relevant Gas Suppliers and are subject to the same defenses as the actual Gas Suppliers.

---

[23] Energy Information Administration. Henry Hub Natural Gas Spot Price. Accessed May 27, 2022. https://www.eia.gov/dnav/ng/NG_PRI_FUT_S1_D.htm.

[24] PUCT. http://www.puc.texas.gov/agency/broadcasts.aspx, and "Order Directing ERCOT to Take Action and Granting Exception of Commission Rules. Project No. 51617, Item #3. February 15, 2021. https://interchange.puc.texas.gov/Documents/51617_3_1111656.PDF.

| Claimant | Claim No. | Date Claim Filed | Amount of Claim as Filed | Priority Asserted | Original Gas Supplier if Different Party |
|---|---|---|---|---|---|
| 507 Capital, LLC | 216 | 5/13/2021 | $40,125.00 | General Unsecured | Mercuria Energy America, LLC |
| 507 Summit, LLC | 106 | 3/23/2021 | $5,382,500.00 | Administrative Priority | Concord Energy LLC |
| Cetus Capital VI, L.P. | 110 | 3/23/2021 | $49,629.64 | Administrative Priority | Concord Energy LLC |
| Cetus Capital VI, L.P. | 113 | 3/23/2021 | $5,850,370.37 | Administrative Priority | Concord Energy LLC |
| Cetus Capital VI, L.P. | 214 | 5/13/2021 | $12,471,259.22 | Priority | Mercuria Energy America, LLC |
| Chase Lincoln First Commercial Corporation | 335 | 6/11/2021 | $30,081,550.00 | Administrative Priority ($30,038,950.00) & General Unsecured (42,600.00) | Tenaska Marketing Ventures |
| Citigroup Financial Products Inc. | 385 | 6/14/2021 | $15,472,239.00 | Administrative Priority ($15,088,289.00) & General Unsecured ($383,950.00) | ETC Marketing, Ltd. |
| CrossingBridge Low Duration High Yield Fund | 115 | 3/23/2021 | $2,467,407.41 | Administrative Priority | Concord Energy LLC |
| CrossingBridge Low Duration High Yield Fund | 207 | 5/13/2021 | $2,930,000.00 | Priority | Mercuria Energy America, LLC |
| Destinations Global Fixed Income Opportunities Fund | 213 | 5/13/2021 | $9,959,000.00 | Priority | Mercuria Energy America, LLC |
| Destinations Low Duration Fixed Income Fund | 114 | 3/23/2021 | $4,493,333.33 | Administrative Priority | Concord Energy LLC |
| Destinations Low Duration Fixed Income Fund | 208 | 5/13/2021 | $6,027,000.00 | Priority | Mercuria Energy America, LLC |
| Leaffilter North Holdings, Inc. | 110 | 3/23/2021 | $471,111.11 | Administrative Priority | Concord Energy LLC |
| Leaffilter North Holdings, Inc. | 210 | 5/13/2021 | $473,000.00 | Priority | Mercuria Energy America, LLC |
| NJR Energy Services Co. | 167 | 4/8/2021 | $26,079,125.00 | Administrative Priority | n/a |
| OFM II, LP | 108 | 3/23/2021 | $433,703.70 | Administrative Priority | Concord Energy LLC |
| OFM II, LP | 110 | 3/23/2021 | $185,925.92 | Administrative Priority | Concord Energy LLC |
| OFM II, LP | 114 | 3/23/2021 | $2,246,666.67 | Administrative Priority | Concord Energy LLC |

