# EXHIBIT A

Date Filed: 04/08/2021
Claim No: 167

**Fill in this information to identify the case:**

Debtor     Brazos Electric Power Cooperative, Inc.

United States Bankruptcy Court for the District of     Southern District of Texas

Case number     21-30725

---

## Official Form 410

# Proof of Claim

**04/19**

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed.** That date is on the notice of bankruptcy (Form 309) **that you received.**

## Part 1:   Identify the Claim

| | |
|---|---|
| 1. **Who is the current creditor?** | NJR Energy Services Company |
| | Name of the current creditor (the person or entity to be paid for this claim) |
| | Other names the creditor used with the debtor _____ |

| | |
|---|---|
| 2. **Has this claim been acquired from someone else?** | ☑ No <br> ☐ Yes. From whom? _____ |

3. **Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

Where should notices to the creditor be sent?

NJR Energy Services Company
Nancy A. Washington
1415 Wyckoff Road
P O Box 1464
Wall, NJ 07719
USA
**P:** 732-919-8039
**E:** nwashington@njresources.com

Where should payments to the creditor be sent? (if different)

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

— — — — — — — — — — — — — — — — — — — — — — — — —

| | |
|---|---|
| 4. **Does this claim amend one already filed?** | ☑ No <br> ☐ Yes. Claim number on court claims registry (if known) _____ Filed on _____ <br> MM/DD/YYYY |

| | |
|---|---|
| 5. **Do you know if anyone else has filed a proof of claim for this claim?** | ☑ No <br> ☐ Yes. Who made the earlier filing? _____ |

---

Official Form 410

1155604082131334296900001

Page 1

6. **Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: _____

7. **How much is a claim?**

$ 26,079,125.00

Does this amount include interest or other charges?

☑ No

☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

8. **What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card
Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).
Limit disclosing information that is entitled to privacy, such as health care information.

See attached rider.

9. **Is all or part of the claim secured?**

☑ No

☐ Yes. The claim is secured by a lien on property.

**Nature of property**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a Mortgage Proof of Claim Attachment (Official Form 410-A)with this Proof of Claim.

☐ Motor vehicle.

☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:** _____

**Amount of the claim that is secured:** _____

**Amount of the claim that is unsecured:** _____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:** _____

**Annual Interest Rate (when case was filed)** _____ %

☐ Fixed

☐ Variable

10. **Is this claim based on a lease?**

☑ No

☐ Yes. Amount necessary to cure any default as of the date of the petition. $ _____

11. **Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

12. **Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A Claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☐ No

☑ Yes.  Check one:

| | Amount entitled to priority |
|---|---|

☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).

_____

☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7).

_____

☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4)

_____

☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8).

_____

☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5).

_____

☑ Other. Specify subsection of 11 U.S.C. § 507(a)(2) that applies.

$ 26,079,125.00

*Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment.

---

## Part 3:  Sign Below

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Check the appropriate box

☑ I am the creditor.

☐ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this Proof of Claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt

I have examined the information in this Proof of Claim and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date & time    04/08/2021 at 02:35 pm PT
                           MM / DD / YYYY HH : MM

/s/Nancy A. Washington
Signature

**Print the name of the person who is completing and signing this claim:**

Name

| Nancy | A. | Washington |
|---|---|---|
| First Name | Middle Name | Last Name |

Title

Senior Vice President and General Counsel

Company

NJR Energy Services Company
Identify the corporate servicer as the company if the authorized agent is a servicer

Address

1415 Wyckoff Road, P O Box 1464

| Number | Street |
|---|---|

| Wall | NJ | 7719 |
|---|---|---|
| City | State | ZIP Code |

Contact phone    7329198039

Email    nwashington@njresources.com

**Fill in this information to identify the case:**

| | |
|---|---|
| Debtor: Brazos Electric Power Cooperative, Inc. | Case Number: 21-30725 |

**United States Bankruptcy Court for the Southern District of Texas**

Official Form 410

# Proof of Claim

04/19

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.**

| Part 1: | Identify the Claim |
|---|---|

| | |
|---|---|
| 1. **Who is the current creditor?** | NJR Energy Services Company<br>Name of the current creditor (the person or entity to be paid for this claim)<br><br>Other names the creditor used with the debtor _____ |
| 2. **Has this claim been acquired from someone else?** | ☒ No<br>☐ Yes. From whom? _____ |

| 3. **Where should notices and payments to the creditor be sent?**<br><br>Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | **Where should notices to the creditor be sent?** | **Where should payments to the creditor be sent?** (if different) |
|---|---|---|
| | ATTN: Nancy A. Washington<br>Name | _____<br>Name |
| | 1415 Wyckoff Road<br>P O Box 1464<br>Street Address | _____<br>Street Address |
| | Wall,          NJ          07719<br>City          State          ZIP Code | _____<br>City          State          ZIP Code |
| | Contact phone  732-919-8039 | Contact phone _____ |
| | Contact email  nwashington@njresources.com | Contact email _____ |

| | |
|---|---|
| 4. **Does this claim amend one already filed?** | ☒ No<br>☐ Yes.  Claim number on court claims registry (if known)_____     Filed on ____/____/____ <br> MM / DD / YYYY |
| 5. **Do you know if anyone else has filed a proof of claim for this claim?** | ☒ No<br>☐ Yes.  Who made the earlier filing? _____ |

| Part 2: | Give Information About the Claim as of the Date the Case Was Filed |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☒ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____

**7. How much is the claim?**

$ 26,079,125.00      **. Does this amount include interest or other charges?**

☒ No

☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

See attached rider.

**9. Is all or part of the claim secured?**

☒ No

☐ Yes.  The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:**                    $_____

**Amount of the claim that is secured:**    $_____

**Amount of the claim that is unsecured:**  $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:**    $_____

**Annual Interest Rate** (when case was filed) _____%

☐ Fixed

☐ Variable

**10. Is this claim based on a lease?**

☒ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.**    $_____

**11. Is this claim subject to a right of setoff?**

☒ No

☐ Yes. Identify the property: _____

| **12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?** | ☐ No | |
|---|---|---|
| A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☒ Yes. *Check all that apply:* | **Amount entitled to priority** |
| | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $ _____ |
| | ☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $ _____ |
| | ☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $ _____ |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $ _____ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $ _____ |
| | ☒ Other. Specify subsection of 11 U.S.C. § 507(a)( 2 ) that applies. | $ 26,079,125.00 |
| | * Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment. | |

---

## Part 3:   Sign Below

| **The person completing this proof of claim must sign and date it. FRBP 9011(b).** | *Check the appropriate box:* |
|---|---|
| If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is. | ☒ I am the creditor. |
| | ☐ I am the creditor's attorney or authorized agent. |
| | ☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004. |
| | ☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005. |
| **A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.** | I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt. |
| | I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct. |
| | I declare under penalty of perjury that the foregoing is true and correct. |

Executed on date  _____
              MM  /  DD  /  YYYY

*NANCY WASHINGTON* 4/8/2021
E48E0F7C681747E...
Signature

Print the name of the person who is completing and signing this claim:

| Name | Nancy | A. | Washington |
|---|---|---|---|
| | First name | Middle name | Last name |
| Title | Senior Vice President & General Counsel | | |
| Company | NJR Energy Services Company | | |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. | | |
| Address | 1415 Wyckoff Road, P O Box 1464 | | |
| | Number          Street | | |
| | Wall | NJ | 07719 |
| | City | State | ZIP Code |
| Contact phone | 732-919-8039 | Email | nwashington@njresources.com |

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

|  |  |  |
|---|---|---|
| In re: | : | **Chapter 11** |
|  | : |  |
| **BRAZOS ELECTRIC POWER** | : | **Case No. 21-30725 (DRJ)** |
| **COOPERATIVE, INC.,** | : |  |
|  | : |  |
| Debtor.[1] | : |  |

**RIDER TO THE ADMINISTRATIVE PROOF OF CLAIM OF**
**NJR ENERGY SERVICES COMPANY PURSUANT TO**
**503(b)(9) OF THE BANKRUPTCY CODE**

NJR Energy Service Company ("NJR") submits this rider to its administrative proof

of claim pursuant to 11 U.S.C. 503(b)(9) for the amounts due NJR from Brazos Electric

Power Cooperative, Inc., the above-captioned debtor and debtor-in-possession (the

"Debtor").

1.      On March 1, 2021 (the "Petition Date"), the Debtor filed a voluntary petition for

relief under chapter 11, title 11, United States Code in the United States Bankruptcy Court for the

Southern District of Texas, Houston Division.

2.      NJR is a creditor of the Debtor and counterparty to a certain *Base Contract for Sale*

*and Purchase of Natural Gas* dated February 17, 2012 ("Base Contract"), pursuant to which NJR

supplies natural gas to the Debtor.  A copy of the Base Contract is attached hereto as **EXHIBIT A**.

---

[1] The Debtor in this chapter 11 case, along with the last four digits of its federal tax identification number is:  Brazos Electric Power Cooperative, Inc. (4729).  Additional information regarding this case may be obtained on the website of the Debtor's claims and noticing agent at http://cases.stretto.com/Brazos.  The Debtor's address is 7616 Bagby Avenue, Waco, TX  76712.

3.       On March 8, 2021, the Debtor filed its *List of Creditors Who Have the 30 Largest Unsecured Claims and Are Not Insiders* [ECF No. 170], where it identified NJR as its 13th largest creditor holding a general unsecured claim in the amount of **$26,079,125**.

4.       Pursuant to the terms of the Base Contract, during the period from February 12 through February 22, 2021, the Debtor ordered and NJR supplied the following quantities of natural gas to the Debtor:

| Delivery Period | # of Days | Price | Quantity Per Day (MMBtus) | Total Vol | Total Dollar |
|---|---|---|---|---|---|
| 2/12/2021-2/12/2021 | 1 | $ 16.685 | 25,000 | 25,000 | $      417,125 |
| 2/13/2021 - 2/16/2021 | 4 | $149.660 | 18,750 | 75,000 | $11,224,500 |
| 2/17/2021-2/17/2021 | 1 | $725.000 | 18,750 | 18,750 | $13,593,750 |
| 2/20/2021-2/22/2021 | 3 | $ 15.000 | 18,750 | 56,250 | $      843,750 |

**Grand Total**       **$26,079,125**

The terms for those orders of natural gas were confirmed by Transaction Confirmation sheets, copies of which are attached hereto as **EXHIBIT B**.  A copy of the unpaid Invoice memorializing the foregoing is attached hereto as **EXHIBIT C**.

5.       Bankruptcy Code Section 503(b)(9) provides that "After notice and a hearing, there shall be allowed, administrative expenses, … including — the  value of any goods received by the debtor within twenty (20) days before the date of the commencement of the case under this title in which the goods have been sold to the debtor in the ordinary course of such debtor's business."  Furthermore, section 2-107 of the Uniform Commercial Code provides that natural gas is a "good."

6.       As shown by the Transaction Confirmation sheets attached hereto as **Exhibit B,** all of the natural gas delivered by NJR was received by the Debtor within 20 days before the commencement of the Debtor's chapter 11 case.  Thus, the full amount of the **$26,079,125**

sought in this proof of claim is entitled to be treated as an administrative expense pursuant to Bankruptcy Code Section 503(b)(9).