| Claimant | Claim No. | Date Claim Filed | Amount of Claim as Filed | Priority Asserted | Original Gas Supplier if Different Party |
|---|---|---|---|---|---|
| OFM II, LP | 115 | 3/23/2021 | $1,233,703.70 | Administrative Priority | Concord Energy LLC |
| OFM II, LP | 215 | 5/13/2021 | $8,666,468.28 | Priority | Mercuria Energy America, LLC |
| OU 2 LLC | 108 | 3/23/2021 | $867,407.41 | Administrative Priority | Concord Energy LLC |
| OU 2 LLC | 211 | 5/13/2021 | $875,000.00 | Priority | Mercuria Energy America, LLC |
| RiverPark Short Term High Yield | 113 | 3/23/2021 | $11,700,740.74 | Administrative Priority | Concord Energy LLC |
| RiverPark Short Term High Yield | 206 | 5/13/2021 | $13,958,000.00 | Priority | Mercuria Energy America, LLC |
| RiverPark Strategic Income Fund | 212 | 5/13/2021 | $5,778,000.00 | Priority | Mercuria Energy America, LLC |
| Total Gas & Power North America, Inc. | 350 | 6/14/2021 | $5,344,400.00 | Administrative Priority | n/a |
| Two Seas Global (Master) Fund LP | 106 | 3/23/2021 | $2,000,000.00 | Administrative Priority | Concord Energy LLC |

67.     Because the relevant proofs of claim do not provide adequate information and discovery of the Gas Claimants has not been allowed thus far, the Debtor cannot, at this time, specifically quantify how much of each Gas Claim is objectionable for the Gas Claimants whose claims are derived from Concord and Mercuria.

**E.     The Contested Trades Were Not Arm's Length Transactions.**

68.     The Gas Claims are the result of individual communications between ACES and the Gas Suppliers during February of 2021.  Although each of the Gas Suppliers had a pre-existing NAESB[25] form contract with Brazos, those agreements did not obligate Brazos to purchase any gas. Nor did they obligate the Gas Suppliers to sell any gas.  Those agreements set forth certain terms, other than quantity and price, that would apply if Brazos and a Gas Supplier were to agree to a sale of a given quantity of gas at a given price in a discrete transaction.

---

[25] "NAESB" stands for North American Energy Standards Board.

69.     During the Contested Period, the twenty (20) trades at issue were separate and individual contracts entered into at or near the dates of the trades, but were not arm's length.  Black's Law Dictionary defines "arm's-length" as "[o]f, relating to, or involving dealings between two parties who are not related or not on close terms and *who are presumed to have roughly equal bargaining power*" (emphasis added).   While the Gas Suppliers have argued that Brazos had equal bargaining power to them and could have readily declined to accept the exorbitant prices offered, this is simply untrue.  Texas law explicitly recognizes that public utilities have a duty to the public.[26] "Continuous service by a public utility is ***essential to the life, health, and safety of the public***." TEX. UTIL. CODE § 186.002(a) (emphasis added).[27]  "The primary duty of a public utility, including its management and employees, is to maintain continuous and adequate service at all times to protect the safety and health of the public against the danger inherent in the interruption of service." TEX. UTIL. CODE § 186.002(b).

70.     During Winter Storm Uri, Brazos had no choice but to procure as much natural gas as it could, regardless of price.  Brazos could not just refuse to buy gas and let Texans freeze.  There were overriding humanitarian issues at stake:   hospitals, jails, police stations, nursing homes, and families within Brazos's Members' service territories that all rely on the power Brazos provides.  The Gas Claimants knew that Brazos had no bargaining power and would have to pay whatever it

---

[26] As Curt Morgan, CEO of Vistra Energy (Texas' largest power generator), aptly put it during a panel discussion in Austin in May 2021: "Our job became a humanitarian job . . . [a]nd we bought as much gas as we could at any price we could get." Mitchell Schnurman, *How Vistra, Atmos Energy and Energy Transfer are moving forward from Texas' epic winter storm*, Dallas Morning News, January 28, 2022, at 1D, available at: https://www.dallasnews.com/business/energy/2022/01/28/how-vistra-atmos-energy-and-energy-transfer-are-moving-forward-from-texas-epic-winter-storm.