7.      The filing of this proof of claim shall not be deemed to be: (a) a waiver or release of NJR's rights; (b) a waiver or release of any right or claim of NJR arising out of any other claim, of any nature whatsoever, which NJR has against the Debtor (or its affiliates, if any); (c) a waiver or release of any rights of NJR under any provision of the Bankruptcy Code or applicable non-bankruptcy law; (d) an election of any remedy to the exclusion, express or implied, of any other remedy; (e) a consent that this claim is a debt which is subject to discharge in this or any other subsequent bankruptcy proceeding; (f) a ratification or consent to any obligations or liability based upon or arising out of any transactions between NJR and the Debtor; (g) a waiver or release of any rights of NJR to have any and all final orders in any and all non-core matters entered only after *de novo* review by a U.S. District Court; (h) a waiver or release of any right to a jury trial; or (i) a waiver or release of any rights of NJR to have the reference withdrawn in this matter or any related proceeding.  All of the foregoing rights and claims are hereby preserved without exception and with no purpose of confessing or conceding any of the foregoing in any way by this filing or by any other participation in this case.

8.      NJR reserves the right to amend or supplement this proof of claim at any time and in any respect, including, without limitations, for the purpose of:  (i) setting forth or changing the basis or amount of the claim described herein; (ii) further describing the claim, and/or (iii) providing further evidence relating to the claim.

DocuSign Envelope ID: 6818B528-C1C6-4291-A494-F2FB63E2A7DA

9.      All notices to NJR should be addressed as follows:

Nancy A. Washington
Senior Vice President & General Counsel
**NJR ENERGY SERVICES COMPANY**
1415 Wyckoff Road
Wall, New Jersey 07719

William P. Scharfenberg
Assistant General Counsel
**NJR ENERGY SERVICES COMPANY**
1415 Wyckoff Road
Wall, New Jersey 07719


With copies to:

**GIBBONS P.C.**
One Gateway Center
Newark, New Jersey 07102
Attn:   Robert K. Malone, Esq.
        Mark B. Conlan, Esq.

Dated: April __, 2021

                                    **NJR ENERGY SERVICES COMPANY**


By: _____
        Nancy A. Washington
        Senior Vice President &
        General Counsel

4

DocuSign Envelope ID: 8818B528-C1C6-4291-A494-F2FB63E2A7DA

# EXHIBIT A

# Base Contract for Sale and Purchase of Natural Gas

This Base Contract is entered into as of the following date: February 17, 2012.  The parties to this Base Contract are the following:

| NJR Energy Services Company | and | Brazos Electric Power Cooperative, Inc. |
|---|---|---|
| 1415 Wyckoff Road, PO Box 1464  Wall, NJ  07719 | | 2404 LaSalle Ave., Waco, TX  76706 |
| Duns Number: 02-571-5165 | | Duns Number: 00377-2290 |
| Contract Number: | | Contract Number: |
| U.S. Federal Tax ID Number: 22-3486298 | | U.S. Federal Tax ID Number: 74-0524729 |

*Notices*:

| NJR Energy Services Company | | Brazos Electric Power Cooperative, Inc. |
|---|---|---|
| Attn: Contracts Dept.-Energy Services | | Attn: Vice President of Power Supply and Generation |
| Phone: (732)938-1196     Fax: (732) 919-8118 | | Phone: (254) 750-6500     Fax: (254) 750-6367 |

*Confirmations*:

| NJR Energy Services Company | | ACES Power Mktg., 4140 W. 99th St., Carmel, IN  46032 |
|---|---|---|
| Attn: Kathy Casey | | Attn: Trading Control |
| Phone: (732) 938-7879     Fax: (732) 938-6744 | | Phone: (317) 344-7000    Fax: (317) 344-7099 |

*Invoices and Payments*:

| NJR Energy Services Company | | Brazos Electric Power Cooperative, Inc. |
|---|---|---|
| Attn: Pasquale Pope | | Attn: General Account Supervisor |
| Phone: (732) 938-1120     Fax: (732) 938-7547 | | Phone: (254) 750-6500     Fax: (254) 750-6229 |

*Wire Transfer or ACH Numbers (if applicable)*:

| BANK: PNC Bank NA, Pittsburgh, PA | | BANK: Bank of America, Dallas, TX |
|---|---|---|
| ABA: ABA-043-000-096 | | ABA: 026009593 |
| ACCT: 1004387446 | | ACCT: 004770496398 |
| Other Details: | | Other Details: |

This Base Contract incorporates by reference for all purposes the General Terms and Conditions for Sale and Purchase of Natural Gas published by the North American Energy Standards Board.  The parties hereby agree to the following provisions offered in said General Terms and Conditions. In the event the parties fail to check a box, the specified default provision shall apply.  Select only one box from each section:

| **Section 1.2** Transaction Procedure | ➡ Oral (default)<br>☐ Written | **Section 7.2** Payment Date | ➡ 25th Day of Month following Month of delivery (default)<br>☐ ___Day of Month following Month of delivery |
|---|---|---|---|
| **Section 2.5** Confirm Deadline | ➡ 2 Business Days after receipt (default)<br>☐ ___ Business Days after receipt | **Section 7.2** Method of Payment | ➡ Wire transfer (default)<br>➡ Automated Clearinghouse Credit (ACH)<br>☐ Check |
| **Section 2.6** Confirming Party | ☐ Seller (default)<br>☐ Buyer | **Section 7.7** Netting | ➡ Netting applies (default)<br>☐ Netting does not apply |
| **Section 3.2** Performance Obligation | ☐ Cover Standard (default)<br>☐ Spot Price Standard | **Section 10.3.1** Early Termination Damages | ➡ Early Termination Damages Apply (default)<br>☐ Early Termination Damages Do Not Apply |
| *Note: The following Spot Price Publication applies to both of the immediately preceding.* | | **Section 10.3.2** Other Agreement Setoffs | ➡ Other Agreement Setoffs Apply (default)<br>☐ Other Agreement Setoffs Do Not Apply |
| **Section 2.26** Spot Price Publication | ➡ Gas Daily Midpoint (default)<br>☐ _____ | **Section 14.5** Choice Of Law | Texas |
| **Section 6** Taxes | ➡ Buyer Pays At and After Delivery Point (default)<br>☐ Seller Pays Before and At Delivery Point | **Section 14.10** Confidentiality | ➡ Confidentiality applies (default)<br>☐ Confidentiality does not apply |

➡ **Special Provisions** Number of sheets attached:  7
☐ Addendum(s):_____

IN WITNESS WHEREOF, the parties hereto have executed this Base Contract in duplicate.

| **NJR Energy Services Company** | **Brazos Electric Power Cooperative, Inc.** |
|---|---|
| Party Name | Party Name |
| By _____ | By _____ |
| Name: Stephen D. Westhoven | Name: Clifton Karnei |
| Title: Senior Vice President | Title: Executive Vice President and General Manager |

Copyright © 2002 North American Energy Standards Board, Inc.
All Rights Reserved

NAESB Standard 6.3.1
April 19, 2002

# General Terms and Conditions
## Base Contract for Sale and Purchase of Natural Gas

## SECTION 1.   PURPOSE AND PROCEDURES

1.1.   These General Terms and Conditions are intended to facilitate purchase and sale transactions of Gas on a Firm or Interruptible basis. "Buyer" refers to the party receiving Gas and "Seller" refers to the party delivering Gas. The entire agreement between the parties shall be the Contract as defined in Section 2.7.

**The parties have selected either the "Oral Transaction Procedure" or the "Written Transaction Procedure" as indicated on the Base Contract.**

**Oral Transaction Procedure:**

1.2.   The parties will use the following Transaction Confirmation procedure. Any Gas purchase and sale transaction may be effectuated in an EDI transmission or telephone conversation with the offer and acceptance constituting the agreement of the parties. The parties shall be legally bound from the time they so agree to transaction terms and may each rely thereon. Any such transaction shall be considered a "writing" and to have been "signed". Notwithstanding the foregoing sentence, the parties agree that Confirming Party shall, and the other party may, confirm a telephonic transaction by sending the other party a Transaction Confirmation by facsimile, EDI or mutually agreeable electronic means within three Business Days of a transaction covered by this Section 1.2 (Oral Transaction Procedure) provided that the failure to send a Transaction Confirmation shall not invalidate the oral agreement of the parties. Confirming Party adopts its confirming letterhead, or the like, as its signature on any Transaction Confirmation as the identification and authentication of Confirming Party. If the Transaction Confirmation contains any provisions other than those relating to the commercial terms of the transaction (i.e., price, quantity, performance obligation, delivery point, period of delivery and/or transportation conditions), which modify or supplement the Base Contract or General Terms and Conditions of this Contract (e.g., arbitration or additional representations and warranties), such provisions shall not be deemed to be accepted pursuant to Section 1.3 but must be expressly agreed to by both parties; provided that the foregoing shall not invalidate any transaction agreed to by the parties.

**Written Transaction Procedure:**

1.2.   The parties will use the following Transaction Confirmation procedure. Should the parties come to an agreement regarding a Gas purchase and sale transaction for a particular Delivery Period, the Confirming Party shall, and the other party may, record that agreement on a Transaction Confirmation and communicate such Transaction Confirmation by facsimile, EDI or mutually agreeable electronic means, to the other party by the close of the Business Day following the date of agreement. The parties acknowledge that their agreement will not be binding until the exchange of nonconflicting Transaction Confirmations or the passage of the Confirm Deadline without objection from the receiving party, as provided in Section 1.3.

1.3.   If a sending party's Transaction Confirmation is materially different from the receiving party's understanding of the agreement referred to in Section 1.2, such receiving party shall notify the sending party via facsimile, EDI or mutually agreeable electronic means by the Confirm Deadline, unless such receiving party has previously sent a Transaction Confirmation to the sending party. The failure of the receiving party to so notify the sending party in writing by the Confirm Deadline constitutes the receiving party's agreement to the terms of the transaction described in the sending party's Transaction Confirmation. If there are any material differences between timely sent Transaction Confirmations governing the same transaction, then neither Transaction Confirmation shall be binding until or unless such differences are resolved including the use of any evidence that clearly resolves the differences in the Transaction Confirmations. In the event of a conflict among the terms of (i) a binding Transaction Confirmation pursuant to Section 1.2, (ii) the oral agreement of the parties which may be evidenced by a recorded conversation, where the parties have selected the Oral Transaction Procedure of the Base Contract, (iii) the Base Contract, and (iv) these General Terms and Conditions, the terms of the documents shall govern in the priority listed in this sentence.

1.4.   The parties agree that each party may electronically record all telephone conversations with respect to this Contract between their respective employees, without any special or further notice to the other party. Each party shall obtain any necessary consent of its agents and employees to such recording. Where the parties have selected the Oral Transaction Procedure in Section 1.2 of the Base Contract, the parties agree not to contest the validity or enforceability of telephonic recordings entered into in accordance with the requirements of this Base Contract. However, nothing herein shall be construed as a waiver of any objection to the admissibility of such evidence.