[27] While Brazos qualifies as a "public utility" for purposes of Title 4 of the Utilities Code, entitled "Delivery of Utility Services," it is not included in the definition of "public utility" or "electric utility" in other sections of the Utilities Code, for example, Title 2—the "Public Utility Regulatory Act." *Compare* TEX. UTIL. CODE § 186.002(a) & §§ 11.004(1), 31.002(6)(G).

took to keep generating power during the storm.    Moreover, the ERCOT protocols required all power generators to produce as much power as possible to meet unprecedented demand.

71.    On information and belief, the Gas Suppliers knew all of this.  The Gas Suppliers took advantage of the fact that Brazos had no viable alternative and that it could be made to pay exorbitant prices that were 5,000% to 35,000% above a normal price with no realistic bargaining power.

**F.    Brazos's Insolvency**

72.    During the course of Winter Storm Uri, Brazos was forced to incur certain obligations beyond its ability to pay and became insolvent on February 15, 2021. These parties include, but are not limited to, ERCOT, the Gas Suppliers, and certain bilateral power suppliers, among others.

73.    Brazos began the month of February 2021 with approximately $497 million of liquidity ($141 million in available cash and $356 million in available credit).  By February 15, 2021, Brazos became insolvent by approximately $211 million, an amount which grew exponentially during the remainder of the week.  By February 28, 2021, Uri-related obligations incurred by Brazos exceeded its total liquidity by $1.913 Billion.

74.    Brazos was also inadequately capitalized because it did not have sufficient liquidity, or the ability to access sufficient liquidity, to pay the obligations incurred related to Winter Storm Uri as they came due.

**G.    The Bankruptcy Case**

75.    In the wake of the Winter Storm Uri catastrophe, on the Petition Date, Brazos filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.  The Debtor has continued in

possession of its property and has continued to operate and manage its business as a debtor in possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

76.     On March 15, 2021, the Office of the United States Trustee (the "U.S. Trustee") appointed an Official Committee of Unsecured Creditors (the "Committee"). *See* Dkt. No. 216. The Committee was reconstituted by the U.S. Trustee on March 24, 2021. *See* Dkt. No. 285.

77.     Additional information about the Debtor's business and affairs, capital structure, prepetition indebtedness, and the events leading up to the Petition Date can be found in the *Declaration of Clifton Karnei in Support of Chapter 11 Petition and First Day Motions* (the "First Day Declaration") [Dkt. No. 3].

78.     On May 5, 2021, the Court entered its *Order (I) Setting Bar Dates for Filing Proofs of Claim, Including Requests for Payment under Section 503(b)(9), (II) Establishing Amended Schedules Bar Date and Rejection Damages Bar Date, (III) Approving the Form of and Manner for Filing Proofs of Claim, Including Section 503(b)(9) Requests, (IV) Approving Notice of Bar Dates, and (V) Granting Related Relief* [Dkt. No. 515], setting the deadline for filing proofs of claim on June 15, 2021 (the "Claims Bar Date").

79.     As delineated above, each Gas Claimant timely asserted their respective Gas Claims against Brazos.

## V.     CAUSES OF ACTION

### Count 1
### Disallowance of Gas Claims under 11 U.S.C. § 502(b)(1)
### (Against all Gas Claimants)

80.     The preceding paragraphs are incorporated herein by reference.

81.     Each Gas Claimant timely filed a proof of claim under Section 501 of the Bankruptcy Code by the Claims Bar Date, asserting an obligation allegedly owed by the Debtor.

82.     None of the Gas Claims are contingent, unmatured, or unliquidated.

83.     Pursuant to Section 502(a) of the Bankruptcy Code, each Gas Claim is deemed allowed, unless a party in interest objects.

84.     Each Gas Claim is objectionable and must be disallowed to the extent such claim is unenforceable against the Debtor and property of the Debtor under applicable non-bankruptcy law.  *See* 11 U.S.C. § 502(b)(1).

85.     Pursuant to Section 558 of the Bankruptcy Code, the bankruptcy estate of the Debtor has the benefit of all defenses available to the Debtor as against the Gas Claimants, including, without limitation, defenses available under applicable Texas law.