## SECTION 2.   DEFINITIONS

The terms set forth below shall have the meaning ascribed to them below. Other terms are also defined elsewhere in the Contract and shall have the meanings ascribed to them herein.

2.1.   "Alternative Damages" shall mean such damages, expressed in dollars or dollars per MMBtu, as the parties shall agree upon in the Transaction Confirmation, in the event either Seller or Buyer fails to perform a Firm obligation to deliver Gas in the case of Seller or to receive Gas in the case of Buyer.

2.2.   "Base Contract" shall mean a contract executed by the parties that incorporates these General Terms and Conditions by reference; that specifies the agreed selections of provisions contained herein; and that sets forth other information required herein and any Special Provisions and addendum(s) as identified on page one.

2.3.   "British thermal unit" or "Btu" shall mean the International BTU, which is also called the Btu (IT).

Copyright © 2002 North American Energy Standards Board, Inc.
All Rights Reserved

NAESB Standard 6.3.1
April 19, 2002

2.4.    "Business Day" shall mean any day except Saturday, Sunday or Federal Reserve Bank holidays.

2.5.    "Confirm Deadline" shall mean 5:00 p.m. in the receiving party's time zone on the second Business Day following the Day a Transaction Confirmation is received or, if applicable, on the Business Day agreed to by the parties in the Base Contract; provided, if the Transaction Confirmation is time stamped after 5:00 p.m. in the receiving party's time zone, it shall be deemed received at the opening of the next Business Day.

2.6.    "Confirming Party" shall mean the party designated in the Base Contract to prepare and forward Transaction Confirmations to the other party.

2.7.    "Contract" shall mean the legally-binding relationship established by (i) the Base Contract, (ii) any and all binding Transaction Confirmations and (iii) where the parties have selected the Oral Transaction Procedure in Section 1.2 of the Base Contract, any and all transactions that the parties have entered into through an EDI transmission or by telephone, but that have not been confirmed in a binding Transaction Confirmation.

2.8.    "Contract Price" shall mean the amount expressed in U.S. Dollars per MMBtu to be paid by Buyer to Seller for the purchase of Gas as agreed to by the parties in a transaction.

2.9.    "Contract Quantity" shall mean the quantity of Gas to be delivered and taken as agreed to by the parties in a transaction.

2.10.    "Cover Standard", as referred to in Section 3.2, shall mean that if there is an unexcused failure to take or deliver any quantity of Gas pursuant to this Contract, then the performing party shall use commercially reasonable efforts to (i) if Buyer is the performing party, obtain Gas, (or an alternate fuel if elected by Buyer and replacement Gas is not available), or (ii) if Seller is the performing party, sell Gas, in either case, at a price reasonable for the delivery or production area, as applicable, consistent with:  the amount of notice provided by the nonperforming party; the immediacy of the Buyer's Gas consumption needs or Seller's Gas sales requirements, as applicable; the quantities involved; and the anticipated length of failure by the nonperforming party.

2.11.    "Credit Support Obligation(s)" shall mean any obligation(s) to provide or establish credit support for, or on behalf of, a party to this Contract such as an irrevocable standby letter of credit, a margin agreement, a prepayment, a security interest in an asset, a performance bond, guaranty, or other good and sufficient security of a continuing nature.

2.12.    "Day" shall mean a period of 24 consecutive hours, coextensive with a "day" as defined by the Receiving Transporter in a particular transaction.

2.13.    "Delivery Period" shall be the period during which deliveries are to be made as agreed to by the parties in a transaction.

2.14.    "Delivery Point(s)" shall mean such point(s) as are agreed to by the parties in a transaction.

2.15.    "EDI" shall mean an electronic data interchange pursuant to an agreement entered into by the parties, specifically relating to the communication of Transaction Confirmations under this Contract.

2.16.    "EFP" shall mean the purchase, sale or exchange of natural Gas as the "physical" side of an exchange for physical transaction involving gas futures contracts.  EFP shall incorporate the meaning and remedies of "Firm", provided that a party's excuse for nonperformance of its obligations to deliver or receive Gas will be governed by the rules of the relevant futures exchange regulated under the Commodity Exchange Act.

2.17.    "Firm" shall mean that either party may interrupt its performance without liability only to the extent that such performance is prevented for reasons of Force Majeure; provided, however, that during Force Majeure interruptions, the party invoking Force Majeure may be responsible for any Imbalance Charges as set forth in Section 4.3 related to its interruption after the nomination is made to the Transporter and until the change in deliveries and/or receipts is confirmed by the Transporter.

2.18.    "Gas" shall mean any mixture of hydrocarbons and noncombustible gases in a gaseous state consisting primarily of methane.

2.19.    "Imbalance Charges" shall mean any fees, penalties, costs or charges (in cash or in kind) assessed by a Transporter for failure to satisfy the Transporter's balance and/or nomination requirements.

2.20.    "Interruptible" shall mean that either party may interrupt its performance at any time for any reason, whether or not caused by an event of Force Majeure, with no liability, except such interrupting party may be responsible for any Imbalance Charges as set forth in Section 4.3 related to its interruption after the nomination is made to the Transporter and until the change in deliveries and/or receipts is confirmed by Transporter.

2.21.    "MMBtu" shall mean one million British thermal units, which is equivalent to one dekatherm.

2.22.    "Month" shall mean the period beginning on the first Day of the calendar month and ending immediately prior to the commencement of the first Day of the next calendar month.

2.23.    "Payment Date" shall mean a date, as indicated on the Base Contract, on or before which payment is due Seller for Gas received by Buyer in the previous Month.

2.24.    "Receiving Transporter" shall mean the Transporter receiving Gas at a Delivery Point, or absent such receiving Transporter, the Transporter delivering Gas at a Delivery Point.

2.25.    "Scheduled Gas" shall mean the quantity of Gas confirmed by Transporter(s) for movement, transportation or management.

2.26.    "Spot Price " as referred to in Section 3.2 shall mean the price listed in the publication indicated on the Base Contract, under the listing applicable to the geographic location closest in proximity to the Delivery Point(s) for the relevant Day; provided, if there is no single price published for such location for such Day, but there is published a range of prices, then the Spot Price shall be the average

of such high and low prices.  If no price or range of prices is published for such Day, then the Spot Price shall be the average of the following: (i) the price (determined as stated above) for the first Day for which a price or range of prices is published that next precedes the relevant Day; and (ii) the price (determined as stated above) for the first Day for which a price or range of prices is published that next follows the relevant Day.

2.27.    "Transaction Confirmation" shall mean a document, similar to the form of Exhibit A, setting forth the terms of a transaction formed pursuant to Section 1 for a particular Delivery Period.

2.28.    "Termination Option" shall mean the option of either party to terminate a transaction in the event that the other party fails to perform a Firm obligation to deliver Gas in the case of Seller or to receive Gas in the case of Buyer for a designated number of days during a period as specified on the applicable Transaction Confirmation.

2.29.    "Transporter(s)" shall mean all Gas gathering or pipeline companies, or local distribution companies, acting in the capacity of a transporter, transporting Gas for Seller or Buyer upstream or downstream, respectively, of the Delivery Point pursuant to a particular transaction.

# SECTION 3.    PERFORMANCE OBLIGATION

3.1.    Seller agrees to sell and deliver, and Buyer agrees to receive and purchase, the Contract Quantity for a particular transaction in accordance with the terms of the Contract.  Sales and purchases will be on a Firm or Interruptible basis, as agreed to by the parties in a transaction.

| The parties have selected either the "Cover Standard" or the "Spot Price Standard" as indicated on the Base Contract. |
| --- |
| **Cover Standard:** |
| 3.2.    The sole and exclusive remedy of the parties in the event of a breach of a Firm obligation to deliver or receive Gas shall be recovery of the following: (i) in the event of a breach by Seller on any Day(s), payment by Seller to Buyer in an amount equal to the positive difference, if any, between the purchase price paid by Buyer utilizing the Cover Standard and the Contract Price, adjusted for commercially reasonable differences in transportation costs to or from the Delivery Point(s), multiplied by the difference between the Contract Quantity and the quantity actually delivered by Seller for such Day(s); or (ii) in the event of a breach by Buyer on any Day(s), payment by Buyer to Seller in the amount equal to the positive difference, if any, between the Contract Price and the price received by Seller utilizing the Cover Standard for the resale of such Gas, adjusted for commercially reasonable differences in transportation costs to or from the Delivery Point(s), multiplied by the difference between the Contract Quantity and the quantity actually taken by Buyer for such Day(s); or (iii) in the event that Buyer has used commercially reasonable efforts to replace the Gas or Seller has used commercially reasonable efforts to sell the Gas to a third party, and no such replacement or sale is available, then the sole and exclusive remedy of the performing party shall be any unfavorable difference between the Contract Price and the Spot Price, adjusted for such transportation to the applicable Delivery Point, multiplied by the difference between the Contract Quantity and the quantity actually delivered by Seller and received by Buyer for such Day(s).  Imbalance Charges shall not be recovered under this Section 3.2, but Seller and/or Buyer shall be responsible for Imbalance Charges, if any, as provided in Section 4.3.  The amount of such unfavorable difference shall be payable five Business Days after presentation of the performing party's invoice, which shall set forth the basis upon which such amount was calculated. |
| **Spot Price Standard:** |
| 3.2.    The sole and exclusive remedy of the parties in the event of a breach of a Firm obligation to deliver or receive Gas shall be recovery of the following: (i) in the event of a breach by Seller on any Day(s), payment by Seller to Buyer in an amount equal to the difference between the Contract Quantity and the actual quantity delivered by Seller and received by Buyer for such Day(s), multiplied by the positive difference, if any, obtained by subtracting the Contract Price from the Spot Price; or (ii) in the event of a breach by Buyer on any Day(s), payment by Buyer to Seller in an amount equal to the difference between the Contract Quantity and the actual quantity delivered by Seller and received by Buyer for such Day(s), multiplied by the positive difference, if any, obtained by subtracting the applicable Spot Price from the Contract Price.  Imbalance Charges shall not be recovered under this Section 3.2, but Seller and/or Buyer shall be responsible for Imbalance Charges, if any, as provided in Section 4.3.  The amount of such unfavorable difference shall be payable five Business Days after presentation of the performing party's invoice, which shall set forth the basis upon which such amount was calculated. |

3.3.    Notwithstanding Section 3.2, the parties may agree to Alternative Damages in a Transaction Confirmation executed in writing by both parties.

3.4.    In addition to Sections 3.2 and 3.3, the parties may provide for a Termination Option in a Transaction Confirmation executed in writing by both parties.  The Transaction Confirmation containing the Termination Option will designate the length of nonperformance triggering the Termination Option and the procedures for exercise thereof, how damages for nonperformance will be compensated, and how liquidation costs will be calculated.

# SECTION 4.    TRANSPORTATION, NOMINATIONS, AND IMBALANCES

4.1.    Seller shall have the sole responsibility for transporting the Gas to the Delivery Point(s).  Buyer shall have the sole responsibility for transporting the Gas from the Delivery Point(s).