86.     The Gas Claims accrued as a result of one or more purported agreements underlying the Gas Claims that, under applicable Texas law, (a) were unconscionable, (b) were contrary to public policy, and/or (c) required the performance of an illegal act.  *See, e.g.* TEX. BUS. & COM. CODE § 2.302.

87.     It is well settled that a contract that cannot be performed without violating the law is void.  Texas has outlawed price gouging during a declared disaster.  Section 17.46 of the DTPA states the Texas public policy that it is unlawful to take advantage of a disaster declared by the Governor under Chapter 418 of the Government Code by: "(A) selling or leasing fuel . . . or another necessity at an exorbitant or excessive price; or (B) demanding an exorbitant or excessive price in connection with the sale or lease of fuel . . . or another necessity." TEX. BUS. & COM. CODE § 17.46(b)(27).

88.     Despite this prohibition, when Governor Abbott issued an emergency declaration regarding Winter Storm Uri on February 12, 2021, the Gas Suppliers raised their prices 5,000% to 35,000% above pre-Uri prices.  The details of these Contested Trades are provided in **Exhibit B**.

89.     Because both Brazos and its Members are non-profit organizations whose costs are passed through to consumers, the only way for the Gas Claims to be satisfied in full would be for individual consumers to pay the costs for the Contested Trades.  In other words, the contracts underlying the Gas Claims cannot be performed without violating the prohibition against price-gouging consumers—which would be an illegal act and contrary to public policy.

90.     For the avoidance of any doubt, Brazos is not making an express claim as a consumer under the DTPA. However, Brazos does point to and incorporates the price gouging provisions contained in the DTPA as a means to show that the DTPA is implicated if Brazos and its Members are required to pass on the exorbitant costs to Texas consumers.

91.     Moreover, the Contested Trades are unconscionable.  The Gas Claimants forced the Debtor to choose between paying shockingly high prices, which they knew the Debtor and Texas consumers could not afford, or letting Texans literally freeze to death.   The Gas Claimants knew that Brazos had no viable alternative to paying these extortionate prices because the consumers who receive power from the Debtor's Members were all counting on Debtor to provide the electricity they needed to survive Winter Storm Uri. The Contested Trades were not arm's length transactions because the parties lacked equal bargaining power at the time of the trade, which was a separate contract from the master agreement (NAESB standard form master agreement).

92.     Accordingly,  the  Contested  Trades  are  not  enforceable  because  they  were unconscionable, contrary to public policy, and/or required the performance of an illegal act.

93.     As a result of the extraordinary and well-documented circumstances of Winter Storm Uri, there is no basis for holding the Debtor liable for the extortionate pricing included in the Gas Claims. The exorbitant prices sought by the Gas Suppliers are not justified as, on information and belief, they are each seeking windfall profits.

4896-1399-9138.8

94.     If the unenforceable portions of the Gas Claims are not disallowed, the Gas Claimants would receive recoveries to which they are not entitled, to the detriment of the Debtor's estate and its other stakeholders.

95.     The Debtor is therefore entitled to an order and judgment under Section 502(b)(1) of the Bankruptcy Code (a) disallowing each Gas Claim to the extent of the aggregate "Total Overcharge" amount for each Contested Trade underlying such Gas Claim, and (b) allowing each such Gas Claim in a reduced amount in accordance with the reasonable price for gas delivered during the Contested Period.

## Count 2
### Avoidance of Constructively Fraudulent Obligations Under 11 U.S.C. § 548(a)(1)(B)
### (Against all Gas Claimants)

96.     The preceding paragraphs are incorporated herein by reference.

97.     Under Bankruptcy Code Section 548(a)(1)(B), a debtor may avoid any obligation incurred by the debtor on or within two years prior to the date of the filing of the bankruptcy petition, if the debtor voluntarily or involuntarily received less than a reasonably equivalent value in exchange for such obligation, and, as applicable, (i) the debtor was insolvent on the date that such obligation was incurred, or became insolvent as a result of such obligation; (ii) the debtor was engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital; or (iii) the debtor intended to incur, or believed that the debtor would incur, obligations that would be beyond the debtor's ability to pay as such obligations matured.[28]

98.     Each Gas Claim was the result of obligations incurred by the Debtor (i.e., the date of the trade) within two years before the Petition Date.