4.2.    The parties shall coordinate their nomination activities, giving sufficient time to meet the deadlines of the affected Transporter(s).  Each party shall give the other party timely prior Notice, sufficient to meet the requirements of all Transporter(s) involved in the transaction, of the quantities of Gas to be delivered and purchased each Day.  Should either party become aware that actual deliveries at the Delivery Point(s) are greater or lesser than the Scheduled Gas, such party shall promptly notify the other party.

Copyright © 2002 North American Energy Standards Board, Inc.
All Rights Reserved

NAESB Standard 6.3.1
April 19, 2002

4.3.    The parties shall use commercially reasonable efforts to avoid imposition of any Imbalance Charges.  If Buyer or Seller receives an invoice from a Transporter that includes Imbalance Charges, the parties shall determine the validity as well as the cause of such Imbalance Charges.  If the Imbalance Charges were incurred as a result of Buyer's receipt of quantities of Gas greater than or less than the Scheduled Gas, then Buyer shall pay for such Imbalance Charges or reimburse Seller for such Imbalance Charges paid by Seller.  If the Imbalance Charges were incurred as a result of Seller's delivery of quantities of Gas greater than or less than the Scheduled Gas, then Seller shall pay for such Imbalance Charges or reimburse Buyer for such Imbalance Charges paid by Buyer.

# SECTION 5.    QUALITY AND MEASUREMENT

All Gas delivered by Seller shall meet the pressure, quality and heat content requirements of the Receiving Transporter.  The unit of quantity measurement for purposes of this Contract shall be one MMBtu dry.  Measurement of Gas quantities hereunder shall be in accordance with the established procedures of the Receiving Transporter.

# SECTION 6.    TAXES

| The parties have selected either "Buyer Pays At and After Delivery Point" or "Seller Pays Before and At Delivery Point" as indicated on the Base Contract. |
| --- |
| **Buyer Pays At and After Delivery Point:** |
| Seller shall pay or cause to be paid all taxes, fees, levies, penalties, licenses or charges imposed by any government authority ("Taxes") on or with respect to the Gas prior to the Delivery Point(s).  Buyer shall pay or cause to be paid all Taxes on or with respect to the Gas at the Delivery Point(s) and all Taxes after the Delivery Point(s).  If a party is required to remit or pay Taxes that are the other party's responsibility hereunder, the party responsible for such Taxes shall promptly reimburse the other party for such Taxes.  Any party entitled to an exemption from any such Taxes or charges shall furnish the other party any necessary documentation thereof. |
| **Seller Pays Before and At Delivery Point:** |
| Seller shall pay or cause to be paid all taxes, fees, levies, penalties, licenses or charges imposed by any government authority ("Taxes") on or with respect to the Gas prior to the Delivery Point(s) and all Taxes at the Delivery Point(s).  Buyer shall pay or cause to be paid all Taxes on or with respect to the Gas after the Delivery Point(s).  If a party is required to remit or pay Taxes that are the other party's responsibility hereunder, the party responsible for such Taxes shall promptly reimburse the other party for such Taxes.  Any party entitled to an exemption from any such Taxes or charges shall furnish the other party any necessary documentation thereof. |

# SECTION 7.    BILLING, PAYMENT, AND AUDIT

7.1.    Seller shall invoice Buyer for Gas delivered and received in the preceding Month and for any other applicable charges, providing supporting documentation acceptable in industry practice to support the amount charged.  If the actual quantity delivered is not known by the billing date, billing will be prepared based on the quantity of Scheduled Gas.  The invoiced quantity will then be adjusted to the actual quantity on the following Month's billing or as soon thereafter as actual delivery information is available.

7.2.    Buyer shall remit the amount due under Section 7.1 in the manner specified in the Base Contract, in immediately available funds, on or before the later of the Payment Date or 10 Days after receipt of the invoice by Buyer; provided that if the Payment Date is not a Business Day, payment is due on the next Business Day following that date.  In the event any payments are due Buyer hereunder, payment to Buyer shall be made in accordance with this Section 7.2.

7.3.    In the event payments become due pursuant to Sections 3.2 or 3.3, the performing party may submit an invoice to the nonperforming party for an accelerated payment setting forth the basis upon which the invoiced amount was calculated.  Payment from the nonperforming party will be due five Business Days after receipt of invoice.

7.4.    If the invoiced party, in good faith, disputes the amount of any such invoice or any part thereof, such invoiced party will pay such amount as it concedes to be correct; provided, however, if the invoiced party disputes the amount due, it must provide supporting documentation acceptable in industry practice to support the amount paid or disputed.  In the event the parties are unable to resolve such dispute, either party may pursue any remedy available at law or in equity to enforce its rights pursuant to this Section.

7.5.    If the invoiced party fails to remit the full amount payable when due, interest on the unpaid portion shall accrue from the date due until the date of payment at a rate equal to the lower of (i) the then-effective prime rate of interest published under "Money Rates" by The Wall Street Journal, plus two percent per annum; or (ii) the maximum applicable lawful interest rate.

7.6.    A party shall have the right, at its own expense, upon reasonable Notice and at reasonable times, to examine and audit and to obtain copies of the relevant portion of the books, records, and telephone recordings of the other party only to the extent reasonably necessary to verify the accuracy of any statement, charge, payment, or computation made under the Contract.  This right to examine, audit, and to obtain copies shall not be available with respect to proprietary information not directly relevant to transactions under this Contract.  All invoices and billings shall be conclusively presumed final and accurate and all associated claims for under- or overpayments shall be deemed waived unless such invoices or billings are objected to in writing, with adequate explanation and/or documentation, within two years after the Month of Gas delivery.  All retroactive adjustments under Section 7 shall be paid in full by the party owing payment within 30 Days of Notice and substantiation of such inaccuracy.

7.7.    Unless the parties have elected on the Base Contract not to make this Section 7.7 applicable to this Contract, the parties shall net all undisputed amounts due and owing, and/or past due, arising under the Contract such that the party owing the greater amount shall make a single payment of the net amount to the other party in accordance with Section 7; provided that no payment required to be made pursuant to the terms of any Credit Support Obligation or pursuant to Section 7.3 shall be subject to netting under this Section.  If the parties have executed a separate netting agreement, the terms and conditions therein shall prevail to the extent inconsistent herewith.

DocuSign Envelope ID: 6818B528-C1C6-4291-A494-E2FB63E2A7DA

# SECTION 8. TITLE, WARRANTY, AND INDEMNITY

8.1.    Unless otherwise specifically agreed, title to the Gas shall pass from Seller to Buyer at the Delivery Point(s). Seller shall have responsibility for and assume any liability with respect to the Gas prior to its delivery to Buyer at the specified Delivery Point(s). Buyer shall have responsibility for and any liability with respect to said Gas after its delivery to Buyer at the Delivery Point(s).

8.2.    Seller warrants that it will have the right to convey and will transfer good and merchantable title to all Gas sold hereunder and delivered by it to Buyer, free and clear of all liens, encumbrances, and claims. EXCEPT AS PROVIDED IN THIS SECTION 8.2 AND IN SECTION 14.8, ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING ANY WARRANTY OF MERCHANTABILITY OR OF FITNESS FOR ANY PARTICULAR PURPOSE, ARE DISCLAIMED.

8.3.    Seller agrees to indemnify Buyer and save it harmless from all losses, liabilities or claims including reasonable attorneys' fees and costs of court ("Claims"), from any and all persons, arising from or out of claims of title, personal injury or property damage from said Gas or other charges thereon which attach before title passes to Buyer. Buyer agrees to indemnify Seller and save it harmless from all Claims, from any and all persons, arising from or out of claims regarding payment, personal injury or property damage from said Gas or other charges thereon which attach after title passes to Buyer.

8.4.    Notwithstanding the other provisions of this Section 8, as between Seller and Buyer, Seller will be liable for all Claims to the extent that such arise from the failure of Gas delivered by Seller to meet the quality requirements of Section 5.

# SECTION 9. NOTICES

9.1.    All Transaction Confirmations, invoices, payments and other communications made pursuant to the Base Contract ("Notices") shall be made to the addresses specified in writing by the respective parties from time to time.

9.2.    All Notices required hereunder may be sent by facsimile or mutually acceptable electronic means, a nationally recognized overnight courier service, first class mail or hand delivered.

9.3.    Notice shall be given when received on a Business Day by the addressee. In the absence of proof of the actual receipt date, the following presumptions will apply. Notices sent by facsimile shall be deemed to have been received upon the sending party's receipt of its facsimile machine's confirmation of successful transmission. If the day on which such facsimile is received is not a Business Day or is after five p.m. on a Business Day, then such facsimile shall be deemed to have been received on the next following Business Day. Notice by overnight mail or courier shall be deemed to have been received on the next Business Day after it was sent or such earlier time as is confirmed by the receiving party. Notice via first class mail shall be considered delivered five Business Days after mailing.

# SECTION 10. FINANCIAL RESPONSIBILITY

10.1.    If either party ("X") has reasonable grounds for insecurity regarding the performance of any obligation under this Contract (whether or not then due) by the other party ("Y") (including, without limitation, the occurrence of a material change in the creditworthiness of Y), X may demand Adequate Assurance of Performance. "Adequate Assurance of Performance" shall mean sufficient security in the form, amount and for the term reasonably acceptable to X, including, but not limited to, a standby irrevocable letter of credit, a prepayment, a security interest in an asset or a performance bond or guaranty (including the issuer of any such security).

10.2.    In the event (each an "Event of Default") either party (the "Defaulting Party") or its guarantor shall: (i) make an assignment or any general arrangement for the benefit of creditors; (ii) file a petition or otherwise commence, authorize, or acquiesce in the commencement of a proceeding or case under any bankruptcy or similar law for the protection of creditors or have such petition filed or proceeding commenced against it; (iii) otherwise become bankrupt or insolvent (however evidenced); (iv) be unable to pay its debts as they fall due; (v) have a receiver, provisional liquidator, conservator, custodian, trustee or other similar official appointed with respect to it or substantially all of its assets; (vi) fail to perform any obligation to the other party with respect to any Credit Support Obligations relating to the Contract; (vii) fail to give Adequate Assurance of Performance under Section 10.1 within 48 hours but at least one Business Day of a written request by the other party; or (viii) not have paid any amount due the other party hereunder on or before the second Business Day following written Notice that such payment is due; then the other party (the "Non-Defaulting Party") shall have the right, at its sole election, to immediately withhold and/or suspend deliveries or payments upon Notice and/or to terminate and liquidate the transactions under the Contract, in the manner provided in Section 10.3, in addition to any and all other remedies available hereunder.