---

[28] Section 548(a)(i)(B) contains another provision related to insider transactions, which is not applicable here.

99.     The Debtor received less than a reasonably equivalent value in exchange for the obligations incurred.

100.    As detailed above and in **Exhibit B**, the Contested Trades seek to enforce obligations derived from exorbitant and excessive prices for natural gas for which the Debtor voluntarily or involuntarily received less than reasonably equivalent value in exchange because those transactions were not entered into at arm's length and were not for reasonable market prices.  In fact, they seek to impose obligations that are far greater than the relevant TX-OK market price or the pre-Uri price for natural gas.

101.    The obligations to each Gas Claimant were incurred on the date the trade was made while the Debtor was insolvent, or the Debtor became insolvent as a result of the obligations incurred (on the date the trade was made) to each Gas Claimant.  At the time of, or as a result of the obligations incurred on the date the trade was made to each Gas Claimant, the Debtor was engaged in, or was about to be engaged in, a business or transaction for which any property remaining with the Debtor was unreasonably small in relation to its business.  In addition, at the time the obligations to each Gas Claimant were incurred, the Debtor intended to incur, or believed that it would incur, debts beyond the Debtor's ability to pay as such debts matured.

102.    As explained above, during the course of Winter Storm Uri, Brazos was inadequately capitalized considering the obligations it incurred and became insolvent on or about February 15, 2021.  Throughout the entire Contested Period, the Debtor (i) was engaged in or was about to engage in transactions for which its remaining assets were unreasonably small in relation to its business and (ii) intended to incur, or believed that it would incur, debts it could not pay in an effort to protect consumers from life threatening conditions.

103.     Accordingly, the obligations listed on **Exhibit B** are avoidable pursuant to Bankruptcy Code Section 548(a)(1)(B) to the extent that such obligations exceed the reasonably equivalent value of what the Debtor received, and the Debtor is entitled to avoidance and reduction of each Gas Claim to the extent the obligations incurred in connection with each such Gas Claim are far greater than the relevant TX-OK market price or the pre-Uri price for natural gas supplied to the Debtor.

**Count 3**
**Avoidance of Constructively Fraudulent Obligations Under 11 U.S.C. § 544(b) and TEX. BUS. & COM. CODE § 24.005**
**(Against all Gas Claimants)**

104.     The preceding paragraphs are incorporated herein by reference.

105.     Under Bankruptcy Code Section 544(b), the Debtor may avoid any obligation incurred by the Debtor that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under Bankruptcy Code Section 502, or that is not allowable only under Bankruptcy Code Section 502(e).

106.     Under Bankruptcy Code Section 544(b), the Debtor has the rights and powers of an actual creditor holding a claim which is allowable under Bankruptcy Code Section 502.

107.     At all relevant times, for each of the Contested Trades, the Debtor had at least one creditor holding an unsecured claim that is allowable under Bankruptcy Code Section 502 that arose before or within a reasonable time after the obligation was incurred, including, the Gas Suppliers and Gas Claimants, ERCOT, Freepoint Commodities LLC, Exelon Corporation, Conoco Phillips, Sun Coast Resources, Inc., and Mica Steelworks, Inc., among others.[29]

---

[29] For additional creditors, see the Debtor's Schedules of Assets and Liabilities filed in the Bankruptcy Case No. 21-30725 at Doc. No. 353, as may be amended or supplemented.

108.     Under TEX. BUS. & COM. CODE § 24.005 (Transfers Fraudulent as to Present and Future Creditors), an obligation incurred by a debtor is fraudulent as to a creditor, whether the creditor's claim arose before or within a reasonable time after the obligation was incurred, if the debtor incurred the obligation (1) without receiving a reasonably equivalent value in exchange for the obligation and (2) the debtor was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction, or the debtor intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.  Such obligations are avoidable pursuant to TEX. BUS. & COM. CODE § 24.008(a).