10.3.    If an Event of Default has occurred and is continuing, the Non-Defaulting Party shall have the right, by Notice to the Defaulting Party, to designate a Day, no earlier than the Day such Notice is given and no later than 20 Days after such Notice is given, as an early termination date (the "Early Termination Date") for the liquidation and termination pursuant to Section 10.3.1 of all transactions under the Contract, each a "Terminated Transaction". On the Early Termination Date, all transactions will terminate, other than those transactions, if any, that may not be liquidated and terminated under applicable law or that are, in the reasonable opinion of the Non-Defaulting Party, commercially impracticable to liquidate and terminate ("Excluded Transactions"), which Excluded Transactions must be liquidated and terminated as soon thereafter as is reasonably practicable, and upon termination shall be a Terminated Transaction and be valued consistent with Section 10.3.1 below. With respect to each Excluded Transaction, its actual termination date shall be the Early Termination Date for purposes of Section 10.3.1.

**The parties have selected either "Early Termination Damages Apply" or "Early Termination Damages Do Not Apply" as indicated on the Base Contract.**

**Early Termination Damages Apply:**

10.3.1.   As of the Early Termination Date, the Non-Defaulting Party shall determine, in good faith and in a commercially reasonable manner, (i) the amount owed (whether or not then due) by each party with respect to all Gas delivered and received between the parties under Terminated Transactions and Excluded Transactions on and before the Early Termination Date and all other applicable charges relating to such deliveries and receipts (including without limitation any amounts owed under Section 3.2), for which payment has not yet been made by the party that owes such payment under this Contract and (ii) the Market Value, as defined below, of each Terminated Transaction.  The Non-Defaulting Party shall (x) liquidate and accelerate each Terminated Transaction at its Market Value, so that each amount equal to the difference between such Market Value and the Contract Value, as defined below, of such Terminated Transaction(s) shall be due to the Buyer under the Terminated Transaction(s) if such Market Value exceeds the Contract Value and to the Seller if the opposite is the case; and (y) where appropriate, discount each amount then due under clause (x) above to present value in a commercially reasonable manner as of the Early Termination Date (to take account of the period between the date of liquidation and the date on which such amount would have otherwise been due pursuant to the relevant Terminated Transactions).

For purposes of this Section 10.3.1, "Contract Value" means the amount of Gas remaining to be delivered or purchased under a transaction multiplied by the Contract Price, and "Market Value" means the amount of Gas remaining to be delivered or purchased under a transaction multiplied by the market price for a similar transaction at the Delivery Point determined by the Non-Defaulting Party in a commercially reasonable manner.  To ascertain the Market Value, the Non-Defaulting Party may consider, among other valuations, any or all of the settlement prices of NYMEX Gas futures contracts, quotations from leading dealers in energy swap contracts or physical gas trading markets, similar sales or purchases and any other bona fide third-party offers, all adjusted for the length of the term and differences in transportation costs.  A party shall not be required to enter into a replacement transaction(s) in order to determine the Market Value.  Any extension(s) of the term of a transaction to which parties are not bound as of the Early Termination Date (including but not limited to "evergreen provisions") shall not be considered in determining Contract Values and Market Values.  For the avoidance of doubt, any option pursuant to which one party has the right to extend the term of a transaction shall be considered in determining Contract Values and Market Values.  The rate of interest used in calculating net present value shall be determined by the Non-Defaulting Party in a commercially reasonable manner.

**Early Termination Damages Do Not Apply:**

10.3.1.   As of the Early Termination Date, the Non-Defaulting Party shall determine, in good faith and in a commercially reasonable manner, the amount owed (whether or not then due) by each party with respect to all Gas delivered and received between the parties under Terminated Transactions and Excluded Transactions on and before the Early Termination Date and all other applicable charges relating to such deliveries and receipts (including without limitation any amounts owed under Section 3.2), for which payment has not yet been made by the party that owes such payment under this Contract.

**The parties have selected either "Other Agreement Setoffs Apply" or "Other Agreement Setoffs Do Not Apply" as indicated on the Base Contract.**

**Other Agreement Setoffs Apply:**

10.3.2.   The Non-Defaulting Party shall net or aggregate, as appropriate, any and all amounts owing between the parties under Section 10.3.1, so that all such amounts are netted or aggregated to a single liquidated amount payable by one party to the other (the "Net Settlement Amount").  At its sole option and without prior Notice to the Defaulting Party, the Non-Defaulting Party may setoff (i) any Net Settlement Amount owed to the Non-Defaulting Party against any margin or other collateral held by it in connection with any Credit Support Obligation relating to the Contract; or (ii) any Net Settlement Amount payable to the Defaulting Party against any amount(s) payable by the Defaulting Party to the Non-Defaulting Party under any other agreement or arrangement between the parties.

**Other Agreement Setoffs Do Not Apply:**

10.3.2.   The Non-Defaulting Party shall net or aggregate, as appropriate, any and all amounts owing between the parties under Section 10.3.1, so that all such amounts are netted or aggregated to a single liquidated amount payable by one party to the other (the "Net Settlement Amount").  At its sole option and without prior Notice to the Defaulting Party, the Non-Defaulting Party may setoff any Net Settlement Amount owed to the Non-Defaulting Party against any margin or other collateral held by it in connection with any Credit Support Obligation relating to the Contract.

10.3.3.   If any obligation that is to be included in any netting, aggregation or setoff pursuant to Section 10.3.2 is unascertained, the Non-Defaulting Party may in good faith estimate that obligation and net, aggregate or setoff, as applicable, in respect of the estimate, subject to the Non-Defaulting Party accounting to the Defaulting Party when the obligation is ascertained.  Any amount not then due which is included in any netting, aggregation or setoff pursuant to Section 10.3.2 shall be discounted to net present value in a commercially reasonable manner determined by the Non-Defaulting Party.

10.4.   As soon as practicable after a liquidation, Notice shall be given by the Non-Defaulting Party to the Defaulting Party of the Net Settlement Amount, and whether the Net Settlement Amount is due to or due from the Non-Defaulting Party.  The Notice shall include a written statement explaining in reasonable detail the calculation of such amount, provided that failure to give such Notice shall not affect the validity or enforceability of the liquidation or give rise to any claim by the Defaulting Party against the Non-Defaulting Party.  The Net Settlement Amount shall be paid by the close of business on the second Business Day following such Notice, which date shall not be earlier than the Early Termination Date.  Interest on any unpaid portion of the Net Settlement Amount shall accrue from the date due until the

date of payment at a rate equal to the lower of (i) the then-effective prime rate of interest published under "Money Rates" by The Wall Street Journal, plus two percent per annum; or (ii) the maximum applicable lawful interest rate.

**10.5.** The parties agree that the transactions hereunder constitute a "forward contract" within the meaning of the United States Bankruptcy Code and that Buyer and Seller are each "forward contract merchants" within the meaning of the United States Bankruptcy Code.

**10.6.** The Non-Defaulting Party's remedies under this Section 10 are the sole and exclusive remedies of the Non-Defaulting Party with respect to the occurrence of any Early Termination Date. Each party reserves to itself all other rights, setoffs, counterclaims and other defenses that it is or may be entitled to arising from the Contract.

**10.7.** With respect to this Section 10, if the parties have executed a separate netting agreement with close-out netting provisions, the terms and conditions therein shall prevail to the extent inconsistent herewith.

# SECTION 11.  FORCE MAJEURE

**11.1.** Except with regard to a party's obligation to make payment(s) due under Section 7, Section 10.4, and Imbalance Charges under Section 4, neither party shall be liable to the other for failure to perform a Firm obligation, to the extent such failure was caused by Force Majeure. The term "Force Majeure" as employed herein means any cause not reasonably within the control of the party claiming suspension, as further defined in Section 11.2.

**11.2.** Force Majeure shall include, but not be limited to, the following: (i) physical events such as acts of God, landslides, lightning, earthquakes, fires, storms or storm warnings, such as hurricanes, which result in evacuation of the affected area, floods, washouts, explosions, breakage or accident or necessity of repairs to machinery or equipment or lines of pipe; (ii) weather related events affecting an entire geographic region, such as low temperatures which cause freezing or failure of wells or lines of pipe; (iii) interruption and/or curtailment of Firm transportation and/or storage by Transporters; (iv) acts of others such as strikes, lockouts or other industrial disturbances, riots, sabotage, insurrections or wars; and (v) governmental actions such as necessity for compliance with any court order, law, statute, ordinance, regulation, or policy having the effect of law promulgated by a governmental authority having jurisdiction. Seller and Buyer shall make reasonable efforts to avoid the adverse impacts of a Force Majeure and to resolve the event or occurrence once it has occurred in order to resume performance.

**11.3.** Neither party shall be entitled to the benefit of the provisions of Force Majeure to the extent performance is affected by any or all of the following circumstances: (i) the curtailment of interruptible or secondary Firm transportation unless primary, in-path, Firm transportation is also curtailed; (ii) the party claiming excuse failed to remedy the condition and to resume the performance of such covenants or obligations with reasonable dispatch; or (iii) economic hardship, to include, without limitation, Seller's ability to sell Gas at a higher or more advantageous price than the Contract Price, Buyer's ability to purchase Gas at a lower or more advantageous price than the Contract Price, or a regulatory agency disallowing, in whole or in part, the pass through of costs resulting from this Agreement; (iv) the loss of Buyer's market(s) or Buyer's inability to use or resell Gas purchased hereunder, except, in either case, as provided in Section 11.2; or (v) the loss or failure of Seller's gas supply or depletion of reserves, except, in either case, as provided in Section 11.2. The party claiming Force Majeure shall not be excused from its responsibility for Imbalance Charges.

**11.4.** Notwithstanding anything to the contrary herein, the parties agree that the settlement of strikes, lockouts or other industrial disturbances shall be within the sole discretion of the party experiencing such disturbance.

**11.5.** The party whose performance is prevented by Force Majeure must provide Notice to the other party. Initial Notice may be given orally; however, written Notice with reasonably full particulars of the event or occurrence is required as soon as reasonably possible. Upon providing written Notice of Force Majeure to the other party, the affected party will be relieved of its obligation, from the onset of the Force Majeure event, to make or accept delivery of Gas, as applicable, to the extent and for the duration of Force Majeure, and neither party shall be deemed to have failed in such obligations to the other during such occurrence or event.

**11.6.** Notwithstanding Sections 11.2 and 11.3, the parties may agree to alternative Force Majeure provisions in a Transaction Confirmation executed in writing by both parties.

# SECTION 12.  TERM

This Contract may be terminated on 30 Day's written Notice, but shall remain in effect until the expiration of the latest Delivery Period of any transaction(s). The rights of either party pursuant to Section 7.6 and Section 10, the obligations to make payment hereunder, and the obligation of either party to indemnify the other, pursuant hereto shall survive the termination of the Base Contract or any transaction.