109.     Each Gas Claim was the result of obligations incurred on the date the trade was made by the Debtor prior to the Petition Date.

110.     The Debtor received less than reasonably equivalent value in exchange for the obligations the Gas Claims seek to enforce.  The Contested Trades were not the product of an arm's-length transaction in the ordinary course of the Debtor's business at reasonable market rates. The Gas Suppliers knew that Brazos had no bargaining power because it was obligated to provide a continuous supply of electricity to help its Members' customers survive Winter Storm Uri.  It had no viable alternative at the time the trade was made to paying exorbitant prices.  Neither this lack of bargaining power nor anything else about Winter Storm Uri can be fairly characterized as in the ordinary course of the Debtor's business.  Additionally, the exorbitant prices that the Gas Suppliers seek to impose in the Contested Trades seek far more than the reasonable market price of the gas at issue on the date the trade was made (*see* **Exhibit B**).

111.     Further, throughout the Contested Period, the Debtor either was engaged in or was about to engage in a business or a transaction for which the remaining assets of the Debtor were

unreasonably small in relation to the business or transaction.  Throughout the Contested Period, the Debtor intended to incur, or believed or reasonably should have believed that it would incur, debts beyond the Debtor's ability to pay as they became due.

112.    Prior to and at the time of the Contested Period, and continuing through the Petition Date, there are creditors holding unsecured claims against the Debtor that are allowable under Bankruptcy Code Section 502.  The purported obligations underlying the Gas Claims would be voidable by these creditors pursuant to TEX. BUS. & COM. CODE §§ 24.005 and 24.008(a).

113.    Accordingly, the obligations listed on **Exhibit B** are avoidable pursuant to TEX. BUS. & COM. CODE §§ 24.005 and 24.008(a) and Bankruptcy Code Section 544(b) to the extent that such obligations exceed the reasonably equivalent value of what the Debtor received, and the Debtor is entitled to an avoidance and reduction of each Gas Claim to the extent the obligations incurred (on the dates the trades were made) in connection with each such Gas Claim are far greater than the relevant TX-OK market price (on the dates the trades were made) or the pre-Uri price for natural gas supplied to the Debtor.

**Count 4**
**Objection to Priority of Gas Claims Under**
**11 U.S.C. § 503(B)(9): Goods Were Not Sold In the**
**Ordinary Course Of The Debtor's Business**

114.    The preceding paragraphs are incorporated herein by reference.

115.    Bankruptcy Code Section 503(b)(9) provides for administrative priority for "the *value* of any goods received by the debtor within 20 days before the date of commencement of a case under this title in which the goods have been sold to the debtor *in the ordinary course of such debtor's business*." 11 U.S.C. § 503(b)(9) (emphasis added).

116.    The gas supplied by each Gas Claimant is a "good" under applicable law and within the meaning of Bankruptcy Code Section 503(b)(9).

117.    The gas supplied by each Gas Claimant was received by the Debtor within the twenty (20) days prior to the Petition Date.

118.    The Debtor was unable to conduct its business in the ordinary course during Winter Storm Uri, which included the Contested Period. Moreover, the Gas Claims are not entitled to priority status because the gas at issue was not purchased in the ordinary course of the Debtor's business as required by Bankruptcy Code Section 503(b)(9).  During Winter Storm Uri, the Gas Suppliers charged exorbitant and unprecedented prices knowing that the Debtor had no bargaining power because it faced a Hobson's choice: Buy gas at extortionate prices or allow Texans to die. This is the antithesis of the ordinary course of business, and therefore, the entirety of any allowed portion of the Gas Claims should be reclassified as general unsecured claims.