# SECTION 13.  LIMITATIONS

FOR BREACH OF ANY PROVISION FOR WHICH AN EXPRESS REMEDY OR MEASURE OF DAMAGES IS PROVIDED, SUCH EXPRESS REMEDY OR MEASURE OF DAMAGES SHALL BE THE SOLE AND EXCLUSIVE REMEDY. A PARTY'S LIABILITY HEREUNDER SHALL BE LIMITED AS SET FORTH IN SUCH PROVISION, AND ALL OTHER REMEDIES OR DAMAGES AT LAW OR IN EQUITY ARE WAIVED. IF NO REMEDY OR MEASURE OF DAMAGES IS EXPRESSLY PROVIDED HEREIN OR IN A TRANSACTION, A PARTY'S LIABILITY SHALL BE LIMITED TO DIRECT ACTUAL DAMAGES ONLY. SUCH DIRECT ACTUAL DAMAGES SHALL BE THE SOLE AND EXCLUSIVE REMEDY, AND ALL OTHER REMEDIES OR DAMAGES AT LAW OR IN EQUITY ARE WAIVED. UNLESS EXPRESSLY HEREIN PROVIDED, NEITHER PARTY SHALL BE LIABLE FOR CONSEQUENTIAL, INCIDENTAL, PUNITIVE, EXEMPLARY OR INDIRECT DAMAGES, LOST PROFITS OR OTHER BUSINESS INTERRUPTION DAMAGES, BY STATUTE, IN TORT OR CONTRACT, UNDER ANY INDEMNITY PROVISION OR OTHERWISE. IT IS THE INTENT OF THE PARTIES THAT THE LIMITATIONS HEREIN IMPOSED ON REMEDIES AND THE MEASURE OF DAMAGES BE WITHOUT REGARD TO THE CAUSE OR CAUSES RELATED THERETO, INCLUDING THE NEGLIGENCE OF ANY PARTY, WHETHER SUCH NEGLIGENCE BE SOLE, JOINT OR CONCURRENT, OR ACTIVE OR PASSIVE.

Copyright © 2002 North American Energy Standards Board, Inc.
All Rights Reserved

NAESB Standard 6.3.1
April 19, 2002

TO THE EXTENT ANY DAMAGES REQUIRED TO BE PAID HEREUNDER ARE LIQUIDATED, THE PARTIES ACKNOWLEDGE THAT THE DAMAGES ARE DIFFICULT OR IMPOSSIBLE TO DETERMINE, OR OTHERWISE OBTAINING AN ADEQUATE REMEDY IS INCONVENIENT AND THE DAMAGES CALCULATED HEREUNDER CONSTITUTE A REASONABLE APPROXIMATION OF THE HARM OR LOSS.

## SECTION 14. MISCELLANEOUS

14.1. This Contract shall be binding upon and inure to the benefit of the successors, assigns, personal representatives, and heirs of the respective parties hereto, and the covenants, conditions, rights and obligations of this Contract shall run for the full term of this Contract. No assignment of this Contract, in whole or in part, will be made without the prior written consent of the non-assigning party (and shall not relieve the assigning party from liability hereunder), which consent will not be unreasonably withheld or delayed; provided, either party may (i) transfer, sell, pledge, encumber, or assign this Contract or the accounts, revenues, or proceeds hereof in connection with any financing or other financial arrangements, or (ii) transfer its interest to any parent or affiliate by assignment, merger or otherwise without the prior approval of the other party. Upon any such assignment, transfer and assumption, the transferor shall remain principally liable for and shall not be relieved of or discharged from any obligations hereunder.

14.2. If any provision in this Contract is determined to be invalid, void or unenforceable by any court having jurisdiction, such determination shall not invalidate, void, or make unenforceable any other provision, agreement or covenant of this Contract.

14.3. No waiver of any breach of this Contract shall be held to be a waiver of any other or subsequent breach.

14.4. This Contract sets forth all understandings between the parties respecting each transaction subject hereto, and any prior contracts, understandings and representations, whether oral or written, relating to such transactions are merged into and superseded by this Contract and any effective transaction(s). This Contract may be amended only by a writing executed by both parties.

14.5. The interpretation and performance of this Contract shall be governed by the laws of the jurisdiction as indicated on the Base Contract, excluding, however, any conflict of laws rule which would apply the law of another jurisdiction.

14.6. This Contract and all provisions herein will be subject to all applicable and valid statutes, rules, orders and regulations of any governmental authority having jurisdiction over the parties, their facilities, or Gas supply, this Contract or transaction or any provisions thereof.

14.7. There is no third party beneficiary to this Contract.

14.8. Each party to this Contract represents and warrants that it has full and complete authority to enter into and perform this Contract. Each person who executes this Contract on behalf of either party represents and warrants that it has full and complete authority to do so and that such party will be bound thereby.

14.9. The headings and subheadings contained in this Contract are used solely for convenience and do not constitute a part of this Contract between the parties and shall not be used to construe or interpret the provisions of this Contract.

14.10. Unless the parties have elected on the Base Contract not to make this Section 14.10 applicable to this Contract, neither party shall disclose directly or indirectly without the prior written consent of the other party the terms of any transaction to a third party (other than the employees, lenders, royalty owners, counsel, accountants and other agents of the party, or prospective purchasers of all or substantially all of a party's assets or of any rights under this Contract, provided such persons shall have agreed to keep such terms confidential) except (i) in order to comply with any applicable law, order, regulation, or exchange rule, (ii) to the extent necessary for the enforcement of this Contract , (iii) to the extent necessary to implement any transaction, or (iv) to the extent such information is delivered to such third party for the sole purpose of calculating a published index. Each party shall notify the other party of any proceeding of which it is aware which may result in disclosure of the terms of any transaction (other than as permitted hereunder) and use reasonable efforts to prevent or limit the disclosure. The existence of this Contract is not subject to this confidentiality obligation. Subject to Section 13, the parties shall be entitled to all remedies available at law or in equity to enforce, or seek relief in connection with this confidentiality obligation. The terms of any transaction hereunder shall be kept confidential by the parties hereto for one year from the expiration of the transaction.

In the event that disclosure is required by a governmental body or applicable law, the party subject to such requirement may disclose the material terms of this Contract to the extent so required, but shall promptly notify the other party, prior to disclosure, and shall cooperate (consistent with the disclosing party's legal obligations) with the other party's efforts to obtain protective orders or similar restraints with respect to such disclosure at the expense of the other party.

14.11 The parties may agree to dispute resolution procedures in Special Provisions attached to the Base Contract or in a Transaction Confirmation executed in writing by both parties.

**DISCLAIMER:** The purposes of this Contract are to facilitate trade, avoid misunderstandings and make more definite the terms of contracts of purchase and sale of natural gas. Further, NAESB does not mandate the use of this Contract by any party. **NAESB DISCLAIMS AND EXCLUDES, AND ANY USER OF THIS CONTRACT ACKNOWLEDGES AND AGREES TO NAESB'S DISCLAIMER OF, ANY AND ALL WARRANTIES, CONDITIONS OR REPRESENTATIONS, EXPRESS OR IMPLIED, ORAL OR WRITTEN, WITH RESPECT TO THIS CONTRACT OR ANY PART THEREOF, INCLUDING ANY AND ALL IMPLIED WARRANTIES OR CONDITIONS OF TITLE, NON-INFRINGEMENT, MERCHANTABILITY, OR FITNESS OR SUITABILITY FOR ANY PARTICULAR PURPOSE (WHETHER OR NOT NAESB KNOWS, HAS REASON TO KNOW, HAS BEEN ADVISED, OR IS OTHERWISE IN FACT AWARE OF ANY SUCH PURPOSE), WHETHER ALLEGED TO ARISE BY LAW, BY REASON OF CUSTOM OR USAGE IN THE TRADE, OR BY COURSE OF DEALING. EACH USER OF THIS CONTRACT ALSO AGREES THAT UNDER NO CIRCUMSTANCES WILL NAESB BE LIABLE FOR ANY DIRECT, SPECIAL, INCIDENTAL, EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGES ARISING OUT OF ANY USE OF THIS CONTRACT.**

Copyright © 2002 North American Energy Standards Board, Inc.
All Rights Reserved

TRANSACTION CONFIRMATION                                    EXHIBIT A
FOR IMMEDIATE DELIVERY

| Letterhead/Logo | Date: _____, _____ |
| | Transaction Confirmation #: _____ |

This Transaction Confirmation is subject to the Base Contract between Seller and Buyer dated _____. The terms of this Transaction Confirmation are binding unless disputed in writing within 2 Business Days of receipt unless otherwise specified in the Base Contract.

| SELLER: | BUYER: |
|---|---|
| _____ | _____ |
| _____ | _____ |
| _____ | _____ |
| Attn: _____ | Attn: _____ |
| Phone: _____ | Phone: _____ |
| Fax: _____ | Fax: _____ |
| Base Contract No. _____ | Base Contract No. _____ |
| Transporter: _____ | Transporter: _____ |
| Transporter Contract Number: _____ | Transporter Contract Number: _____ |

Contract Price:  $_____ /MMBtu or _____

Delivery Period:  Begin: _____, ____          End: _____, ____

Performance Obligation and Contract Quantity:  (Select One)

Firm (Fixed Quantity):                  Firm (Variable Quantity):                  Interruptible:
_____ MMBtus/day                       _____ MMBtus/day Minimum                   Up to _____ MMBtus/day
☐ EFP                                   _____ MMBtus/day Maximum
                                        subject to Section 4.2. at election of
                                        ☐ Buyer or ☐ Seller

Delivery Point(s): _____
(If a pooling point is used, list a specific geographic and pipeline location):

Special Conditions:




| Seller: _____ | Buyer: _____ |
|---|---|
| By: _____ | By: _____ |
| Title: _____ | Title: _____ |
| Date: _____ | Date: _____ |

DocuSign Envelope ID: 6818B528-C1C6-4291-A494-F2FB63E2A7DA

### SPECIAL PROVISIONS ATTACHED TO AND FORMING PART OF THE BASE CONTRACT FOR SALE AND PURCHASE OF NATURAL GAS
by and between
NJR Energy Services Company ("NJRES" or "Party A") and
Brazos Electric Power Cooperative, Inc. ("Brazos" or "Party B"),
dated February 17, 2012

The terms and conditions set forth in these Special Provisions shall supplement and form part of the Base Contract and shall govern with respect to any conflicting or inconsistent provision in the Base Contract. Except as amended herein, the Base Contract shall remain in full force and effect. Unless otherwise noted, capitalized terms used in these Special Provisions have the meaning assigned to them in the Base Contract, and section references used in these Special Provisions refer to the sections of the Base Contract.

1.  Insert a new Section 1.5, as follows:

    "Messages exchanged by the parties using AOL Instant Messenger shall be treated as telephonic conversations for purposes of this Base Contract."

2.  Section 2.4 is amended by inserting the following language to the end of the sentence:

    "and shall begin at 8:00 a.m. and end at 5:00 p.m. Central Prevailing Time"

3.  Section 2.8 is amended by adding the following language to the end thereof:

    "The Contract Price includes reimbursement to Seller for any production or severance taxes owed by Seller with respect to Gas delivered hereunder."

4.  Section 3.4 shall be amended by adding the following language after the word "calculated" in the second sentence:

    ", provided, however, if a Termination Option is not otherwise specified in a Transaction Confirmation, the parties hereby agree that each party shall have, pursuant to this Section 3.4, a Termination Option for such Transaction Confirmations and shall have (a) the right to exercise its Termination Option in the event of nonperformance by the other party for a period of five (5) consecutive Days for the specific transaction affected by such nonperformance and (b) damages and liquidated costs calculated pursuant to Section 10 of the Base Contract, as amended by the Special Provisions."