119.    Therefore, the Gas Claims are not entitled to priority under 11 U.S.C. §§ 503(b)(9) and 507.

## Count 5
### Objection to Priority of Gas Claims Under 11 U.S.C. § 503(B)(9): The Gas Claims Exceed the Value of Goods Received

120.    The preceding paragraphs are incorporated herein by reference.

121.    The Gas Claims are not entitled to priority status under Bankruptcy Code Section 503(b)(9) for an additional reason: The Gas Claims far exceed the "value" of the goods received by the Debtor.

122.    The amounts that the Gas Claimants seek exceed the reasonably equivalent value of the gas supplied to the Debtor on the dates the trades were made.

123.    Therefore, the Gas Claims are not entitled to priority under 11 U.S.C. §§ 503(b)(9) and 507.

31

## VI.   RESERVATION OF RIGHTS AND RIGHT TO AMEND

124.    This Objection is limited to the grounds stated herein.  Accordingly, it is without prejudice to the rights of the Debtor to object to any claim on any ground whatsoever.  The Debtor expressly reserves all further substantive or procedural objections to the Gas Claims and any other claim.  The Debtor further reserves its right to amend or supplement this Objection as additional information is discovered, including the right to assert affirmative relief.

125.    Nothing contained herein or any actions taken pursuant to such relief is intended or should be construed as: (i) an admission as to the validity of any prepetition claim against the Debtor; (ii) a waiver of the Debtor's right to dispute any prepetition claim on any grounds; (iii) a promise or requirement to pay any prepetition claim; (iv) an implication or admission that any particular claim is of a type specified or defined in this Objection or any order granting the relief requested by this Objection; (v) a request or authorization to assume any prepetition agreement, contract, or lease pursuant to Section 365 of the Bankruptcy Code; or (iv) a waiver of the Debtor's rights under the Bankruptcy Code or any other applicable law.

## VII.   PRAYER

For the foregoing reasons, the Debtor respectfully requests that this Court enter a final judgment (a) disallowing, in part, and reducing the Gas Claims in an amount to be determined by the Court, and (b) finding that the entirety of the Gas Claims are not entitled to priority under Bankruptcy Code Section 503(b)(9), and (c) declaring that the agreements underlying the Gas Claims are unenforceable against the Debtor;  and (d) for such other and further relief as may be just and proper.

Dated:  June 1, 2022

Respectfully submitted,

**FOLEY & LARDNER LLP**

/s/ *Ronald L. Oran, Jr.*
Ronald L. Oran, Jr.
State Bar No. 24072268
Email: *roran@foley.com*
Drake Lawsage
State Bar No. 24102070
Email: *dlawsage@foley.com*
Jennifer N. Huckleberry
State Bar No. 24118414
Email: *jhuckleberry@foley.com*
1000 Louisiana Street, Suite 2000
Houston, TX 77002
Telephone: 713.276.5500
Facsimile: 713.276.5555

-and-

Holland N. O'Neil
State Bar No. 14864700
Email: *honeil@foley.com*
2021 McKinney Avenue, Suite 1600
Dallas, Texas 75201
Telephone: 214.999.4961
Facsimile: 214.999.4667

-and-

Timothy C. Mohan
State Bar No. 50559
Email: *tmohan@foley.com*
600 17th Street, Suite 2020S
Denver, CO 80202
Telephone: 720.437.2000
Facsimile: 720.437.2200

**SPECIAL COUNSEL AND CONFLICTS
COUNSEL TO THE DEBTOR**

**MCKOOL SMITH**

John J. Sparacino
State Bar No. 18873700
Email: *jsparacino@mckoolsmith.com*
Veronica Manning
State Bar No. 24098033
Email: *vmanning@mckoolsmith.com*
600 Travis Street, Suite 7000
Houston, TX  77002
Telephone: 713.485.7300
Facsimile: 713.485.7344

**SPECIAL COUNSEL AND CONFLICTS
COUNSEL TO THE DEBTOR ONLY FOR
ISSUES SPECIFIC TO CITIGROUP
FINANCIAL PRODUCTS INC.**