5.  Section 7.7 is amended by (i) deleting the phrase "or pursuant to Section 7.3" from the fourth line thereof, and

    (ii) by inserting the following sentence at the end of Section 7.7:

    "Each party acknowledges and agrees that (i) this Contract constitutes a "master netting agreement" and the parties are "master netting agreement participants" as defined in the Bankruptcy Code and (ii) the parties are entitled to all rights under, and protections afforded by, the Bankruptcy Code, including without limitation, those contained in Sections 362, 546, 556, 561, 562, 753 and 767."

6.  Section 8.1 is hereby amended by adding the word "assume" after the word "and" on the third line thereof.

7.  The following language is added as a new Section 8.5:

"8.5    The parties represent and warrant to each other that to the extent Gas is sold or purchased under this Contract and such Gas will be transported by an Energy Transfer company, an Atmos company, and/or other Texas intrastate transporters ("Intrastate Transporters"), then such transportation will be undertaken pursuant to, and in full compliance with, the warranty provisions of the agreements of Intrastate Transporters that prevent the imposition on Intrastate Transporters of jurisdiction under the Natural Gas Act of 1938, as amended ("NGA"), except for NGA Sections 4A and 23 or the application of any other NGA section, but only to the extent that such other section is used to enforce or implement NGA Section 4A or 23.  The parties represent and warrant to each other that if the Delivery Point for Gas sold or purchased under this Contract is a point of interconnection between an interstate pipeline and any gas pipeline facilities owned by Brazos, transportation of Gas to such Delivery Point will be pursuant to Section 311 of the Natural Gas Policy Act.  In addition to and without excluding any remedy the aggrieved party may have at law or in equity, the party that breaches a warranty set forth in this Section 8.5 shall (a) be liable to the aggrieved party for all damages, injuries, and reasonable expenses the aggrieved party may sustain by reason of any breach hereof, and (b) indemnify the aggrieved party with respect to any liability the aggrieved party may incur by reason of any breach hereof."

8.  Section 9.2 shall be amended by adding the following language to the end thereof:

"; provided, however, that any Notice delivered pursuant to Section 10.2, 10.3 or 10.4 shall not be delivered by electronic means, and if any such Notice is delivered via facsimile, then a copy of such Notice shall also be sent via overnight courier service, first class mail or hand delivery."

9.  Section 10.1 is modified by adding the following sentence as the second and next-to-the-last sentence thereof:

"Reasonable grounds for insecurity shall include, but not be limited to, the downgrade of Y's or Y's guarantor's senior unsecured debt rating, if any, by either Standard & Poor's or Moody's Investor's Service to a rating below an investment grade rating (respectively, BBB- or Baa3)."

10. Section 10.1 is further modified by inserting the following immediately after the last sentence thereof:

"Adequate Assurance of Performance shall not exceed the sum of (i) the amount calculated in accordance with the procedure for determining the Net Settlement Amount set forth at Section 10.3.2, as of the date of the demand for Adequate Assurance of Performance, as if all transactions had been terminated, plus (ii) all other outstanding amounts owed or accrued under the Contract.  Any letter of credit provided as Adequate Assurance of Performance must be substantially in the form set forth in Exhibit B attached hereto, with such changes to the terms in that form as the issuing entity may require and as may be reasonably acceptable to the beneficiary thereof.  The parties recognize that Brazos and its assets are subject to certain mortgages and other debt

2

DocuSign Envelope ID: 6818B528-C1C6-4291-A494-F2FB63F2A7DA

agreements, (collectively, the "Debt Covenants") and in particular, nothing contained in the Contract shall be construed or deemed to require Brazos to grant any security interest inconsistent with its obligations under the Debt Covenants. Brazos shall not be deemed in breach of this Base Contract by virtue of its compliance with the requirements of its Debt Covenants."

11. Section 10.2 is hereby amended by deleting the word "or" before subsection (viii) and by adding the following immediately after the ";" at the end of subsection (viii):

"(ix) repudiate or reject, in whole or in part, this Contract or any applicable guaranty; (x) transfer all or substantially all of its assets or merges into or consolidates with any entity (A) where the merging party's obligations are not assumed by operation of law or written instrument or (B) the creditworthiness of the resulting entity is materially weaker than that of such merging party immediately before such transfer, merger or consolidation; (xi) have made any representation or warranty herein or in any applicable guaranty which is false or misleading in any material respect when made or when deemed made or repeated; or (xii) breach the intrastate warranty set out in Section 8.5;"

12. The following language is added as a new Section 10.8:

"10.8   Notwithstanding any provision to the contrary contained in the Contract, the Non-Defaulting Party shall not be required to pay to the Defaulting Party any amount under this Section 10 until the Non-Defaulting Party receives confirmation satisfactory to it in its reasonable discretion (which may include an opinion of its counsel) that all other obligations of any kind whatsoever of the Defaulting Party to make payments to the Non-Defaulting Party or any of its affiliates under the Contract or otherwise have been fully and finally performed."

13. Section 11.6 shall be deleted in its entirety.

14. Section 12 is hereby amended by adding the word "prior" in the first sentence immediately before the words "written Notice" and by replacing the words "Section 7.6 and Section 10" with "Section 7.6, Section 10, and Section 13" in the second sentence thereof.

15. Section 14.1 is amended by replacing subsection (ii) of the second sentence with the following:

"(ii) transfer or assign this Contract to any affiliate or to any person or entity succeeding to all or substantially all of the transferring party's assets if (A) the transferring party or its guarantor, if any, agree in writing to remain liable for the obligations of the transferee or (B) the creditworthiness of the transferee is equal to or better than that of the transferring party or its guarantor, if any, immediately preceding such transfer and the transferee agrees in writing to be bound by this Contract, and (C) in the case of either (A) or (B) the transfer has no adverse tax consequences to the non-assigning party, without the prior approval of the other party."

16. Section 14.8 is hereby deleted in its entirety and replaced with the following:

"On the date of this Base Contract and the date of entering into each transaction, each party represents and warrants to the other party that: (i) it is duly organized, validly

existing and in good standing under the laws of the jurisdiction of its formation and is qualified to conduct its business in each jurisdiction in which a transaction will be performed by it; (ii) it has all regulatory authorizations necessary for it to legally enter into and perform its obligations under this Base Contract; (iii) the execution, delivery and performance of this Base Contract are within its powers, have been duly authorized by all necessary action and do not violate any terms and conditions in its governing documents, any contracts to which it is a party or any law applicable to it; (iv) each transaction when entered into in accordance with this Base Contract constitutes its legally valid and binding obligation enforceable against it in accordance with its terms, subject to any equitable defenses; (v) there are no bankruptcy proceedings pending or being contemplated by it or, to its knowledge, threatened against it; (vi) there are no legal proceedings that materially adversely affect its ability to perform its obligations under this Base Contract; (vii) it has knowledge and experience in financial matters and the gas industry that enable it to evaluate the merits and risks of entering into this Base Contract; and (viii) it is entering into this Base Contract as a principal and not as an agent for any party."

17. Section 14.10 is amended by striking the word "or" in the sixth line and adding the following after the word "index" prior to the period:

"(v) information that is or becomes generally available to the public other than as a result of a disclosure by the receiving party, (vi) information that was already in a party's files on a nonconfidential basis prior to disclosure, or (vii) information that becomes available to a party on a nonconfidential basis from a source other than the other party if such source was not known by such party to be subject to any confidentiality obligation."

18. Section 14.11 is hereby deleted in its entirety and replaced with the following:

**"EACH PARTY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT TO TRIAL BY JURY WITH RESPECT TO ANY PROCEEDINGS RELATING TO THIS CONTRACT OR ANY TRANSACTION HEREUNDER. EACH PARTY SUBMITS TO THE NON-EXCLUSIVE JURISDICTION OF THE STATE AND FEDERAL COURTS LOCATED IN WACO, TEXAS, FOR ANY ACTION OR PROCEEDING RELATING TO THIS CONTRACT OR ANY TRANSACTION, AND EXPRESSLY WAIVES ANY OBJECTION IT MAY HAVE TO SUCH JURISDICTION OR THE CONVENIENCE OF SUCH FORUM."**

19. Add the following as new Section 14.12:

"14.12  Each party hereby expressly waives all rights to, and expressly agrees not to contest, any transaction, or assert or otherwise raise any defenses or arguments related to any transaction to the effect that such is not binding, valid or enforceable in accordance with its terms because either the employee(s) or representative(s) who entered into the transaction on behalf of a party, and who reasonably appeared because of office, position, or title to have the requisite authority to do so, did not, in fact, have such authority or because the provisions of certain applicable laws require the transaction to be in writing and/or executed by one or both parties."

20. The following language is added as a new Section 15:

"15.1    Resolution of Disputes.  Any dispute ("Dispute") arising under this Contract shall be referred for resolution to a senior representative of each party, where such senior representative has the authority to resolve such Dispute. Upon receipt of a notice describing the Dispute and designating the notifying party's senior representative and that the Dispute is to be resolved by the parties' senior representatives under this Contract, the other party shall promptly designate its senior representative to the notifying party.  The senior representatives so designated shall attempt to resolve the Dispute on an informal basis as promptly as practicable.  If the Dispute has not been resolved within thirty (30) days after the notifying party's notice was received by the other party, or within such other period as the parties may jointly agree, either party may pursue any remedy available at law or in equity to enforce its rights provided in the Contract.

THE PARTIES DO HEREBY REPRESENT AND WARRANT THAT THE GENERAL TERMS AND CONDITIONS OF THE BASE CONTRACT HAVE NOT BEEN MODIFIED, ALTERED, OR AMENDED IN ANY RESPECT EXCEPT FOR THESE SPECIAL PROVISIONS WHICH ARE ATTACHED TO AND MADE A PART OF THE BASE CONTRACT.

IN WITNESS WHEREOF, the parties have executed these Special Provisions to supplement and, where applicable to modify and supersede the Base Contract between the parties.

NJR ENERGY SERVICES COMPANY

By: _____

Name: Stephen D. Westhoven

Title: Senior Vice President

Date: _____3/15/12_____

BRAZOS ELECTRIC POWER COOPERATIVE, INC.

By: _____

Name: Clifton Karnei

Title: Executive Vice President and General Manager

Date: _____

**EXHIBIT B**
**IRREVOCABLE STANDBY LETTER OF CREDIT FORMAT**
**DATE OF ISSUANCE:**

[Address]

Re: Credit No.

We hereby establish our Irrevocable Standby Letter of Credit in your favor for the account of _____(the "Account Party"), for the aggregate amount not exceeding _____ United States Dollars ($  ), available to you at sight upon demand at our counters at (Location) on or before the expiration hereof against presentation to us of one or more of the following statements, dated and signed by your representative:

1.      "This Letter of Credit No. [_____] will expire in twenty (20) or fewer Local Business Days, and beneficiary has not received an extension of said Letter of Credit or other acceptable replacement collateral in accordance with the terms of the [name of Contract(s)] dated as of _____ between Account Party and beneficiary.   Wherefore, beneficiary hereby demands payment of the entire undrawn amount available under Letter of Credit No. [___]"; or

2.      "An Event of Default (as defined in the [name of Contract(s)] dated as of _____ between Account Party and beneficiary, as the same may have been amended (the "Master Agreement")) has occurred with respect to Account Party under the Master Agreement, and Account Party's payment to beneficiary of $[amount] is due and owing and Account Party has failed to make such payment in accordance with the terms of the Master Agreement.  Wherefore, Beneficiary hereby demands payment of the above referenced amount under Letter of Credit No. [____]"; or

3.      "An Early Termination Date (as defined in the [name of Contract(s)] dated as of _____ between Account Party and beneficiary, as the same may have been amended (the "Master Agreement") has occurred or been designated with respect to the Account Party and the Account Party has failed to make all payments due and owing to Beneficiary in accordance with the terms of the Master Agreement, and Account Party's payment to beneficiary of $[amount] is due and owing.   Wherefore, beneficiary hereby demands payment of the above referenced amount under Letter of Credit No. [____]."

        The amount which may be drawn by you under this Letter of Credit shall be automatically reduced by the amount of any drawings previously paid by us hereunder. Partial drawings are permitted hereunder.

        We hereby agree with you that drafts drawn under and in compliance with the terms of this Letter of Credit shall be duly honored upon presentation as specified.

        Except as far as otherwise expressly stated herein, this Irrevocable Standby Letter of Credit is subject to the International Standby Practices ("ISP98"), International Chamber of Commerce Publication No. 590, and as to matter not governed by the ISP98, shall be governed by and construed in accordance with the laws of the State of New York and applicable U.S. federal law.

        This Letter of Credit may not be amended, changed or modified without the express written consent of the beneficiary hereof, the Issuing Bank and the Account Party.

Typographical errors other than in amounts are not considered discrepancies.

All charges are for the account of the Account Party.

[BANK SIGNATURE]

# EXHIBIT B

EXHIBIT A



**TRANSACTION CONFIRMATION**
**FOR IMMEDIATE DELIVERY**

DEAL ID:          TFK-SM-2021-02-1113431                    TRADE DATE:          02-11-2021

---

This Transaction Confirmation is subject to the Base Contract between Seller and Buyer          dated   02-17-2012
The terms of this Transaction Confirmation are binding unless disputed in writing by the terms specified in the Base Contract.

| **SELLER:** | NJR Energy Services Company<br>1415 Wyckoff Road<br>P.O. Box 1464<br>Wall, NJ 07719 | **BUYER:** | Brazos Electric Power Cooperative, Inc.<br>ACES Power Mktg.<br>4140 W. 99th St.<br><br>Carmel, IN 46032 |
|---|---|---|---|
| Attention: | Timothy F. Keough | Attention: | Rob Vrabel |
| Phone: | (732) 938-1493 | Phone: | (317) 344-7230 |
| Fax: | (732) 938-6744 | Fax: | (317) 344-7099 |

**Price Per DTH:**          $16.685000

**Delivery Period:**     **Begin:**   02-12-2021          **End:**   02-12-2021

**Service Level:**          Firm (Fixed Quantity)

**Quantity Per Day:**          25000  MMBtus/day

| **Delivery Point(s)** | **Pipeline(s)** |
|---|---|
| Tolar Hub | Worsham-Steed Gas Storage, LP |

**Special**
**Conditions :**

---

| **BUYER** | SIGNATURE: _____ |
|---|---|
|  | TITLE: _____    DATE: _____ |
| **SELLER** | SIGNATURE:   *Timothy F. Keough* _____ |
|  | TITLE:   Transportation Representative   DATE:   *March 01, 2021* |

EXHIBIT A



**TRANSACTION CONFIRMATION**
**FOR IMMEDIATE DELIVERY**

| DEAL ID: | TFK-SM-2021-02-1113788 | | TRADE DATE: | 02-12-2021 |

This Transaction Confirmation is subject to the Base Contract between Seller and Buyer　　dated　02-17-2012
The terms of this Transaction Confirmation are binding unless disputed in writing by the terms specified in the Base Contract.

| **SELLER:** | NJR Energy Services Company<br>1415 Wyckoff Road<br>P.O. Box 1464<br>Wall, NJ 07719 | **BUYER:** | Brazos Electric Power Cooperative, Inc.<br>ACES Power Mktg.<br>4140 W. 99th St.<br><br>Carmel, IN 46032 |
|---|---|---|---|
| Attention: | Timothy F. Keough | Attention: | Rob Vrabel |
| Phone: | (732) 938-1493 | Phone: | (317) 344-7230 |
| Fax: | (732) 938-6744 | Fax: | (317) 344-7099 |

| **Price Per DTH:** | $149.660000 | |
|---|---|---|
| **Delivery Period:** | **Begin:** 02-13-2021 | **End:** 02-16-2021 |
| **Service Level:** | Firm (Fixed Quantity) | |
| **Quantity Per Day:** | 18750 MMBtus/day | |

| **Delivery Point(s)** | **Pipeline(s)** |
|---|---|
| Tolar Hub | Worsham-Steed Gas Storage, LP |

**Special Conditions :**

| **BUYER** | SIGNATURE: |
|---|---|
| | TITLE:　　　　　　　　　　DATE: |
| **SELLER** | SIGNATURE:　*Timothy F. Keough* |
| | TITLE:　Transportation Representative　　DATE:　*March 01, 2021* |

Page 1



EXHIBIT A



**TRANSACTION CONFIRMATION**
**FOR IMMEDIATE DELIVERY**

| DEAL ID: | TFK-SM-2021-02-1114029 | TRADE DATE: | 02-16-2021 |

This Transaction Confirmation is subject to the Base Contract between Seller and Buyer      dated   02-17-2012
The terms of this Transaction Confirmation are binding unless disputed in writing by the terms specified in the Base Contract.

| **SELLER:** | NJR Energy Services Company | **BUYER:** | Brazos Electric Power Cooperative, Inc. |
| | 1415 Wyckoff Road | | ACES Power Mktg. |
| | P.O. Box 1464 | | 4140 W. 99th St. |
| | Wall, NJ 07719 | | |
| | | | Carmel, IN 46032 |
| Attention: | Timothy F. Keough | Attention: | Rob Vrabel |
| Phone: | (732) 938-1493 | Phone: | (317) 344-7230 |
| Fax: | (732) 938-6744 | Fax: | (317) 344-7099 |

| **Price Per DTH:** | $725.000000 | | |
| **Delivery Period:** | **Begin:**  02-17-2021 | **End:**  02-17-2021 | |
| **Service Level:** | Firm (Fixed Quantity) | | |
| **Quantity Per Day:** | 18750  MMBtus/day | | |

| **Delivery Point(s)** | **Pipeline(s)** |
| Worsham Steed Storage | Worsham-Steed Gas Storage, LP |

**Special**
**Conditions :**

| **BUYER** | SIGNATURE: | |
| | TITLE: | DATE: |
| **SELLER** | SIGNATURE: | *Timothy F. Keough* |
| | TITLE:   Transportation Representative | DATE:   *March 01, 2021* |

EXHIBIT A



**TRANSACTION CONFIRMATION**
**FOR IMMEDIATE DELIVERY**

| DEAL ID: | TFK-SM-2021-02-1114629 | TRADE DATE: | 02-19-2021 |

This Transaction Confirmation is subject to the Base Contract between Seller and Buyer    dated   02-17-2012
The terms of this Transaction Confirmation are binding unless disputed in writing by the terms specified in the Base Contract.

| **SELLER:** | NJR Energy Services Company | **BUYER:** | Brazos Electric Power Cooperative, Inc. |
| | 1415 Wyckoff Road | | ACES Power Mktg. |
| | P.O. Box 1464 | | 4140 W. 99th St. |
| | Wall, NJ 07719 | | |
| | | | Carmel, IN 46032 |

| Attention: | Timothy F. Keough | Attention: | Rob Vrabel |
| Phone: | (732) 938-1493 | Phone: | (317) 344-7230 |
| Fax: | (732) 938-6744 | Fax: | (317) 344-7099 |

| **Price Per DTH:** | $15.000000 |

| **Delivery Period:** | **Begin:**  02-20-2021 | **End:**  02-22-2021 |

| **Service Level:** | Firm (Fixed Quantity) |

| **Quantity Per Day:** | 18750  MMBtus/day |

| **Delivery Point(s)** | **Pipeline(s)** |
| Worsham Steed Storage | Worsham-Steed Gas Storage, LP |

**Special Conditions :**

| **BUYER** | SIGNATURE: | |
| | TITLE: | DATE: |
| **SELLER** | SIGNATURE: | *Timothy F. Keough* |
| | TITLE:   Transportation Representative | DATE:   *March 01, 2021* |

# EXHIBIT C



1415 Wyckoff Road
P. O. Box 1464
Wall, New Jersey  07719

Brazos Electric Power Cooperative, Inc.

2404 LaSalle Ave.

Waco, TX 76706

Fax # (254) 750-6229

| | | |
|---|---|---|
| Invoice # | : | 1103-022021 |
| Invoice Date | : | 03/05/2021 |
| Invoice Month | : | February 2021 |
| Due Date | : | On or Before    03/25/2021 |

ATTN: Accounting

| | | Volumes | Dollars | |
|---|---|---|---|---|
| Total Sales | : | 175,000 | $26,079,125.00 | USD |
| Total Purchase | : | 0 | $0.00 | USD |
| **Net** | : | | **$26,079,125.00** | **USD**    **Amount Due NJR** |

**Please Remit Via Wire Transfer**

| | | | |
|---|---|---|---|
| **Bank** | **:** | PNC | |
| **Address** | **:** | Pittsburgh, PA | |
| **Account** | **:** | 1004387446 | |
| **ABA** | **:** | 043000096 | |

Prepared by:

Joanne McCracken
732-938-1135
settlements@njresources.com

**Netting Statement**

Brazos Electric Power Cooperative, Inc.

02/2021

| Trade Date | Deal# | Pipeline | Location | From Date | To Date | Volume | | Price | Amount |
|---|---|---|---|---|---|---|---|---|---|
| **Sales** | | | | | | | | | |
| *Commodity* | | | worsh | | | | | | |
| 02/11/2021 | 1113431 | | Nortex-Tolar Hub | 02/12/2021 | 02/12/2021 | 25,000 | DTH | $16.685000 | $417,125.00 |
| 02/12/2021 | 1113788 | | Nortex-Tolar Hub | 02/13/2021 | 02/16/2021 | 75,000 | DTH | $149.660000 | $11,224,500.00 |
| 02/16/2021 | 1114029 | | WORSH | 02/17/2021 | 02/17/2021 | 18,750 | DTH | $725.000000 | $13,593,750.00 |
| 02/19/2021 | 1114629 | | WORSH | 02/20/2021 | 02/22/2021 | 56,250 | DTH | $15.000000 | $843,750.00 |
| | | | | | **worsh Total:** | **175,000** | **DTH** | | **$26,079,125.00** |
| | | | | | **Sales Total:** | | | | **$26,079,125.00** |